

**U.S. Department of Justice**

Criminal Division

_____

*Appellate Section*                    *Washington, D.C. 20530*

February 2, 2017

Honorable Catherine O'Hagan Wolfe
Clerk of the Court
U.S. Court of Appeals for the Second Circuit
Thurgood Marshall United States Courthouse
40 Foley Square
New York, NY 10007

   Re: *United States v. Anthony Allen & Anthony Conti*
     Docket Nos. 16-898(L) & 16-939(CON)

Dear Ms. Wolfe:

  At argument in the above-referenced cases on January 26, 2017, the Court inquired about other LIBOR-related prosecutions in the United States and in the United Kingdom. The United States submits this letter to supplement the information provided at argument.

  The Department of Justice has to date entered into criminal resolutions with six banks (Barclays, UBS AG, Royal Bank of Scotland, Rabobank, Lloyds Bank, and Deutsche Bank)[1] and has charged 13 individuals (including defendants Anthony Allen and Anthony Conti) with criminal conduct related to manipulation of the LIBOR. *See United States v. Tom Hayes, et al.*, 12-MJ-3229 (S.D.N.Y.); *United*

_____

  [1] The resolutions reached with these banks are available electronically. *See* https://www.justice.gov/iso/opa/resources/337201271017335469822.pdf (Barclays deferred prosecution agreement); https://www.justice.gov/iso/opa/resources/ 1392012121911745845757.pdf (UBS); https://www.justice.gov/iso/opa/resources/ 28201326133127414481.pdf (Royal Bank of Scotland); https://www.justice.gov/sites/ default/files/opa/press-releases/attachments/2014/11/06/deferred_prosecution_ agreement.pdf (Rabobank); https://www.justice.gov/sites/default/files/opa/press-releases/attachments/2015/04/23/db_dpa.pdf (Deutsche Bank); https://www.justice. gov/opa/pr/lloyds-banking-group-admits-wrongdoing-libor-investigation-agrees-pay-86-million-criminal (Lloyds Bank press release) (all webpages last visited January 31, 2017). The criminal information filed against Rabobank was dismissed after Rabobank complied with the terms of its deferred prosecution agreement. *See United States v. Coöperatieve Centrale Raiffeisen-Boerenleenbank B.A.*, 3:13-CR-200-SWT (D. Conn. 2013).

States v. Darrell Read, et al., 13-MJ-2224 (S.D.N.Y.); *United States v. Anthony Allen, et al.*, 14-CR-272-JSR (S.D.N.Y.); *United States v. Matthew Connolly, et al.,* 16-CR-370-CM (S.D.N.Y.). Two defendants (from Rabobank and UBS) are fugitives. *See United States v. Hayes*, 118 F. Supp. 3d 620, 629 (S.D.N.Y. 2015) (denying motion to dismiss by fugitive defendant Roger Darin). Six defendants (four from Rabobank and two from Deutsche Bank) have pleaded guilty. The United States dismissed charges against Tom Hayes (a trader from UBS) and three cash brokers after they were either convicted or acquitted on charges in the United Kingdom. Allen and Conti have thus far been the only defendants to proceed to trial in the United States. Two defendants (from Deutsche Bank) have pleaded not guilty, and proceedings against them remain pending. Additional investigations are ongoing.

The United Kingdom has to date charged 19 individuals with LIBOR-related crimes and is seeking to extradite four additional individuals for prosecution. One individual was convicted upon pleading guilty and four were convicted after trial. Six individuals were acquitted after trial. Cases against the others remain pending.

The Court also asked at argument about testimony by John Ewan as a Crown witness at a criminal trial in the United Kingdom that resulted in the conviction of Tom Hayes. As the district court noted (Special Appendix 9-10), defendants provided 32 pages of Ewan's testimony in connection with their initial motion for a Rule 15 deposition and subsequently provided hundreds of additional pages of Ewan's testimony with their motion for reconsideration. The government cited to those transcripts at argument (Argument Tr. 35-36 (citing Dkt. 106-3, at 8-9)) and in its response brief (Br. 103-06 (citing Dkt. 106-1, at 12-14, 24-28; Dkt. 106-3, at 8)), but the joint appendix contains only select portions. We therefore attach in full, for the Court's convenience, the transcripts submitted with defendants' reconsideration motion (Dkt. 106-1, 106-2, 106-3).

Finally, the Court asked the parties to make arrangements with the clerk's office to have a transcript of the oral argument prepared. It is our understanding that the clerk's office will make the transcript available to the Court but we nonetheless attach a copy here for the Court's convenience.

Respectfully submitted,

/s/John M. Pellettieri
John M. Pellettieri

2

## CERTIFICATE OF SERVICE

I hereby certify that on February 2, 2017, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Second Circuit by using the CM/ECF system. I further certify that counsel for appellants are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

/s/John M. Pellettieri
JOHN M. PELLETTIERI
Attorney, Appellate Section
Criminal Division
U.S. Department of Justice
950 Pennsylvania Ave., NW
Rm. 1260
Washington, DC 20530
(202) 307-3766

# Attachment 1
# (Dkt. 106-1, 106-2, 106-3)

# EXHIBIT 1

Excerpts from *R. v. Thomas Hayes*
No:  T20137308,
Southwark Crown Court



**Page 85**

10   MR CHAWLA:  My Lord, I call next, please, Mr John Ewan.

11       Page 196 in my Lord's bundle.

12            MR JOHN EWAN (sworn)

13         Examination-in-chief by MR CHAWLA

14   MR CHAWLA:  Before I ask you anything at all, Mr Ewan, you

15       can see that this is a large courtroom and it's

16       important that everyone hears what you say.  So could

17       you keep, please, your voice up and speak slower than

18       you might otherwise do.

19   **A.  I will try.**

20   Q.  Don't, please, be surprised if I stop you if you're

21       saying too much for us to take in in one go.

22   **A.  Okay.**

23   Q.  Would you give us your full names, please.

24   **A.  My name is John McInnes Ewan.**

25   Q.  Mr Ewan, up until July --

**Page 87**

**Page 86**

1   MR CHAWLA:  I'm sorry, I'm just going to pause, my Lord.

2       (A note was received from the jury)

3   MR JUSTICE COOKE:  I'll deal with this point later, if

4       I may, but the short answer is you get bundles that are

5       put in front of you and such bundles as the parties wish

6       to put in front of you.  There may be further documents

7       still to come, but if they are only appearing on the

8       screen, then that's all that's happening for the moment.

9       What is being said, Mr Hawes, is that it will be

10      helpful with some of this material if the jury had it so

11      that they could make notes on.

12   MR HAWES:  It would.  There's quite a lot of if it comes

13      into hard copy so your Lordship may want to deal with

14      how the jury will deal with the electronic evidence

15      because it will be available to them.  It won't all be

16      put into hard copy for them.  We can put certain

17      amounts.

18   MR JUSTICE COOKE:  What is going to happen in relation to

19      the documents this morning upon which you have been

20      cross-examining?

21   MR HAWES:  There will be an index and, as the Crown's

22      documents as well, the index -- we would anticipate all

23      the documents that have been shown to the jury would

24      there be referenced on that index and if there's any one

25      particular document, if it's not produced into hard

**Page 88**

| | |
|---|---|
| 1    documentation for the jury at the end, will be available | 1    subject of counsel's submissions to you but I shall sum |
| 2    to them on the electronic system in the usual way. | 2    up what the themes are as they have emerged to remind |
| 3    MR JUSTICE COOKE: So they will have it on the electronic | 3    you of the relevant themes of evidence. Thank you for |
| 4    system? | 4    that. It's a very valid point. We appreciate the |
| 5    MR HAWES: Certainly, yes, and can call for it again. | 5    difficulties. |
| 6    MR CHAWLA: My Lord, our proposal -- I'm sorry if there's | 6    MR CHAWLA: Mr Ewan, were you formally employed by the |
| 7    a cross-purpose message here -- we had intended that | 7    British Bankers Association, the BBA? |
| 8    anything the jury had electronically they should be able | 8    A. I was. |
| 9    to have in hard copy as well, perhaps not immediately, | 9    Q. Was that until July of 2012? |
| 10   which doesn't solve the immediate problem of being able | 10   A. Yes. |
| 11   to write on documents. | 11   Q. At that point did you leave in order to join an |
| 12   MR JUSTICE COOKE: No. | 12   organisation we have heard of, Thomson Reuters? |
| 13   MR CHAWLA: But certainly it's impossible for anyone to | 13   A. That's correct. |
| 14   remember documents that they might have seen some weeks | 14   Q. Is that where you're currently working? |
| 15   earlier. | 15   A. Yes. |
| 16   MR JUSTICE COOKE: Quite. | 16   Q. Now, as far as the scope of your evidence at the moment |
| 17   MR CHAWLA: If they haven't had a chance to go back to it in | 17   is concerned, I'm going to be focusing on events between |
| 18   hard copy form. So what we're proposing to do is to | 18   approximately 2006 and 2010, but we need to deal with |
| 19   create and keep updating a hard copy bundle so that it's | 19   one or two matters for context prior to that; all right? |
| 20   updated on a daily basis, as it were, so it's referable | 20   A. Yes. |
| 21   to a particular witness and for the jury to have that. | 21   Q. Now, first of all, when did you join the BBA? |
| 22       What we hadn't yet decided, I have to say, is | 22   A. I believe it was May 2005. |
| 23   exactly when the jury would get it. | 23   Q. You have, I think to your right, a copy of your |
| 24   MR JUSTICE COOKE: Yes. They're not in a position to make | 24   statements that you prepared or a number of statements |
| 25   electronic notes on the electronic documents as they | 25   that you prepared and signed as part of this |
| <div align="center">Page 89</div> | <div align="center">Page 91</div> |
| 1    come up. | 1    investigation, did you not? |
| 2    MR CHAWLA: No. | 2    A. Correct. |
| 3    MR JUSTICE COOKE: So all they can do is make a paper note | 3    Q. You refer to a large number of documents and details in |
| 4    of a date of a document and something that was said | 4    there. Would it assist you to have that available to |
| 5    about it and then when later they receive the physical | 5    you in order to refresh your memory of the events? |
| 6    hard copy, they could then transfer such notes to the | 6    A. I have been provided with a copy of my statement. |
| 7    document in question, but that's not really very | 7    Q. But just going back to my question: would it help you to |
| 8    satisfactory. | 8    be able to refer to it? |
| 9    MR CHAWLA: My Lord, until we find a system to enable jurors | 9    A. Yes. |
| 10   to mark on screen -- | 10   MR CHAWLA: My Lord -- |
| 11   MR JUSTICE COOKE: That is coming, but it's not available as | 11   MR JUSTICE COOKE: Provided there's no objection -- |
| 12   yet. | 12   MR HAWES: No. |
| 13   MR CHAWLA: I know. | 13   MR JUSTICE COOKE: Certainly. |
| 14   MR JUSTICE COOKE: I have suffered from the same problems | 14   MR CHAWLA: I'm going to take your own role, at least in |
| 15   you have this morning. I have had some of these | 15   overall terms, very briefly at the moment, although |
| 16   documents and been able to find one or two of them but | 16   we'll have to look at aspects of it shortly. |
| 17   not all and I have been doing what you have been doing, | 17      Prior to 2005, when you joined the BBA, what was |
| 18   namely making notes in my notebook and then I'll have to | 18   your experience in the financial world? |
| 19   check up on them in due course. | 19   A. I had worked in a call centre for an investment manager |
| 20   MR CHAWLA: We'll try and find the most efficient way of | 20   for a year and then I had worked for FTSE, which is a -- |
| 21   doing it but trying at the same time not to overburden | 21   Q. Just tell us what FTSE means? |
| 22   the jury with other documents. | 22   A. Well, it stands for Financial Times Stock Exchange which |
| 23   MR JUSTICE COOKE: Indeed. Some of the detail of the | 23   were the two companies that at the time owned FTSE and |
| 24   document is less important than the overall message that | 24   it's probably best known for calculating stock market |
| 25   is coming through, which will in the end not only be the | 25   indices. |
| <div align="center">Page 90</div> | <div align="center">Page 92</div> |

Merrill Corporation       www.merrillcorporation.com/mls       8th Floor, 165 Fleet Street
(+44) 207 404 1400                                       London EC4A 2DY

1  Q. What role did you have at FTSE?
2  A. I was employed initially to do reviews of the
3     constituents of the stock market indices and then that
4     role moved more to acting as the secretary for the
5     various independent committees that oversaw the
6     operation of families of indices.
7  Q. How long were you in that role for?
8  A. I believe it was 1998 to 2003.
9  Q. Then were you in fact abroad between 2003 and 2005?
10 A. Yes. I resigned and went travelling for a little over
11    a year.
12 Q. Then coming back to England and starting work in
13    about May 2005 at the BBA?
14 A. Correct.
15 Q. What was your role there at that time?
16 A. I was LIBOR manager.
17 Q. What did that mean?
18 A. It meant looking after the day-to-day business of the
19    LIBOR benchmark and acting as the secretary to the
20    Foreign Exchange and Money Markets Committee which is
21    the group that was responsible for the operation of the
22    LIBOR benchmark.
23 Q. So your title at that time was LIBOR Manager?
24 A. Yes.
25 Q. Did that title change?

Page 93

1  A. Yes. I was given the title of LIBOR Director in
2     about 2007 and this was due to the way that job
3     descriptions worked in the BBA. It doesn't mean
4     director in the formal sense of being a company
5     director. It was just the way that you progressed
6     through. And then in 2010, when the BBA incorporated
7     LIBOR as its own company within the BBA group, I became
8     the managing director of BBA LIBOR Ltd. That's the
9     title that I held until I resigned.
10 Q. Up until that time, in 2010, did your role, regardless
11    of title, actually change, so between 2005 and then we
12    have the title in 2007 and then another title in 2010?
13 A. No. My role didn't change. My position in the company
14    perhaps changed because rather than reporting to an
15    immediate superior called Alex Merriman, who left,
16    I started reporting to the deputy chief executive and
17    the chief executive of the BBA.
18 Q. We have heard that they were respectively Mrs Scutt and
19    Mrs Knight?
20 A. Correct.
21 Q. We have heard something about the BBA and I'm not going
22    to invite you to repeat that which we have heard and
23    which is not controversial. We know something about
24    some of those individuals, including Mrs Knight, now
25    obviously Mrs Scutt. You mentioned Mr Merriman. Just

Page 94

1     help us a little bit about Mr Merriman. You have told
2     us that you reported initially to him?
3  A. Correct.
4  Q. So what was his title and role? My Lord, I'm looking at
5     paragraph 13.
6  A. I believe when I joined his job title was director and
7     he was at the time that I joined responsible directly
8     for the day-to-day operation of LIBOR and, in addition
9     to that, he had a role where he worked on the BBA's
10    lobbying and policy operations.
11 Q. Now, in the early days of your employment, how hard or
12    easy was your work?
13 A. Well, whenever you join a new company there's a lot to
14    learn so I had a background knowledge about financial
15    markets in general and I knew a bit about financial
16    benchmarks and I knew quite a lot about how you manage
17    the working rhythm of a committee that looks after
18    benchmarks, but I had to learn a lot about LIBOR and the
19    specifics of that one benchmark, how it operated. So,
20    I mean, there was a lot to learn but it wasn't
21    particularly difficult or stressful because it was
22    a period when the financial markets were in a very
23    benign state.
24 MR CHAWLA: I'm going to come next -- and I suspect,
25    my Lord, it may be better to do it after the short

Page 95

1     adjournment -- to 2007 onwards as an overview.
2  MR JUSTICE COOKE: Yes. All right. 2 o'clock, please,
3     members of the jury. Thank you.
4        (In the absence of the jury)
5  MR JUSTICE COOKE: Mr Ewan, I think you're going to be here
6     for some time but the basic rule is that during
7     adjournments you don't talk to anybody at all about your
8     evidence, any break at all, once you're in the witness
9     box.
10 A. Thank you. That has been explained to me.
11 MR JUSTICE COOKE: You can talk about anything else, but not
12    about the case. Thank you.
13 (1.05 pm)
14        (Luncheon Adjournment)
15 (2.00 pm)
16 MR JUSTICE COOKE: Can I just raise one thing before the
17    jury come in. I have an e-mail here from
18    Professor Cooper who would like to attend on Monday or
19    Tuesday, about which of course there's no problem, but
20    in real terms it will obviously be better from her
21    perspective if she was able to sit in front of the dock
22    and that really depends on either prosecution or defence
23    being happy to have her sit in the area.
24 MR HAWES: We would be very content for her to sit.
25 MR JUSTICE COOKE: Wherever.

Page 96

24 (Pages 93 to 96)

| | |
|---|---|
| 1   MR HAWES:  She has been very assistul to us, as I indicated | 1   Q.  You were also responsible for organising the LIBOR |
| 2       to your Lordship, so no difficulty at all. | 2       website and any LIBOR-related events, whether |
| 3   MR JUSTICE COOKE:  So I can tell her she can come and who | 3       conferences, conventions and the like? |
| 4       shall I tell her to make contact with? | 4   A.  Yes, or meetings with participants and other interested |
| 5   MR HAWES:  Mr Convey. | 5       parties. |
| 6   MR JUSTICE COOKE:  Very good. | 6   Q.  In addition to that, did you also conduct annual |
| 7   MR HAWES:  Thank you. | 7       relationship visits with banks, primarily LIBOR panel |
| 8       (In the presence of the jury) | 8       banks? |
| 9   MR CHAWLA:  Mr Ewan, you told us about the first year or so, | 9   A.  Yes. |
| 10      learning about the job, learning about LIBOR and other | 10  Q.  For the first couple of years of your employment, were |
| 11      things.  We know during the period of your employment at | 11      those led by your more senior colleague, Mr Merriman? |
| 12      the BBA of the credit crisis coming in in 2007 and | 12  A.  Yes. |
| 13      reaching its peak in 2008. | 13  Q.  And thereafter did you lead the meetings yourself, |
| 14          What was the nature of your job?  How easy or | 14      assisted by other members of the BBA? |
| 15      difficult was it at that stage? | 15  A.  Yes. |
| 16  **A.  It became significantly more challenging because LIBOR** | 16  Q.  We'll look at one or two aspects of those meetings in |
| 17      **is the benchmark that indicates stress in the credit** | 17      due course, but before we do just still with an overview |
| 18      **markets and so there was a lot of interest in the** | 18      of your role.  Was an important part of your role acting |
| 19      **benchmark.  Where before it had been a very minor cog in** | 19      as the -- we have heard it described as the secretariat |
| 20      **the global financial markets, it now became used very** | 20      for the FXMMC? |
| 21      **widely as an indicator of stress and, as such, it became** | 21  A.  Yes. |
| 22      **of great interest to the media and the financial markets** | 22  Q.  In terms of the FXMMC, was that a decision-making body |
| 23      **worldwide.** | 23      which oversaw the panel banks as contributors to or of |
| 24  Q.  What impact did that have on you? | 24      the rates for LIBOR? |
| 25  **A.  Well, it meant that there was considerably more work to** | 25  A.  Yes. |
| Page 97 | Page 99 |
| 1       do, not necessarily in the actual production but because | 1   Q.  Was it separate from the BBA? |
| 2       we at the BBA at the time were fielding a lot of | 2   **A.  Yes, it was.  It was held at the BBA premises and I was** |
| 3       requests and interests from all participants in the | 3       **the secretary and so I or people who worked with me** |
| 4       financial markets and from the media and we had to deal | 4       **would write the minutes, but the BBA had no seat or vote** |
| 5       with these and a lot of this interest was in suggestions | 5       **at any time and it was made up of individuals, largely** |
| 6       that the rate was either too high or too low, depending | 6       **representatives of LIBOR rate-setting banks.** |
| 7       on who was asking the questions.  So we had to put a lot | 7   Q.  Was it designed to provide practitioner advice on money |
| 8       of effort into our own internal work to ensure that the | 8       market issues and LIBOR? |
| 9       rate is accurate and also to try to ensure that we dealt | 9   A.  Yes. |
| 10      with all of the enquiries, comments, queries that were | 10  Q.  Did its main role involve the oversight of the |
| 11      coming in all the time. | 11      membership of the submitter panels? |
| 12  Q.  We'll look at some of those shortly, but can I just | 12  **A.  During my time at the BBA, yes, and, as we move** |
| 13      deal, first of all, with aspects of your role itself so | 13      **through 2007 and 2008 and 2009, attempting to formulate** |
| 14      that we can put all of that into context. | 14      **a response to the credit crisis to make sure that the** |
| 15          My Lord, I'm picking it up at paragraph 17.  As | 15      **rate remained accurate.** |
| 16      LIBOR manager, as the BBA LIBOR manager, your role, was | 16  Q.  In addition, did it deal with any issues of governance, |
| 17      it not, was to oversee and deal with all day-to-day | 17      scrutiny and surveillance of LIBOR generally? |
| 18      matters relating to LIBOR? | 18  **A.  It was the ultimate body that was responsible for that,** |
| 19  A.  Yes. | 19      **yes.** |
| 20  Q.  That involved on a daily basis organising the licensing | 20  Q.  Was the BBA as an organisation empowered to, as it were, |
| 21      arrangements, responding to queries in relation to the | 21      overrule or challenge or alter any decisions of the |
| 22      rate, dealing with press releases, to be approved by the | 22      FXMMC? |
| 23      chief executive officer, Mrs Knight, or the press team, | 23  **A.  Absolutely not.** |
| 24      and on occasion yourself speaking to the media? | 24  Q.  As far as the FXMMC was concerned, did you have or did |
| 25  A.  Yes. | 25      it have, I should say, approximately, depending on |
| Page 98 | Page 100 |

| | |
|---|---|
| 1   precisely when, 15 members sitting on the committee? | 1   employment, 2005/2006, did the committee meet annually? |
| 2   **A. That's correct.** | 2   **A. That's correct.** |
| 3   Q. And were they individuals from panel banks? | 3   Q. Once the financial crisis struck, did that become more |
| 4   **A. In large part, yes.** | 4      often? |
| 5   Q. Were they representatives of the banks or were they | 5   **A. It did.** |
| 6      there in an individual capacity? | 6   Q. To what sort of number? |
| 7   **A. They were there in their capacity as individual experts.** | 7   **A. Well, there were a number of ad hoc committees that were** |
| 8   Q. Just by way of example, without looking at the detail of | 8      **called between I think the first one was in 2007 and** |
| 9      this document, can we have on screen, please, JME/0001. | 9      **I think after 2008 the committee moved to a quarterly** |
| 10     Go to the next page of that, please, because there we | 10     **basis, but, again, as necessary with ad hoc meetings to** |
| 11     have what is called an advisory panel of the FXMMC; yes? | 11     **discuss an issue that might have come up.** |
| 12  **A. Yes.** | 12  Q. In very broad terms, and just in a sentence or so, what |
| 13  Q. Is that in fact the FXMMC? | 13     sort of issues were coming up during the financial |
| 14  **A. Yes, it is.** | 14     crisis? |
| 15  Q. You can see, and we'll just look at the names, in | 15  **A. Mainly did the definition of LIBOR mean that we could** |
| 16     attendance there are 11, including yourself and | 16     **still set an accurate rate through this remarkable** |
| 17     Mr Denton of the BBA? | 17     **turmoil in the market.** |
| 18  **A. Yes.** | 18  Q. It's easy now, 2015, to think back to 2007 but how |
| 19  Q. The others we can see, we have a representative from | 19     difficult was that time for someone who was going |
| 20     Bank of America or an individual, I should say, from the | 20     through it as a member of the BBA? |
| 21     Bank of America, JP Morgan, HBOS, Abbey National, the | 21  **A. Well, it was extremely difficult because the financial** |
| 22     Royal Bank of Scotland, Citibank, the Bank of | 22     **crisis, the credit crisis in 2007 and 2008 was the most** |
| 23     Tokyo-Mitsubishi, HSBC and UBS? | 23     **severe crisis in the credit market for a very, very long** |
| 24  **A. Yes.** | 24     **time and nobody who was working in any financial market** |
| 25  Q. Were there others at that time, can you remember -- it | 25     **or the BBA had experienced this in their careers before** |
| Page 101 | Page 103 |

| | |
|---|---|
| 1   may not be very important -- who were also members of | 1   **and we didn't -- LIBOR itself didn't exist the last time** |
| 2   the FXMMC?  This is in October 2008. | 2      **that there was such a severe crisis in the market so we** |
| 3   **A. Yes, I think there were other members at that time who** | 3      **were attempting to navigate unchartered warts.** |
| 4      **were not at that meeting.** | 4   Q. We'll come back to that period shortly.  You mentioned |
| 5   Q. All right.  As I say, we're jumping ahead there but is | 5      your meetings initially led by Mr Merriman.  Can we just |
| 6      that, as it were, a broad spectrum, a representation of | 6      look at the form that they took. |
| 7      the membership of the FXMMC, even at that snapshot in | 7   **A. Certainly.** |
| 8      time? | 8   Q. Can we have, please, on screen JME/0002.  We can see |
| 9   **A. Yes.** | 9      that its notes on the meetings with BBA LIBOR |
| 10  Q. We have heard about those who chaired the FXMMC.  They | 10     contributor banks ahead of the 2005 panel review. |
| 11     included -- and this is in the right order -- | 11     Thereafter, does this note or do these notes cover |
| 12     Mr Miles Storey of Barclays?  We can take the document | 12     a number of pages starting with a summary and then |
| 13     down now, sorry.  I'm moving on about | 13     individual notes for a number of the banks with whom |
| 14     Mr Miles Storey of Barclays, Jonathan Wood of HSBC, | 14     there were meetings? |
| 15     Frederick Mouchel of JP Morgan and then others as well? | 15  **A. That's correct.** |
| 16  **A. Are you asking who the Chairman of the committee was?** | 16  Q. I appreciate it's not easy when you're looking at a part |
| 17  Q. Yes. | 17     of a document on the screen.  Starting with a summary |
| 18  **A. In my time initially there was no chair and then Miles** | 18     though, is that yours or Mr Merriman's, can you |
| 19     **became the chair and then Jon Wood became the chair and** | 19     remember, in 2005 or ahead of the 2005 panel review? |
| 20     **he was still the Chairman of the committee when I left** | 20  **A. I believe that was drafted by me and then approved by** |
| 21     **the BBA in 2012.** | 21     **Mr Merriman.** |
| 22  Q. Sorry, I have jumped ahead.  That started in June 2008, | 22  Q. Very well.  So we'll look at the individuals concerned, |
| 23     the position of the chair of that committee? | 23     but in broad terms, in terms of the summary, the current |
| 24  **A. Yes.** | 24     rate setting process is efficient.  We're talking now |
| 25  Q. Now, in the early days, so the early days of your | 25     specifically about LIBORs across the board, are we? |
| Page 102 | Page 104 |

Day 8                                R v Hayes                              5 June 2015

| | |
|---|---|

1   **A.  Yes.**
2   Q.  "In general BBA LIBOR is a healthy, well used product,
3      although BBA euro LIBOR has lost ground to EURIBOR."
4      Let's not worry too much about that.  We know that
5      there are different benchmarks around the world.
6      "Nobody we have visited has any bright ideas on how
7      to fix this as banks on the continent will generally
8      choose their local fix."
9      Then this:
10      "There is consensus amongst banks that sterling
11      LIBOR and US dollar are being set 3 to 4 basis points
12      above the true cash rate.  There is a definite split in
13      how this is viewed.  Those banks whose main business is
14      in derivatives or loans are perfectly happy with this,
15      as it is to their advantage.  Those more active in the
16      cash market regard this as a problem that must be
17      addressed.  The third and easily the largest group
18      recognises the fact but see it as a construct of the
19      market and are unconcerned about it."
20      What does "construct of the market" mean in this
21      context?
22   **A.  It's the way things are.**
23   Q.  All right.  Then there's talk about disaster recovery
24      scenarios.  Presumably that's if somebody loses lots of
25      panel banks as members?

Page 105

1   **A.  I think that's more a reference to what happens if there**
2   **   is a failure of the banks to get the data to**
3   **   Thomson Reuters to do the calculation.**
4   Q.  Then we have:
5      "The ambiguity in the current LIBOR definition,
6      concentrating on the words 'in reasonable market size
7      just prior to 11.00' should be retained ..."
8      The reasons for that are given.
9      The next bullet point, and you understand I'm not
10      taking every word of these but just to get flavour of
11      them:
12      "There is a split on the matter of the BBA
13      introducing further LIBOR currency calculations.
14      "There is no appetite for any other brand new
15      products from the BBA."
16      Finally, a reference to euro LIBOR and EURIBOR and,
17      as I say, apart from seeing the reference, I don't think
18      we are going to be assisted by analysing that.
19      Can we go to the last page of this document, so we
20      can see how it works, page 10.  Was the situation this,
21      Mr Ewan, that the individuals that you spoke to at the
22      banks were asked generally to address these six issues?
23   **A.  That's correct.**
24   Q.  So the first one is:
25      "General impressions on how the BBA LIBOR panel

Page 106

1   process has worked over the last year.  Does anything
2      need fixing?
3      "2.  Any view of the quality of market fixings,
4      generally and specifically.
5      "3.  Any other observations on BBA LIBOR."
6      Then that's split into:
7      "Can the definition be improved.  Any precise
8      descriptions of just before 11.00 am or reasonable
9      marketable size [written there] possible.  Is it
10      desirable to have precise definitions?  Is the new basis
11      for reporting market activity an improvement both in
12      terms of the reporting period and what transactions
13      should be included?"
14      Number 4:
15      "What other issues should be discussed by the FXMMC
16      in the near future?"
17      5:
18      "Does your bank have business continuity procedures
19      in place to ensure that their contribution into the BBA
20      LIBOR rate setting process is not interrupted?"
21      That's what you were just referring to, the disaster
22      recovery.
23      6:
24      "Are there any new data products you would like to
25      see the BBA introduce?"

Page 107

1   That, again, is spelt out in a little detail; yes?
2      So with those questions in mind, I'm not going to go
3      through every one of these, please, by any stretch of
4      the imagination but can we go back to page 2.  Do we
5      then have listed in the following pages on this and the
6      following pages a note of your meeting with the
7      individual or individuals from the particular banks, so
8      we have -- can we put the whole page up.  I'm sorry if
9      it might be a little small.  The next page.
10      We have there Bank of America, Credit Suisse First
11      Boston.  Just pausing there, please, just so we can
12      follow it for a moment.  Up a little bit more so we have
13      the whole page.  You have who the attendee is from the
14      bank, what their particular role is within the bank, the
15      date.  Does that refer to the date of the meeting with
16      that individual?
17   **A.  I believe so.**
18   Q.  Then contributors to, and is that the currency to which
19      they're a panel bank?
20   **A.  Correct.**
21   Q.  Then under that, at 1 through to 6, are those the
22      answers to the issues that were addressed in that
23      appendix?
24   **A.  Yes.**
25   Q.  So, for example, if you go down to -- can we blow up the

Page 108

27 (Pages 105 to 108)

1  bottom of that page, please -- Credit Suisse in Swiss
2  francs, euros and US dollars.  The two people there
3  observed at number 2:
4      "The sterling and US dollar LIBOR are set 3 to 4
5  basis points too high each day.  This is a major problem
6  and must be fixed.  They submit their true rates each
7  day and believe that most days they're knocked out of
8  the rate setting process in the topping and tailing
9  process ..."
10      That's the trimming process, is it not?
11  **A.  Yes.**
12  Q.  "... as many other banks are contributing inflated
13  rates."
14      So that's one comment.  In fact there are
15  a number of different comments.
16      If we take another one, for example, at page 4,
17  JP Morgan Chase:
18      "(i) the BBA LIBOR fixing process works well."
19      We can see, just in passing, that they are
20  a contributor to nine of the ten currencies for LIBOR?
21  **A.  Yes.**
22  Q.  So they say:
23      "The fixing process works well.  Note that pounds
24  and dollar LIBOR are higher than the true position but
25  everyone in the market knows this and prices

1  will quote rates to suit their current position.  It has
2  always been the way."
3      Now, during your period, and certainly -- we'll look
4  very briefly at 2006, but would you get complaints that
5  other banks are doing something wrong?
6  **A.  At this time, in 2005, I do not recall that.**
7  Q.  All right.  In any event, we know that this is very
8  early on.  I think you have been there about a month at
9  this stage?
10  **A.  Yes.**
11  Q.  These meetings are at June of 2005 and you joined
12  in May.  It may well be, is this the position, that the
13  detail of this perhaps was not something that you were
14  intimately familiar with at this point?
15  **A.  That's right.  I was just taking notes on what people**
16  **said to me.**
17  Q.  Okay.  The next year there was a similar review, was
18  there not?
19  **A.  Yes.**
20  Q.  Can we have on screen, please, JME/0003.  We start in
21  fact at page 15 of this document, the last page,
22  because, again, we have within an appendix the agenda
23  which are the questions of issues that are there raised;
24  yes?
25  **A.  Yes.**

1  accordingly.  Don't want the BBA to attempt to 'correct'
2  this."
3      There are other comments such as that; yes?
4  **A.  Yes.**
5  Q.  Then you have, over the page -- and I'm just going to
6  pick up a couple of comments, if we may -- BOTM:
7      "The fixing process works well.  The change of
8  definition has made the information that has to be
9  submitted to the review harder to gather but this is not
10  a problem."
11      Third, he observed that:
12      "Sometimes BBA LIBOR quotes are high because they're
13  set by the treasury function within a bank that then
14  goes on to use the LIBOR rate internally in the bank.
15  In these cases the treasury department can make extra
16  profit by charging other departments in the bank itself
17  at that artificial rate."
18      If you're going to make money, you're going to make
19  money, aren't you?  Sorry, that was a flippant comment.
20  In any event, that's what it says?
21  **A.  It is.**
22  Q.  Then, finally, in the context of this just as again an
23  example, HBOS, at the bottom of that page:
24      "The fixing process works well as the market
25  standard.  BBA LIBOR is well understood.  Some companies

1  Q.  So, first of all:
2      "General impressions on how the LIBOR panel process
3  has worked over the last year.  Does anything need
4  fixing?"
5      Secondly:
6      "Any view of the quality of market fixings,
7  generally and specifically."
8      Third:
9      "Any other observations?  Can the definition be
10  improved?"
11      Fourth, this is a new question from the previous
12  year:
13      "Will the Bank of England's money market reforms
14  have an effect on sterling rates?
15      "5.  What other issues should be discussed by the
16  FXMMC?
17      "6.  Does your bank have business continuity
18  procedures?
19      "7.  What currencies should we consider introducing
20  BBA LIBOR calculation."
21      Then a further point about that.
22      8.
23      "Are there any data products you would like to see
24  the BBA introduce or are there others with more or
25  greater potential?"

| | |
|---|---|

**Page 113**

1       Again, is the process similar going across to

2  different banks and in fact other organisations?

3  A. Yes.

4  Q. So we have -- and, again, I'm only going to look at

5    examples, please. Back to page 1. BNP Paribas who

6    submitted in sterling. General comments include, at the

7    third bullet point:

8       "They are very happy with the LIBOR rate setting and

9    regard it as very useful, very high quality tool and the

10   representative there said it was the most important

11   fixing in the world."

12       Citigroup, bottom of that page, we have there

13   a Mr Gray and a Mr Thursfield. They submitted in five

14   currencies, including yen:

15       "The BBA LIBOR fixing process is stable and

16   efficient. The rates are accurate and what is more

17   consistent. The JPY rate is getting more accurate."

18       Can you help us now at all about what that means?

19   I appreciate I am asking you events nine years ago now.

20  A. I don't know.

21  Q. Very well. Thirdly:

22       "It's not broken, don't try to fix it."

23       It continues.

24       The next bank, over the page, the National Australia

25   Bank, Australian dollars and New Zealand dollars:

**Page 115**

1   market which gives them a different perspective to other

2   banks. Bank of America sets its rates 4 basis points

3   above where they could raise funds which is the return

4   they need."

5       So that's a slightly different message on this one;

6   yes?

7  A. Yes.

8  Q. Can you remember anything about that now, so talking

9   about generating their LIBOR rates off the derivatives

10   market?

11  **A. Well, I don't recall the specifics. There are**

12   **a number of things that that could mean, but I don't**

13   **know -- I couldn't say at nine years removed what**

14   **exactly Dan Knight meant.**

15  Q. Do you remember whether that caused you any concern at

16   that particular point?

17  **A. I think at that point, no, not really, because I was at**

18   **that point still the junior person and these were --**

19   **this was information that I was gathering, then giving**

20   **to my managers and then ultimately to the committee**

21   **whose job it is to look at these comments and decide how**

22   **to act.**

23  Q. So where were these notes going?

24  **A. They were going to the Foreign Exchange and Money**

25   **Markets Committee.**

**Page 114**

1       "Fixings are good. There used to be some dodgy BBA

2   LIBORs but they're now reliable."

3       At the bottom of the page, JP Morgan Chase, still

4   contributing to nine currencies:

5       "The BBA LIBOR fixing process works well."

6       Then at 2:

7       "When the Bank of Japan changed its outlook on

8   interest rates in early May there was instability in the

9   yen rates for a few days but this has settled down."

10       Then it concludes:

11       "The definition of BBA LIBOR is just fine as it is."

12       Can we go over to page 4 because the message isn't

13   the same across every person you speak to, is it?

14  A. No.

15  Q. So here we have at the Bank of America a Mr Knight.

16   They contribute to four currencies, including yen LIBOR:

17       "The impressions on BBA LIBOR panel process, does

18   anything need fixing?" which was the first issue.

19       Answer:

20       "It's fine."

21       Second, the view of the quality of market fixings:

22       "The rate setting process is currently efficient.

23   Bank of America is often dropped from the US dollar

24   fixings at one month and three month but this is because

25   they generate their LIBOR rates off the derivatives

**Page 116**

1  Q. Then, please, can we go on to the next page. There's

2   reference at the top to Deutsche Bank and the comments

3   that the BBA LIBOR panel process itself is okay. I'm

4   going to pass over LIBOR and EURIBOR. Then Mr Nicholls

5   is recorded as having said something to this effect:

6       "Sees the market as more volatile in the last year

7   than previously but unsecured bank funding rates are

8   nevertheless closing to BBA LIBOR rates. The rate

9   setting process is okay and no banks try to skew it.

10   Need to watch the yen rates as Bank of Japan

11   announcements are having profound effects at the

12   moment."

13       Finally:

14       "BBA LIBOR setting doesn't always react fast enough

15   to events in the market, for example Fed ..."

16       The American Federal Bank, is that?

17  **A. The Federal Reserve system.**

18  Q. "... rate changes. Deutsche create their BBA LIBOR

19   rates referencing the derivatives market as cash isn't

20   liquid or transparent enough."

21       Then talking about capability and the like.

22       Again, can you remember what that is a reference to?

23  **A. Well, there is a little more context around that. As**

24   **I imagine we will discuss at length, as we move through**

25   **time towards 2007 and 2008 the cash markets dry up**

29 (Pages 113 to 116)

**Page 117**

1   entirely. I mean, this effect is seen in 2005 and 2006
2   because the cash markets have been shrinking for many
3   years and so I think what Deutsche Bank are saying is if
4   they are not able to set a LIBOR with direct reference
5   purely to cash that they're borrowing because there's
6   not cash being borrowed and lent, they have to use
7   another means of setting their LIBOR rates and there are
8   markets in derivatives that are like the cash markets,
9   not exactly the same but similar, and you can use those
10   as a tool to help you set your LIBOR.
11   Q. Was that of any particular concern to you, can you
12   remember?
13   A. I don't recall it being of any great concern.
14   Q. Did that theme, so, for example, where there's no cash
15   or very little cash actually being traded and people
16   using other reference points, did that come up as
17   a theme in due course as well?
18   A. That will become a central theme.
19   Q. We'll come to that in due course then. Then, finally --
20   not quite finally, but just in the context of this
21   document, let's move down the page to HSBC. Now, this
22   is Mr Wood and we've seen reference to him already,
23   either as Jonathan Wood or Jon Wood. He starts by
24   saying, first of all, how the process worked. It's
25   fine. Secondly:

**Page 118**

1   "2005/2006 has been a more normal stable year in the
2   markets. There was a problem earlier in the year with
3   negative yen interest rates but this has resolved."
4   Then he's talking about sterling and dollar being
5   set 3 to 4 basis point, presumably, is it?
6   A. Yes.
7   Q. Above the actual cash rate each day but euro LIBOR is
8   representative. This time they estimated that euro was
9   1 basis point over the offer side, et cetera. He's
10   saying that this is indicative of tightening spreads in
11   all currencies.
12   "Any other observations", he says:
13   "It isn't broken, don't attempt to fix."
14   Just because it's not something that we may be
15   familiar with -- I don't know if you are -- a negative
16   interest rate, do you know what that means? If not, say
17   so.
18   A. Well, a negative interest rate is if you would --
19   normally interest rates are -- you would borrow money
20   and you would then pay it back and you would pay an
21   interest rate for the benefit of having borrowed that
22   money, but under certain very strange circumstances you
23   can see it the other way around.
24   Q. We don't need to worry too much about that.
25   A. You would need to get an economist to give you a full

**Page 119**

1   explanation of that.
2   Q. I don't think we're going to be assisted by that so
3   we'll move on in any event.
4   That was earlier in the year when that is being
5   spoken of, earlier in 2006.
6   Jumping ahead please, to page 9. At the bottom of
7   that page, we can see it wasn't just panel banks who
8   were being consulted but there is an inter-dealer
9   broker, ████████████ yes?
10   A. Yes.
11   Q. They are being asked about his views. He says all his
12   brokers are happy with the quality of the fixings:
13   "Currently circumstances are good. There's healthy
14   volatility in the market. Not too little, not too much.
15   This is however from a broker perspective. A trader
16   would find the markets too quiet. Not enough
17   opportunities for making money."
18   So you are getting a different perspective on it as
19   well?
20   A. Yes.
21   Q. We see that as well if we go to page 11. We almost see
22   that because if you go to the middle of that page, we
23   see a reference to ████ a date and absolutely nothing
24   below that. So quite what they said is not clear,
25   certainly not recorded here?

**Page 120**

1   A. Well, that's correct, yes.
2   Q. All right. So did those meetings continue into the
3   succeeding years?
4   A. I believe they happened every year I was at the BBA.
5   Q. All right. We've seen something about those and
6   obviously the different perspectives that the
7   individuals are giving you.
8   Now, let me then come, please, to the definition of
9   LIBOR before we move on to events around the credit
10   crisis and the financial crisis. Throughout this
11   time -- and we've seen this so I'm going to take this
12   relatively quickly -- although there was guidance and
13   amplification, did the definition of LIBOR throughout
14   the time you were at the BBA, certainly until the end
15   of 2010, remain the same?
16   A. Yes.
17   Q. We know already that there were various discussions
18   about the definition and how it might be augmented or
19   improved or changed in any way.
20   A. There were many.
21   Q. But in fact the definition, subject to some guidance,
22   remained the same?
23   A. That's correct.
24   Q. If I go, please, to -- my Lord, I'm conscious I'm
25   jumping around a little bit -- paragraph 48. Now, how

30 (Pages 117 to 120)

1    important was that definition so far as you or the BBA
2    were concerned?
3    **A.  Well, it's fundamental.  It is the basis for everything**
4    **that is built on top of LIBOR, the rate itself, and of**
5    **course then the huge numbers of financial products that**
6    **use LIBOR as its benchmark.**
7    Q.  What would any deviation from that definition mean or
8    result in?
9    **A.  Potentially inaccurate LIBOR rates being set.**
10   Q.  With what effect?  To what effect?
11   **A.  People could potentially lose money.**
12   Q.  Now, in terms of the definition of LIBOR, at any point
13   during the course of your employment with the BBA was
14   the BBA ever prepared to let that definition be ignored
15   or not adhered to?
16   **A.  No.**
17   Q.  Did the BBA ever endorse any deviation; that is to say,
18   endorse or approve any deviation from the definition?
19   **A.  No.**
20   Q.  You have told us -- my Lord, again jumping ahead to
21   132 -- that the definition itself was subject to
22   continuous review throughout this period, 2005 to 2010.
23   **A.  That's correct.**
24   Q.  In terms of the communication of that definition to not
25   merely the banking world but to the wider world, how was

1    that communicated?
2    **A.  Well, it was at all times on our website and any**
3    **additional guidance was posted on our website.  It was**
4    **several times given to the contributing banks in**
5    **e-mails.  It was laid out in consultation documents.**
6    **Whenever I was speaking at a conference or discussing**
7    **with the media, I would refer to it.  It was very widely**
8    **available and we did our best to ensure that it was as**
9    **well understood as possible.  The BBA's published on**
10   **numerous occasions various guides, written for both**
11   **professionals and lay people, to try and explain it as**
12   **clearly as we possibly could.**
13   Q.  Of course the definition refers to what one might call
14   a pure cash rate?
15   **A.  That's correct.**
16   Q.  2007/2008, when cash was scarce, how did that affect the
17   definition?  Did that put any strain on the definition?
18   **A.  A great deal.**
19   Q.  Just tell us how?
20   **A.  Because the rate -- the definition of LIBOR is in the**
21   **form of a question that a bank that is submitting to**
22   **LIBOR needs to answer and that question is:**
23   **"If I was to go into the interbank market and ask to**
24   **borrow a sum of money in a given currency, how much**
25   **would it cost me?"**

1    **Now, before the credit crunch that was not**
2    **a difficult question to answer because banks frequently**
3    **went into the interbank borrowing markets and borrowed**
4    **money, so it would be a trivial matter to set your LIBOR**
5    **almost.  You could look at the last time you did that**
6    **sort of transaction and say, "Well, that's my LIBOR",**
7    **but those transactions became fewer and fewer and at**
8    **certain times there was very, very little or no activity**
9    **in these markets and, yet, we were told that we had to**
10   **set LIBOR rates.**
11   **So that puts a great deal of strain on the LIBOR**
12   **definition and the contributing banks.**
13   Q.  In terms of the FXMMC, did it take any steps to try and
14   ensure that banks could do this or could cope with this,
15   anything such as that?
16   **A.  Well, yes, we launched a consultation in which we asked**
17   **the entire market, not just LIBOR banks but everybody,**
18   **literally anybody who could want to was invited to**
19   **respond, with, "Please, do you have any bright ideas for**
20   **how we can improve LIBOR or help us to set accurate**
21   **rates for the market in these difficult times?"**
22   Q.  Was it ever thought appropriate that one could simply
23   fundamentally change that definition?
24   **A.  Yes, and that was discussed.  That presents its own**
25   **difficulties because there are large numbers of**

1    **financial products that have lifespans of decades that**
2    **reference LIBOR.  So, for example, many people have**
3    **their mortgage linked to LIBOR and if you have 15 or**
4    **20 years left on your mortgage and you took out**
5    **a mortgage based on LIBOR and then it fundamentally**
6    **changes, it will fundamentally change the interest rate**
7    **you have to pay on your mortgage, for example, which**
8    **could be much higher or much lower.**
9    **So, again, it could cost people, but in these sort**
10   **of circumstances you have what is called a market**
11   **disruption clause and this is if there is a fundamental**
12   **change to a financial contract under certain**
13   **circumstances it can be ripped up and nobody -- but that**
14   **hadn't happen in these circumstances.  Nobody knew what**
15   **would happen.  So we were, as the BBA, encouraged to**
16   **ensure, as far as possible, continuity so that these**
17   **circumstances wouldn't happen.**
18   Q.  Now, within the context of the definition you have been
19   asked, have you not, to give detail to essentially three
20   different types of activity which might be inconsistent
21   with the definition?
22   **A.  Yes.**
23   Q.  You have called them type 1, type 2 and type 3; yes?
24   **A.  Yes.**
25   Q.  We're going to look at these and see the development of

Day 8                          R v Hayes                          5 June 2015

**Page 125**

1    these in some of the documents. First of all, can
2    I just identify, and you have set it out in fact in
3    paragraph 50 of your witness statement, what do you mean
4    by type 1 behaviour, just so that we're all clear about
5    it?
6    **A. So type 1 behaviour is where a bank has not based its**
7    **submission on the rate at which it could borrow cash**
8    **because there is no cash in the market available to be**
9    **borrowed, at which point you have to use other related**
10   **information to try and submit a LIBOR that is as**
11   **accurate as you possibly can.**
12   Q. So it's not strictly and formally based on the rate at
13   which it is borrowing cash because it hasn't borrowed
14   cash?
15   **A. LIBOR was never the rate at which you were borrowing**
16   **cash; it was the rate at which you could borrow cash at**
17   **11 o'clock in the morning with some other conditions**
18   **attached.**
19   Q. But where there were no cash transactions at all, how
20   easy is it to come up with that sort of figure?
21   **A. That depends on what is going on in other related**
22   **markets.**
23   Q. We saw a reference a little earlier, and you expanded
24   this slightly, to the derivatives market in relation to
25   one of your contact notes; yes?

**Page 126**

1    **A. Yes.**
2    Q. Is that the sort of thing you're talking about relating
3    to other markets?
4    **A. Correct.**
5    Q. So how might that market inform a submitter as to the
6    rate at which to submit a particular LIBOR submission?
7    **A. So cash markets involve actual movements of chunks of**
8    **real cash which represents real risk and a derivative**
9    **market is usually a much more liquid market, and by that**
10   **I mean there's more trading going on. So if a cash**
11   **market doesn't trade for days, a derivative market might**
12   **trade many times a day and if you know that your LIBOR**
13   **rate has historically been very closely tied to the**
14   **movement in a certain derivative rate, you could infer**
15   **that, "Although I haven't traded cash, I know that**
16   **typically it costs me 5 basis points to borrow cash**
17   **above this particular derivative instrument" and so it**
18   **would not be unreasonable to say, "I haven't traded**
19   **cash. I know that typically I'm 5 basis points above**
20   **this rate. Therefore, my rate for the LIBOR submission**
21   **today is 5 basis points above where that derivative**
22   **market is at 11 o'clock".**
23   Q. So as the financial crisis took hold, did that sort of
24   calculation become or that sort of basis for calculation
25   become more common as far as you could see?

**Page 127**

1    **A. Definitely.**
2    Q. Therefore, that isn't exactly within the definition, is
3    it?
4    **A. Well, because you're being asked the rate at which you**
5    **could borrow or the rate you think that you could**
6    **borrow, I think that is within an interpretation of the**
7    **definition of LIBOR.**
8    Q. Right.
9    **A. Sorry, shall we say within the spirit of the definition**
10   **certainly.**
11   Q. That's one aspect of derivatives and how one might use
12   that in forming a view. What about a trader or
13   a trader's desk's position, i.e. where they might want
14   it fixed, where they might want a rate for their book?
15   **A. That's clearly not within the spirit or the letter of**
16   **the definition.**
17   Q. We'll look at one or two examples of that in due course.
18        Let's look at the behaviour which you've called
19   type 2 behaviour which you have set out at paragraph 55.
20   Now, just define, please, what you mean by type 2
21   behaviour?
22   **A. Type 2 behaviour is where a bank works out what its cost**
23   **of borrowing would be. So what its LIBOR rate -- what**
24   **its LIBOR submission should be and then chooses to put**
25   **in a different number, almost always a lower number, in**

**Page 128**

1    **order to not be seen as risky.**
2    Q. The jury have seen this on occasion being referred to as
3    low-balling?
4    **A. That is one of the ways that this is called, yes.**
5    Q. Which specifically talks about -- when you say usually
6    a lower number, specifically talks about there being
7    a lower number input than is the actual cost?
8    **A. Correct.**
9    Q. Or the perceived cost?
10   **A. Yes.**
11   Q. You say in order not to be seen to be risky. Again, we
12   have heard something about that because a higher
13   number could suggest to others that that bank is having
14   trouble getting funds at rates that other banks can?
15   **A. Yes, that's right.**
16   Q. The damage that that causes a bank?
17   **A. Well, it was certainly felt by contributing banks,**
18   **I think, that that could be extremely damaging to the**
19   **reputation of a bank. Remember that this is taking**
20   **place in an environment in which banks not only could**
21   **fail but did fail and these failures may have been**
22   **because the banks were broken or it may have just been**
23   **because the market started believing that they were**
24   **broken and so nobody would lend to them and so that**
25   **action in itself led to the banks becoming broken,**

32 (Pages 125 to 128)

1  a self-fulfilling prophecy.
2  Q. That activity, what I'm going to call in shorthand
3     low-balling, was that within the definition?
4  A. No.
5  Q. Was that, as it were, permitted or condoned by the BBA?
6  A. Never.
7  Q. Did you have reports coming to you of that happening?
8  A. Yes.
9  Q. Did you seek to address those reports?
10 A. By every means we felt we had available to us.
11 Q. Of course we have heard the BBA aren't a regulator.
12 A. No, that's true.
13 Q. It's a trade association.
14 A. Correct.
15 Q. Its members are the banks themselves?
16 A. Yes.
17 Q. As far as the FXMMC is concerned, individuals were
18    members of the banks?
19 A. Most of them were.
20 Q. Were they not all members of the banks or the panel
21    banks I mean?
22 A. No. One of the actions that we took was to widen the
23    membership of the Foreign Exchange and Money Markets
24    Committee and so we had a representative of the Chicago
25    Mercantile Exchange, we had a representative of the

Page 129

1  London Money Markets Association and a representative of
2     the Association of Corporate Treasurers. We should
3     clarify that by representatives, they are the same as
4     the other members. They are individuals, they just
5     happen to be employed by those bodies.
6  Q. Did you yourself devote time and energy in seeking to
7     address issues of low-balling?
8  A. It was what I spent an awful lot of 2007, particularly,
9     and 2008 trying to do, yes.
10 Q. Were you ever prepared to give the impression to anyone
11    that this sort of activity was permissible as far as the
12    BBA was concerned?
13 A. No.
14 Q. Now, I'm going to then turn to type 3 behaviour. You
15    have again set this out at paragraph 58 so can we be
16    clear precisely what this means. Help us with what you
17    mean by type 3 behaviour?
18 A. So type 3 behaviour would be when somebody takes
19    a position. If you like, in very, very crude terms,
20    bets on an outcome which might be LIBOR is going to
21    go up or LIBOR is going to go down, and they would then,
22    having made those bets or taken those positions or
23    structured their book -- they all mean the same sort of
24    thing -- they would then seek to try and get the LIBOR
25    to move in that particular direction at that particular

Page 130

1  time.
2  Q. Was that compatible with the definition of LIBOR?
3  A. No.
4  Q. Was it remotely compatible with that definition?
5  A. No.
6  Q. At the time, so 2007, 2008, 2009 and 2010, did you
7     yourself actually become aware of it?
8  A. No.
9  Q. Looking back on it you have now seen some documents,
10    have you not, in the course of making your witness
11    statement, where there appear to be some indications of
12    it, if I can just put it in neutral terms? Did you
13    recognise any of those indications at the time?
14 A. No.
15 Q. When was the first that you yourself became aware of
16    this sort of type 3 behaviour?
17 A. It was in -- I forget the exact date, but it was when
18    the CFTC, which is a US regulator, issued a fine to
19    Barclays for that sort of behaviour, the type 3
20    behaviour.
21 Q. I am going to suggest that is June/July 2012.
22 A. Yes, that sounds right.
23 Q. Did you, while you were at the BBA -- forgive me, let me
24    be more specific than that. Up until the end of 2010,
25    did you have any suspicion that this sort of activity

Page 131

1  was taking place?
2  A. None.
3  Q. Could you conceive of that sort of activity taking
4     place?
5  A. It's not -- it's not impossible as a thought experiment.
6     You would need -- because, I mean, LIBOR is a fairly
7     simple idea. It is a number of banks putting in
8     a number and if enough of them moved together in the
9     same way, the topping and tailing effect would cease to
10    be effective and the LIBOR rates would move.
11 Q. I am just going to take you, please -- I am sorry,
12    my Lord, I'll have to come back to it. (Pause)
13        Can I just then deal with one or two events in
14    order, if we can. Can I take you, please, and ask to
15    have on screen to JME/0010. The jury have heard little
16    reference to this but just so we have it in the
17    chronology. This is September 2007. It's dated the
18    25th and someone has written on there, "Published
19    26 September". Do you know whose writing that is?
20 A. I don't, but I don't think it's mine.
21 Q. Okay. It's written by a report on the Financial Times,
22    headed, "LIBOR's value is called into question":
23        "In recent weeks the BBA, a trade body in London,
24    has embarked on a novel briefing mission.
25        "While the BBA used to receive few requests for

Page 132

33 (Pages 129 to 132)

1   information about how it compiles LIBOR, it has recently
2   been bombarded with queries about this benchmark.
3   Consequently, trade bodies started disseminating those
4   rates to a wider audience for the first time, together
5   with notes explaining how the benchmark works."
6       Summarising:
7       "This is unsurprising as the credit squeeze has
8   spread. The LIBOR benchmark has risen relentlessly.
9   Observers have seized on these rates as a handy visible
10  litmus test of banking stress, not least because the
11  rest of the interbank market tends to be very opaque and
12  thus not easily monitored. While these pressures propel
13  LIBOR into public view, it has come at the very moment
14  when some banks are quietly starting to question its
15  value. In particular recent turmoil has prompted
16  suggestions that LIBOR is no longer offering such an
17  accurate benchmark of borrowings costs as before. As
18  a result, some bankers are beginning to suggest that the
19  status of these indices may need to be reconsidered in
20  the future. Says the treasurer of one of the largest
21  City banks, without being named: 'The LIBOR rates are
22  a bit of a fiction. The number on screen doesn't always
23  match what we see'. That is unsurprisingly rebuffed by
24  those who compile the index each day."
25      I know there's more to come and the article

Page 133

1   continues over the page and the next page. Without
2   looking at all of that, was that the start of the
3   publicity about LIBOR and its position within the credit
4   crunch?
5   A. I don't know if that's very first, but that was an
6       example of an early article written about LIBOR.
7   Q. Were there further articles in the course particularly
8       of the following year?
9   A. Yes.
10  Q. The jury have seen reference to a couple of them
11      in 2008. I'm not going to go back to them, but in
12      particular the Wall Street Journal and Bloomberg. Was
13      LIBOR the subject of, as it were, both interest and
14      criticism?
15  A. Yes.
16  Q. And the criticism in broad terms being what?
17  A. That LIBOR was not reflective of the true cost of
18      borrowing in the interbank market.
19  Q. What steps did the BBA take in relation to those?
20  A. We had many repeated meetings of the committee whose job
21      it is to oversee LIBOR to ask them, firstly, did they
22      agree, did they think it was accurate or inaccurate and,
23      secondly, what could be done to ensure that it was as
24      accurate as possible.
25  Q. Was one of the principal criticisms around this question

Page 134

1   of low-balling?
2   A. Yes.
3   Q. Can we then look, please, at the sort of steps that you
4       took and the BBA took in relation to allegations of
5       low-balling.
6   A. Hmm, hmm.
7   Q. First of all, did you yourself or within the BBA receive
8       specific, as it were, detailed allegations of
9       low-balling?
10  A. We would hear repeated allegations that were never
11      actual smoking guns. It was a strong suggestion and
12      some of it was general, some of it was more specific,
13      but, yes, I think it's fair to say that as we go
14      through 2007 and into 2008 there is sustained suggestion
15      that this is going on in the markets.
16  Q. What did you do about it?
17  A. Well, first of all, we asked our committee what we could
18      do to try and shore up the rates, to make sure they were
19      as accurate as possible. We wrote regularly to the
20      contributing banks, reminded them of the definition,
21      urged them to submit accurate rates, underlined the
22      importance of submitting accurate rates and then,
23      in 2008, we -- Angela wrote to --
24  Q. This is Mrs Knight?
25  A. Mrs Knight, sorry, the then chief executive of the

Page 135

1   BBA -- wrote to the chief executives of all of the
2   participating banks to urge them to ensure that the
3   rates were accurate. We built a much stronger
4   surveillance and governance and discipline regime and we
5   asked absolutely everybody in the markets what can we do
6   to ensure that these rates are as accurate as possible.
7   We tried very hard to get as much support for setting
8   accurate LIBOR rates because we viewed that as being
9   very important.
10  Q. Why was it so important?
11  A. Well, a number of reasons, the most fundamental being
12      that there were large numbers of financial products that
13      were based on LIBOR that people could be losing money on
14      if the rates weren't accurate and also it was a major
15      reputational problem for the British Bankers
16      Association.
17  Q. We have seen, and I'm just going to refer to it very
18      briefly, in our core bundle, at tab A, page 6A, and on
19      screen, please, it's SJS/0003. We looked at this
20      yesterday, Mr Ewan, in fact through your erstwhile
21      colleague Mrs Scutt, so we're not going to go back
22      through it again, but one of the documents we have
23      looked at is this consultative paper from the BBA
24      in June 2008.
25  A. Yes.

Page 136

34 (Pages 133 to 136)

1   Q.  In a sentence, the purpose of this?
2   A.  It's to try and explain what LIBOR is and to try and ask
3       the widest population of people to help us ensure the
4       rates are appropriate and accurate, given the prevailing
5       market conditions.
6   Q.  What do we read into the timing of this at June 2008?
7       We know that in fact this was right in the middle or at
8       the very height or towards the very height of the
9       financial crisis.
10  A.  Yes.
11  Q.  Is this the time of what was perceived to be strain on
12      the definition?
13  A.  Yes.
14  Q.  We also see, just in the context of the events, at core
15      bundle A/7.  We'll just look at this on screen.  We have
16      obviously seen it before.  We have clarification.  We
17      have discovered that the purpose of that in terms of the
18      government guarantee scheme, the importance of it being
19      unsecured rates.  So we'll, as it were, pass over that.
20      This of course comes about three months after the
21      collapse of Lehman Brothers.
22          Then going ahead, please, to A/9.  Can we have the
23      whole document so that Mr Ewan can see it.  You can see
24      that this is in July of 2009 from yourself to the BBA
25      distribution list.  Who was on that list, can you

Page 137

1   all contributors.  There should be nothing in the
2   documents that represents a change to current practices
3   but it will enable us to demonstrate that all
4   contributors formulate their rates in a uniform manner,
5   thus underlining the accuracy of BBA LIBOR.  Please sign
6   and return."
7       I am paraphrasing that part.  We have the terms of
8   reference.  I'm not going to take you through the
9   details of those, but was this all about strengthening
10  what LIBOR was about?
11  A.  Yes.
12  Q.  Now, you have been asked and have looked at a large
13      number of documents, both --
14  MR CHAWLA:  Can I pause there, my Lord.
15  MR JUSTICE COOKE:  Yes.  We'll have a five-minute break,
16      please, members of the jury.  Thank you.
17  (3.34 pm)
18              (Short break)
19  (3.45 pm)
20  MR CHAWLA:  Mr Ewan, leading up to and in the course of
21      making your statement you have been asked to look at
22      a wide range of documents, have you not?
23  A.  Yes.
24  Q.  And provided a comment in relation to those if anyone
25      seeks further information about any of those and other

Page 139

1   remember, or approximately how many were on that list?
2   A.  I don't know because there may have been more than one
3       of those lists.  However, I would infer that as the
4       letter is headed, "Dear Contributor", the distribution
5       list is the contributors to LIBOR.
6   Q.  There you set out:
7       "On behalf of the BBA I would like to thank you all
8       for helping to ensure that BBA LIBOR is still seen as
9       the benchmark rate for money and credit market, despite
10      the extremely difficult conditions over the last two
11      years.
12      "We appreciate that there have been times at which
13      it has been very challenging to submit accurate rates
14      but in discussion with all contributors I have noted the
15      amount of intellectual rigour that the contributors
16      apply in formulating their submissions."
17      You talk about how it has attracted commentary in
18      the media and from market participants, some of which
19      misunderstand LIBOR.  You refer to the consultation
20      exercise last year, terms of reference arising out of
21      those and since then you set out that:
22      "I have worked with the FXMMC that oversees LIBOR to
23      prepare these and many contributors have also helped
24      with the drafting.  The final version was agreed at the
25      last meeting of the FXMMC.  I'm now circulating this to

Page 138

1   documents; yes?
2   A.  Yes.
3   Q.  I'm just going to ask you about one or two aspects now
4       in the next 15 or so minutes before I conclude.  First
5       of all, I'm just going to focus on what you have
6       referred to as type 3 behaviour.  My Lord, I'm jumping
7       to paragraph 161.
8       You told us a few minutes ago that you did not know
9       or believe that type 3 behaviour was taking place.  We
10      just remind ourselves, this is an attempt by a trader to
11      move LIBOR to suit a particular trading position; yes?
12  A.  Yes.
13  Q.  I asked you about whether that was ever in your
14      contemplation.  Can I just take you, please, or invite
15      you to look on screen, please, at JME/0024.  We can see
16      that this particular e-mail chain -- let's identify
17      exactly what it is at the moment.  Let's go on to page 6
18      of this chain, so back in October 2008 you were invited
19      to a LIBOR seminar in Zurich, in Switzerland, and the
20      invitation came from Mr Schlegel of the Swiss National
21      Bank; yes?
22  A.  Yes.
23  Q.  You were asked to give a short presentation on the
24      concept of the LIBOR and the problems that had arisen in
25      the current money market turmoil.  You are told that

Page 140

35 (Pages 137 to 140)

Day 8                              R v Hayes                          5 June 2015

1  Mr Schlegel is currently analysing the contributing
2  behaviour in the Swiss franc LIBOR panel:
3  "Looking forward to discussing the preliminary
4  finding with you in the seminar."
5  In the event, at page 2 of this document, on
6  18 December of 2008 you put your comments on a paper
7  that has been supplied to you; yes?
8  **A. Yes. That seems to be what this is, yes.**
9  Q. We can see that there's reference to BIS LIBOR
10 March 2008. BIS, Bank of International Settlements?
11 **A. Correct.**
12 Q. You say here, and can we just look at this document,
13 please, or these comments over this page and the
14 following page:
15 "Martin, as discussed, here are our comments on the
16 paper."
17 Just turning to page 4, please, we can see -- just
18 scrolling down slowly -- that these are your comments,
19 signed by you.
20 So back to page 2, please:
21 "The quality of the LIBOR has repeatedly been put
22 into question."
23 Are these now your comments:
24 "It is certainly true that there has been commentary
25 on LIBOR"?

Page 141

1  **A. Yes.**
2  Q. "I would venture that for every article that includes
3  'questioning the accuracy of LIBOR' there is another
4  that supports the LIBOR rates. One of the things that
5  we have observed is that the press will only report on
6  matters that they regard as being 'a story'. 'LIBOR is
7  not accurate' is a story. 'LIBOR is as accurate as is
8  practicably possible in difficult market conditions' is
9  not and so it does not get printed. I would note that
10 the IMF [International Monetary Fund] and BIS have both
11 looked into the following press speculation and are of
12 the view that broadly LIBOR is accurate, although they
13 do no specifically investigate Swiss franc."
14 You give conclusions that the IMF have set out:
15 "Although the integrity of the US dollar LIBOR
16 fixing process has been questioned by some market
17 participants in the financial press, it appears that
18 US dollar LIBOR remains an accurate measure of a typical
19 creditworthy bank's marginal cost of unsecured US dollar
20 term funding ..."
21 You give the reference to the website.
22 Similarly, so far as the Bank of International
23 Settlements is concerned, you quote:
24 "The design of the LIBOR fixing producing an
25 estimate that is close to the true interbank rate. This

Page 142

1  is the case even during the stress period."
2  You attach the full report which is the attachment
3  that we can see at the top of the document, the
4  March 2008 document; yes?
5  **A. Hmm, hmm.**
6  Q. You refer to the article by Mollincamp and that's an
7  article in --
8  **A. The Wall Street Journal.**
9  Q. That's it. Thank you.
10 "... in the journal [as you say] is very widely
11 quoted. Essentially its point is that if you accept CDS
12 rates ..."
13 Is that certificates of deposit?
14 **A. No, that's credit default swap.**
15 Q. "... as a good proxy for bank creditworthiness LIBOR is
16 inaccurate. My view and the view of the majority of the
17 participant is that this is fraud."
18 You set out two reasons for it. I'm not going to
19 read through those reasons, but you set out two reasons
20 for it.
21 You quote specifically:
22 "Secondly, as a bank's profit depends partially on
23 the LIBOR it prefers a high or low LIBOR on a specific
24 date."
25 That's what was being said to you and you're now

Page 143

1  commenting on it afterwards, aren't you, in the small
2  print?
3  **A. I believe so, yes.**
4  Q. So the larger print is things that you are specifically
5  addressing and the smaller print are your comments to
6  that?
7  **A. Yes.**
8  Q. "As a bank's profit depends partially on LIBOR, it
9  prefers a high or low LIBOR on a specific date" is what
10 is being said to you.
11 You say this:
12 "I think there are three assumptions here. We know
13 that banks that quote LIBOR use the LIBOR rates as their
14 own internal funding rates, as well as borrowing and
15 lending based on spreads to LIBOR. For the above to be
16 true, the bank would need to be very long or short
17 against LIBOR as well as
18 "2. The various departments that were taking
19 exposure to LIBOR would need to be in constant detailed
20 contact with each other which would contravene rules
21 about 'Chinese Walls' and finally
22 "3. The department that stood to profit from
23 a manipulated LIBOR would have to persuade the
24 individual with responsibility for submitting the rate
25 that they should manipulate their true cost of funding.

Page 144

36 (Pages 141 to 144)

1 Quite apart from any moral questions or fear of
2 sanction, we require the individual ultimately
3 responsible for submitting LIBOR to be each bank's
4 treasurer or head of balance sheet or equivalent and
5 they would presumably be damaging their own interests by
6 submitting an inaccurate LIBOR."
7     What was the point that you were seeking to make
8 there?
9 A. Could we -- could I ask, could we scroll up so I can see
10     the quote?
11 Q. The second was:
12     "Secondly, as a bank's profit depends partially on
13 the LIBOR, it prefers a high or low LIBOR on a specific
14 date."
15     There are three assumptions here. Scroll down,
16 please.
17 A. Yes, could you repeat the question then?
18 Q. What was the point you were seeking to make here?
19 A. That a bank does not prefer a high or a low LIBOR in
20     particular for the reasons that I set out here. In the
21     first case, I was told by contacts, people on the
22     Foreign Exchange and Money Markets Committee, that banks
23     as banks don't particularly want a LIBOR to be very high
24     or very low because these banks have to both borrow and
25     lend against LIBOR. So if they -- so putting it up or
Page 145

1 down is just giving with the one hand and then taking
2     away with the other. So it's not in a bank's interest
3     for a higher or low LIBOR.
4     The second point is that, quite apart from anything
5     that the BBA has said in our terms of reference, all of
6     the banks that contribute to LIBOR are regulated by
7     their own financial regulator or financial regulators
8     and they will have rules which the banks have to abide
9     by about Chinese Walls.
10     Would you like me to clarify or --
11 Q. Just a little, if you would?
12 A. A Chinese Wall is essentially -- it's not a physical
13     wall but it's a set of rules and controls that mean that
14     a bank -- the part of a bank that is engaged in one
15     activity shouldn't be talking about it with another. So
16     a classic example would be that the people in a bank
17     that trade stocks shouldn't be talking to other people
18     in the same bank that might be advising on an initial
19     public offering or a merger or an acquisition.
20 Q. Yes, all right.
21 A. So that's not a BBA thing, that is the rules put in
22     place by regulators.
23     Now, the third is that LIBOR is set by people who
24     borrow and lend cash. Now, that's by this point banks
25     have signed undertakings to assure the BBA that that is
Page 146

1 the case and so we believe, at this point, because all
2 of the banks have told us, that their LIBORs are being
3 set by people who lend and borrow actual money for the
4 banks. If they set artificial LIBORs, they would be
5 potentially damaging themselves and so it would seem --
6 it seemed to me, at the time, that it would be
7 ridiculous to assume that a bank would -- that somebody
8 would do that, apart from, as I note, the fact that it
9 would simply be wrong and it would -- it should get you
10 in trouble with your bank's compliance department that
11 are the people who are in charge of enforcing either the
12 bank's own internal rules or the rules from the
13 financial regulator.
14 Q. All right. Then I am just going to take it on, please,
15 because at 2.2 you then deal with what is called, "The
16 bank's incentives". You set out this:
17     "In addition to the points made above, in the case
18 of bank holding assets conditioned on three-month LIBOR,
19 the rate contributor only has an incentive to manipulate
20 his bank's LIBOR if it will profit him directly. If the
21 asset is held by another department within the bank,
22 even if the contributor is aware of this, why would he
23 wish to manipulate the bank's LIBOR to suit this?"
24     Again, please, just help us with this. What is the
25 point you're making here?
Page 147

1 A. Well, without the benefit of hindsight, putting
2     myself --
3 Q. Dealing with it as you thought at the time?
4 A. As I thought about it then, which was I believe we're at
5     the very tail-end of 2008?
6 Q. Correct.
7 A. The people who are submitting LIBOR rates borrow and
8     lend cash. They do not -- they're not the people who
9     trade in the derivatives that are linked to LIBOR.
10 Q. Was that your understanding at the time?
11 A. Absolutely, and we had in fact by this point written
12     submissions from all of the banks assuring us that this
13     was the case. So at the time it seemed -- it would seem
14     very strange. Why would somebody do something that
15     would potentially lose them money to help out somebody
16     else in another department? It's not like that was
17     going to do him good.
18 Q. So at this time, in December 2008, did you conceive it
19     as a realistic possibility that traders were
20     manipulating LIBOR?
21 A. I did not.
22 Q. Up until the publication of the CFTC notice
23     in June 2012, did you conceive that as a realistic
24     possibility?
25 A. I did not.
Page 148

37 (Pages 145 to 148)

| | |
|---|---|
| 1 Q. Would that possibility ever fall or could that | 1 Mr Ewan's exhibits, whether I've referred to them or |
| 2 possibility ever fall within the definition of LIBOR? | 2 not, but failed because the file was too big. I will |
| 3 **A. No.** | 3 get those on a memory stick. |
| 4 Q. In contrast, you have told us that you were aware of | 4 MR JUSTICE COOKE: That would be the ideal. Thank you. |
| 5 low-balling from 2008 onwards? | 5 MR CHAWLA: I will make sure that they come through. We're |
| 6 **A. We were aware of --** | 6 going to -- in the e-mail that failed I said I was going |
| 7 Q. Allegations -- | 7 to liaise with Mr Hawes in relation to documents that |
| 8 **A. -- increasingly strident allegations.** | 8 are likely to be pulled up next week so that at least |
| 9 Q. Do you remember having any allegations or concerns about | 9 my Lord has them hopefully electronically, possibly in |
| 10 yen LIBOR ever being brought to your attention? | 10 both formats, as they're coming up. I still want to |
| 11 **A. I don't remember any specifics, no.** | 11 talk to Mr Hawes about the best way of getting this |
| 12 Q. Can you remember which currencies formed the focus of | 12 information to the jury. |
| 13 the concern that were brought to your attention? | 13 MR JUSTICE COOKE: Yes. I mean, it's plainly a difficult |
| 14 **A. Overwhelmingly dollar and then sterling and then, to an** | 14 thing. |
| 15 **extent, Swiss franc.** | 15 MR CHAWLA: It's terrible. It's something we have been |
| 16 MR CHAWLA: Mr Ewan, that's all the questions I have. There | 16 exploring for a number of years now in terms of how we |
| 17 will be more for you, please. | 17 do this and there are different schools of thought. The |
| 18 MR HAWES: I don't think anyone would have a heavy heart if | 18 preferred option at the moment is to ensure that there's |
| 19 I applied to your Lordship not to start the | 19 that library of materials available, not necessarily in |
| 20 cross-examination at 4 o'clock on a Friday afternoon. | 20 six copies for the jury but at least in a couple of |
| 21 MR JUSTICE COOKE: I am sure no one would have a heavy | 21 copies, so that they have the ability to refer to them |
| 22 heart, but is it the most efficient way of proceeding? | 22 but that involves obviously making sufficient note to |
| 23 MR HAWES: It is the most efficient way. My learned friend | 23 know what they want to look at. |
| 24 and I are going to try and sort some documents and, | 24 MR JUSTICE COOKE: That's the problem. Immediacy, isn't it? |
| 25 given the length I was with Ms Scutt today, I am going | 25 MR CHAWLA: In fact on one occasion, my Lord, I should say |
| Page 149 | Page 151 |

| | |
|---|---|
| 1 to try to cut some of those down. | 1 that the jury asked the court if they could sit without |
| 2 MR JUSTICE COOKE: If you are telling me that's the most | 2 counsel at all simply to review that library of material |
| 3 efficient way of proceeding, then the jury, heavy heart | 3 before speeches, which seemed a very sensible solution, |
| 4 or not, will go home. | 4 but it obviously took a day -- I think it took them |
| 5 Thank you very much, members of the jury. | 5 a day and a half to do that. |
| 6 10 o'clock on Monday, please, and have a good weekend. | 6 MR JUSTICE COOKE: Mmm. |
| 7 (In the absence of the jury) | 7 MR CHAWLA: So we will give that a little further thought. |
| 8 MR JUSTICE COOKE: So can we just explore what may -- | 8 Ms Jones has lot of practical solutions, including for |
| 9 MR CHAWLA: Could I invite the witness to withdraw. | 9 example, a hot documents pack, but whether that will |
| 10 MR JUSTICE COOKE: It's more questions of timetabling and | 10 quite do it. We'll think about what the best course for |
| 11 the like. Feel free to go. Thank you very much. | 11 that is. |
| 12 (The witness left court) | 12 MR JUSTICE COOKE: Yes. I suspect at the end of the day |
| 13 MR CHAWLA: My Lord, before we come to timing, can I just | 13 that much more, Mr Hawes, will depend not on the detail |
| 14 deal with a little bit of housekeeping, if I may? | 14 as such but, as I was suggesting to them, on the broad |
| 15 MR JUSTICE COOKE: Yes. | 15 themes that you're putting. |
| 16 MR CHAWLA: I've sent to your clerk by e-mail the | 16 MR HAWES: Yes. There are one or two. So what we have |
| 17 documents -- in fact a wider range of the documents that | 17 discussed over the luncheon adjournment there are |
| 18 were referred to this morning. | 18 certainly going to be some, I suspect, one or two key |
| 19 MR JUSTICE COOKE: Yes. | 19 documents that they may want in hard copy and the rest |
| 20 MR CHAWLA: So that my Lord should have those | 20 will be thematic. |
| 21 electronically. | 21 MR JUSTICE COOKE: If they are very specific documents that |
| 22 MR JUSTICE COOKE: Will they go on to a memory stick? | 22 you know you are going to focus on, then self-evidently |
| 23 MR CHAWLA: I can put them on a memory stick. | 23 the sooner the jury have them, the better. |
| 24 MR JUSTICE COOKE: I can put them on to a memory stick. | 24 MR HAWES: Yes. I don't want to promise too much because, |
| 25 MR CHAWLA: I have tried to do the same with all of | 25 as your Lordship will appreciate, at the moment we are |
| Page 150 | Page 152 |

Merrill Corporation                www.merrillcorporation.com/mls                8th Floor, 165 Fleet Street
(+44) 207 404 1400                                                               London EC4A 2DY

| | |
|---|---|
| **Page 153** | **Page 155** |

1  still reducing the documents that we have prepared.
2  MR JUSTICE COOKE:  I understand the practical problems,
3    Mr Hawes.
4  MR HAWES:  It's the unused as well that causes me a little
5    concern so even the documents that are coming to
6    your Lordship, you know that over May we had the BBA
7    disclosure so we have those in separate areas.  We're
8    going to give those – the documents that were used,
9    those are the ones that we have given some D references
10   to, but they will still retain their full original
11   unused title as well so we know where the reference
12   comes from.  I'm afraid that is going to be work done
13   over the weekend and then loaded on the system.
14      It is, as my learned friend says, very difficult
15   because on the one hand we're trying to keep as much
16   electronically as possible so we don't burden the jury
17   with it and then, on the other hand, of course they want
18   something to scribble on.
19  MR JUSTICE COOKE:  Yes.  Just looking at the draft
20   timetable --
21  MR HAWES:  I'm going to try and shorten Mr Ewan, if I can
22  MR JUSTICE COOKE:  You always said two to three days.
23  MR HAWES:  I did, not least because, as your Lordship has
24   identified and I suspect the jury have identified, it is
25   thematic.  There is, as you will appreciate, one or two

**Page 153**

1  Mr Wadsworth, that were on the schedule that
2    your Lordship is aware of that we were after.  We have
3    between ourselves resolved the issue concerning the
4    compelled interviews for the four individuals held with
5    the FCA, in the sense that the Crown, I'm told, can't
6    get it and the regulators are not prepared to release
7    it.
8  MR JUSTICE COOKE:  So simply not in their possession.
9  MR HAWES:  We need to think carefully about what steps will
10   follow from that.
11  MR JUSTICE COOKE:  Yes.
12  MR HAWES:  That's the first thing.
13      In terms of other timings, your Lordship will
14   remember we received Mr Walshe's compelled interview
15   some time ago.  Enquiries are ongoing with him in
16   Australia.  We're trying to make contact with him
17   frankly.  We have sent correspondence.  It's not been
18   responded to.  Certain steps are now being taken to see
19   if we can make direct contact with him with someone on
20   the ground in Australia.  If -- and I don't want to
21   pre-judge it, but let's assume the worst case
22   scenario -- he were not prepared to give evidence,
23   I would probably seek to apply to admit it which is --
24   I only flag it because it's an argument we may need to
25   have one morning.

**Page 155**

1  topics that you need to keep dropping issues to to show
2    the repedity of it because there are certain things that
3    Mr Ewan says he didn't know but, other than that, my
4    learned friend Ms Collins is taking a scalpel to it as
5    I speak.
6  MR JUSTICE COOKE:  Well done.  Can we just look at the
7    timetable though because we're effectively what, a day
8    to a day and a half behind, is that right?
9  MR HAWES:  One day.
10  MR JUSTICE COOKE:  One day you think.
11  MS JONES:  My Lord, I think timetable-wise one day behind
12   because we have agreed into admissions three witnesses
13   that come later on.  So although at the moment it looks
14   like slightly more, I think it will even out.
15  MR HAWES:  On that front, can I say -- I haven't told my
16   learned friends this yet -- towards the end of that
17   there are two witnesses from Citi.  We haven't formally
18   concluded it but one of them we're likely not to
19   require.  So we're in discussion about that so that will
20   shorten as well.
21  MR JUSTICE COOKE:  All right.  The contingencies are
22   disclosure application, if no agreement.
23  MR HAWES:  We've got to -- so disclosure.  My learned
24   friends have disclosed to us this week two of the
25   compelled interviews, one from Mr Liddy and one for

**Page 154**

1  We haven't resolved yet, quite frankly, and as
2    your Lordship will understand we haven't really had time
3    with the BBA evidence coming quickly on us, the
4    disclosure that we had yesterday.  We have discussed it
5    between ourselves, obviously, but I envisage we may have
6    to have some form of argument.  I'm not quite sure what
7    that will take yet and where it goes.
8  MR JUSTICE COOKE:  All right.
9  MR HAWES:  Medical is the other thing as well that we need
10   to resolve.
11  MR JUSTICE COOKE:  Yes.
12  MR HAWES:  In terms of -- well, firstly, I think we're
13   agreed between us that the two respective doctors are
14   going to see one another and much under the CPR to see
15   where the areas of agreement and disagreement are.
16   Subject to what comes out of that meeting between them,
17   I think obviously then the issue will arise as to
18   whether Mr Hayes needs to be retested for the matters,
19   as you will remember.  Once that's resolved, I do
20   anticipate clearly that we will have to have an argument
21   as to what is admissible and what it goes to.  So that's
22   another potential discrete argument one morning,
23   I suspect.
24  MR JUSTICE COOKE:  Yes.  It's worth bearing in mind, I won't
25   say the optimum point for such arguments to take place

**Page 156**

Day 8                        R v Hayes                      5 June 2015

| 1 | but the least disruptive point for that to take place |
| 2 | and of course the one that doesn't affect the parties |
| 3 | putting the case the way they need to, but I'm sure you |
| 4 | have that well in mind. |
| 5 | MR HAWES:  Yes.  The sooner that, frankly, from our |
| 6 | perspective we understand the way in which we can use |
| 7 | it, it may be of assistance -- maybe, in a very tenuous |
| 8 | way -- in the prosecution's case, but it's not essential |
| 9 | that it is resolved at that point.  I can see that we |
| 10 | can resolve this at half-time certainly, before I call |
| 11 | Mr Hayes. |
| 12 | MR JUSTICE COOKE:  It has to be resolved by then. |
| 13 | MR HAWES:  Yes, that's the point, the cut-off point |
| 14 | entirely.  There's, I think, clearly a distinction |
| 15 | between trial management issues, as your Lordship has |
| 16 | indicated, and whether it goes further. |
| 17 | MR JUSTICE COOKE:  Yes. |
| 18 | MR HAWES:  In terms of mens rea. |
| 19 | MR JUSTICE COOKE:  Yes. |
| 20 | MR HAWES:  I think those are the only things on the horizon |
| 21 | in terms of the timing -- |
| 22 | MR JUSTICE COOKE:  All right. |
| 23 | MR HAWES:  -- at the moment. |
| 24 | MR JUSTICE COOKE:  So by this time next week am I being told |
| 25 | that we will be up to speed on this timetable?  I don't |

Page 157

| 1 | MR CHAWLA:  That's the Ewan exhibits, what you have in hard |
| 2 | copy at the moment, but what I haven't done is extract |
| 3 | the further Ewan documents and we don't actually know |
| 4 | what they are at the moment and I don't think those have |
| 5 | been finalised yet by my learned friend. |
| 6 | MR JUSTICE COOKE:  Right.  That's the exercise he was |
| 7 | contemplating doing, yes. |
| 8 | MR CHAWLA:  You have the Scutt defence documents |
| 9 | electronically or your clerk should have them.  I was |
| 10 | hoping that I may be able to get them in hard copy but |
| 11 | I don't know if you want those in hard copy over the |
| 12 | weekend.  It will be another file to carry, I suspect. |
| 13 | MR JUSTICE COOKE:  If I've got them electronically, that's |
| 14 | probably good enough for current purposes. |
| 15 | MR CHAWLA:  My Lord, they are labelled in the way, D/1, |
| 16 | whatever, so although there are more than Mr Hawes |
| 17 | actually referred to, it is simply easier to put them in |
| 18 | one. |
| 19 | MR JUSTICE COOKE:  In terms of the transcript, I can pick |
| 20 | them up. |
| 21 | MR HAWES:  I cut away quite a lot of the documents so the |
| 22 | references are there. |
| 23 | MR CHAWLA:  Yes, yes. |
| 24 | MR CHAWLA:  My Lord, in terms of the page numbers, so there |
| 25 | are two documents with a specific page number 848 or |

Page 159

| 1 | know why I'm looking at Ms Jones. |
| 2 | MS JONES:  How much depends on how long my learned friend is |
| 3 | with Mr Ewan, but if in fact his cross-examination |
| 4 | reduces down to more like a day, a day and a half, then |
| 5 | we should be back on track. |
| 6 | MR JUSTICE COOKE:  Right. |
| 7 | MS JONES:  But that's the indication that I think I'm |
| 8 | getting. |
| 9 | MR HAWES:  No pressure. |
| 10 | MR JUSTICE COOKE:  No, no, but it does depend on that factor |
| 11 | rather more than anything else. |
| 12 | MS JONES:  It does, absolutely. |
| 13 | MR JUSTICE COOKE:  Right.  That's helpful to know anyway. |
| 14 | Thank you very much. |
| 15 | Can I just ask when the further electronic material |
| 16 | will be available?  Will it be available to me for the |
| 17 | weekend is what I really mean? |
| 18 | MR CHAWLA:  The Ewan material? |
| 19 | MR JUSTICE COOKE:  I have some already but you are telling |
| 20 | me there's more than would fit on to a memory stick. |
| 21 | MR CHAWLA:  There's more than would be sent by e-mail.  It |
| 22 | can certainly fit on a memory stick and I can do that |
| 23 | now. |
| 24 | MR JUSTICE COOKE:  If you can do that now, then I can take |
| 25 | that away with me.  That would be very helpful. |

Page 158

| 1 | something like that, those are given just the page |
| 2 | numbers in the folder that I've put them in. |
| 3 | MR JUSTICE COOKE:  All right. |
| 4 | MR CHAWLA:  But, again, when you see those on the transcript |
| 5 | you should be able to see that directly across, but I'll |
| 6 | organise that now, my Lord, and get that to you in the |
| 7 | next few minutes. |
| 8 | MR JUSTICE COOKE:  Thank you very much.  All right. |
| 9 | 10 o'clock, please. |
| 10 | (4.20 pm) |
| 11 | (The court adjourned until |
| 12 | Monday, 8 June 2015 at 10.00 am) |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

Page 160

40 (Pages 157 to 160)

```
 1                    INDEX
 2    MS SALLY SCUTT (continued) ...........................1
 3        Cross-examination by MR HAWES ...................1
 4    MR JOHN EWAN (sworn) ...............................87
 5        Examination-in-chief by MR CHAWLA ...............87
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 161

Merrill Corporation       www.merrillcorporation.com/mls       8th Floor, 165 Fleet Street
(+44) 207 404 1400                                      London EC4A 2DY

Day 9                           R v Hayes                           8 June 2015

| | |
|---|---|
| 1           Monday, 8 June 2015 | 1     you. |

**Page 1**

1           Monday, 8 June 2015
2 (10.00 am)
3        (In the absence of the jury)
4 MR CHAWLA: My Lord, there's a green file in front of you
5     which I suspect will contain the documents, a hard
6     copy -- I just don't have enough hard copies at the
7     moment -- of the documents that Mr Hawes may be
8     referring to today.
9       There's an index at the front which you will need
10     because it gives a page reference number.
11 MR JUSTICE COOKE: Right. What I received electronically or
12     my clerk received electronically this morning, is that
13     in addition to that bundle?
14 MR CHAWLA: Yes, it is.
15 MR HAWES: Yes, it is. There are a very small additional
16     references in the slip you are holding in your hand to
17     that which is in the bundle. I'm very grateful to my
18     learned friend. He has produced that or through the
19     Serious Fraud Office produced that this morning.
20 MR JUSTICE COOKE: Very good. Thank you very much.
21 MR CHAWLA: Can I just mention, my Lord, Professor Cooper is
22     in court --
23 MR JUSTICE COOKE: Yes.
24 MR CHAWLA: -- as expected.
25 MR JUSTICE COOKE: Good. Thank you.

**Page 1**

1 MR HAWES: Before your Lordship has the jury in, in the
2     course of today we have a hard copy of material that my
3     learned friends were good enough to disclose to us
4     yesterday morning. It's about 500-odd pages. It
5     touches on the material that your Lordship had an
6     application for from the third party so that's
7     additional disclosure that has come up.
8       I think, in the circumstances, we're at some stage
9     going to need an argument about it. Your Lordship will
10     need to see it. I'm not going to trouble with it now
11     but it's quite a lot of material.
12 MR JUSTICE COOKE: Yes.
13 MR HAWES: I haven't digested it properly yet, as you will
14     understand why, but it may touch on matters for Mr Ewan.
15     I'm not sure yet. My learned friends are working on
16     that at the moment.
17 MR JUSTICE COOKE: It's material before the disciplinary
18     committee presumably, is it?
19 MR HAWES: Submissions, yes, and associated documents. Just
20     for your Lordship's note, a further disclosure request
21     we drafted yesterday morning, my learned friends have.
22     It's clear from some of the submissions -- and this is
23     not a criticism of the Crown -- not all of that material
24     is yet available and there's clearly more, I'm afraid.
25 MR JUSTICE COOKE: Right. We'll have the jury in. Thank

**Page 2**

1     you.
2        (In the presence of the jury)
3         MR JOHN EWAN (continued)
4        Cross-examination by MR HAWES
5 MR JUSTICE COOKE: Good morning, members of the jury.
6     Yes, Mr Hawes.
7 MR HAWES: Thank you, my Lord.
8 MR JUSTICE COOKE: You're still under oath of course.
9 A. I understand.
10 MR HAWES: Mr Ewan, can we start, please, with some of the
11     evidence that you gave to my learned friend on Friday
12     afternoon. I just want to confirm that this is your
13     position. You were asked the following:
14       "In terms of the definition of LIBOR, at any point
15     during the course of your employment with the BBA was
16     the BBA ever prepared to let the definition be ignored
17     or not adhered to?"
18       Your response to that was "no". Is that correct?
19 A. That is correct.
20 Q. So the BBA and your position was you were not prepared
21     to either ignore or not adhere to the definition?
22 A. That's correct.
23 Q. Thank you. Does it follow that in the event that
24     material was presented to you, you would have
25     investigated that or drawn it to the attention of the

**Page 3**

1     FXMMC?
2 A. Yes, I would.
3 Q. That would involve, would it, the allegations being made
4     by banks of others not observing the definition?
5 A. Yes.
6 Q. Presumably, in those circumstances, you would have
7     required all details possible when an allegation is made
8     so that you, the BBA, can inform the FXMMC and act upon
9     it?
10 A. I think it would depend.
11 Q. Why?
12 A. Because usually or sometimes, depending on what the
13     allegation was, my first thought would be to call
14     a member of the Foreign Exchange and Money Markets
15     Committee, probably the Chairman, and ask for his view
16     as to whether he thinks there is -- the issue is worthy
17     of investigation. If in his view it was, I certainly
18     would have tried to get relevant information and present
19     it in full to the committee.
20 Q. So you would need an adequate amount of detail before
21     you could call the chair of the FXMMC to inform the
22     chair of the issues that had arisen?
23 A. Yes.
24 Q. Thank you. Can we touch on, please, the spirit of the
25     definition. I just want to clarify what your position

**Page 4**

1 (Pages 1 to 4)

**Page 5**

1  is in relation to that. You were asked on Friday:
2  "We saw a little reference earlier, and you have
3  explained this slightly, to the derivatives markets in
4  relation to one of your contact notes; yes?
5  "Answer: Yes.
6  "Question: So how might that market inform
7  a submitter as to the rate at which to submit
8  a particular LIBOR submission?" was the question.
9  You were asked about that and you gave your answer.
10  Then Mr Chawla said to you:
11  "Therefore that isn't exactly within the definition,
12  is it?"
13  Your response was:
14  "Well, because we're being asked the rate at which
15  you could borrow or the rate you think that you could
16  borrow and I think it is within the interpretation of
17  the definition or, shall we say, within the spirit of
18  the definition."
19  Who decides what is within the spirit of the
20  definition or not?
21  A. That's a difficult question. Ultimately the Foreign
22  Exchange and Money Markets Committee, as they are
23  responsible for the maintenance of the definition.
24  Q. Where do we see -- and we'll look at some documentation
25  together today -- the FXMMC looking at the spirit of the

**Page 6**

1  definition?
2  A. Throughout the period of the financial crisis, at if not
3  every meeting of the committee, certainly many of the
4  meetings, that would have been the core of what they
5  were discussing. We recognised that there were very
6  difficult, unprecedented circumstances in the market and
7  that the definition of LIBOR might have to adapt to suit
8  that and so the definition was discussed frequently by
9  the committee.
10  Q. Where are the boundaries for the spirit of the
11  definition?
12  A. Again, that's a difficult question. You are asking me
13  to quantify something that is a qualitative notion.
14  Q. Because we're not talking there, are we, about the
15  definition itself; we're talking about your words "the
16  spirit" of the definition which is something quite
17  different? You would agree with that, would you?
18  A. No.
19  Q. How long did the FXMMC meetings take?
20  A. They would vary. A meeting where the committee was
21  meeting annually to review the constituents might have
22  taken perhaps two hours. A number of the ad hoc
23  meetings took until the members were satisfied that
24  whatever issue was being discussed was addressed.
25  Q. You act, did you say, as the secretariat of the meeting?

**Page 7**

1  A. Correct.
2  Q. Does that mean you took its note and minutes?
3  A. Not usually, no.
4  Q. Who took --
5  A. But during the beginning of the period in question,
6  perhaps in 2005/2006, yes. Later on, when I had people
7  working with me, they would have taken the minute.
8  Q. Again, we'll look at the details in a while, but I just
9  want to ask you the generalities at the moment. Do you
10  suggest that the FXMMC minutes recorded all of the
11  conversations that took place?
12  A. No.
13  Q. Why not?
14  A. It's my experience and understanding that committee
15  minutes generally do not record verbatim.
16  Q. What about important discussions concerning the
17  interpretation of the definition, would they be minuted?
18  A. I think the -- I would imagine the fact that there was
19  discussion would be minuted. If there were important
20  points raised, I would imagine they were minuted. If
21  there were actions, they would be minuted, but word by
22  word, no, that would not be minuted.
23  Q. Would you agree with the proposition that the
24  interpretation of the definition within the market was
25  sometimes quite different?

**Page 8**

1  A. You're asking me to speculate. I couldn't say. What
2  I could say is that at all times the BBA worked very
3  hard to ensure that the definition was made public. We
4  would answer questions about it. We published large
5  amounts of guidance and discussion around the definition
6  to try and make it as clear as possible to everybody
7  that what the definition was, what we were trying to
8  achieve.
9  Q. If the definition had the clarity that you suggest and
10  the interpretation of the definition was
11  straightforward, why during 2006 to 2010 was so much
12  clarification required about the definition?
13  A. Because the market that LIBOR seeks to measure changed
14  so utterly and so rapidly in a way that hadn't been seen
15  for generations.
16  Q. But the definition remained the same?
17  A. At its heart, yes.
18  Q. What does "at its heart" mean, Mr Ewan?
19  A. The definition is -- and I may be slightly paraphrasing
20  because I haven't used it for a while -- is the rate at
21  which you as a contributor bank could raise funds in
22  reasonable market size in the London market at
23  11 o'clock on a banking day. Now, that hasn't changed
24  and we -- the reason that that has not changed is
25  because throughout the period in question, whether by

2 (Pages 5 to 8)

Day 9                                    R v Hayes                                    8 June 2015

| | |
|---|---|
| **Page 9** | **Page 11** |

**Page 9**

1   formal or informal means, we were continually consulting
2   with the market to ask that question: do we need to
3   change the definition? We had that conversation with
4   participants, with users, with Central Banks, with the
5   UK financial regulator, with the American financial
6   regulator, the Swiss National Bank, as wide a group of
7   people as we could interest in the conversation, and
8   they said the definition should not change.
9   Q. Underlying the evidence that you have given however, and
10  we'll look at them now in a moment or two, you were
11  being constantly told about the way in which banks
12  approached the definition, weren't you?
13  A. I'm not sure I would go as far as continually, but
14  I will certainly accept that there was -- there was
15  questions about this throughout the period.
16  Q. Those questions illustrated a lack of consistency of
17  approach toward the definition, didn't they?
18  A. I think they took the form more of questions which was
19  when we have a liquid cash market and we know what our
20  borrowing costs are, because we use it and borrow from
21  it, there's no issue, but when that underlying market
22  doesn't exist, what do we do? I think that is a wholly
23  legitimate question which the BBA spent an awful lot of
24  energy trying to answer.
25  Q. Can I ask you about your three types of behaviour that

**Page 11**

1   like to know when did they come into existence?
2   A. 2014.
3   Q. Type 1 is, as you have described, behaviour where a bank
4   has not based its submission on the rate at which it can
5   borrow cash because there isn't cash, is that correct?
6   A. Yes.
7   Q. At which point the bank would use other related
8   information to try and submit a LIBOR rate. Is that an
9   accurate summary of type 1 activity?
10  A. I think the word perhaps missing there is "accurate".
11  Q. Right. Your evidence on Friday was as accurate
12  as you possibly can; all right?
13      Type 2, the jury have heard of low-balling. It's
14  the shorthand form for it but I just want to identify
15  with you again, before we look at some documentation,
16  what you regard type 2 as being: behaviour where a bank
17  works out what its cost of borrowing would be, so what
18  its LIBOR rate or submission should be, and then chooses
19  to put in a different number, almost always a lower
20  number, in order not to be seen as risky?
21  A. Yes. That will function as a definition of type 2 or
22  low-balling, call it what you will.
23  Q. Therefore, as the jury have heard, and I think you have
24  agreed, it is a submission of a rate to protect your
25  reputation within the market?

**Page 10**

1   you described on Friday.
2   A. Certainly.
3   Q. You have type 1, type 2 and type 3; yes?
4   A. Yes.
5   Q. My first question is: how were those types arrived at?
6   A. They were not current terms at the time. They were
7   loose categorisations that developed as I was answering
8   questions from the Serious Fraud Office about the period
9   in question and so they are, I think, useful ways of
10  thinking about what is going on. They don't have any
11  legal or formal status and they don't have hard
12  delineations, because they are not formal terms.
13  Q. So these are not types that you recognised at the time;
14  correct, in the formal labelling of type 1, 2 and 3?
15  A. Correct.
16  Q. Who devised the types? Was it you or was it someone
17  else?
18  A. I believe that the labels that you described, type 1,
19  type 2, type 3, were first suggested by one of the
20  lawyers for the British Bankers Association.
21  Q. So they're not your types, they're someone else's?
22  A. Well, in labelling them, so type 1, type 2, type 3, yes,
23  but I think I will say that I think they are useful ways
24  of thinking about it.
25  Q. I don't want to know what your lawyers said but I would

**Page 12**

1   A. Yes.
2   Q. It bears no relationship to the definition?
3   A. Correct.
4   Q. And, given that it is some significant way from the
5   range that one would submit for your LIBOR, it clearly
6   is in breach of the definition?
7   A. Well, the degree may or may not be significant. It's --
8   but, again, it brings us back to the spirit of the
9   definition.
10  Q. Well, I just wanted to clarify that with you because do
11  you suggest that low-balling fell within the spirit of
12  the definition?
13  A. No.
14  Q. That's what I assumed was your position but I wanted to
15  clarify it. Do you accept that there was low-balling in
16  the market at the time?
17  A. I think there was very strong evidence of that, yes.
18  Q. Because you said on Friday there was never actually any
19  smoking gun?
20  A. That's correct. I don't think I saw a smoking gun, but
21  I think we have -- I mean, we have seen throughout the
22  evidence that there have been strong suggestions that it
23  was happening, yes.
24  Q. I want to, if I may, ensure that your position is clear
25  to me so I understand it. At the time did you accept

3 (Pages 9 to 12)

| | |
|---|---|
| 1  that there was type 2 low-balling taking place? | 1  Q.  All right.  Type 3 you have defined as behaviour when |
| 2  **A.  No.  At the time I thought it was likely that it was** | 2  somebody takes a position, in very crude terms, bets on |
| 3  **happening, which is why I took action, but I don't think** | 3  an outcome which might be that LIBOR is going to go up |
| 4  **I ever had proof and indeed it would be very difficult** | 4  or it's going to go down and then they would seek to try |
| 5  **to produce absolute proof of that.** | 5  to get the LIBOR to move in that particular direction at |
| 6  Q.  Well, proof would require, wouldn't it, Mr Ewan, someone | 6  that particular time; correct? |
| 7  to take some investigative steps? | 7  **A.  Yes.** |
| 8  **A.  It could or proof could be a participant contacting me** | 8  Q.  We'll come back to the second part of that when we look |
| 9  **or somebody else at the British Bankers Association and** | 9  at some documents, but let's just split that, if we may. |
| 10  **saying, "I just borrowed money miles away from what** | 10  Someone takes a position, in very crude terms, bets on |
| 11  **I put in for my LIBOR submission this morning".** | 11  an outcome which might be that LIBOR is going to go up |
| 12  Q.  Or them contacting you and admitting that their LIBOR | 12  or it's going to go down.  Stop there for one moment. |
| 13  submission is not a true and accurate reflection of the | 13  Isn't that what traders do every single day? |
| 14  rate? | 14  **A.  Well, yes.** |
| 15  **A.  I think that would be -- well, it's not conclusive proof** | 15  Q.  So the issue really is if they seek within their ranges |
| 16  **because I haven't seen a trade ticket, but, yes, I mean,** | 16  to try to get LIBOR to move in a particular direction? |
| 17  **that would be, again, strong evidence that it's** | 17  **A.  Yes.** |
| 18  **happening.** | 18  Q.  That's the issue? |
| 19  Q.  Well if someone is going to contact you and say, "Our | 19  **A.  That's the problem.** |
| 20  LIBOR submissions are not accurate", why is that not | 20  Q.  As I understood your evidence on Friday, are you saying |
| 21  adequate proof? | 21  that you did not understand that type 3 behaviour was |
| 22  **A.  Because against the background there is no absolute way** | 22  taking place between 2006 and 2010? |
| 23  **of defining that because, as we've discussed, at times** | 23  **A.  I did not think it was taking place between 2006 and** |
| 24  **there is no cash market which is why we have the concept** | 24  **2010.** |
| 25  **of type 1 behaviour as well.  If you don't know -- if** | 25  Q.  So you saw no evidence that banks were fixing for reset |
| Page 13 | Page 15 |
| 1  **nobody knows what the cost of funds is because nobody is** | 1  positions? |
| 2  **lending and borrowing, how can you prove completely that** | 2  **A.  If I did, I didn't recognise it as such.** |
| 3  **it's the case?** | 3  Q.  Let's look at some documentation, please, together.  I'm |
| 4  Q.  Forgive me, Mr Ewan, but if a banker -- it doesn't | 4  hoping this is going to work in terms of references. |
| 5  matter where from -- calls you up and has identified | 5  Can we have a look at JEX/001.  This is the first panel |
| 6  that his LIBOR should be X but they have submitted Y, it | 6  review, I hope.  You looked at this on Friday, Mr Ewan. |
| 7  would be within his knowledge as to what his LIBOR | 7  We have a lot of documents to look at so I'm only going |
| 8  should have been, wouldn't it?  It's patently obvious | 8  to take you to certain sections.  If there's any section |
| 9  because he's just told you. | 9  that you feel you need to draw to our attention, please |
| 10  **A.  Right, but in the circumstances that we're talking about** | 10  do so.  Do you understand? |
| 11  **what was happening in the market was there was no cash** | 11  **A.  Yes.** |
| 12  **trading.  So I think a lot of the time a banker --** | 12  Q.  Can we start, please, at the third bullet point.  Let's |
| 13  **whatever he might have thought -- would not have known** | 13  set the context.  This is 2005.  Mr Merriman, I believe |
| 14  **because he would not be able to go into the market and** | 14  you said, was leading the panel review meetings, is that |
| 15  **say, "I would like to borrow $200 million, please" and** | 15  right? |
| 16  **find somebody that would lend to him.** | 16  **A.  Correct.** |
| 17  Q.  But, forgive me, Mr Ewan.  This is quite an important | 17  Q.  You had at that stage been at the BBA for a relatively |
| 18  point.  He's already gone through that process.  We'll | 18  short period of time? |
| 19  look at why and how they could calculate an implied rate | 19  **A.  I think about a month.** |
| 20  when we look at the documents.  That process has come | 20  Q.  So would you have been the scribe for this note? |
| 21  and it has gone.  He's saying to you, "My LIBOR should | 21  **A.  Probably.** |
| 22  be X but I've put in Y".  Why is that not conclusive | 22  Q.  Bullet point 3: |
| 23  proof? | 23  "There is consensus amongst the banks that sterling |
| 24  **A.  How would he -- I don't know how you would go about** | 24  LIBOR and US dollar are being set 3 to 4 basis points |
| 25  **doing that because I don't think that happened.** | 25  above the true cash rate.  There is a definitive split |
| Page 14 | Page 16 |

Merrill Corporation                www.merrillcorporation.com/mls                8th Floor, 165 Fleet Street
(+44) 207 404 1400                                                              London EC4A 2DY

Day 9                              R v Hayes                        8 June 2015

| | |
|---|---|
| 1   in how this is viewed. Those banks whose main business | 1   available. I want to ask you certain questions about |
| 2   is in derivatives or loans are perfectly happy with this | 2   certain extracts. Do you understand, Mr Ewan? |
| 3   as it's to their advantage. Those more active in the | 3   A. Yes. |
| 4   cash market regard this as a problem that must be | 4   Q. Paragraph 2: |
| 5   addressed. The third and easily largest group recognise | 5     "The pound and US dollar LIBOR are set 3 to 4 basis |
| 6   this effect but see it as a construct of the market and | 6   points too high each day. This is a major problem and |
| 7   are unconcerned about it." | 7   must be fixed. They submit their true rates each day |
| 8     My learned friend has a hard copy, like my Lord | 8   [that's Credit Suisse] and believe that most days they |
| 9   does. (Handed) | 9   are knocked out of the rate setting process in the |
| 10     Have you found the page, Mr Ewan? | 10   topping and tailing process as many other banks are |
| 11   A. Yes. | 11   contributing inflated rates." |
| 12   Q. LIBOR clearly was a benchmark that generated incomes for | 12     Inflated rates are not in accordance with the |
| 13   the banks. They used it internally, didn't they, within | 13   definition, are they, Mr Ewan? |
| 14   their treasury departments? | 14   A. They are not. |
| 15   A. Yes, I think some did. | 15   Q. Do you have a memory now about what was done to that |
| 16   Q. They all did, didn't they? | 16   piece of information? |
| 17   A. I don't know if I could go so far as to say that. | 17   A. I don't have a positive memory, but the purpose of these |
| 18   I know some did or some told me they did. | 18   relationship visits are to get market feedback to take |
| 19   Q. The importance in 2005 about the LIBOR rate is set out | 19   to the Foreign Exchange and Money Markets Committee. |
| 20   there because banks whose main business is in | 20   Q. Let's move on to paragraph 3: |
| 21   derivatives or loans are happy with it, to their | 21     "They advised us to collect all the individual rates |
| 22   advantage. "To their advantage" means they are making | 22   submitted each day and analyse these." |
| 23   money out of it; yes? | 23     Pausing there. 2006, was that done? |
| 24   A. That's certainly one reading of that. I must admit | 24   A. I think that's 2005. |
| 25   I don't have a recollection of precisely what I meant | 25   Q. Sorry, 2005. Was it done? |
| Page 17 | Page 19 |
| 1   when and if I wrote that. | 1   A. I don't recall. |
| 2   Q. We will see on a number of occasions this in the | 2   Q. Do you recall when the analysis of the rates was |
| 3   documents so let's deal with this now. The first | 3   introduced? |
| 4   sentence in that document talks about the consensus | 4   A. Perhaps 2007. |
| 5   amongst banks that the US dollar and sterling rates are | 5   Q. All right. Back to the document: |
| 6   being set 3 to 4 basis points above the true cash rate. | 6     "They accept that different banks have different |
| 7   Did you regard that at that stage as an issue of | 7   costs of capital but suspect certain banks may be |
| 8   accuracy? | 8   quoting high or low, depending on the shape of their |
| 9   A. I don't think at that point I was in a position to take | 9   book or loan portfolio at a given point in time." |
| 10   that view. I didn't have the experience or the | 10     What do you understand "shape of their book" to |
| 11   understanding to grasp what is meant. | 11   mean, Mr Ewan? |
| 12   Q. What about now? | 12   A. I now understand that to mean whether they are long or |
| 13   A. If I was still the secretary of the Foreign Exchange and | 13   short. |
| 14   Money Markets Committee and they still had | 14   Q. In their derivatives? |
| 15   responsibility for this, I would take that to them and | 15   A. Yes. |
| 16   attempt to have it addressed. | 16   Q. So you're clearly being told in 2005 that some banks are |
| 17   Q. So you would regard that as illustrating inaccurate | 17   suspected of quoting high or low depending on their |
| 18   information, according to the definition? | 18   derivatives book? |
| 19   A. Yes. | 19   A. Yes. |
| 20   Q. Thank you. If we scroll down the page, please, over the | 20   Q. Thank you. |
| 21   page, to Credit Suisse, so the jury can see that. Thank | 21   A. But, as I have said, I don't think I recognised that at |
| 22   you. Over your page, Mr Ewan. This is, just so the | 22   the time. |
| 23   jury understand, your visiting each of the banks. We | 23   Q. All right. Let's turn over the page, please, to HSBC. |
| 24   looked at it on Friday and, as I indicated, I'm only | 24   Given that you didn't recognise that, let's look at |
| 25   going to pull up certain things. The documents will be | 25   paragraph 2. They state that: |
| Page 18 | Page 20 |

Merrill Corporation                www.merrillcorporation.com/mls        8th Floor, 165 Fleet Street
(+44) 207 404 1400                                                       London EC4A 2DY

**Page 21**

1      "HSBC sets its position against cash each day.

2 There is no interaction between the cash team and the FX

3 or swaps team."

4      Pausing there. That would be in accordance with the

5 definition; correct?

6 A. Yes.

7 Q. "However, they suspect that certain nameless

8 contributors might be setting their rates with an eye on

9 their derivatives book."

10      Pausing there. I know it's a long time ago,

11 nameless, were they asked?

12 A. I don't recall.

13 Q. Well, I know it's you and Mr Merriman but I wanted to

14 understand that if someone is telling you then that

15 they're setting their rates or others are setting their

16 rates with an eye on their derivatives book, that,

17 I think on your account, is not in accordance with the

18 definition?

19 A. It's not.

20 Q. So one would have asked?

21 A. I don't recall. Its ten years ago.

22 Q. Because otherwise one is ignoring or not adhering to the

23 definition, isn't one, Mr Ewan?

24 A. All I can say is this is a very long time ago and

25    I might have been at the BBA for a fortnight or

**Page 22**

1    three weeks, perhaps, and wasn't in a position to form

2    that view.

3 Q. Shall we look over the page, please, at Morgan Chase,

4    paragraph 2:

5      "Pound and US dollar are higher than the true

6 position but everyone in the market knows this and

7 prices accordingly. They do not want the BBA to attempt

8 to 'correct' this."

9      Again, evidence of inaccuracy, is that right,

10 Mr Ewan?

11 A. Again, you are asking me the same question and I am

12    giving the same answer, which I don't recall the precise

13    instances and at the time I don't think I was in

14    a position to recognise the implications.

15 Q. What about now, the use of the word "correct"?

16 A. And, again, if I was the secretary of the Foreign

17    Exchange and Money Markets Committee and it was in

18    charge of setting LIBOR, I would take that to them.

19 Q. Below that:

20      "The cash market is shrinking. This is due to the

21 increasing use of derivatives. You can cover a 12-month

22 position with a lower capital requirement using

23 a derivative as opposed to a cash loan. They suspect

24 that certain banks that contribute to both EURIBOR and

25 BBA Euro LIBOR may be setting their euro rate at

**Page 23**

1 10 o'clock London time for EURIBOR, then contributing

2 the same rate one hour later to the BBA."

3      Now, I highlight that because I just wanted to ask

4 you: would that have been in accordance with the

5 definition or would that make it into the spirit of the

6 definition?

7 A. It would depend. Now, my recollection, and I wouldn't

8    want to absolutely vouch for this, but my recollection

9    was that at the time the definition of EURIBOR was quite

10    similar to the definition of LIBOR, except the question

11    being asked of the EURIBOR bank is not "at what rate can

12    you as a market participant borrow" but "can a prime

13    bank borrow".

14      Now, if you were a contributor to both and you

15    considered yourself to be a prime bank and you didn't

16    think that the market had moved between 10.00 am London

17    time and 11.00 am London time, that could be absolutely

18    fine.

19 Q. Can I ask you this: were EURIBOR transactional based

20 rates?

21 A. No. I mean, I wouldn't want to say 100 per cent because

22    I wasn't ever responsible for EURIBOR, but I believe no.

23 Q. Thank you, Mr Ewan. Shall we turn over the page,

24 please, to Bank of Tokyo, paragraph 3. He observed

25 that:

**Page 24**

1      "Sometimes LIBOR quotes are high because they are

2 set by the treasury function within the bank but then

3 goes on to use the LIBOR rate internally in the bank."

4      Pausing there. The function that I identified to

5 you; in other words, using LIBOR internally on

6 a treasury desk to generate income for the bank, do you

7 agree with that?

8      Let's read on to assist you:

9      "In these cases the treasury department can make

10 extra profit by charging other departments in the bank

11 itself at that artificial rate!"

12      Two things. I'll go back to my question. Treasury

13 were driving and increasing the amount of money as

14 described there, extra profit that they can generate

15 from the other departments within the bank. Do you

16 agree with that?

17 A. That's what the record says, yes.

18 Q. What do you say about the words "artificial rate!"?

19 A. Let's assume that it was me that wrote this note. It

20    indicates that I am surprised.

21 Q. Well, again, I'll come back to a theme. Would you or

22 Mr Merriman have asked for further details about those

23 banks for intelligence?

24 A. I don't recall whether Mr Merriman did. I don't think

25    I did.

6 (Pages 21 to 24)

Day 9                            R v Hayes                          8 June 2015

| | |
|---|---|
| 1 Q. Would you have taken notes other than these, other than | 1 A. I don't recall. |
| 2 what we're looking at here?  Would you have taken a note | 2 Q. Can we move, please, to JEX/002 which should be your |
| 3 of that meeting at the time? | 3 next document, Mr Ewan, in your bundle.  A year has gone |
| 4 **A. Well, I would have -- what I was in the habit of doing** | 4 by.  This is 2006.  Context.  Again, is Mr Merriman |
| 5 **was taking a notepad and making handwritten notes which** | 5 still in charge? |
| 6 **would -- I would then type up.  So in a way, yes, but** | 6 A. Yes. |
| 7 **that is the record of the meeting.** | 7 Q. Do you remember roughly when you took over from |
| 8 Q. So this is the product of your notes that we're now | 8 Mr Merriman? |
| 9 looking at? | 9 **A. I think Alex Merriman left the BBA on the turn of** |
| 10 **A. Yes.  I mean, I can't say whether that was -- well, as** | 10 **2007/2008, I think.** |
| 11 **I say, I don't remember whether that was what I did** | 11 Q. Can we just look briefly again at this document for one |
| 12 **in 2005, whether it was me.  It may well have been, but** | 12 or two other things.  Look at Citigroup, please, on that |
| 13 **certainly in general that is what I did.** | 13 first page.  We can do this quite quickly, I think. |
| 14 Q. Let's look at Citigroup, please, which is two or three | 14 Paragraph 2: |
| 15 pages on.  There's a different reason I want to look at | 15 "The rates are accurate and, what is more, |
| 16 this with you: | 16 consistent.  The Japanese rate is getting more |
| 17 "EURIBOR [paragraph 2] is preferred over BBA Euro | 17 accurate." |
| 18 LIBOR.  However, Euro LIBOR is used for pricing | 18 In other words, I suggest, Mr Ewan, the Japanese |
| 19 overnight for client call accounts.  There is less | 19 rate had not been accurate.  It's implicit, isn't it? |
| 20 credit discrimination between EURIBOR contributors than | 20 **A. It is implicit.** |
| 21 among sterling LIBOR contributors.  Therefore, the Euro | 21 Q. Do you agree with that? |
| 22 LIBOR rates are closer to the real rate.  Apparently the | 22 **A. I agree with that, yes.** |
| 23 Bank of Japan and the Ministry of Finance have made it | 23 Q. Had the BBA done anything about the yen rate in 2006? |
| 24 clear that they don't want to see negative BBA Yen LIBOR | 24 **A. I can't remember.** |
| 25 rates being set, even if this would be reflective of | 25 Q. Can we turn over the page, please, to the National |

Page 25                                                           Page 27

| | |
|---|---|
| 1 reality." | 1 Australian Bank.  1 and 2: |
| 2 I want to ask you two things about that.  What is | 2 "Fixings are good.  There used to be some dodgy |
| 3 a negative LIBOR rate?  We touched on negative interest | 3 LIBORs but they're not reliable.  Without wanting to |
| 4 rates. | 4 point fingers, NAB suspect that some contributors are |
| 5 **A. Well, there is no theoretical reason why a LIBOR rate** | 5 not sufficiently active in the cash markets to know |
| 6 **should not be negative.  It's entirely possible.** | 6 where the market is when they quote.  They jokingly |
| 7 **There's no constraint that says you have to post** | 7 suggest that these people ring ▮▮▮▮ ask where the |
| 8 **a positive rate.** | 8 market is and then submit that as a quote.  They accept |
| 9 Q. Thank you.  It follows, doesn't it, from what you've | 9 that these banks might be much more active in the swaps |
| 10 written there, that the Central Banks, in this instance | 10 market.  NB: selection for LIBOR panels is based on the |
| 11 the Bank of Japan, can have an input on to the rates | 11 ranking of cash activity plus 20 per cent of the swap |
| 12 that are being quoted by the banks?  Would you agree | 12 activity." |
| 13 with that proposition or not? | 13 The first sentence, "Not sufficiently active in the |
| 14 **A. That's what it says.** | 14 cash market to know where the market is when they |
| 15 Q. Thank you.  Over the page, please, to Banca Intesa. | 15 quote".  Would you regard that as an issue of accuracy, |
| 16 I just want to touch on this again, paragraph 2, the | 16 or not? |
| 17 second paragraph: | 17 **A. Yes.** |
| 18 "Some banks always quote high or low.  It's not | 18 Q. Thank you.  Calling an inter-dealer broker, ▮▮▮▮ and |
| 19 always possible to get a bank to deal at the price it | 19 using the figure quoted to them might or might not be |
| 20 quotes for the LIBOR setting process." | 20 a way in which you could submit your LIBOR, would you |
| 21 Is that again an issue of accuracy? | 21 agree with that? |
| 22 **A. It certainly could be.** | 22 **A. Yes, I would.** |
| 23 Q. Would you have asked for details of those banks that | 23 Q. It comes down to the submitter's personal opinion and |
| 24 were posting rates that were not, as you have recorded | 24 the response from ▮▮▮ in this illustration would have |
| 25 there, in accordance with their LIBORs? | 25 been market colour, would you accept that? |

Page 26                                                           Page 28

7 (Pages 25 to 28)

Day 9                                R v Hayes                         8 June 2015

| Page 29 | Page 31 |
|---|---|

**Page 29**

1  **A. Yes.**
2  Q. Thank you. JP Morgan, please, at the bottom of that
3    page. We can touch on this very quickly:
4    "They think the New Zealand dollar and to a lesser
5    extent the Australian dollar rates are based on FX
6    forward trading, rather than the cash market. Since
7    LIBOR is a measure of the price of borrowing funds, this
8    does not in fact dictate the price of borrowing in that
9    market. This is not an issue."
10    Now, in 2006, was your rate based on FX forward
11    trading permitted?
12  **A. If you're basing it solely on FX forwards, no.**
13  Q. It would not have been, on your account, in accordance
14    with the definition? It follows, doesn't it?
15  **A. Yes.**
16  Q. Would you agree?
17  **A. Yes.**
18  Q. What was done with that information?
19  **A. I don't remember.**
20  Q. Can we turn to the Bank of America, which is a few pages
21    on. Paragraph 2:
22    "The rate setting process is currently efficient.
23    Bank of America is often dropped from the US dollar at
24    fixings and one month and three month but this is
25    because they generate their LIBOR rates off the

**Page 30**

1    derivatives market which gives them a different
2    perspective to other banks."
3    Mr Chawla asked you about this on Friday. I think
4    your evidence is that the implied rate of funds from
5    derivative trading, is that right, Mr Ewan?
6  **A. Yes. We're now getting into the sphere of what we're**
7    **calling type 1 behaviour.**
8  Q. So this is type 1. To assist the jury, that is using
9    other sources of information for the implied rate value
10    of cash -- value of borrowing?
11  **A. Yes.**
12  Q. In 2006 was taking an implied rate off the derivatives
13    market in accordance with the definition?
14  **A. It would depend whether cash was available to you.**
15  Q. Let's come back to the question. In 2006 would the
16    implied rate be available to you from the derivatives
17    market? Would that have been in accordance with the
18    definition?
19  **A. Well, let's assume that the derivative markets are**
20    **always liquid so, yes, you could at any day work out**
21    **what your LIBOR is by using the rate that is implied by**
22    **the derivatives market. The point is that if you're**
23    **able to borrow cash, you should be using that because**
24    **that's what the definition says.**
25  Q. "Bank of America sets its rates 4 basis points above

**Page 31**

1    where they could raise funds which is the return they
2    need."
3    What did you understand by that phrase?
4  **A. That is quite clearly inconsistent with the definition**
5    **of LIBOR.**
6  Q. Thank you. What did you understand the phrase to mean?
7  **A. I don't know what I took that to mean at the time.**
8  Q. What do you take it to mean now?
9  **A. Now I take it to mean Bank of America is setting its**
10    **rates 4 basis point above where they should have been**
11    **submitting LIBOR.**
12  Q. It states, as we can all see, it set its basis points
13    above where they could raise funds. It's just not
14    accurate, is it?
15  **A. No.**
16  Q. And you're being told in 2006 that it's not accurate,
17    aren't you?
18  **A. Yes.**
19  Q. What did you do with that information?
20  **A. I can't remember.**
21  Q. Turn to the note:
22    "Should stabilise rates especially short-term rates.
23    This would make the Bank of America happy as stable
24    short-term rates will offer them certain trading
25    opportunities."

**Page 32**

1    What does that mean?
2  **A. Without much more information and context, I couldn't**
3    **say. It may be as simple as volatile markets mean that**
4    **you can lose a lot of money or a stable -- if you trade,**
5    **whereas if you have a reasonable expectation when**
6    **a market is going to be stable, you might be more keen**
7    **to take on trades because you don't think the market is**
8    **going to fall apart and you lose all of your money.**
9    **I don't know.**
10  Q. Does it mean, I suggest, that the bank could trade off
11    the curve?
12  **A. It's not -- there's no -- not enough context.**
13  Q. Well, was the context discussed?
14  **A. I can't remember.**
15  Q. Would you have noted the context anywhere else?
16  **A. I don't know.**
17  Q. Let's move to Credit Suisse, just below, please. I want
18    to just touch on this for a single issue. At the bottom
19    of paragraph 2:
20    "The BBA noted that Reuters are now analysing the
21    contributions each day and compiling lists of who quotes
22    high, low, erratically."
23    Now, that is in May 2006. I'm assuming, Mr Ewan, as
24    you have noted it, that was taking place?
25  **A. Yes.**

8 (Pages 29 to 32)

Day 9                                R v Hayes                            8 June 2015

| | |
|---|---|
| 1  Q.  You would have taken − that would have taken place, as | 1   as the submitter honestly submits what they believe to |
| 2    you've noted there, through Reuters? | 2   be in their opinion the true rate, it would have been |
| 3  A.  Yes. | 3   a proper submission? |
| 4  Q.  In the event of high, low or erratic quotes, what would | 4  A.  Well, yes, so long as they haven't dealt in cash at |
| 5    have happened? | 5   a different rate.  Yes, that's the key. |
| 6  A.  Well, the information would have been compiled for the | 6  Q.  Well, it's quite a fundamental point.  Even if they have |
| 7    benefit of the Foreign Exchange and Money Markets | 7   dealt at a different rate, it wouldn't |
| 8    Committee to take what action they saw fit. | 8   automatically affect their submission, would it?  It |
| 9  Q.  Can we go, please, to Deutsche Bank, over the page, | 9   might, depending on how far it was away from the |
| 10    paragraph 2, the middle of that − | 10   submission. |
| 11      "Sees the market as more volatile in the last year | 11  A.  So I think -- if you have dealt in cash in a manner that |
| 12    than previously but unsecured bank funding rates are | 12   fits the LIBOR definition, i.e. in reasonable size via |
| 13    nevertheless closer to LIBOR rates.  The rate setting | 13   the London Market at or about 11 o'clock in the morning, |
| 14    process is okay and no banks try to skew it." | 14   that should be your LIBOR rate.  There should be no |
| 15      Pausing there.  Does that imply that banks had tried | 15   reason to apply any other thinking to it.  There are |
| 16    to skew it beforehand? | 16   a number of reasons why you might trade cash and it not |
| 17  A.  I don't -- on the face of it, that's just an | 17   be reflective of your LIBOR rate.  You could be dealing, |
| 18    observation. | 18   for example, in extremely large or extremely small size. |
| 19  Q.  "Need to watch the yen rates.  Bank of Japan ..." | 19   You could be dealing through another market.  You could |
| 20      Would you agree with that? | 20   be dealing at a different time of day and the market's |
| 21  A.  Yes. | 21   moved. |
| 22  Q.  "Bank of Japan announcements are having profound effects | 22      Now, all of those are reasons why a cash trade might |
| 23    at the moment." | 23   not be the same as your LIBOR rate, but if you have just |
| 24      This was in May 2006.  Do you remember what those | 24   traded something that fits the definition of -- fits the |
| 25    announcements were? | 25   definition of LIBOR, that should be what you should put |

Page 33                                                         Page 35

| | |
|---|---|
| 1  A.  I don't. | 1   in. |
| 2  Q.  But clearly if we're talking in LIBOR terms, its | 2  Q.  I think we agree it's a subjective assessment, however, |
| 3    profound effects on the value of cash? | 3   of your rate.  It's not transactional based, is it? |
| 4  A.  Yes, because fundamentally one of the things that | 4  A.  It's not transactional based, but you are asked the |
| 5    Central Banks do is put up or drop base interest rates | 5   question: what would be your cost of funds if you took |
| 6    which immediately feed through to LIBOR.  So you would | 6   this action, which is borrow money in the London Market |
| 7    fully expect if the Bank of Japan said, "Today interest | 7   at 11 o'clock in reasonable size?  Now, it therefore |
| 8    rates go up by 1 per cent", you would expect LIBORs to | 8   very clearly follows if you have done that, dealt in |
| 9    follow immediately. | 9   that manner, in that market, at that time, in that size, |
| 10  Q.  Well, look at the next sentence: | 10   that's your LIBOR rate.  I think that's very clear.  We |
| 11      "BBA LIBOR setting doesn't always react fast enough | 11   would not need to use any other form of indication. |
| 12    to events in the market, eg Fed rate changes.  DB create | 12  Q.  Thank you.  Can we turn to Barclays in that document, |
| 13    their LIBOR rates referencing the derivatives markets as | 13   please.  I just wanted to touch on paragraph 4: |
| 14    cash isn't liquid or transparent enough." | 14      "It is the early days yet but the reforms working at |
| 15      So clearly Deutsche are telling you that they create | 15   the moment.  We noted that there is a trend to increase |
| 16    their LIBORs for implied funding off of the derivatives | 16   the amount of business off-balance sheet, as opposed to |
| 17    that they are using.  Do you agree with that? | 17   on but there will always be a cash market." |
| 18  A.  Yes. | 18      I want to ask you two things about that.  The |
| 19  Q.  I think you have agreed that that is consistent, is it, | 19   reference to "business off-balance sheet" is a reference |
| 20    with the definition in 2006? | 20   to what? |
| 21  A.  It can be.  It depends upon their intent.  If they're | 21  A.  Well, without a great deal more context, I wouldn't |
| 22    using these rates to fairly and accurately try and work | 22   know, but I think one definition -- one interpretation |
| 23    out what their true cash rate would be, there's no | 23   of what Barclays are saying there is that trading cash |
| 24    problem with that. | 24   is on balance sheet, trading derivatives is off-balance |
| 25  Q.  The key, Mr Ewan, I think, is right, isn't it?  As long | 25   sheet. |

Page 34                                                         Page 36

9 (Pages 33 to 36)

1   Q.  Mr Chawla makes it clear, and I want to make it clear to
2       you, question 4 may not relate to LIBOR.  So if you look
3       at the --
4   A.  Yes.  This is, if I recall, a reference to sterling
5       money market reform.
6   Q.  Thank you.  I won't press that.  Bank of Canada below
7       that.  You can see that for yourself:
8           "US dollar LIBOR is getting very close to the actual
9       funding rate and LIBOR LIBID spread has virtually
10      disappeared."
11          What is LIBID?
12  A.  LIBOR is an offered rate, the rate at which -- let's
13      assume I'm a contributor bank, it's the rate at which
14      money is offered to me.  LIBID would be the rate at
15      which I would offer money and LIBID was never -- it was
16      not a formal product.  It wasn't something that the BBA
17      created.  It was a notional idea that certain people in
18      the market came up with.  It's not really something that
19      I could offer a great deal of information around because
20      it wasn't something the BBA ever --
21  Q.  "... getting very close to the actual funding rate ..."
22          Do we read that therefore again as an issue of
23      accuracy, as we have discussed already?
24  A.  Yes.
25  Q.  So it's implicit it hadn't been accurate, would you

1   constricting quite significantly, hence pricing off
2   derivatives, so on and so forth?
3   A.  I think it's fair to say that for a long time before the
4       period that we're considering there had been a general
5       decrease in liquidity.  I don't know if I could say
6       exactly when it became a big problem, but it was
7       certainly 2006, 2007, yes.
8   Q.  Thank you.  If we turn over the page to Bank of Tokyo,
9       please.  I want to just reference this for something
10      else, please.  3:
11          "The yen money market has not settled down following
12      the increase of rates by the Bank of Japan.  Volatility
13      is still very high."
14          The Japanese market in 2006 went through quite
15      a significant amount of transformation, didn't it, in
16      terms of interest rates?  Do you remember that?
17  A.  I don't recall it, but from context it seems to say, the
18      first line of 3 "increasing rates by the Bank of Japan",
19      so, yes, let's assume that's the case.
20  Q.  Thank you.  Just bear with me for one moment.  (Pause)
21          If we turn now, please, to JEX/003.  22 June 2006.
22      The BBA LIBOR steering group, is that a subdivision of
23      the FXMMC or was that the FXMMC in effect?
24  A.  It was a junior committee and its membership overlapped
25      with the Foreign Exchange and Money Markets Committee

1       agree with that?
2   A.  There are a number of readings of that.  It could be
3       that guy at the Royal Bank of Canada is saying that
4       dollar LIBOR is getting very close to his funding rate,
5       his personal funding rate, which he might regards being
6       a good thing.
7   Q.  Move down the page to West LB, please, over the page.
8       I just want to touch on this for one very brief point
9       because it's an early reference.  Paragraph 4.
10      I appreciate it's not LIBOR related, but there is
11      a reference that says:
12          "... led to liquidity drying up slightly."
13          Is that generally in the market or does that relate
14      to the matters that paragraph 4 was addressing?
15  A.  I'm sorry, could you repeat or rephrase that?
16  Q.  Yes.  Where it says:
17          "... led to liquidity drying up slightly."
18          Is that an issue that paragraph 4 was addressing
19      specifically or was that more general observation about
20      the state of the market?  I'm going to suggest, Mr Ewan,
21      the market, the cash market, had been for a number of
22      years drying up.  Would you agree with that?  Maybe
23      that's the easiest way to --
24  A.  Yes, I would agree with that.
25  Q.  In 2006, where we are, you're beginning to see it

1   but it wasn't identical.
2   Q.  What was its purpose?
3   A.  Its purpose was to -- every year we did a review of the
4       contributor banks for LIBOR and that review was based on
5       information submitted by the banks.  The steering group
6       would meet in the morning and would read through the
7       review in detail and make preliminary recommendations
8       that would then be taken to the Foreign Exchange and
9       Money Markets Committee, which would typically meet in
10      the afternoon, and they would consider the
11      recommendations from the junior group.
12  Q.  I want to just ask you about paragraph 7 in that note,
13      please, under, "Any other business".  The rest is
14      talking about arrangements:
15          "Members requested more information in future on
16      late contributions to the rate setting process, an
17      analysis of which banks are regularly eliminated from
18      the rate setting process.  The analysis should also show
19      how far from the eventual rate each contributor is.
20      John Ewan confirmed that Reuters had recently introduced
21      software that can do this and so next year this
22      information will be made available to committee members.
23      Members requested that next year as an agenda item
24      to review the definition of LIBOR in order to ensure
25      it's still relevant."

**Page 41**

1      I wanted to just refer this, Mr Ewan, to this
2  extent: the information, would you supply in 2006, which
3  is the year we're in, the data from Reuters to this
4  committee that sets out those that have been eliminated
5  from the rate regularly and would that have been the
6  subject of some investigation?
7  **A.  Yes, but let's just think about what being eliminated**
8  **from the rate means because the LIBOR panel seeks to**
9  **ensure that the biggest, strongest banks are**
10 **contributing to LIBOR and that happens via this review**
11 **process.  Now, nevertheless let's look at the dollar**
12 **panel.  There are 16 banks on the dollar panel.  One of**
13 **those is going to be the strongest bank and then there**
14 **will be a range down to the sixteenth bank which will be**
15 **the least strong bank.  So the strongest bank will be**
16 **able to borrow at the best rate and then you'll see**
17 **rates will differ.  So if the best bank can borrow at**
18 **5 per cent, maybe the next one borrows at 5.01 per cent,**
19 **5.02.  Now four of those banks are going to get knocked**
20 **out at the bottom and four are going to get knocked out**
21 **at the top.**
22     **It follows that the best bank gets knocked out every**
23 **day because they have the ability to borrow at the best**
24 **rate.  So the mere fact that you're being eliminated**
25 **regularly doesn't mean that there's a problem.  It in**

**Page 42**

1  **fact shows that the rate is working properly.**
2  Q.  The key I really wanted to establish, Mr Ewan -- thank
3  you for your evidence -- was that by 2006 the BBA had
4  introduced data tools that were effectively
5  analysing where and who were setting what rates?
6  **A.  Yes.**
7  Q.  If there were any irregularities, if there were
8  irregularities, those would be drawn to the attention of
9  whoever, the FXMMC or you in the first instance?
10 **A.  Yes.**
11 Q.  Can we move now, please, to JEX/004.  One of the first
12 questions I'm going to ask you, because this may be
13 slightly out of context, Mr Ewan, it's dated
14 9 March 2007 but I want you to look at the content of it
15 and I want to know whether the dat e has been
16 Americanised?
17 **A.  You mean it's actually 3 September, rather than 9 March?**
18 Q.  Yes.  To assist you -- and I'm sure I'll be forgiven for
19 saying -- I don't think any of the other BBA e-mails do
20 that, but I just want you to look at the context of this
21 because we may need to come back to it later
22 chronologically.  Does the content assist you, in
23 particular if you look at the penultimate paragraph
24 about a Bloomberg story?  Do you have any recollection
25 now?

**Page 43**

1  **A.  Of what precisely?**
2  Q.  Well, do you think it is in March or do you think it's
3  in September?  I know it's a difficult question.  My
4  learned friend thinks it's September, in which case
5  we'll take that down and come back to it at the
6  appropriate point in time.
7      Can we have JEX/005, please.  This is 2007.  Again,
8  these are now the notes of your meetings again that
9  we've looked at, so we've done 2005, 2006 and this is
10 now 2007; all right?
11 **A.  Hmm, hmm.**
12 Q.  By this stage were you the lead individual?
13 **A.  I couldn't say for sure.  Up until the point when he**
14 **left the BBA, Alex Merriman was my manager so he was**
15 **more senior.  I can't remember whether these were**
16 **meetings that I did alone or with Alex.  I don't -- I'm**
17 **afraid I couldn't say.**
18 Q.  I only want to touch on a couple of these.  If we turn
19 to -- I think it's Bank of Tokyo which is internal
20 page 6.  Would you have taken these notes, even if you
21 were the lead, and would you then have had admin
22 support?
23 **A.  I cannot remember.  No, I am sorry, I can't remember.**
24 Q.  Someone -- in any event, you would have been on these
25 meetings?

**Page 44**

1  **A.  Yes.**
2  Q.  Thank you:
3      "Although for the last 7 or 8 years the Japanese
4  market has been quite static, the last year has seen an
5  increase in both interest rate and market activity.
6  Accordingly, this has increased liquidity which has
7  allowed contributors to give a more accurate LIBOR
8  fixing that is tied closer to the market."
9      Two issues.  The first is the economic activity that
10 you have noted, do you remember what that concerned
11 in 2007 for the yen market?
12 **A.  I don't recall, but from context the bank seems to be**
13 **saying that interest rates have gone up and also market**
14 **activity has gone up.  There is more cash being traded.**
15 Q.  The second is another issue of accuracy, would you
16 agree?
17 **A.  Well, I think the reading I would offer of that is LIBOR**
18 **is a cash rate.  We've already gone over many times what**
19 **the definition is and it -- LIBORs must be more accurate**
20 **when they are being set by reference to a liquid cash**
21 **market, rather than by doing your best to try and arrive**
22 **at an honest rate by using implied data.**
23 Q.  Someone has noted the following:
24      "... to give a more accurate LIBOR fixing ..."
25 **A.  And qualified it:**

11 (Pages 41 to 44)

| | |
|---|---|
| 1    "... that is tied closer to the market." | 1    "Mentioned that occasionally groups of banks seem to |
| 2  Q. It implies, doesn't it, Mr Ewan, that the LIBOR fixing | 2    simultaneously quote higher than the actual market |
| 3    had not been as accurate? | 3    resulting an excessively high LIBOR which doesn't |
| 4  **A. No, I don't accept that.** | 4    accurately represent the market." |
| 5  Q. Do you not accept this one because by 2007 you are, if | 5    Clearly, I suggest, an issue of accuracy. Would you |
| 6    I may suggest, in the front seat? You accepted it | 6    agree? |
| 7    for 2005. You accepted it for 2006. | 7  **A. Yes.** |
| 8  **A. I don't think that's relevant. You have asked me what** | 8  Q. What did you do about it? My learned friend asks me to |
| 9    **I interpret this statement to mean and I have offered** | 9    put it in context and I'm happy to do that: |
| 10    **you what I think it means.** | 10    "Happy with fixing process and its fixings broadly |
| 11  Q. Can we look at HSBC, which is internal page 7. | 11    speaking. Mentioned that occasionally a group of banks |
| 12    Jon Wood, who is the person that you were speaking to, | 12    seem to simultaneously quote higher than the actual |
| 13    he was to become chair of the FXMMC, wasn't he? | 13    market resulting in excessively high LIBOR which doesn't |
| 14  **A. Yes.** | 14    accurately represent market." |
| 15  Q. After Mr Storey, I think you said? | 15    That's my question, Mr Ewan. Clearly an issue of |
| 16  **A. Correct.** | 16    accuracy? You have agreed. |
| 17  Q. "Very happy with LIBOR in general in terms of the | 17  **A. Yes.** |
| 18    product and the processes behind it. Happy that all of | 18  Q. My question: what did you do about it? |
| 19    the contributors seem to be behaving themselves in terms | 19  **A. I presented this paper to the Foreign Exchange and Money** |
| 20    of not quoting excessively high or low." | 20    **Markets Committee.** |
| 21    Had contributors not been "behaving" themselves? | 21  Q. What did they do about it? |
| 22  **A. Well, you have taken me through a number of documents** | 22  **A. I can't remember. I mean, can we just look at it again?** |
| 23    **that certainly, with the benefit of more experience and** | 23    **For a bit of context we have, I think, just looking very** |
| 24    **hindsight, indicates that they weren't.** | 24    **roughly here, perhaps 15 or 20 banks all saying they're** |
| 25  Q. Well, you had been in your job now for well over | 25    **happy with the process and the way that the rates fix.** |
| Page 45 | Page 47 |

| | |
|---|---|
| 1    12 months and I'm assuming -- using the vernacular -- | 1    **Now, it's to the Foreign Exchange and Money Markets** |
| 2    you had got your feet under the table; yes? | 2    **Committee's decision as to what to do, but it would** |
| 3  **A. Yes.** | 3    **appear that most of the users don't have a problem.** |
| 4  Q. You understood what your role was? | 4  Q. Let's come on to another user in that document, |
| 5  **A. Yes.** | 5    Barclays. Miles Storey, who was to become, I think, the |
| 6  Q. You understood what your responsibilities were? | 6    first chair of the FXMMC, is that right? |
| 7  **A. Yes.** | 7  **A. Yes, that's correct.** |
| 8  Q. Jon Wood was, shall we say, an individual who was to | 8  Q. He wasn't chair at this stage, was he, or when did he |
| 9    become the chair of the FXMMC, someone that you, as | 9    take his Chairmanship up? We may be able to reference |
| 10    we'll see, would speak to on a regular basis? | 10    that in another document, Mr Ewan. |
| 11  **A. That's correct.** | 11  **A. I am sorry, I can't remember.** |
| 12  Q. Did you ask him to elaborate on what he meant by | 12  Q. "Miles was happy with the process in the BBA LIBOR |
| 13    "contributors seem to be behaving themselves"? Was any | 13    fixings. Looking from a position with vast experience |
| 14    detail put to this? | 14    of dealing with LIBOR, Miles commented that it is |
| 15  **A. I can't remember.** | 15    currently at its peak performance. Although it isn't |
| 16  Q. Because it wouldn't be in accordance with the | 16    perfect, it's probably running as near to perfect as it |
| 17    definition, would it? | 17    will reach. The rumblings from other banks regarding |
| 18  **A. What, if they were behaving themselves?** | 18    Barclays' manipulation of the rates seems to have now |
| 19  Q. If they were not behaving themselves? | 19    subsided. Miles mentioned that it was not be feasible |
| 20  **A. If they were not behaving themselves, it would not be in** | 20    for Barclays to be involved in a conspiracy with |
| 21    **accordance with the definition.** | 21    a number of other banks that would be required in order |
| 22  Q. It would be ignoring it or not adhering to it, wouldn't | 22    to manipulate the rates with the currencies that have 16 |
| 23    it? | 23    contributors." |
| 24  **A. It would.** | 24    What was that a reference to? |
| 25  Q. Abbey, below that, please: | 25  **A. I don't recall what the specific -- what, if any, there** |
| Page 46 | Page 48 |

Merrill Corporation        www.merrillcorporation.com/mls        8th Floor, 165 Fleet Street
(+44) 207 404 1400                                                 London EC4A 2DY

1      was a specific reference to there.
2    Q. Over the page, please, Credit Suisse. The context, to
3      put it accurately:
4        "LIBOR is currently the best it has ever been in
5      terms of process efficiency and accuracy. Euro LIBOR
6      fully represents the market. Whereas the US dollar and
7      GB pound tend to be around 3 to 4 basis points or ticks
8      over, everyone active in the market expects and
9      understands this. That still doesn't provide an
10     acceptable explanation of why this is."
11     I want to go down -- let's read it in total:
12       "There is an issue with trading volumes. Euro is
13     most accurate and the markets are very liquid. The
14     dollar and pound are liquid but not to such an extent so
15     it's hard to provide an offered rate in those
16     currencies. It was implied that it is in the interests
17     of most of the contributors to set there contributed
18     rates at a few points higher. This is because it makes
19     their loan book a bit more profitable."
20      Two issues. Setting your contributed rates a few
21     points higher would not be in accordance with
22     definition, would it?
23    A. No.
24    Q. "Loan book more profitable" is a reference to what?
25    **A. Well, the loan book is the sum total of all of the**

                       Page 49

1     **makes it completely clear who should be submitting, what**
2     **their role should be and how they should go about doing**
3     **that.**
4    Q. Pause there, Mr Ewan. My last question before I ask his
5     Lordship for an adjournment. You knew throughout,
6     despite the clarity that you have just mentioned, that
7     submitters were also traders?
8    **A. Well, hold on, trading what?**
9    Q. Well, submitting wasn't their only role within the bank,
10     was it?
11    **A. No, that's correct. The banks didn't have a person**
12     **whose only job was at 11 o'clock in the morning to put**
13     **in LIBORs every day.**
14    Q. No. So they would be doing income generation in other
15     areas for the bank?
16    **A. What do you mean by "other areas"?**
17    Q. Trading, working on the cash desk, trading cash
18     necessarily sometimes.
19    **A. Well --**
20    Q. It doesn't really matter, but they would be trading,
21     generating an income for the bank?
22    **A. Our view was that, yes, the point of a bank treasury**
23     **function is to borrow and lend money. The guys that are**
24     **borrowing and lending the money must be the people who**
25     **clearly know what the cost of funds to the bank are.**

                       Page 51

1     lending that the bank is carrying out.
2    Q. In other words, are the banks suggesting to you that
3     their LIBORs are being used for commercial purposes?
4    **A. Yes.**
5    Q. I just want to touch on another issue towards the bottom
6     of the note.
7       "A point was raised regarding who it is at the
8     contributor banks that actually inputs the rates.
9       "Issues of currency expertise and how junior or
10     senior the person is.
11       "It is vital that the role of contributor is taken
12     very seriously."
13       What do those three bullet points mean?
14    **A. Well, it looks like, and I don't recall this**
15     **conversation, but it looks like Credit Suisse are asking**
16     **for clarification about who should input the rates, how**
17     **much expertise they should have, how senior they are and**
18     **stating that it is important that contributors take**
19     **their role seriously.**
20    Q. Was there some discussion about conflicts between
21     submitters and traders?
22    **A. There may have been, I cannot recall, but this looks**
23     **like it's the -- perhaps the first -- the genesis of the**
24     **BBA's actions later, when the BBA -- the Foreign**
25     **Exchange and Money Market Committee, rather, actually**

                       Page 50

1     **Therefore, they are the best person to be submitting**
2     **LIBOR, or their manager is or whatever, but it shouldn't**
3     **be somebody trading derivatives.**
4    MR HAWES: We'll come back to that after, subject to your
5     Lordship, a short adjournment.
6    MR JUSTICE COOKE: Yes. Ten minutes, please, members of the
7     jury.
8    (11.48 am)
9        (Short break)
10    (12.05 pm)
11    MR HAWES: Mr Ewan, we'll just finish off that document that
12     we had open. Can we have internal page 10, please,
13     JP Morgan. Very quick reference, just that top line:
14       "BBA LIBOR seems to be running smoothly without any
15     signs of manipulation."
16      It's implicit, Mr Ewan, isn't it, that therefore
17     there's an acceptance that there could have been
18     manipulation?
19    **A. Are you -- is the question about theory or practice?**
20    Q. Practice. We have looked at 2005. We have looked
21     at 2006. Reference to earlier manipulation:
22       "BBA LIBOR seems to be running smoothly without any
23     signs of manipulation."
24      It's a strange thing to note, if it's not practice,
25     isn't it?

                       Page 52

                       13 (Pages 49 to 52)

**Page 53**

1  A. I can only take that on its face value. It says:
2     "BBA LIBOR seems to be running smoothly and it's not
3     being manipulated."
4  Q. Over the page, internal page 11, please. Lloyds, very
5     quickly:
6     "LIBOR running to satisfaction with a lower level of
7     complaints and rumblings than there previously was."
8     Complaints and rumblings, do you remember what those
9     concerned?
10 A. No, I can't.
11 Q. Did they concern accuracy?
12 A. Possibly.
13 Q. Did they concern manipulation?
14 A. I don't know.
15 Q. Over the page, please, internal page 12, Royal Bank of
16    Scotland. Towards the bottom there:
17    "We also see no changes in the dollar LIBOR due to
18    market laziness. Rate setters are comfortable with the
19    current levels. Rate setters are obviously setting to
20    suit their underlying positions to some extent. If
21    they're long, they will set below. If they're being
22    aggressive, they will set above."
23    "Underlying positions", what does that mean?
24 A. That would appear to be a reference to what we discussed
25    before as being the shape of their book, whether they

**Page 55**

1     so the Foreign Exchange and Money Markets Committee or
2     perhaps the BBA in the name of the Foreign Exchange and
3     Money Markets Committee wrote to all of the contributor
4     banks and said, "Will you please contribute accurately
5     according to the definition. Here's the definition".
6     Later that year the chief executive of the BBA
7     convened a meeting of all of the panel banks and asked
8     them to contribute accurately. I think around then, or
9     perhaps slightly later, the chief executive of the BBA
10    wrote to the chief executive officers of all of the
11    contributing banks and said, "Here is the definition.
12    Please contribute accurately. It will be damaging if
13    that's not happening".
14 Q. Well, we'll come on to that chronology because there's
15    documents around that time and I accept what you say
16    that those events took place. I'm not saying they
17    didn't.
18 A. Hmm, hmm.
19 Q. I am trying to understand and help the jury understand
20    that, whilst those events took place, other events were
21    also taking place and the BBA were being told about
22    those events; all right? That's what I want to question
23    you about. Do you understand?
24 A. Yes.
25 Q. I mean, would you agree -- let's deal with it in one

**Page 54**

1     are long or short.
2  Q. So you're being told that they're setting it
3     commercially for their profit?
4  A. Well --
5  Q. Well you are, aren't you, Mr Ewan?
6  A. The thing is it goes on to say:
7     "It would not be feasible for banks to manipulate.
8     The process is transparent and if someone was
9     continually manipulating the rate, we would see a lot of
10    protests."
11 Q. Yes. I'm asking you about the top section first. Are
12    they telling you that they're setting their LIBORs
13    commercially?
14 A. To some extent, yes.
15 Q. To what extent?
16 A. Well, no, to some extent is they are being set
17    commercially to some extent is what we're being told --
18    I am being told.
19 Q. Is that in accordance with the definition?
20 A. No.
21 Q. What, if anything, did the FXMMC do about that?
22 A. Well, in -- where are we? We're in June 2007.
23    Throughout 2007, the later part of 2007, I think if we
24    were to look at the documents we would find there were
25    more concerns raised about the accuracy of the rates and

**Page 56**

1     fell swoop -- the only governance at this stage that the
2     BBA and the FXMMC had was twofold: you could tell off
3     a panel bank about their contributions if you thought
4     that they were not correct?
5  A. Yes.
6  Q. And you could take them off the panel?
7  A. Correct.
8  Q. There was no other form of discipline at all?
9  A. Not that we could think of.
10 Q. Well, there was no other form of discipline at all?
11    There was none provided for within the terms of
12    reference, was there?
13 A. I think that's what I'm saying. We couldn't come up
14    with anything else that we could do.
15 Q. In that period of time were any panel banks removed due
16    to inaccurate submissions?
17 A. No.
18 Q. Were any panel banks removed at all between 2006 to 2010
19    for the purposes of discipline?
20 A. No.
21 Q. I wonder if we can move, please, to JEX/006, please. If
22    we go to the very bottom of that e-mail, please. I just
23    want you to see, Mr Ewan, so you have a reference --
24    I know you have it in front of you but the chain starts
25    at the bottom; okay?

**Page 57**

1   **A. We're looking at e-mails on --**
2   Q. 26 September at 9.42.
3   **A. Yes, got you.**
4   Q. Do you have it?
5   **A. Yes.**
6   Q. The jury saw on Monday, I think, either through you or
7     Ms Scutt, the FT article. I'm not going to show it to
8     you. The jury have seen it. You're aware of it, aren't
9     you?
10   **A. Yes.**
11   Q. This is an e-mail chain that starts as a result of that
12     so you're e-mailing. Who are the individuals there?
13     Are they the members of the FXMMC?
14   **A. Yes.**
15   Q. "All, we intend to produce a rebuttal of this unhelpful
16     article. We weren't offered any opportunity to comment
17     ahead of publication, although on the bright side it's
18     nice to finally see the FT acknowledge that the product
19     is BBA LIBOR, rather than some random rate that
20     magically appears in the market."
21     I only draw your attention to that because that's
22     how this e-mail chain starts; all right?
23   **A. Hmm, hmm.**
24   Q. I would like you to scroll up, please, to the e-mail
25     from Mr Thomasson, back to you at 12.16 that day. He

**Page 58**

1     was working obviously for RBS and he was a member of the
2     FXMMC?
3   **A. I can't remember if he was at the time. I think -- no,**
4     **I couldn't say for sure, but I'm certain that he had**
5     **involvement with the committee. He was aware of the**
6     **committee and he worked -- if he wasn't RBS's member, he**
7     **worked with for the BS's member in his office.**
8   Q. Thank you. He write:
9     "John, with reference to yesterday's FT article and
10     subsequent comment, I think you need to investigate some
11     of the US dollar three month LIBOR fixings submitted
12     today. Three month dates now maturing in two hours of
13     the date. One would expect the rate to have firmed to
14     take account of the year-end turn. Most contributors
15     accordingly fixed higher than yesterday with three
16     notable exceptions. These fixings do not reflect
17     activity in the cash market and do little to enhance the
18     credibility of the London fix.
19     "Regards, Mark."
20     Can we scroll up. Your response:
21     "Mark, I had a look at the underlying data and
22     I agree that there is certainly a wider spread than one
23     would normally expect to see in normal market
24     conditions, although a 12 basis point spread between
25     contributors has been common lately. I will however

**Page 59**

1     contact the banks you mentioned and ask them for their
2     reasoning as to why they contributed as they did.
3     I don't believe the credibility of the fix should be
4     damaged. We top and tail the data as part of the rate
5     fixing process for exactly circumstances like these. As
6     an illustration of this, if each of the three lowest
7     quoting banks today have quoted the same rate as RBS,
8     the effect on the fixing would have been less than
9     1 basis point."
10     Now, I read those both together, Mr Ewan, so you
11     have the proper context. Mr Thomasson is giving you
12     information that he's asking you to investigate, would
13     you agree?
14   **A. Yes.**
15   Q. As a result of your e-mail, you say that you're going to
16     contact the banks and make those enquiries. Did you?
17   **A. I can't remember, but I see no reason why I would not**
18     **have done. I state an intention.**
19   Q. Where would you have noted those enquiries?
20   **A. Probably in my handwritten notebook.**
21   Q. You would have made a note at the time of the enquiries
22     that you had made?
23   **A. I can't say I did that with every enquiry, but it was**
24     **certainly my habit to do so so I had an aide memoire so**
25     **I could take it to the Foreign Exchange and Money**

**Page 60**

1   **Markets Committee.**
2   Q. I was going to ask you about that. So there was ever
3     a filter process by you about what you would or wouldn't
4     take to the FX Committee?
5   **A. Yes.**
6   Q. What would make it to the FX Committee?
7   **A. If I asked a bank, "Why did you do this?" and they gave**
8     **me an explanation that I found unconvincing, I would**
9     **then take it to the Foreign Exchange and Money Markets**
10     **Committee or at least call the Chairman and say, "Look,**
11     **this bank's told me this. Does that sound fair to you?"**
12   Q. So there would be a record somewhere of your
13     communication, firstly, to the banks concerned here?
14   **A. There would be, yes.**
15   Q. And you think it would be in your notebook?
16   **A. I think so. If not, I believe, and I can't say this for**
17     **sure, but I believe that all of the people that I spoke**
18     **to were on taped lines so there should be records at the**
19     **bank of the conversations.**
20   Q. To what degree would the FX Committee note, in the sense
21     of record in the minutes, these kind of enquiries that
22     you would undertake? I'm going to suggest they don't.
23   **A. I think they do if they're of concern and if they're**
24     **not of concern, I don't think they did.**
25   Q. All right. Can we please on the same sort of vein then

**Page 61**

1  look at JEX/007. This is an agenda for 2 August for the
2  BBA's meeting with the Bank of England. Paragraph 2
3  concerns BBA LIBOR:
4    "Business continuity agreement."
5  We're not worried about that:
6    "Panel review and feedback on LIBOR and markets
7  (BBA)."
8    My first question is: would there have been notes
9  for this meeting? Would there have been minutes?
10 **A. I can't speak for what the bank might have done.**
11 **I don't recall whether these were minuted meetings.**
12 Q. Would you have taken a note of the meeting?
13 **A. Not unless I was asked to.**
14 Q. You wouldn't have taken a personal note, not a formal
15 record, but would you have taken a personal aide memoire
16 of the meeting?
17 **A. If there were actions for me to -- things that I needed**
18 **to do, yes.**
19 Q. I don't think we have minutes, you see. That's why I'm
20 asking you the questions. We have the agenda but
21 I haven't seen minutes.
22 **A. From what I recall of these meetings, some of which**
23 **I attended and some of which I didn't, I believe they**
24 **were at the request of the Bank of England and they**
25 **would ask us, the BBA, to provide information about**

**Page 62**

1  **topics that they were interested in -- the bank was**
2  **interested in.**
3  Q. They, the bank, were clearly interested in feedback on
4  LIBOR?
5  **A. Yes.**
6  Q. Would you have reflected the matters that we have looked
7  at in our notes, your notes, about the concerns that had
8  been expressed as to the accuracy of the rates?
9  **A. I cannot remember what was said at that meeting, but we**
10 **would have no reason at all not to be open with the Bank**
11 **of England and, you know, as we will doubtless get to,**
12 **it can be seen that the BBA specifically and me in**
13 **person spent an awful lot of time trying to get the bank**
14 **to take more of an interest and be more formally engaged**
15 **with LIBOR.**
16 Q. And they, I think, were reticence to be publicly
17 acknowledged with LIBOR?
18 **A. Correct.**
19 Q. Whilst we touch on this subject, the financial services,
20 the FSA, to become the FCA, were equally of that view,
21 they didn't want to be publicly associated with LIBOR?
22 **A. Yes.**
23 Q. And they declined to regulate it?
24 **A. Yes, until April or whenever it was, until 2013, when**
25 **they finally did.**

**Page 63**

1  Q. When everything changed?
2  **A. Yes.**
3  Q. Can we have, please, JEX/008, please. You have just
4  referred to lines that were recorded, Mr Ewan?
5  **A. Yes.**
6  Q. This is you speaking to Clive Jones, who clearly is
7  identified he's at Lloyds. Who was he?
8  **A. He was Lloyds -- he was a member of the Foreign Exchange**
9  **and Money Markets Committee and his day job was, as far**
10 **as I recall, he worked in some capacity in the treasury.**
11 Q. Was he a submitter himself?
12 **A. I couldn't tell you whether he was the person that**
13 **actually punched the numbers in, but I believe he was**
14 **the person responsible -- when we formulised the**
15 **requirement to have a named individual to be**
16 **responsible, I think it was him.**
17 Q. All right. Let's look at transcript together. He said:
18   "Lloyds."
19   You say:
20   "Hi Clive, it's John Ewan at the BBA."
21 I'm going to cut out some of the "rights" and
22 "okays". You can follow that, Mr Ewan, on the page.
23   You:
24   "I've just spoken to a few people on the committee.
25 Their view is that you really although the definition

**Page 64**

1  says it's got to be what you can get in good size,
2  really the underlying thing is what LIBOR's just trying
3  to reflect is how do you fund yourself so it's the level
4  that you've got to set yourself at to fund yourself.
5  However, you're going to do that. Whether that's what
6  you can issue paper at or how you're doing it off the
7  dollar arbitrage, does that help?
8    "No. Well, this is just normal I would say. The
9  point is there isn't any there."
10   Just pause. We'll come through this. This is
11 a reference, isn't it, to the lack of liquidity in the
12 market, Mr Ewan?
13 **A. I think "there isn't anything there" is exactly**
14 **a reference to there being --**
15 Q. We'll read on. He then continues:
16   "So as high as -- it could be as high as whether it
17 needs to entice out an offer then or a bid for the
18 paper.
19   "Yes, I guess so, but I think one of the things
20 about LIBOR is it is always a ref -- it's a distilled
21 reflection of an individual bank's view though so
22 I guess like different banks will have different views
23 and different ways of dealing with it at the moment."
24   "Dealing with it" is, I suggest, the definition and
25 setting of the LIBOR, would you agree?

16 (Pages 61 to 64)

**Page 65**

1  A. I'm sorry, could you repeat that?

2  Q. "Dealing with it" is in relation to the setting of the

3  LIBOR?

4  A. Yes.

5  Q. He continues:

6  "Yes, don't get me wrong really, we'll probably put

7  something in about 5 or 10 points higher than yesterday

8  but realistically that's not real. If you get

9  challenged on that, you can't tell -- well, that's where

10  that bank can raise money because we couldn't.

11  "Right.

12  "So I just -- that's the thing. So I just thought

13  because I just give you a call and let you know that

14  because, to be fair, lots of guys, you might get

15  questions about it later on. That's all.

16  "Yes.

17  "Do you see what I mean?

18  "Yes, I see exactly what you mean."

19  Pausing there and we'll carry on down in a moment.

20  He's just told you that the rate coming in that he's

21  likely to post is not real. How is that in accordance

22  with the definition?

23  A. I think what Clive -- right, so the definition says the

24  rate at which you could borrow money and Clive is saying

25  there is no money to be borrowed. Therefore, it can't

**Page 66**

1  be a real rate because if you -- if there isn't money to

2  be borrowed, you cannot borrow money. It's not a real

3  rate. It has to be set somehow. So that would move us

4  into what we have discussed before as type 1 behaviour

5  within the spirit of the rules.

6  Q. So this is a spirit illustration, is it?

7  A. I think so, yes.

8  Q. Because despite the problems with liquidity, it appears,

9  doesn't it, that the definition is not being adhered to?

10  A. Well, the definition -- the definition has a component

11  which we have discussed at length which is at what rate

12  could you borrow and I think we're shortly going to get

13  into questions about what exactly does "could you borrow

14  at" mean.

15  Now, at this time, to put a bit of context around

16  this, we're in the teeth of a very bad crisis in the

17  markets and a lot of people are genuinely concerned that

18  essential parts of the financial landscape are going to

19  stop working. So at or around this time I had many

20  conversations with market participants, with

21  Central Banks and with regulators and said, baldly, "If

22  we can't set LIBORs that are anchored in actual market

23  liquidity, actual cash trades, should we be setting

24  LIBORs at all? Should we just not?" I was told every

25  single time, by everybody, "No, no, the markets are in

**Page 67**

1  a bad way. There must be a LIBOR rate. It must get

2  posted every day".

3  Q. So there was, if I may suggest -- you may disagree, and

4  I want you to understand it's a suggestion -- over this

5  period of time artificiality to the rate?

6  A. It depends on how you are defining "artificiality". If

7  you mean banks were posting a rate for cash that simply

8  was not there, did not exist, then, yes, the rates were

9  artificial, but the view of the Foreign Exchange and

10  Money Markets Committee and every single other person in

11  the market was the fact that the definition says if you

12  were to borrow, not where have you borrowed, and it

13  would be very difficult to describe in these

14  circumstances what is an accurate rate because there's

15  no way of grounding it. Somebody could say -- it would

16  be perfectly possible for the rate to be 7 per cent,

17  let's say, and one person could say, "Rubbish, it's 20"

18  and somebody could say, "No, it's 3" and both of those

19  people would say that the rate is wrong. Neither of

20  them would be able to actually prove that because the

21  thing that you're trying to measure isn't there.

22  Q. Thank you. It continues, if we return to it, he says:

23  "We can issue paper at certain levels but that's

24  extremely high so perhaps that's where LIBOR's got to be

25  but it would be -- if people are there, it's the

**Page 68**

1  interest as opposed to -- you can't, if there's one

2  orange, you can't eat two. It's just like that. It

3  doesn't matter how much you pay for the second if it

4  isn't there.

5  "Right.

6  "So it's just what could happen is the LIBOR could

7  be quite high.

8  "I think that's going to happen, yes.

9  "So on that basis you might get questions and it

10  will be because -- it's not because a particular bank

11  would lend to try to ramp them up, it's just there isn't

12  money out there."

13  So he's clearly giving you a call, Mr Ewan, to give

14  you -- in the vernacular -- a heads up that their rates

15  are not predicated on actual cash, they're a guess?

16  A. Yes, that's type 1 behaviour. What do you do when there

17  isn't a cash offer?

18  Q. But a guess, an educated guess on your account would

19  have been adequate to comply with the definition?

20  A. If you could show that you were trying to set as best

21  you could an accurate rate, that's the best that could

22  be done. At this time I was seriously suggesting to

23  lots of people that the actual LIBOR rate should be

24  infinity because that's -- you know, if the -- as Clive

25  said, if there isn't another orange, what does it cost?

17 (Pages 65 to 68)

**Page 69**

1  Q.  Thank you.  Let's go, please, to the next document.  I'm
2     going to jump one, my Lord, so JEX/010, please.  If we
3     go to the e-mail at 9.44 on 16 August, please.  Can we
4     stop there.  Mr Ewan, this is from you and I take it
5     this is again to the FX Committee.
6  A.  Yes.
7  Q.  "Given the ongoing problems with the interbank
8     market ..."
9       This is, as we've just looked at, August 2007 and
10    liquidity, as I suggest, had really dried up by then.
11    Would you agree?
12  A.  Yes.
13  Q.  "Given the ongoing problems with the interbank market,
14    I would like to have an ad hoc meeting of this committee
15    to discuss the impact that this has on the LIBOR rates.
16    Specifically (i) the definition of LIBOR states the
17    panel banks must contribute 'the rate at which it could
18    borrow funds, were it to do so, by asking for and then
19    accepting interbank offers'.  In that I understand that
20    currently there is no London interbank market, certainly
21    in the short dates.  Do we need to clarify the
22    definition?"
23      This touches on the evidence you gave to my learned
24    friend and the evidence in fact you have given today,
25    which is tension being brought on the definition due to

**Page 70**

1     the lack of liquidity.  Do you agree?
2  A.  Yes.
3  Q.  Thank you. (ii).
4      "How best to defend ourselves against potential
5    accusations that the current rates are not a genuine
6    reflection of the market."
7      Two things.  Did you think they were not a genuine
8    reflection of the market at that stage?
9  A.  I didn't know.
10  Q.  You were sufficiently concerned to write what you have,
11    which speaks for itself.  In fairness to you it says
12    "potential accusations", but I want to ask you was there
13    a concern at that stage -- I suggest there clearly must
14    have been -- on your part for you to have written that?
15  A.  I was clearly concerned and I think there are -- you're
16    touching on a number of issues there.  I would not be in
17    a position to know absolutely whether the rates were
18    accurate because, for a start, as I've just said,
19    I understood that there wasn't an interbank market so
20    it's very difficult to measure something that isn't
21    there and also I wasn't in the unique position of having
22    perfect market knowledge.  So how could I know?
23  Q.  Well, I suppose on the second point, Mr Ewan, had you
24    asked the FX members about some of these concerns?  They
25    reflected the markets, that's what they were there for.

**Page 71**

1     Did ask you them, "Is this going on?"?
2  A.  Well, in a way, but the manner in which I did so was to
3    say, "What do we need to do to ensure that the rates are
4    accurate?"
5  Q.  I wonder if we can then turn, please, to JEX/011.
6    I want to just show you this.  It's not your document,
7    Mr Ewan, but I think you have seen some of these
8    documents before.  They originate from the Bank of
9    England.  You were shown some Bank of England documents,
10    is that right?
11  A.  I'll accept that, yes.
12  Q.  Landesbank is a bank that works in London; yes?
13  A.  I don't know.  I've never -- I don't believe I've ever
14    dealt with them.  I couldn't tell you anything about
15    them.
16  Q.  One of the questions I was going to ask you is: are they
17    one of your members?
18  A.  Well, I don't know whether they were a member of the
19    BBA.
20  Q.  My purpose for showing you this is to set the context of
21    what was taking place in August of 2007; all right?
22  A.  Yes.
23  Q.  "Sterling still difficult, although the short end has
24    eased a little.  Still few offers out past one month.
25    Euro short dates are slightly more liquid.  Finds it

**Page 72**

1     strange that CBs have been more proactive in leading and
2    reassuring the market."
3      CBs being, I suggest, Central Banks?
4  A.  Yes.
5  Q.  "The Fed discount rate cut has helped the market
6    psychologically and was acute move to extend out to
7    30 days but questionable as long-term solution.  BoE
8    [Bank of England] did little to calm the market.  The
9    majority of their assets are LIBOR based and so the
10    volatile fixings have been causing them a few problems.
11    They continue to finance in sterling and euro on an
12    overnight basis.  See little point in locking in losses
13    on term funds, especially given the overnight
14    volatility.  Concerned at what might develop should
15    liquidity in the short dates dry up.  They have noticed
16    the significant amount of discrimination based upon
17    names, including towards them at Landesbank, and also
18    believe that they may be manipulating LIBOR and SONIA
19    fixings, though wasn't forthcoming with any names."
20      That bank, in August 2007, is suggesting to the Bank
21    of England that there is manipulation potentially in the
22    market.  Were you getting that kind of information from
23    your members in 2007 at this stage?
24  A.  I don't recall whether there was specific allegations of
25    manipulation.  I remember that there was increasing

18 (Pages 69 to 72)

**Page 73**

1     **concern about the accuracy of LIBOR.**

2   Q. The second issue that I wanted to touch on that this

3     document demonstrates was there was a shift in the

4     creditworthiness of the panel banks. Would you agree

5     with that? So good names may be at the top of the LIBOR

6     postings or would be at the bottom of the postings and

7     the less creditworthy banks would be at the top?

8   **A. Well, that had always been the case, but it grew --**

9     **I certainly recall it grew much more profound as an**

10    **effect.**

11   Q. So did you see a widening of submissions between the

12     top, whether outliers or otherwise, and the bottom?

13   **A. Yes, we did.**

14   Q. And quite a significant widening?

15   **A. Yes.**

16   Q. Was that in all currencies or was that particularly in

17     certain currencies only?

18   **A. I believe it was in all currencies.**

19   Q. Thank you. Can we turn, please, to JEX/012. They were

20     a panel bank, Deutsche, is that right?

21   **A. I am sorry, I'm trying to catch up to where you are.**

22   Q. Sorry. It should be your next document in your bundle.

23   **A. My next document is what looks like a Bank of England**

24     **note of a meeting.**

25   Q. Let's look at this on the screen for one moment and

**Page 74**

1     then --

2   **A. Sorry, over the page. Right, sorry, I do have this.**

3   Q. Do you have it, 22 August, Deutsche, panel bank, and

4     indeed I think we'll come to see a gentleman called

5     Mr Curtler came to sit on the FXMMC at some stage,

6     didn't he, in 2008?

7   **A. I don't know if it was 2008, but, yes, he did.**

8   Q. "They were comfortable with the liquidity going forward

9     but were anxious at absence of a turn market for funding

10    further down the line. Their worry was others rather

11    than themselves, a common comment. They had thought

12    been seen bidding for a lot of cash lately and been at

13    the top of three month sterling LIBOR rates for a few

14    days on the BBA fixings. They thought others were doing

15    them artificially low to allay market concerns."

16     Low-balling --

17   **A. Yes.**

18   Q. -- being expressed to the Bank of England?

19   **A. So it would appear, yes.**

20   Q. Similar question, and we'll look at other examples in

21     a while: you were being told in the same fashion about

22     the existence of low-balling at that stage?

23   **A. And exactly in precisely that fashion, which was in**

24     **essence, "Everybody else was doing it but we're not".**

25   Q. JEX/013, please. Now, you are an attendee at this

**Page 75**

1     meeting. Do you remember it?

2   **A. I don't.**

3   Q. It's a meeting with the BBA, 29 August 2007, to discuss

4     the fixings. I wonder if we can just scroll down,

5     please:

6     "BBA agreed with our assessment of the LIBOR premium

7     as part credit. Uncertainty about bank credit risks

8     which is common across all currencies and part liquidity

9     varying across currencies. AO different perceptions of

10    Central Bank stance."

11     Do you know what AO means?

12   **A. I don't, but I would hazard a guess at "on account".**

13   Q. "Mr Ewan noted that in his dialogue with the commercial

14     banks he had not heard of any grumblings in the market

15    in regard to the BoE's policy stance."

16     Is that a reference to the injection of liquidity at

17    that stage?

18   **A. Probably, but I wouldn't want to be certain.**

19   Q. "By contrast, he thought the ECB's policy, whilst

20    helping liquidity, has not improved sentiment. He

21    questioned if the provision of liquidity sent a message

22    to the market that there was a problem. Two weeks ago

23    the BBA held a conference call with the FEMMC, the

24    Foreign Exchange Money Markets Committee ..."

25    Pause there. Should that be the FXMMC?

**Page 76**

1   **A. Yes.**

2   Q. Thank you:

3     "... which is a body formed of the treasurers of the

4     big banks. In these meeting they re-affirmed that they

5     could not tinker with the definition of LIBOR. Note,

6     that a contributor's rate does not actually have to be

7     dealt in the market. The definition of what constitutes

8     a reasonable size has never been defined precisely so it

9     can vary with circumstance. However, the BBA's take was

10    that in normal market conditions a reasonably sized deal

11    was around 500 million. In current conditions the

12    consensus from the conference call was that the

13    reasonable market size was 60 to 100 million."

14     Hence we see, Mr Ewan, don't we, the reduction of

15    liquidity?

16   **A. Yes.**

17   Q. "Regarding the timing of BBA releases, the whole process

18    is outsourced to Reuters. Banks feed data straight to

19    them. Delays in the postings have been due to market

20    volatility and higher dispersion of quote ..."

21     Pausing there. Is that the width of band that I've

22    just asked you about?

23   **A. Correct.**

24   Q. Did that cause a problem in terms of the delivery

25    therefore of the rate to the market?

Merrill Corporation      www.merrillcorporation.com/mls      8th Floor, 165 Fleet Street
(+44) 207 404 1400                                             London EC4A 2DY

**Page 77**

1    A. No.
2    Q. "Together these trigger automatically. Plausibility
3    checks with Reuters will then have to confirm with the
4    panel banks and is hence time-consuming."
5    What is that a reference to, the automatic
6    plausibility check?
7    **A. I think this is a reference to checks that Reuters have**
8    **in place at the behest of the Foreign Exchange and Money**
9    **Markets Committee that mean that if a bank submits**
10   **a rate that is significantly different one day to the**
11   **next, it triggers a call whereby Reuters would ring the**
12   **bank and say, "Could you confirm your rate to me".**
13   Q. So if a bank is an outlier at the bottom one day and
14   then suddenly either goes to become an outlier at the
15   top the next day, that would provoke a call?
16   **A. Yes.**
17   Q. If a bank was an outlier at the bottom and produced or
18   came into the pack but towards the top, that would
19   produce a call?
20   **A. It might, yes.**
21   Q. There would be some presumably enquiry about the
22   movement of the rate, as you have just described?
23   **A. Yes.**
24   Q. And, I'm assuming, evidence might be required for why
25   the rate had moved in the way in which it had?

**Page 78**

1    A. Yes.
2    Q. If the evidence was satisfactory, would that have been
3    drawn to the attention of the FXMMC committee or not?
4    **A. It may have been. I wouldn't like to say that in all**
5    **cases it was or in all cases it wasn't.**
6    Q. Back to paragraph 5:
7    "The BBA do check that the panel are honest and that
8    they are not 'quoting their book. One of their
9    techniques ..."
10   Does that mean your techniques?
11   **A. Well, they would be techniques that would be recommended**
12   **by the Foreign Exchange and Money Markets Committee,**
13   **given to us that we would then ask Reuters to do or**
14   **possibly they might have been done internally within the**
15   **BBA.**
16   Q. Thank you:
17   "One of their techniques was to make sure the higher
18   rated banks were quoting rates that were below lower
19   rated banks. Note that recently this has not been the
20   case."
21   Pausing there. That is a reference to
22   creditworthiness of banks, is it?
23   **A. Yes.**
24   Q. So, in other words, if an AAA bank is quoting higher
25   than an AA bank, that would trigger an enquiry or might

**Page 79**

1    do?
2    **A. It might do, yes.**
3    Q. "As an example they said that a bank should not
4    oscillate between the top and the bottom of the panel's
5    range, unless they have a change in credit status.
6    Whilst the BBA admitted that fixings are only valid if
7    the panel bank are honest in their quotes, analysis
8    would be retrospective and punishment would be the 'slap
9    on the wrist' variety. Mr Ewan noted that there should
10   not be a significant difference between Euro LIBOR and
11   EURIBOR fixings, aside from panel composition and timing
12   effects. He also noted that the banks should not
13   necessarily be posting the same rate for Euro LIBOR as
14   for EURIBOR, though this was very difficult to prove."
15   Pausing there. Forgive me if I've misunderstood
16   your evidence this morning. I think you said they could
17   quote the same?
18   **A. Well, there's no explicit prohibitions for doing that**
19   **so, yes, they can.**
20   Q. The note continues:
21   "He noted that BBA rates had to be formed in London
22   whereas this was not the case for EURIBOR rates and
23   hence would account for very small differences in rates.
24   However, it's equally true that both could quote could
25   come from the same source. We asked the BBA if there

**Page 80**

1    were any lessons to be learnt in regard to how the
2    fixings were designed. They defended the current from
3    by reference to its simplicity and its long time series
4    which would be broken if the fix was redefined. The BBA
5    had not had much contact with users of LIBOR,
6    eg corporates and derivatives traders, in regard to the
7    impact of higher fixings."
8    Is paragraph 8 accurate?
9    **A. Well, it depends what -- I don't know what Jerry Jones,**
10   **who appears to be the author of this, would regard as**
11   **being "much" so I couldn't state outright. I record**
12   **speaking to corporates. I can't remember whether it was**
13   **at or around August 2007 and I don't know is the answer.**
14   Q. We move, please, then -- thank you -- to JEX/014.
15   I wonder if we could just go to the e-mail at 8.33.
16   Just to assuage your concern, Mr Ewan, you're in this
17   further up. You will see this on the page. So this is
18   an e-mail that you have received it's from
19   Boris Siegers. Who was he, do you know him?
20   **A. No.**
21   Q. "Yesterday I recognised a huge difference between the
22   fixed one month US dollar at 5.665 and interbank rates
23   provided by brokers of 5.85. Only Barclays quoted real
24   market rates. Would you be so kind to investigate it as
25   most contributors' quotes are not in line with your true

Merrill Corporation              www.merrillcorporation.com/mls          8th Floor, 165 Fleet Street
(+44) 207 404 1400                                                        London EC4A 2DY

Page 81

1    LIBOR definition."
2        If we look up the page, you respond to him at 10.32
3    on 4 September:
4        "I recognise your concerns. We have convened
5    a meeting of the independent Foreign Exchange and Money
6    Markets Committee which oversees LIBOR tomorrow and I'll
7    raise these points with them."
8        Did you?
9    A. I don't recall whether I raised that specific concern
10   from Mr Siegers, but I do recall around this time, the
11   summer/autumn of 2007, having many conversations with
12   the committee that were centred around non-LIBOR
13   contributing banks saying, "These rates are
14   unrealistically low".
15   Q. It wasn't just non-panel banks, was it, Mr Ewan, as
16   we'll come on to; panel banks were also telling you at
17   that stage, and this is low-balling I suggest?
18   A. Not necessarily. When I -- the reason that -- well, the
19   reason I mentioned non-panel banks is because one of the
20   things that the Foreign Exchange and Money Markets
21   Committee was telling me was around something that you
22   raised which is credit tiering, about the fact that
23   banks that are not as strong have to pay more money.
24   When I raised these sorts of concerns, I was told by the
25   Foreign Exchange and Money Markets Committee, "This is

Page 82

1    a bank who in the current market conditions is being
2    discriminated against and rather than thinking, 'Oh,
3    it's a horrible market, I have to pay up' is complaining
4    that LIBOR's broken".
5    Q. So is this the phenomenon that became known as tiering?
6    A. Yes.
7    Q. We see levels?
8    A. Yes.
9    Q. But, looking at the e-mail that was sent to you, whilst
10   I take on board what you've just said, here is
11   a complaint, quite a blunt complaint, asking you to
12   investigate the quotes because this individual does not
13   regard them to be in accordance with the definition?
14   A. I don't think that's how I read it.
15   Q. Well:
16       "Would you be so kind to investigate. It seems most
17   contributors' quotes not in line with the true
18   definition."
19       How could you not read it that way, Mr Ewan?
20   A. Well, what he's said is -- the first thing that he says
21   is LIBOR fixed at 5.665 and he was provided by rates of
22   5.85. I read that as saying LIBOR banks, the best,
23   strongest banks in the market, can fund at 5.6 and
24   I have to pay 5.85.
25   Q. It says, doesn't it:

Page 83

1        "Only Barclays have quoted real market rates"?
2    A. In his view.
3    Q. Well, maybe in his view but it's unequivocal, isn't it?
4        You can't misinterpret his view of what's taking place?
5    A. No. He's quite clear on what he thinks has happened,
6    yes.
7    Q. Can we now turn, please, to JEX/015. I wonder if we can
8    scroll down that e-mail. I'm afraid that's the wrong
9    reference. I wonder if we can, from the larger bundles,
10   go to 284, please. This I don't think will be in your
11   hard copy bundle, Mr Ewan, but just bear with us for
12   a moment whilst it's put on to the screen. Electronic
13   284. It should be an e-mail of 3 September. (Pause)
14       Thank you. Can you scroll slightly down that,
15   please. This is an e-mail, Mr Ewan, from you
16   to Alex Merriman, Angela Knight and Christopher Ford.
17   Is Christopher Ford in the BBA?
18   A. Yes, Chris Ford was working with me.
19   Q. It's titled, "Barclays and the BBA LIBOR". We'll come
20   to this in a moment, but:
21       "Further to our conversation, Miles Storey from
22   Barclays has called me to discuss off the record
23   Barclays's position re BBA LIBOR. Last week they
24   contributed sterling rates of 6.8 above the Bank of
25   England penalty rate and they expect to do so again this

Page 84

1    week. This reflects their belief that there is simply
2    no liquidity in the interbank market. They believe that
3    other banks are posting rates based on how they can fund
4    themselves using the swaps market. This runs contrary
5    to the definition of BBA LIBOR which insists that rates
6    are based on the interbank market. It's a dirty little
7    secret that this is not always the case. Swaps market
8    is more liquid than the interbank rate and the bank
9    might find it hard to post a rate for, say, seven month
10   Kiwi dollar LIBOR without reference to the swap market.
11   It should not be the case in big currencies like
12   sterling, euro or dollar. I have also recently had an
13   e-mail from Dan Knight, the senior trader at Bank of
14   America. Have you had much feedback on the Mark Gilbert
15   story in Bloomberg this morning regarding Barclays's
16   LIBORs? I put a high LIBOR fix result in getting hauled
17   through the media. There is going to be artificial
18   discounts on the setting. The rates in my view will not
19   drop this week and Miles suggested that we should
20   reconvene the FXMMC that oversees the rates to check
21   they still believe we are setting accurate, credible
22   rates. In that one could argue this case, I tend to
23   agree with him."
24       There's quite a lot within that, but the first is
25   that you recognise that what is taking place from what

1    Mr Storey has said to you is contrary to the definition
2    of LIBOR or banks are submitting contrary to the
3    definition of LIBOR?  Do you agree?
4    **A.  They are submitting contrary to the written definition.**
5    **I don't think that they are contributing against the**
6    **spirit of the definition.**
7    Q.  Well, it comes down to boundaries.  Who determines the
8    spirit in this instance if we've abandoned the written
9    definition?
10   **A.  We've touched on this before.  I think the spirit of**
11   **something is necessarily a judgment.  It's not something**
12   **that has a hard boundary because the definition has**
13   **a hard boundary but it's very clear, I think, what the**
14   **definition is trying to do, which is to --**
15   Q.  Whose judgment?
16   **A.  I beg your pardon?**
17   Q.  Whose judgment?
18   **A.  Any fair-minded person.**
19   Q.  Is it the submitter?  Is it the FXMMC?  Is it the bank?
20   Is it the BBA?
21   **A.  Well, in that the FX and Money Markets Committee is the**
22   **ultimate arbiter, ultimately it's them but the**
23   **definition we were trying to be as clear as possible so**
24   **that there wouldn't be a requirement for interpretation,**
25   **which is why we spent so much time discussing it and**

1    **adding guidance.**
2    MR HAWES:  Is that an appropriate moment, my Lord?
3    MR JUSTICE COOKE:  Yes, all right.
4    MR CHAWLA:  My Lord, can I indicate that e-mail that we're
5    looking at is the one that we'd seen earlier which was
6    3/9/07, page 31 of my Lord's bundle.
7    MR JUSTICE COOKE:  Thank you.
8    MR CHAWLA:  It's just that one.  The reply isn't there, if
9    I may say so.
10   MR JUSTICE COOKE:  2.05, please, members of the jury.
11       (In the absence of the jury)
12   MR HAWES:  Before your Lordship rises, it's not all of it
13   and I haven't told my learned friends but this is the
14   disclosure we received yesterday.  There's a copy for
15   your Lordship.  I'll ensure that that's passed up
16   through your clerk.  Mr Convey printed it yesterday in
17   chambers.  I'll ensure it's passed to your Lordship so
18   you can see it.  If it's too small, please tell us
19   because some of the print is quite small and we'll have
20   it reprinted at some stage for you.
21   MR JUSTICE COOKE:  Thank you very much.
22   (1.06 pm)
23       (Luncheon Adjournment)
24   (2.05 pm)
25       (In the presence of the jury)

1    MR HAWES:  Mr Ewan, I know you now have a hard copy of the
2    document that we were just looking at before lunch.
3    **A.  Yes.**
4    Q.  I am just going to wait for it to come up for the jury.
5    Thank you very much.  This is the --
6    MR CHAWLA:  My Lord, I think -- sorry, Mr Hawes -- there's
7    a hard copy there.
8    MR JUSTICE COOKE:  Thank you.
9    MR CHAWLA:  The e-mail that we looked at just before lunch
10   is below this in the chain.  So this is Alex Merriman's
11   response to you, about the Barclays issue?
12   **A.  Hmm, hmm.**
13   Q.  He says:
14       "My take on this is that there is no more
15   a reflection, though an obviously exaggerated, one of
16   the dealers continuing to quote high [I think that
17   should be 'clearers'] because of the shape of their
18   setting sterling long books and other non-sterling books
19   quoting low.  Barclays are quoting so high because
20   it is not in their interests to lend interbank
21   when there are questions being asked in the market over
22   their liquidity/funding.
23       "We know that deriving long-term rates from swaps
24   for certain currencies happens and so the FX & MM needs
25   to be reminded of 'going back to cash'.  If necessary,

1    we think we might think about for market discipline
2    reasons putting out a press release along the lines that
3    we have discussed this with the FX & MM and all LIBOR
4    panel contributors must provide 'true' prices to the
5    best of there ability, even in troubled market
6    conditions."
7        Looking at that e-mail, Mr Ewan, which is from
8    Mr Merriman to you, this is all an internal BBA e-mail
9    at this stage, isn't it, still?
10   **A.  Yes.**
11   Q.  Would you agree that there's a recognition there that
12   Barclays are not quoting -- well, do you think Barclays
13   are quoting an accurate rate?
14   **A.  I can't remember what I thought on Monday,**
15   **3 September 2007.**
16   Q.  Because Barclays at this point in the market, at this
17   point in time, were higher than other banks, weren't
18   they?
19   **A.  I don't recall, but I'll accept that they were due to**
20   **the context.**
21   Q.  The point about it was, actually, that Barclays may have
22   been the only one quoting their true rates; in other
23   words, all the other banks were low-balling.  Does that
24   jog your memory?
25   **A.  I don't know because a lot of our conversation is around**

**Page 89**

1     **accurate and true and the difficulty is that if there is**
2     **no market, it's very, very hard to say what a true price**
3     **is.**
4   Q. Right.
5   **A. So Alex Merriman has a view. I don't recall -- I think**
6     **the question was: what did I think and I don't recall**
7     **what I thought at the time.**
8   Q. Well, we're in September 2007. Quite a lot of events
9     had gone on in the economy at that stage; yes?
10  **A. Yes.**
11  Q. You have described the pressure that LIBOR was under at
12    that stage?
13  **A. Yes.**
14  Q. If I were to suggest that LIBOR was acting as
15    a barometer for banks' financial stability, would you
16    agree with that proposition?
17  **A. That is how it was being used, yes.**
18  Q. Thank you. Barclays were clearly quoting higher than
19    the rest of the pack because he says:
20     "Barclays are quoting so high ..."
21  **A. Yes.**
22  Q. "It's not in their interest to lend interbank when there
23    are questions in the market over their liquidity or
24    funding."
25    In other words, they're lying between the rate of

**Page 90**

1    LIBORs to the banks's financial health. Do you not see
2    that connection?
3  **A. As I have said, it's not possible to know with absolute**
4    **certainty what the rate for any of these banks was,**
5    **I don't think, which is why at this time, in this**
6    **context, this e-mail trail describes internal**
7    **conversation at the BBA that conclude that, firstly, we**
8    **need to get the committee that is responsible together**
9    **to discuss and that there needs to be a restating that**
10  **the panel contributors must provide the best prices they**
11  **can.**
12  Q. He continues:
13    "We know that deriving long-term rates from swaps
14    for certain currencies happens and so the FX needs to be
15    reminded of 'going back to cash'."
16    Is he implying there that the use of long-term rates
17    from swaps is not in accordance with the definition?
18  **A. It comes back to whether there is cash in the market.**
19    **If there's not cash in the market, that's acceptable**
20    **because you have to do your best.**
21  Q. Why would he write:
22    "So they need to be reminded of 'going back to
23    cash'" if the former is acceptable?
24  **A. I don't know. You would need to ask him.**
25  Q. You have described what you think he means by the word

**Page 91**

1    "true prices to the best of their ability"?
2  **A. Yes. We have been spending quite a lot of time on this**
3    **and it's because this is very difficult. It would be**
4    **like perhaps, as an example, asking a bunch of experts**
5    **what price they think something, maybe a Picasso**
6    **painting, would sell at auction without there actually**
7    **being that auction.**
8  Q. The point is there must have been quite a significant
9    amount of internal discussion at the BBA reflected in
10    these kind of e-mails about concern about the accuracy
11    of the rates?
12  **A. Yes, which is why we do what we can, which is bring the**
13    **matter to the attention of the committee, tell people**
14    **what the definition is and say that they have to do**
15    **their best to set accurate rates in difficult markets.**
16  Q. I move on, please, to JEX/017. I wonder if we could go
17    to the bottom of that e-mail. Thank you. I think
18    that's a wrong reference. Excuse me, my Lord. (Pause)
19    An e-mail for 7 September at the bottom, please.
20    I wonder if we can get to it another way. Could I have
21    page 910, please.
22  MR CHAWLA: It is on there. It's the last page of JEX/017.
23  MR HAWES: Can you scroll down. Thank you, Mr Chawla.
24    This is an e-mail from Angela Knight to you,
25    7 September 2007. A number of individuals copied in,

**Page 92**

1    all BBA, Mr Ewan; yes? Do you have it?
2  **A. This is on it's Friday, 7 September --**
3  Q. 7.17 in the morning.
4  **A. I'm looking at it, yes.**
5  Q. All to BBA individuals; yes? Subject, "LIBOR: two
6    things urgent"; yes?
7  **A. Yes, those are all BBA people.**
8  Q. Thank you.
9    "All, I think we need to tell our members what we're
10    doing with LIBOR primarily so that they know we are not
11    sitting on our hands but providing the info so that
12    discussions can be made. E-mail all counsel, new board,
13    CEOs wholesale [I think that should be], retail coms and
14    no doubt there are others as follows.
15    "As you are aware, the BBA runs LIBOR. In order to
16    assist the debate we have been issuing daily to the Bank
17    of England and to the thinking media plots of sterling
18    LIBOR, dollar LIBOR and Euro LIBOR and I attach the
19    latest set. These provide a quick pictorial comparator
20    of what is happening in the three markets and are
21    indicative of the different policies being followed. We
22    are giving factual explanations to the many queries that
23    we have been receiving and we're also in constant
24    contact with the bank ..."
25    That being the Bank of England, is that right,

23 (Pages 89 to 92)

Day 9                          R v Hayes                          8 June 2015

| | |
|---|---|
| 1   Mr Ewan? | 1   PR office? |

**Page 93 (left column)**

1   Mr Ewan?

2   **A. Yes.**

3   Q. "... and I trust you find the attachments of interest

4     and would be grateful for any posts that you may have.

5     "The next is touching on press. Something similar

6     should go in the morning. When is LIBOR fixed for the

7     day? Is it 11.00 am? If so, get everything ready and

8     as soon as there is a fix, then plot and send. I would

9     like it on their desks by midday.

10    "The next is the press. Pete, suggest you speak to

11    the Evening Standard. They have not done much on this

12    yet. They go to press around 9.00 am but nevertheless

13    worth an early chat on yesterday's figures. The

14    weekenders, both Sat and Sunday, are going to do

15    something. I think the line that will be taken is that

16    interest rates stay steady but the cost of money has

17    gone up and so will mortgages, new ones that is, and

18    remortgages. Not an easy one. Also the line that they

19    might take is that banks have lost money by gambling in

20    the US and now it's the poor British householder who

21    will pay. I think the line that we should take is that

22    Brits actually not hard hit, it's the Germans who are.

23    This is a tricky time but the long-term rates are pretty

24    steady so don't panic and don't despair. There may well

25    be some changes but not necessarily. Shop around for

Page 93

**Page 95 (right column)**

1   PR office?

2   **A. I believe the -- well, ultimately the tone and the line**

3     **would be dictated by Ms Knight and some of the people on**

4     **this e-mail are in the BBA's press office and I think**

5     **would understand that they are being given instruction**

6     **by Ms Knight.**

7   Q. I wonder if we can just scroll up, please, to the bottom

8     of page 908 in the corner. The same chain,

9     Alex Merriman, 7 September, later in the morning:

10    "I spoke to Simon Wells last night. Vanessa Crowe

11    from the bank's press office was also on the call."

12    Simon Wells was who?

13   **A. I don't recall, but I think from context he would have**

14     **been somebody at the Bank of England.**

15   Q. Thank you.

16    "Essentially the bank noted that when LIBOR was

17    compared with other rates, such as government bonds or

18    swap rates, the divergences, which are apparent between

19    the UK and the euro dollar, particularly at

20    three months, are not nearly so marked. They're

21    obviously uneasy that UK sticks out like a sore thumb.

22    I said their comments were noted and I would pass on.

23    I said that it was not our job to compare LIBOR with

24    other rates but that obviously there was interest in the

25    way LIBOR rates had developed and that was what we felt

Page 95

**Page 94 (left column)**

1   the mortgage. It's a good time to save. Also release

2   the plots and make sure that it is well understood that

3   money problem lies with the bank and I'm afraid I think

4   that should be of England, not us, but do not get

5   quoted. Problems with press at all, call me. It's

6   a delicate balancing act. Angela."

7    I have shown you that for two reasons, Mr Ewan. The

8   first is Ms Knight, as the CEO of the BBA, took an

9   increasing control over the day-to-day press relations

10   of LIBOR?

11   **A. Ms Knight was in direct control of all aspects of the**

12     **BBA's press policy about everything. It's just that she**

13     **thinks that LIBOR is becoming a story so her focus turns**

14     **to LIBOR.**

15   Q. It reflects the pressure that you were under at that

16     stage that you have talked about and I've shown it for

17     that reason, contemporaneous evidence of the pressure

18     that LIBOR was suffering from?

19   **A. Yes.**

20   Q. Was the BBA concerned about the media and reputation --

21     media comment about the reputation of the BBA?

22   **A. Of course.**

23   Q. Not just the rate but the BBA?

24   **A. Yes.**

25   Q. Who controlled the publicity for that, you, Ms Knight,

Page 94

**Page 96 (right column)**

1   competent to comment on. All in all this left me

2   feeling that we should try to be bit more nuanced in

3   what we say to the market. Notably perhaps in noting

4   that LIBOR on LIBOR is just one way of measuring what is

5   happening in money markets and that there are different

6   indicators and approaches as well."

7    Did the Bank of England suggest to you, certainly

8   directly, Mr Ewan, that the LIBOR rates were inaccurate?

9   **A. I don't recall that they ever did.**

10   Q. There was concern about the rates understandably, given

11     their reflection of financial health of the market; yes?

12   **A. Yes.**

13   Q. As time moves on, the concern develops to such a point,

14     as we will see this afternoon, Ms Knight gets the CEOs

15     of the banks in to have a chat with them; yes?

16   **A. I don't recall Angela ever getting the CEOs of the --**

17     **when you say "the banks", do you mean participating**

18     **banks?**

19   Q. Panel banks.

20   **A. I don't recall her ever getting the CEOs in for**

21     **a physical meeting. I know she wrote to them.**

22   Q. All right. Let's move slightly up the e-mail, please.

23     Again, you're copied into all of this. This is from

24     Michael McKee, who is obviously the executive director

25     of wholesale:

Page 96

24 (Pages 93 to 96)

| | |
|---|---|
| 1      "Alex, I don't have a problem with a bit more nuance | 1   A. I don't recall ever speaking to Simon Green, but I may |
| 2   but overall I think we need to keep on the side of the | 2     well have done. |
| 3   line which John has been keeping, i.e. explanation of | 3   Q. Where would that have been noted? |
| 4   LIBOR plus information, rather than commentary on market | 4   A. I may or may not have noted that in my handwritten |
| 5   movements/speculation." | 5     notebook. |
| 6     Why did you maintain that line as described there? | 6   Q. Because that's another example, isn't it, Mr Ewan, of |
| 7   A. Well, I think, without having more context, what that | 7     someone who is offering to provide evidence about |
| 8   says is that I have been told by my senior management | 8     potential failings, let's put it that way, with LIBOR? |
| 9   that if the press asks questions, I can offer factual | 9   A. Yes. |
| 10  information about LIBOR but not more than that. | 10  Q. So you would have followed that up, would you? |
| 11  Q. Because you found yourself -- and I think probably about | 11  A. I cannot say absolutely whether I would or would not |
| 12  this period, but moving forward -- thrust a little into | 12    have, but it was part of my job to speak to people who |
| 13  the limelight. Would you agree with that? You were | 13    had comments, queries or complaints about LIBOR. |
| 14  doing radio. You were doing television. | 14  Q. Go to JEX/022, please. Now, this is a document which |
| 15  A. Yes. | 15    I'm not sure you were copied into, Mr Ewan, but I want |
| 16  Q. Published articles in The Economist, trying to take the | 16    to ask you about it because it's dated in October 2007, |
| 17  line of defending LIBOR; yes? | 17    a month later; all right? |
| 18  A. Yes. | 18  A. Yes. |
| 19  Q. Dealing with the Wall Street Journal article, as we'll | 19  Q. Did you see this when you were shown documentation from |
| 20  come to see; yes? | 20    the Serious Fraud Office? Do you have a memory of it, |
| 21  A. Yes. | 21    or not? |
| 22  Q. And we've already reflected on the FT article much | 22  A. I can't remember, I'm afraid. I saw an awful lot of |
| 23  earlier in this chronology and did you deal with that? | 23    documents. |
| 24  A. I didn't -- it depends what you mean by "deal with". | 24  Q. All right. Let's look at it together. |
| 25  I would -- as we seem to see here, I'm told, "Go and | 25  MR CHAWLA: He wasn't shown it, so I'm not sure how he can |
| <div align="center">Page 97</div> | <div align="center">Page 99</div> |
| 1  give factual information about LIBOR". Whether that's | 1    comment on it. |
| 2  dealing with it, I don't know. I answered questions. | 2  MR HAWES: Thank you. In which case, we'll deal with it |
| 3  Q. Who would tell you to do that? | 3    with someone else. |
| 4  A. Angela. | 4    JEX/023. Just look at the top of that again. Was |
| 5  Q. So that would come from the BBA? | 5    that -- before we look at the detail, can we focus on |
| 6  A. Yes. | 6    the top of that only, please, and not its content. |
| 7  Q. Let's look, please, at JEX/021. I have taken a few of | 7    Again, was that a document that you saw? |
| 8  the documents, my Lord, from your bundle so I'm not | 8  A. I don't recall it. |
| 9  going to take those. This is an mail that is ultimately | 9  Q. Thank you. Take that down. Thank you. |
| 10  forwarded to you, I think, Mr Ewan, and you're aware of | 10    JEX/024. You were present at this meeting. Let me |
| 11  it; all right? I'm not showing you that at the moment | 11    just get my -- how frequently would you attend the Money |
| 12  but just so you can see this. It's from Simon Green and | 12    Markets Liaison Group, Mr Ewan? |
| 13  it's to Christopher Ford. Christopher was who? | 13  A. In 2007 I believe infrequently. You can see that where |
| 14  A. He was somebody who worked with me on LIBOR. | 14    my name is listed, it says "alternate" because the BBA's |
| 15  Q. So he was one of your assistants, was he? | 15    usual representative was Alex Merriman. |
| 16  A. Yes. | 16  Q. Go to paragraph 2 of that note, please. I wonder if we |
| 17  Q. "Hi Chris, I wonder if you would be able to help me. | 17    can just bring that up, "Interbank market and LIBOR |
| 18  I work at RBS as an interest rate derivatives trader and | 18    fixings": |
| 19  obviously a number of my instruments fix against LIBOR. | 19    "Several group members thought that LIBOR fixings |
| 20  Today I think there have been some serious issues with | 20    had been lower than actually traded interbank rates |
| 21  certain banks' LIBOR inputs and I would like to speak to | 21    through the period of stress. LIBOR indices needed to |
| 22  someone at the BBA to raise my concerns. If you or one | 22    be of the highest quality given their important role as |
| 23  of your colleagues can help me [he then gives his | 23    a benchmark for corporate lending and hedging and as |
| 24  number] give me a call effectively." | 24    a reference rate for derivative contracts. Mr Ewan |
| 25  Now, was that followed up? | 25    outlined the quality, control and safeguard measures |
| <div align="center">Page 98</div> | <div align="center">Page 100</div> |

<div align="right">25 (Pages 97 to 100)</div>

| | |
|---|---|
| 1 used by the BBA to ensure the quality of LIBOR. | 1 November 2007. This is an e-mail from you, again |
| 2 Dispersion between panel banks submissions had increased | 2 I suggest to the FXMMC, is that correct? |
| 3 during August but had since fallen back, in part | 3 A. Yes. |
| 4 reflecting clarification on the BBA on LIBOR | 4 Q. Thank you. |
| 5 definitions." | 5 "All, I'm starting to receive more and more comments |
| 6 Outlining the quality, control and safeguarding | 6 and queries on the levels at which rates are currently |
| 7 measures, what does that refer to at that point in time? | 7 setting. These universally state that the rates are |
| 8 **A. I can't remember exactly what was in place at that time,** | 8 unrealistically low as the few offers of cash in the |
| 9 **but I think -- I think by this point we are preparing** | 9 market are well above posted BBA LIBOR rates. Others |
| 10 **for the Foreign Exchange and Money Markets Committee** | 10 comment that the LIBOR rates do not correlate accurately |
| 11 **regular reports on the inputs into the rates.** | 11 with other market indicators." |
| 12 Q. Did you reflect at that meeting to the participants the | 12 I will go through the e-mail entirely and ask you |
| 13 reports that you had received, certainly it looks like | 13 some questions about it: |
| 14 about low-balling, talks about rates? Did you reflect | 14 "Currently these queries are coming largely from |
| 15 at that meeting some of the concerns that had been | 15 hedge funds, non-contributing banks and the occasional |
| 16 expressed about fixing against books? | 16 broker. As I understand it, the that Bank of England is |
| 17 **A. I can't remember.** | 17 informally asking questions of market participants and |
| 18 Q. Because it was, shall we say, an acknowledged activity | 18 I know that this is an issue in which Paul Tucker is |
| 19 in 2007, looking at the relationship meetings we looked | 19 interested. I would very much like to avoid any further |
| 20 at, 2006, 2005, that there was a relationship between | 20 short-term bad publicity such as a further hostile FT |
| 21 banks' books and LIBOR, do you agree? | 21 article, but more importantly I do not want the fixings |
| 22 **A. We had had suggestions, reports, accusations that it** | 22 to lose credibility in the market. I'm not best placed |
| 23 **happened which we did our very best to put right.** | 23 to judge this but I would welcome your views on whether |
| 24 Q. Thank you for that, but was it acknowledged by that | 24 rates in the market are currently artificially low. |
| 25 stage, as reflected in the meeting notes that you have | 25 I realise that this is not a straightforward question as |

| | |
|---|---|
| 1 taken with panel banks between 2005 and 2007, that banks | 1 the interbank market is not functioning as usual at the |
| 2 were commercially setting against their LIBORs? | 2 moment. Further, if this group agrees that rates may be |
| 3 **A. I really can't remember the exact state of mind or state** | 3 too low or are concerned that there might be |
| 4 **of certainty that I was in at November 2007.** | 4 a perception that this is the case, I would welcome |
| 5 Q. Well, earlier that year we've looked at -- in fairness | 5 views on how we address this. My view is that we can do |
| 6 to you it doesn't talk about derivatives but it talks | 6 no harm by writing to all contributors to the rates. |
| 7 about manipulation -- in the 2007 panel visits the | 7 I envisage that such a letter would note that there is |
| 8 possibility of former manipulation taking place, let's | 8 a heightened scrutiny of the rates at the moment |
| 9 put it that way, in 2007? Do you remember the | 9 combined with difficult conditions and differing views |
| 10 references, "It's going well. It's working well now, | 10 of the market and remind all contributors of the |
| 11 you know, all the problems that have been existing"? | 11 definition of LIBOR and the instructions to |
| 12 **A. And that would, I think, having read through the** | 12 contributors. We might also mention that the FX & MM |
| 13 **documents with you earlier today, have been my view.** | 13 committee scrutinising the rates as membership of the |
| 14 **There wasn't unanimity on this, but I think the --** | 14 bank is at the invitation of the FX & MM panel members |
| 15 **I think it's fair to say that the composite generally** | 15 and may be replaced at the discretion of the committee. |
| 16 **held view was that the rates were about as accurate as** | 16 "Sorry to be intruding on your time. Given the |
| 17 **they could be, given what was going on.** | 17 state of the markets, I believe it is important we |
| 18 Q. The question was not just about accuracy. It was | 18 actively consider these matters now to avoid any |
| 19 a question that it was a received wisdom that some banks | 19 possible tarnishing of the reputation of the rates and |
| 20 submitted LIBORs for commercial advantage? | 20 also in order to demonstrate to market participants that |
| 21 **A. That was certainly something that was put to the BBA** | 21 there is an effective governance of the rate setting |
| 22 **repeatedly.** | 22 process." |
| 23 Q. Thank you. JEX/026, please. I wonder if we can just go | 23 Then you invite everyone for a conference call; all |
| 24 to the bottom of that e-mail, please. It's the | 24 right? Now, within that you clearly are, as you have |
| 25 penultimate page. Thank you. We have moved now to | 25 said to the jury, trying to maintain the rate, the |

Day 9                                R v Hayes                              8 June 2015

**Page 105**

1    accuracy of the rate; yes?
2    A.  Yes.
3    Q.  But you're also reflecting, aren't you, the overwhelming
4         amount of information that you had received that
5         low-balling was taking place?
6    A.  As I say, there are comments saying that it's happening,
7         yes.
8    Q.  If we scroll up, please.  This is again you circulating
9         an e-mail, around 6 December, so a few days after that
10        first e-mail:
11             "I have received mixed responses to my previous
12        e-mail.  Some committee members agree that LIBOR rates
13        are currently setting below 'real' market rates but
14        others do not feel that this is the case, at least as
15        a general statement across all currencies."
16             Pause there.  There was a distinction, wasn't there,
17        Mr Ewan, between the problems that LIBOR experienced in
18        US dollar and other currencies?
19   A.  Yes, there was, because the committee and the BBA knew
20        that there were a lot more financial instruments,
21        products that referenced dollar LIBOR more than the
22        other currencies.
23   Q.  Please tell me if you disagree.  The currencies that the
24        BBA were particularly focusing on at this stage, in this
25        period of volatility, were dollar, sterling and euros,

**Page 106**

1    in particular?
2    A.  From what I recall, yes, I think that's fair.
3    Q.  Thank you.
4         Let's return to the e-mail:
5             "There is certainly agreement that usual market
6         conditions are not in effect and the concept of
7         reasonable market size has moved to a much smaller
8         amount now relative to earlier in the year."
9             That being a reference back in quotes to the
10        definition; yes?
11   A.  Reasonable market size is a term in the definition, yes.
12   Q.  Thank you.
13            "However, I have heard from two sources as yet
14        unnamed contributor banks have offered to take US
15        dollars at 10 basis points above the rates they
16        submitted to the fixing process earlier in the day.
17        I feel strongly that if this is true, it must be not
18        allowed to continue.  Such allegations are extremely
19        damaging to the credibility of the LIBOR rate at any
20        time and in the current market climate when the fixings
21        are under heightened scrutiny I believe that they must
22        be seen to be taking action to ensure the accuracy of
23        the rates."
24            Did you make or take steps to find out who those two
25        contributor banks were?

**Page 107**

1    A.  I don't recall.  I do recall in general that amongst the
2         people that I spoke to, in general, there was a marked
3         reluctance to point fingers or tell tales.
4    Q.  It would have required, wouldn't it, the appropriate
5         questioning of an individual when they provide
6         information?  Would you agreed with that?
7    A.  But it may well have been -- I can't recall the exact
8         details surrounding this -- that I did and whoever was
9         speaking to me said, "I don't want to tell you" and
10        I did not have any abilities to make them.
11   Q.  So are there instances where that response was given to
12        you?  Are there instances where that response was given
13        to you, "I don't want to tell you"?
14   A.  I can't recall a specific example, but, yes, it was --
15        there was -- it was -- the people that I spoke to didn't
16        want to name names.
17   Q.  I'm going to suggest, Mr Ewan, there are instances where
18        you didn't pursue it because of the tension of the BBA
19        with its members.
20   A.  Yes, I can -- I can recall on one occasion not asking
21        and --
22   Q.  Because ...?
23   A.  I beg your pardon?
24   Q.  Because ...?
25   A.  I wouldn't -- it wasn't clear to me what I would have

**Page 108**

1    been able to do with that information.
2    Q.  You will see an example of that later.
3         So:
4             "Some members of the committee have noted that
5         a threat to replace existing panel members could be
6         counter-productive as existing panels are a good
7         representation of those banks that are at the top of the
8         credit spectrum.  Appointing panel members who might pay
9         higher rates would undermine the rate as the reputation
10        of the lowest available real world rate.  This clearly
11        is an issue of concern but I'm not sure this matters if
12        the market begins to question whether BBA LIBOR
13        currently reflects the real world anyway."
14            That was the position, wasn't it, Mr Ewan?  At that
15        stage, at that point there was significant questions
16        about the accuracy of the rates and whether they
17        reflected real world?
18   A.  Yes.
19   Q.  Thank you.
20            "Apart from my concerns about credibility of the BBA
21        product, if the rates are in fact too low this will not
22        help contributors or the wider market in the longer
23        term.  For example, the Monetary Policy Committee pays
24        close attention to the BBA LIBOR rate in its
25        decision-making process and any possible inaccuracy in

27 (Pages 105 to 108)

Day 9                              R v Hayes                          8 June 2015

**Page 109**

1  the rate may influence their action.  For these reasons
2  I would like permission from the committee members to
3  write to all contributors banks to remind them of the
4  definition of LIBOR, their undertaking to submit
5  accurate rates and inform them that it is the FX & MM
6  committee's view that reasonable market size has shrunk
7  considerably in the last few months."
8      Pausing there.  Letters did go out, as you have
9  described, to contributing panel banks; yes?
10 **A.  Yes.**
11 Q.  But in the context in which we're now dealing with it,
12 there was obviously a groundswell of banks that were on
13 occasion ignoring the BBA's recommendations?
14 **A.  I don't think that's a safe conclusion.**
15 Q.  So you don't think that even members of the FXMMC were
16 low-balling?
17 **A.  It comes back to the point we've discussed many times,**
18 **which is it's very, very difficult to know because what**
19 **was the real rate in a market where there isn't actual**
20 **cash?  It's extremely hard to prove and to know and we**
21 **could through the evidence find many, many occurrences**
22 **of participant banks saying, "This happens but it's not**
23 **me".**
24 Q.  Yes, agreed.
25 **A.  And my response to this at the time was to try to get**

**Page 110**

1  **the committee to agree that there should be therefore**
2  **blanket instructions to all submitters to say, "Please**
3  **submit accurate rates".**
4  Q.  Did you not think it was part of your responsibility to
5  undertake some investigative steps to acquire evidence
6  when you were told about these events, to then put it in
7  front of the FXMMC?
8  **A.  Yes, and I did.**
9  Q.  Right.  The evidence would have taken the form
10 presumably of you speaking to the relevant banks?
11 **A.  Yes.**
12 Q.  Where, firstly, the complaint arose?
13 **A.  Yes.**
14 Q.  They saying, as you have just described, "It's not us,
15 it's someone else"?
16 **A.  Well, it depends whether it was a general or a specific**
17 **allegation.**
18 Q.  If they then sought to deflect the attention to another
19 bank, it would have required you to have asked which
20 bank; yes?
21 **A.  Yes.**
22 Q.  Did you do that?
23 **A.  I don't recall.**
24 Q.  Having asked which bank, presumably you would have then
25 taken the step of phoning up the person responsible for

**Page 111**

1  the submission?
2  **A.  As I've said, banks were very reluctant to actually name**
3  **names.**
4  Q.  Let's look slightly further up that e-mail then to the
5  next e-mail on the chain, over the page.  This is from
6  Phil Rawlins at Bank of Scotland.  Was he on the FXMMC?
7  **A.  I think he was.**
8  Q.  This is now 6 December on this chain:
9      "John, I can confirm that there are banks setting
10 LIBORs well below the level that they're paying in the
11 market.  We are not one of them."
12     Pausing there.  Evidence, as you say, of exactly
13 what you have just described here; yes?
14 **A.  Yes.**
15 Q.  "The issue is particularly obvious in dollars.  Whilst
16 this is frustrating and complicating the funding
17 process, we're largely ignoring LIBORs now in a cash
18 sense as the absolute level of markets seems to be more
19 relevant.  By this I mean the implied cost of funds
20 generated from the FX swap price (3 sterling swap to
21 dollar LIBOR plus 20 basis points).
22     "As for enforcing the LIBOR definition, while
23 I welcome this initiative it is likely to be
24 unproductive.  For some years the concept of funding
25 levels beyond three months has been completely

**Page 112**

1  speculative and therefore based on the futures strip and
2  more accurately the swap level for the comparative
3  period.  The issue created by the credit crisis is that
4  the spread between annual three swap, for example, and
5  LIBOR has diverged from the consistent 2 basis points
6  between 10 and 30 basis points at present.  Where is the
7  real money coming?  It's not.  What benchmark should you
8  use to set LIBORs?  Arguably the swap rate.  This is
9  clearly happening at some banks and while the cash
10 market is restricted to sub 90 days, it's hard to argue
11 against it."
12     Just pausing there.  Against the swap rate, would
13 that have been consistent with the definition at that
14 stage?
15 **A.  No.**
16 Q.  So it would have required, in light of the evidence you
17 have given, for him -- did you speak to him about which
18 banks were doing this?
19 **A.  I can't remember.**
20 Q.  "Separately many institutions set their LIBORs based on
21 their derivatives reset position which under normal
22 conditions cannot be manipulated because of the
23 stability suggest above.  When markets become volatile,
24 their real intentions become clear."
25     What did you understand that sentence to mean?

28 (Pages 109 to 112)

1    A.  I can't remember what I -- what construction I placed on
2        that when I received it.
3    Q.  He's clearly identified to you, Mr Ewan, hasn't he,
4        that, as he says, many institutions set their LIBORs
5        based on their derivative reset position; yes?
6    A.  That's what Phil Rawlins says.
7    Q.  Would that have been consistent with type 1 activity or
8        was that something else?
9    A.  If you're setting your LIBOR because of your derivatives
10       position, that's wrong.
11   Q.  So do you now understand that extract to have been
12       inconsistent with the LIBOR definition?
13   A.  Yes.
14   Q.  And he is a member, I think you said, of the FXMMC?
15   A.  I think so.  I couldn't say to be absolutely sure.
16   Q.  Some of the communications that you're receiving are
17       directly from your committee members; yes?
18   A.  Hmm, hmm.
19   Q.  Reflecting this activity going on, whether it be
20       low-balling, derivative reset positions that we've just
21       looked at, but in essence what you're doing is
22       therefore, as I understand it, taking back to the people
23       who have informed you about it, is that right?
24   A.  Well, I think what we did in this particular case is at
25       or very shortly afterwards we had a meeting of all of

1        the contributor banks, to which Ms Knight attended, and
2        laid out to them why it is so important that they need
3        to submit accurate LIBOR rates.
4    Q.  You knew by that stage, didn't you, that people were
5        setting prices that were not the reality of the prices
6        in the market?
7    A.  Which is why we tried our very best to do everything
8        within our abilities to make sure that people set
9        accurate LIBORs.
10   Q.  If you had been given examples I think we've touched on
11       already of other banks and those banks were named, you
12       would have taken steps, would you?  Is that what you're
13       saying?
14   A.  Yes.
15   Q.  I wonder if we can please have on the screen JEX/028.
16       This is a transcript, Mr Ewan, of you and Mr Storey.  So
17       the jury can follow it and can follow it -- I think
18       you have it in your hard copy -- I think we also have
19       the associated audio with it, if that could be played,
20       please.
21           (Audio recording played to the court)
22       That's not the one.  Is there one under JEX/028?
23       Let's read it.  Mr Ewan and you are speaking:
24       "Hi, it's Miles from Barclays.
25       "Hello, how are you?

1        "Oh interesting times, as the Chinese would say."
2        You laugh.
3        "You may live in them, yes.
4        "Indeed" says Miles.
5        "Good old LIBORs.  Appearance at the turn of the
6        year in the one month and stuff.
7        "Yes."
8        Pausing there.  What do you think he meant by the
9        "appearance of the turn of the year in the one month and
10       stuff"?  Do you know?
11   A.  Well, I think I can take a reasonably informed stab at
12       that.  I think that tends to happen -- what you find
13       happening is there's an effect with LIBORs where as you
14       get to the year-end, because a bank has to ensure that
15       it is funded across the year-end, when you get to the
16       day which is one month away from the last business day
17       banks try to ensure that they are funded so they will be
18       very keen to borrow which means that there are lots of
19       people who want -- in the market to borrow one month
20       money which means that the price will go up and that's
21       a simple supply and demand effect.
22   Q.  Yes.
23   A.  And this seems to be November 29th and so it's probably
24       a month before the last business day, so this is
25       probably a discussion around the appearance or

1        non-appearance or size of that spike.
2    Q.  Thank you.  Miles says:
3        "I know we've talked about this, you know, and where
4        people are setting them versus the reality of the prices
5        in the market.
6        "Yep.
7        "I think this is sort of raising its head again.
8        "Hmm, hmm.
9        "Just talking off the record so that you're aware,
10       on the one dollar month for instance.
11       "Yeah.
12       "The highest, I think the highest setting today was
13       5.30 and we were one of those people.  It's actually in
14       the market at 40, 50 and 60 and there are some people
15       putting in settings of 15.
16       "Right.
17       "One person, for instance, setting at 15 was RBS and
18       yet ABN was paying 50 and getting money.  How that sort
19       of thing, you know, I'm not saying that ABN is RBS,
20       et cetera, et cetera, and I'm not trying to pick on them
21       as particularly counterparty -- particular counterparty
22       because there are other people setting them down in the
23       15s, 18s and 20s but, you know, the divergence between
24       where people are posting them for whatever reason and
25       where they're actually trading, if they're trading at

| Page 117 | Page 119 |
|---|---|
| 1   all, but also where people may be doing things with | 1   A.  Yes. |
| 2   corporates is beginning to sort of creep out of the | 2   Q.  We referred earlier to Barclays at one point earlier in |
| 3   woodwork and I think, you know, you as the BBA, we as | 3       the year being consistently higher in the rates; yes? |
| 4   the BBA, might see some of something coming 'our way'. | 4   A.  Yes. |
| 5   The other thing I would make an observation is that we | 5   Q.  As a result of which, they attracted adverse financial |
| 6   believe that the FSA has been talking to people, like | 6       media comment about their financial health? |
| 7   brokers, about their responsibility when giving | 7   A.  Yes. |
| 8   indications of market prices for the purposes of fair | 8   Q.  It was one of the reasons that provoked low-balling, do |
| 9   valuing. | 9       you agree with that? |
| 10       "Right. | 10  A.  It was certainly one of the factors in banks becoming |
| 11      "Now that could easily creep into all you might say | 11      concerned about what their LIBOR submissions could be |
| 12   that a broker might start thinking about.  Are they | 12      interpreted as. |
| 13   referring to where I sell people, where I say to banks | 13  Q.  We'll come on to it in a second.  He actually deals with |
| 14   I think LIBOR might be?  You know, how LIBOR fixings | 14      it, but he's just said to you: |
| 15   work, half the time banks actually ask brokers. | 15      "Banks are afraid to stick their heads above the |
| 16      "Yeah. | 16  parapet." |
| 17      "Banks ask the brokers where the market is, as | 17      He continues: |
| 18   against a bank working out where the market is so, | 18      "Barclays has got a problem because it's posting |
| 19   again, I'm not saying that the FSA are looking at | 19  higher LIBORs than anyone else and, that having |
| 20   LIBORs, it would surprise me if they were and even if | 20  happened, I think people are reluctant to post higher |
| 21   they did they would probably only come back to you guys, | 21  because no one will get out of the pack.  The pack sort |
| 22   those guys. | 22  of stays low." |
| 23      "Yeah. | 23      He's explicitly telling you, isn't he, Mr Ewan, |
| 24      "On the topic but I think that second point I'm | 24  about the existence of low-balling? |
| 25   making is more something that somebody said to me and | 25  A.  He says -- he says what he says.  He says that Barclays |

| Page 118 | Page 120 |
|---|---|
| 1   they were interpreting it around LIBORs. | 1       attracted adverse comment when they posted numbers |
| 2       "Right. | 2       higher than other banks. |
| 3       "The next question is what do you do or what do you | 3   Q.  What did you understand when he was saying to you, |
| 4   do but I think market stress is starting to show this | 4       "Stick their head above the parapet, they're afraid to"? |
| 5   one up and I think, you know, in good times everyone's | 5   A.  Well, what -- he says that he feels that Barclays posted |
| 6   happy but at the moment this isn't.  It's not a good | 6       higher LIBORs and people then questioned Barclays. |
| 7   time and I'm staring -- I must admit, I'm starting to | 7   Q.  Is this what you would describe as only the smoking gun |
| 8   hear this more often. | 8       of type 2 activity? |
| 9       "Yeah. | 9   A.  It's not a smoking gun because I wasn't shown Barclays |
| 10      "One of the vulnerabilities of the BBA and the | 10      posting a LIBOR at a level and then borrowing in the |
| 11   indices as indices is, you know, accusations or comments | 11      market at a higher level. |
| 12   around the risk -- without being too emotive -- | 12  Q.  Forgive me, that's not the point.  He is saying, "We are |
| 13   manipulation for whatever reason is going to come out. | 13      above the pack".  You would have had the rates available |
| 14   Now you could say what's the point, you know, because | 14      to you; yes? |
| 15   we've had this before about the top four and the bottom | 15  A.  Yes. |
| 16   four have dropped out but as an aggregate I believe, you | 16  Q.  He would have at this stage -- Barclays would have been |
| 17   know, I'm not going to say whether I think manipulation | 17      an outlier at the top by some margin in certain |
| 18   is or isn't going on because I think it's far too | 18      currencies? |
| 19   difficult to point that out, but I do believe that | 19  A.  Yes. |
| 20   LIBORs are being set lower than they ought to be because | 20  Q.  It's not about his LIBOR but everyone else's? |
| 21   in the aggregate banks are afraid to stick their heads | 21  A.  Well, if he's posting where he thinks he needs -- if |
| 22   above the parapet and post higher numbers because what | 22      he's putting the rate in that he thinks is the rate at |
| 23   happened to us when we did, you get shot at." | 23      which he gets money and other banks are putting in the |
| 24      Pause there for one moment.  Miles Storey is at | 24      rate at which they think they get money, you know, |
| 25   Barclays; yes? | 25      I can't exactly recall and construct the credit quality |

| | |
|---|---|
| 1     **of all of the LIBOR banks at this time, but maybe** | 1  Q. He was clearly telling you about the market.  He was |

**Page 121 (left column)**

1     **of all of the LIBOR banks at this time, but maybe**
2     **Barclays was a higher risk bank.  Maybe it should have**
3     **been posting a higher LIBOR.**
4  Q. Wouldn't it have required -- and this is Mr Storey.  Was
5     he the Chairman of the FXMMC at that stage?
6  **A. I think so.  He was certainly on it.  I think he may**
7     **have been the chair at that time, but I can't remember**
8     **exactly when he became chair.**
9  Q. All right.  Turn over the page:
10     "I personally don't believe that that's what's
11  actually keeping them lower than where they ought to be
12  and therefore accentuating or aggravating the
13  differentiation.  There's no way on earth that we as
14  banks should go and talk to each other, for instance.
15     "Hmm, hmm.
16     "Well, I'll set it 10 higher if you do because
17  that's just as bad the other way round.  We had quite
18  a long conversation with our money market guys this
19  morning before we decided where to set our dollar LIBORs
20  and dollar is the one that is most accentuated.
21     "Right.
22     "Sterling is much less of an issue but because
23  everybody is chasing dollar liquidity.
24     "Yes.
25     "That's where it's coming to a head.  I'm sure

*Page 121*

**Page 123 (right column)**

1  Q. He was clearly telling you about the market.  He was
2     clearly telling you about potentially other banks.
3     I suggest he gave basis for an enquiry about other
4     banks.  Did you follow it up?
5  **A. Our follow-up was to tell all of the banks to submit**
6     **accurate rates and I believe at or slightly after this**
7     **time -- I think a few days after this -- Angela Knight**
8     **went as far as to write to the Chairman or CEO of all of**
9     **the contributors banks to explain to them why they had**
10     **to submit accurate rates.**
11  Q. Look at the next document, please, JEX/030.  We can take
12     this relatively quickly as we've seen part of it before.
13     At the bottom of that e-mail, Mr Ewan, is the starting
14     to receive more and more comments, the one you've looked
15     at already; okay?
16     I want to go to the top, please.  Again, this is
17  Mark Thomasson:
18     "I would not agree that all currency LIBORs are
19  fixing artificially low, although the US dollar rates
20  have attracted much attention.  In short, the market is
21  broken.  There are no offers of reasonable market size
22  in the cash markets.  This period has illustrated that
23  many panel members are not active in the cash markets
24  and will fix according to their perception of where they
25  think cash should be available to them or how the

*Page 123*

**Page 122 (left column)**

1  you're aware.
2     "I mean, I would like to head this off before it
3  becomes an issue.  I do think there is a -- there is
4  a way that we can, I mean, we can, can we, I'm quite
5  happy, for example, to write to all contributors and
6  say -- I mean, it's very difficult for me, you know,
7  there's no precedent of the BBA having done this, but
8  saying, 'Oi, you lot'.
9     "Yep, I did.  I think some at the very least, if
10  only for internal and/or future external consumption,
11  something from you guys, a rec -- you know, the thing
12  about this is where is the enforcement of governance?
13  The answer is there isn't any because (i) there wasn't
14  needed to be and then (ii) how does a trade association
15  enforce on can't [is how it's written] on contributors."
16     He is, we think at this stage, the chair of the
17  FXMMC; yes?
18  **A. Hmm, hmm.  Yes.**
19  Q. He is saying enforcement is your responsibility?
20  **A. I think that the action of enforcement is the**
21     **responsibility of the BBA so the act of enforcing**
22     **against a contributor bank is done by the BBA because**
23     **the BBA owns the rates, but the decision to enforce and**
24     **the form of the enforcement would be the decision of the**
25     **committee.**

*Page 122*

**Page 124 (right column)**

1  spreads against derivatives are trading."
2     "With regard to panel members, he talks about that.
3  I'm not going to take you through that.
4     "With reference to press articles, I feel you would
5  be well-placed to question the integrity of some of the
6  articles published in the recent months, in particular
7  the reporting of banks using the standing facilities
8  offered by the Bank of England has been far from
9  accurate.  This type of misinformation creates a fear of
10  being seen to be out of line, the suggestion being that
11  fixing higher LIBORs demonstrates a need for cash."
12     We had seen the bottom half of the e-mail but this
13  is a new response to that original bottom.  What do you
14  understand by how the spreads against derivatives are
15  trading at the end of that first paragraph?
16  **A. I think that is a reference to what would be permissible**
17     **type 1 behaviour.  There is no cash.  You have to do**
18     **something to try and fix your LIBOR.  So you look at how**
19     **derivatives that have historically tracked LIBOR are**
20     **trading and you work out where your cash would be using**
21     **those levels.**
22  Q. You don't think that's a suggestion, because of the word
23     "or", looking at spreads against derivatives for LIBOR
24     fixing?
25  **A. I think that is a reference to permissible type 1**

*Page 124*

**31 (Pages 121 to 124)**

| | |
|---|---|
| 1   behaviour. | 1   [there's a slight distortion the tape] money markets is |
| 2   Q. Thank you. | 2   I heard somebody at Gulf International Bank rang me this |
| 3   MR HAWES: My Lord, I'm just asked for an afternoon break, | 3   morning and said LIBORs are too low. He says that |
| 4     if that's a convenient time? | 4   a contributor bank offered to take cash from him at 10 |
| 5   MR JUSTICE COOKE: Yes, thank you. Five minutes, please, | 5   basis points above what they had been contributing. |
| 6     members of the jury. | 6     "Right. |
| 7   (3.21 pm) | 7     "And he didn't name the bank and I specifically |
| 8         (Short break) | 8   asked him not to but that's not okay." |
| 9   (3.35 pm) | 9     Why did you specifically ask him not to name the |
| 10   MR HAWES: Can we have JEX/031, please. Mr Ewan, this is | 10   bank? |
| 11     a further telephone call between you and Mr Storey on | 11   A. I don't recall exactly, but I think it would have been |
| 12     5 December. I think you have seen this before, haven't | 12   because I would not have known what my response or |
| 13     you? | 13   responsibility should have been without speaking to my |
| 14   A. Yes. | 14   management, the Foreign Exchange and Money Markets |
| 15   Q. Let's summarise it to this extent: there's introductions | 15   Committee. |
| 16     at the start and then towards the bottom of that page, | 16   Q. Forgive me, Mr Ewan. Someone from Gulf International |
| 17     this is Miles to you: | 17   Bank is phoning you to complain that LIBORs are too low |
| 18     "It sort of grumbled through the grapevine that -- | 18   and he's talking about a contributor bank. You don't |
| 19     and I believe this to be a mixed message down the | 19   need, do you, permission to ask which contributor bank |
| 20     trenches, if you know what I mean, that the FSA has been | 20   he is talking about? |
| 21     communicating with people about LIBORs. | 21   A. Yes, but my response is it must not happen. |
| 22     "Right. | 22   Q. It's a different question. |
| 23     "Has that filtered to you at all? | 23   A. I accept that, but -- |
| 24     "No. | 24   Q. You don't need permission to ask which contributor bank |
| 25     "I don't believe it to be the case and we saw the | 25   he is talking about? |
| Page 125 | Page 127 |
| 1   FSA ourselves in person and they didn't raise the issue | 1   A. At the time I was very clear, as this phone call -- this |
| 2     but I wondered if anyone -- anybody at anywhere else | 2   transcript says, that it can't happen. It must not |
| 3     around your neck of the woods had raised it? | 3   happen and the way that I felt that that should best |
| 4     "I'd only heard that. I've only heard it in | 4   happen is by everybody behaving in appropriate -- in |
| 5     connection with things that -- well, that might be | 5   line with what they had agreed to do, to quote the |
| 6     interested and they could show interest, but nobody -- | 6   definition to the best of their ability. |
| 7     I don't know of anybody at any bank who has said, 'Yes | 7   Q. Let's break it down, shall we? At the time you |
| 8     the FSA have spoken to me'." | 8   have just said you were very clear that people should |
| 9     Pause there. That's in relation to LIBOR that we | 9   set the rate accurately; yes? |
| 10     are talking about here, as opposed to anything else? | 10   A. Yes. |
| 11   A. I would assume so. | 11   Q. You have been told by a non-panel bank, which I assume |
| 12   Q. Thank you. | 12   Gulf International is, yes? |
| 13     "Right. I know some people worry about it but | 13   A. Yes. |
| 14     I don't know that stuff. Worrying and thinking is one | 14   Q. That they are aware of a contributor bank, namely one on |
| 15     thing and (ii) FSA conversations are supposed to be | 15   the panel, who has offered to take cash from him at 10 |
| 16     confidential anyway" says Miles. | 16   basis points above what they have contributed that day; |
| 17     You agree. He wondered if you had heard overtly and | 17   yes? |
| 18     you say you hadn't heard anything. | 18   A. Yes. |
| 19     I want to just go over the page, please. There's | 19   Q. You have agreed earlier that that type of activity would |
| 20     discussion about rumours, how they go round very | 20   not be in accordance with the definition? |
| 21     quickly. Then we come to this: | 21   A. Yes. |
| 22     "Yes, I mean [this is you], ah, yeah, that's all | 22   Q. To ensure clarity of the rate and accuracy of the rate, |
| 23     I've heard, is that it might be the case now what I did | 23   as you are telling the jury, required you to ask which |
| 24     hear and I'm going to get back in touch with him before | 24   bank it was? |
| 25     I exchange. I send another e-mail around before I check | 25   A. I disagree. |
| Page 126 | Page 128 |

32 (Pages 125 to 128)

| | |
|---|---|
| 1 Q. Because ...? | 1 not, you needed to ask the question who? It's simple. |
| 2 A. I believed then that the best way of making sure the | 2 Do we agree? |
| 3 rates were accurate was for everybody to behave in line | 3 A. I've said that I don't -- I did not know how to respond |
| 4 with the definition. | 4 to that situation. |
| 5 Q. How -- | 5 Q. All right. Let's move on. Miles then says to you in |
| 6 A. It was not -- | 6 response: |
| 7 Q. Sorry -- | 7 "Well that's going on. We know that's going on" |
| 8 A. It was not clear to me what I would be able to do with | 8 which is a reference to the variance between the LIBOR |
| 9 the information, what the correct response was, but, as | 9 postings and where people are taking cash in the market |
| 10 you can see from what I said at the time, I believed it | 10 that day, do you agree? |
| 11 was wrong. | 11 A. That's what Miles says. |
| 12 Q. It's a separate issue. My question is one about | 12 Q. You say, in fairness to you, as I just indicated: |
| 13 investigation; all right? I'm not suggesting you say | 13 "That must stop. It can't happen because that is |
| 14 here it's right. The transcript speaks for itself. | 14 going to undermine the rates irredeemably quickly, |
| 15 I want to understand whether any investigation was | 15 incredibly quickly. |
| 16 undertaken. Is the short answer "no"? | 16 "That helps to contribute to lead me on the second |
| 17 A. I don't remember. | 17 point about what feedback you have had from your note." |
| 18 Q. Were you nervous about a contributor bank being named, | 18 This is Miles. |
| 19 given that they may well be sitting on the FXMMC? | 19 Now, you say, over the page: |
| 20 A. Yes, that would have been of concern to me. | 20 "I've only heard back from one member of the |
| 21 Q. Why? | 21 committee who says that he wouldn't agree that the |
| 22 A. Because the BBA is a trade body that's supposed to act | 22 currencies that all LIBORs are fixing artificially low. |
| 23 in the best interests of its members. | 23 The fact that market is broken, there are no offers of |
| 24 Q. A conflict of interest? | 24 reasonable size, panel members are not active in the |
| 25 A. I don't know whether it's technically a conflict of | 25 cash markets, won't affect according to their perception |
| Page 129 | Page 131 |

| | |
|---|---|
| 1 interest but -- | 1 of where cash should be available to them, the cash -- |
| 2 Q. Never mind the technicalities. | 2 because cash isn't available to them. I just marked |
| 3 A. But, yes, I agree there is a difficulty there because | 3 Thomas into RBS." |
| 4 the BBA is responsible, on the one hand, for ensuring | 4 Then there's a noise and then Miles says: |
| 5 that the rates are accurate and, on the other hand, is | 5 "Right, okay, so rather than, you know, in summary, |
| 6 also responsible for looking after its members. | 6 there's been one answer so that implies people, you |
| 7 Q. I'm not going to labour the point but you talk about | 7 know, they're not too busy choosing not to necessarily |
| 8 accuracy of the rate? | 8 address the issue." |
| 9 A. Yes. | 9 You agree: |
| 10 Q. Here was an opportunity to take a step to identify | 10 "I think it's going to need, having heard that this |
| 11 a contributor bank from which you could have then | 11 morning, I need to write or I need to send another |
| 12 ensured the accuracy of the rate, but you didn't take | 12 message to be able to defend myself that I'm taking |
| 13 it? | 13 action if I stood up by the FSA or some journalist or |
| 14 A. That's not necessarily the case because all there is | 14 something or a journalist or something." |
| 15 there is a reported allegation from Gulf International | 15 What did you mean by that? |
| 16 Bank that somebody -- who they may in fact not have been | 16 A. Well, having made the point that I believe it is |
| 17 prepared to name anyway -- was doing something. I mean, | 17 absolutely wrong, if this is happening, for it to |
| 18 there is an obvious assumption that the person from Gulf | 18 happen, and I'm saying that as well as my belief that |
| 19 International Bank is telling the truth. | 19 it's wrong I need to demonstrate that the BBA is taking |
| 20 Q. "I specifically asked him not to ..." | 20 action to make sure it doesn't happen again because |
| 21 A. Yes. | 21 I wouldn't like to find myself in seven years hence |
| 22 Q. To get to the point whether there was any truth in the | 22 asking questions about the issue. |
| 23 allegation or not, you would have specifically needed to | 23 Q. Well, if that is the case, why make the decision that |
| 24 have asked him, wouldn't you? To even start the process | 24 you made about the Gulf Bank? |
| 25 of knowing whether this was just merely an allegation or | 25 A. Because, as I've said, I didn't have clear guidelines |
| Page 130 | Page 132 |

Merrill Corporation
(+44) 207 404 1400                    www.merrillcorporation.com/mls                    8th Floor, 165 Fleet Street
London EC4A 2DY

**Page 133**

1  about what I was supposed to do.  As I have said,
2  I agree there is a tension between the two jobs of the
3  BBA, if you like, but both Miles and I agree it
4  shouldn't happen and we would like to do everything in
5  our powers to make sure that it doesn't.
6  Q.  Miles has said to you that, in light of your note, which
7     is a note you wanted to send out to contributors -- do
8     you remember the reference me saw earlier? -- people are
9     choosing not to necessarily address the issue.  Is that
10    something that you found was the case?
11 A.  I don't think we -- well, if it was, it was something
12    that was addressed very quickly because there were
13    follow-ups by me, by Angela Knight, with all of the
14    contributor banks so it was certainly with something that
15    they had to address.  Angela Knight wrote to the chief
16    executives or Chairman of all of the contributors banks
17    so there's not -- I don't really see what more the BBA
18    could have done.  I mean, at the highest levels of the
19    bank they are aware that it's happening and we have
20    said, "This is not right".  The BBA had no regulatory
21    power.
22 Q.  Forgive me, Mr Ewan, does that mean that you are
23    accepting, if this is about low-balling, you do now
24    accept this is not just a smoking gun, this is
25    happening?

**Page 134**

1  A.  Miles thinks that it's something that is seen in the
2     market.  I don't know, because I don't know exactly
3     where every bank is taking cash, but I -- the point
4     surely is that we're very clear that whether it's
5     provable, it should not be happening.
6  Q.  Put that to one side for one moment because, as
7     I understand, and correct me if I'm wrong, your evidence
8     you have said to the jury there were smoking guns, there
9     were lots of complaints --
10 A.  Those aren't smoking guns, those are just complaints.
11 Q.  Right, but ultimately you at that stage didn't recognise
12    low-balling.  Have I misunderstood your evidence?
13 A.  That --
14 Q.  At that stage you didn't recognise that there was
15    low-balling taking place?
16 A.  I think at around that time, and I can't remember
17    exactly what I thought on the day, but I was extremely
18    worried that it might be happening and -- which is why
19    I took the actions that we've just been describing.
20 Q.  Yes.  I want to concentrate on your state of knowledge
21    at that time because here's Mr Storey, chair of your
22    FX Committee, and you sharing a conversation where he
23    says, "Well, we know, mutual, that this is happening".
24    Common wisdom between the both of you.
25 A.  I don't accept that.

**Page 135**

1  Q.  Well, he says it to you.  You don't disagree with him.
2  A.  I don't --
3  Q.  Do you?
4  A.  I do not know whether I could have said at the time that
5     I was certain that it was happening.  I know that I was
6     very concerned about it and I was trying to do my best
7     to make sure it wasn't happening.
8  Q.  In fairness to you, if we look at page 3 of that
9     transcript -- so let's not take it out of context -- he
10    says to you:
11       "We know that's going on."
12    Your response is:
13       "It's got to stop" in essence.
14    So, in fairness to you, that's precisely what you
15    were saying, but the point is you're not saying to him,
16    "What do you mean it's going on?"  There was a received
17    wisdom at that time that you and the BBA knew that
18    low-balling was taking place?
19 A.  I don't accept that.
20 Q.  All right.  Let's look at JEX/032, please.  I wonder if
21    we can just scroll to the bottom of that firstly.  Thank
22    you.  This is an e-mail from you toward the end of 2007
23    now, 7 December, subject, "LIBOR rates":
24       "All ..."
25    This is an internal BBA e-mail communication; yes?

**Page 136**

1  A.  Yes.
2  Q.  Thank you.
3       "... we have to keep a close eye on how the rates
4     are perceived at the moment.  There is more sustained
5     stress in the credit market than there has been seen for
6     a very long time.  The BBA LIBOR is going to come in for
7     criticism whatever we do.  Hopefully this will be
8     a short-term issue which will peak in the run-up to the
9     New Year.  Between now and year-end we will see more
10    banks announcing their results and their plans for
11    managing exposure to subprime."
12       That's a reference, is it, Mr Ewan, subprime,
13    mortgages and their exposure to debt?
14 A.  Yes.
15 Q.  "On this front so far all the banks look like they're
16    okay, unless there are further skeletons in the
17    cupboards or special investment vehicles that we don't
18    know about.  Paralysis of money markets will only get
19    worse until year-end.  The issue is how to manage
20    perception of the rates partially in the media but more
21    importantly from my point of view how they are perceived
22    by the bank, the FSA and the treasury.  I am happy we
23    can deal with the further instances of slanted reporting
24    in the pink press but if these stories are launched on
25    the back of questions from the government or regulator,

34 (Pages 133 to 136)

1    that will be harder to answer."
2      Why would those questions have been harder to
3    answer?
4   A. So at this time there were lots of people talking and
5    writing about LIBOR and these people were writing both
6    that the rates were too high and that they're too low,
7    which additionally was an issue because one of those
8    statements might be right but they can't both be right,
9    but they're both criticisms which we felt at the BBA we
10   had to deal with.
11     Now, if a journalist comes to the BBA and says,
12   "I believe that the rates are too high or too low
13   because such and such a person has told me so", the one
14   response to that is, "Well, that's just the opinion of
15   such and such a person and here are three other guys
16   that think the reverse", whereas if the questions come
17   from the government or a regulator you immediately get
18   a follow-up question which is, "Are you saying that the
19   regulator's wrong or the government's wrong?" and that's
20   a more -- that's a bigger issue.
21  Q. Well, it's not a bigger issue. You have described it as
22   harder to answer.
23  A. Yes.
24  Q. Because it concerns, does it, the accuracy of the rate?
25  A. Potentially, yes.

Page 137

1  Q. And the way in which banks were operating at that stage
2   in the market to fix their LIBORs which you knew about.
3   Isn't that why you've written it's harder to answer; in
4   other words, in your evidence, Mr Ewan, are you saying
5   that the questions from government or regulator would
6   be -- my words -- more piercing?
7  A. Well, they might be, but that's, I don't think, my
8   point. My point is that a journalist would feel they
9   had a stronger story if they can write FSA are asking
10   questions about LIBOR, rather than some random bloke
11   asking questions about LIBOR.
12  Q. All right. Let's scroll up the e-mail then, please.
13   Ross Barrett is who?
14  A. He was a colleague who --
15  Q. Can you scroll down, please?
16  A. -- worked for Alex Merriman, like I did, but he
17   wasn't really involved in anything to do with LIBOR.
18  Q. Internal BBA though?
19  A. Internal BBA colleague, yes.
20  Q. Thank you. The next e-mail, you said, "Yes, certainly"
21   in response to that. He says:
22   "We'll chat on Monday. It's all going off. Angela
23   has asked me to get in the head of treasury for all the
24   contributor banks to give them a kicking."
25   What does that mean, if that's not plain?

Page 138

1  A. I can't remember exactly, but I would imagine that is
2   a lighthearted illusion to Ms Knight's rather forthright
3   style.
4  Q. Was it a frequent occurrence that you would get in the
5   head of treasuries from the various panel banks to "give
6   them a kicking"?
7  A. No.
8  Q. So may I ask why is there a difficulty in recollecting
9   these particular events?
10  A. I don't think I said there was a difficulty in
11   recollecting it. You asked me for context and I gave
12   you the context, I believe.
13  Q. All right. Scroll up the e-mail, please. Ross Barrett
14   back to you:
15   "Tin hats on then."
16   Were you present at that meeting that Angela Knight
17   had with the head of treasuries?
18  A. I don't recall. Probably. I think I was travelling for
19   business and/or around then. I don't recall whether
20   I actually attended it. I can't say for sure.
21  Q. Thank you. Let's look, please, at JEX/033. I am sorry,
22   that's a wrong reference on my part. JEX/034, sorry.
23   Just allow me one moment, please, Mr Ewan. (Pause)
24   Can we scroll to the bottom of the e-mail. There's
25   a lot of headers on this one so just scroll. Thank you,

Page 139

1   that's fine. So you're writing an e-mail to those
2   individuals we'll see above. I think you have the hard
3   copy but we'll look at them in a minute, saying:
4   "Thank you very much for your reply. Responses
5   favour a meeting."
6   So in essence this is just a general e-mail to these
7   individuals calling -- go down slightly. You see the
8   original e-mail that you have called to the
9   contributors:
10   "As you know, accurate BBA LIBOR fixings are central
11   to the ongoing health of the markets and so at this time
12   the heightened stress and scrutiny more than ever is
13   vital that the BBA LIBOR rate setting process is seen to
14   be transparent and robust. It has been increasingly
15   prominent comment in the market and media on the rates
16   and so I would like to invite you to a meeting chaired
17   by our chief executive Angela Knight to discuss openly
18   the integrity of the fixings and how to ensure their
19   accuracy in the future."
20   Two issues arise from that. Integrity and accuracy,
21   both presumably, therefore, Mr Ewan, had been called
22   into question by this stage?
23  A. Yes.
24  Q. You then set out the provisions for the conference call.
25   We won't read that into the transcript. Then we scroll

Page 140

1  up, which is the e-mail we've just been looking at. You
2  say:
3      "Balance of responses favour the meeting on
4  11 December."
5      Then I think Jon Wood, if we go above that, please,
6  that's to the FXMMC and members of the BBA, is that
7  right, that was sent to? If you look on screen,
8  Mr Ewan, that may assist you.
9  A. So the question is this --
10  Q. Those are the FXMMC and the BBA members that were
11  invited to the meeting?
12  A. I think that's correct.
13  Q. Thank you. Can we scroll up, please. Jon Wood then
14  e-mails you on 11 December:
15      "Can you enlighten me on conclusions. For your
16  information we are seeing the first signs of easing
17  today. If we can get a bit of momentum going it will be
18  as well not to break it."
19      Jon we know became, but not at this stage, the chair
20  of the FXMMC, is that right?
21  A. Correct.
22  Q. Scroll up. Your response to him:
23      "Jon, no conclusions really, more of a tour de table
24  where everybody vented their pain. All agreed that we
25  are seeing a high liquidity premium in the emergence of

Page 141

1  two or even three tier market where you're ability to
2  raise funds depends on your name. All also observed
3  that right now posting a high LIBOR rate is interpreted
4  by the market as meaning that you have a funding problem
5  so no one will do so as it's a self-fulfilling prophecy.
6  The one concrete conclusion was to get the FX & MM
7  committee to meet in mid-January when the year-end has
8  passed and when we're hopefully in calmer waters to
9  think about the definition of LIBOR. It clearly isn't
10  the rate at which banks lend to each other. It seems
11  that view is that the rate really indicates where you
12  can access liquidity and there might be a better way of
13  defining this."
14      Now, two issues that arise from that. Posting
15  a high LIBOR rate is interpreted by the market as
16  meaning you have a funding problem so it's in essence
17  a self-fulfilling prophecy. That is reflective, is it,
18  Mr Ewan, of what you were being told at that meeting?
19  A. Yes.
20  Q. Which is low-balling?
21  A. Yes.
22  Q. Were you told by the banks that were low-balling they
23  were doing it?
24  A. As ever, in these situations you would find that
25  either -- when asked the question banks would either

Page 142

1  say, "It happens but it's not us" or they would not name
2  names.
3  Q. Pause, because the context of this meeting is the tin
4  hats meeting; all right? Ms Knight internally is, to
5  use the colloquial, going to give them a kicking. It's
6  about integrity and it's about accuracy. Were you told
7  that the banks were low-balling?
8  A. I can't remember if that was -- that happened at that
9  meeting.
10  Q. Because in the context in which meeting was called I'm
11  assuming, but correct me if I'm wrong, that maybe the
12  first response of, "We're not doing it" wouldn't
13  necessarily have been accepted, would it, because it's
14  not consistent with the tenor internally within the BBA?
15  A. I think I'm fairly happy to state that Ross and I were
16  at the time fairly junior members of staff who observed
17  Angela's usually extremely frank and forthright style.
18  Q. So --
19  A. And we had both been on the receiving end of it.
20  Q. So if she had a very frank and forthright style and this
21  was about integrity and accuracy, she's not going to
22  effectively let them off the hook, is she?
23  A. I think she was insistent that banks should be posting
24  LIBORs that are as accurate as possible in a frozen
25  market.

Page 143

1  Q. In terms of integrity and accuracy, were derivatives
2  discussed?
3  A. I don't recall.
4  Q. Can you assist us, please, with the last paragraph. You
5  clearly have identified to Mr Wood that in early 2008,
6  mid-January, you're going to think about the definition;
7  yes?
8  A. Yes.
9  Q. "It clearly isn't the rate at which banks lend to each
10  other. It seems that view is that the rate really
11  indicates where you can access liquidity."
12      What does that mean?
13  A. I think that is -- well, it's not the rate at which the
14  banks lend to each other. I think that's probably
15  a reference to the then governor of the Bank of
16  England's pithy comment that LIBOR is the rate at which
17  banks don't lend to each other. It's a reference to the
18  fact that there's no lending activity in the market.
19  Q. So that was the governor?
20  A. That was what the governor said at one point, yes.
21  Q. So the governor of the Bank of England has misstated the
22  definition?
23  A. I think the governor of the Bank of England was
24  attempting a rare joke.
25  Q. But getting the definition wrong?

Page 144

36 (Pages 141 to 144)

**Page 145**

1   A. He was making a joke.
2   Q. But it required you to re-think about the definition at
3      least, if it was a joke?
4   A. Well, no, the governor's joke didn't, but the meeting
5      where, in seriousness, our contributor banks told us
6      that LIBOR is a rate for cash and there is not cash
7      transacting in the market, so if there isn't cash
8      transacting in the market and your definition is for
9      cash transacting in the market, there is a problem with
10     the definition.
11  Q. But your type 1 activity would accommodate that?
12  A. Yes, it would.
13  Q. So it --
14  A. But it's not -- sorry to interrupt. Yes, it would, but
15     it would be better for everybody if, rather than having
16     to rely on type 1 activity, it was possible to create
17     a rate that didn't require that.
18  Q. Did you contemplate -- I know it didn't change --
19     changing the definition to something other than cash?
20  A. Yes.
21  Q. To reflect the difficulties in the market in the
22     interbank cash market?
23  A. Yes. I think that was -- whether we'll come to it or
24     not I don't know, but that was one of the central planks
25     of the consultation that took place in early 2008.

**Page 146**

1   Q. I'm going to take you, please, to JEX/035. Now, you may
2     need to assist us, Mr Ewan. Firstly, is that your
3     handwriting?
4   A. Yes.
5   Q. So now this is one of the notes that we have of one of
6     the meetings. You dated it at the top right-hand
7     corner, is that accurate? Is that your hand?
8   A. I think, yes.
9   Q. Can you help us with this. So top left-hand corner, is
10     this a meeting internally or is this a meeting with the
11     FXMMC?
12  A. It's neither because there are people who are external
13     to the BBA but there are people who I don't recognise as
14     being Foreign Exchange and Money Markets Committee
15     members, like Adrian Spain, Nick van Overstraten that
16     looks like.
17  Q. So can you identify from the -- so Miles appears to be
18     there. Is that Miles Storey?
19  A. Yes, I would assume so.
20  Q. Can you identify from the participants in what looks to
21     be some on the telephone -- I think there's a little
22     legend at the top "on phone" -- what the purpose of the
23     meeting was?
24  A. Without completely reviewing this, no, but I would
25     assume it's a meeting to discuss LIBOR which was being

**Page 147**

1     chaired by AK is Angela Knight, with a group of LIBOR
2     contributors.
3   Q. Is this the Angela Knight meeting?
4   A. It may very well be, yes.
5   Q. Right. I'm afraid you're going to have to help me with
6     your hand. Is that "cross currency swaps spreads very
7     wide"?
8   A. Yes.
9   Q. "Term cash market doesn't exist"?
10  A. Yes.
11  Q. That meaning as we've discussed?
12  A. That at longer dates, like six months, 12 months, it's
13     very difficult for banks to borrow cash.
14  Q. Then I'm afraid below that, with the next hash, what
15     does that say?
16  A. "Lowings" which would be a reference to Mark Lowings who
17     was a contributor but I don't recall from which bank,
18     and it says:
19        "LIBOR is very relevant because 90 per cent of all
20     internal business is priced off LIBOR."
21  Q. What did you -- obviously that's your note, but
22     90 per cent of all internal business priced off LIBOR,
23     is that a reference to treasury functions within a bank?
24  A. I would assume so.
25  Q. Thank you. The next entry, is that --

**Page 148**

1   A. "Differential between derivatives and cash market."
2   Q. Meaning ...?
3   A. Well, I assumed means that they price at different
4     levels which is perhaps wholly understandable.
5     Unfortunately I haven't recorded precisely which
6     derivatives he was discussing.
7   Q. The next entry, is that "FX forwards normally arb
8     [arbitrage] out"?
9   A. Yes.
10  Q. "But not happening at the moment."
11     What does that mean?
12  A. Usually I think what this is a reference to is in theory
13     in a perfect market, where there's plenty of liquidity
14     and nobody is worried about credit, you should be able
15     to, let's say, borrow cash in dollars at whatever the
16     rate is, say 5 per cent, and then you should be able to
17     borrow cash in another currency, perhaps euros, and then
18     do foreign exchange swap into dollars and the two should
19     come out at the same. There should be no advantage or
20     disadvantage in those transactions. They should in
21     effect look the same.
22  Q. Is it a way in which one can get implied level of
23     funding for your LIBOR submission?
24  A. It is something that you can use as colour for your
25     LIBOR. It's market information, but it should not be

37 (Pages 145 to 148)

**Page 149**

1  how you set your LIBOR.
2  Q. Next, does it say -- correct me if I'm wrong:
3      "Some banks can still attract cash, depends on your
4  name. There is no point in one contributor post"?
5  A. One contributor posting 4.95 and the other 5.35 as it
6      dilutes the credibility of LIBOR."
7  Q. Well, that's not in accordance with the definition?
8  MR JUSTICE COOKE: What isn't?
9  MR HAWES: The comment that has been made in the note.
10 A. Well, first of all, that is reportage of one person at
11     this meeting and their viewpoint and there's nothing in
12     there that's a problem with the definition of LIBOR. If
13     one contributor can borrow at 4.95 and the other has to
14     pay 5.35 if that's the way that market is discriminating
15     between those two banks, that's just fine.
16 Q. Isn't he saying there is no point in one contributing
17     bank posting one figure and another posting another
18     because it dilutes the credibility of LIBOR?
19 A. Whoever this person is, it is their view that if a bank
20     posts one -- yes, posts 4.95 and the other posts 5.35,
21     it dilutes the credibility of LIBOR and I think, as we
22     will come to see, if we look at what happens
23     through 2008, in fact banks post considerably wider
24     spreads between the lowest and the highest because
25     that's an effect of the market and it's perfectly

**Page 150**

1  consistent with the definition. It may just be that at
2  this point whoever it is either hasn't come to terms
3  with or just doesn't like the cash markets.
4  Q. Well, in the narrow confines in which you have described
5  it just now, whoever has spoken there is saying one bank
6  puts in one rate, another puts in another rate and the
7  variance between the two would undermine the credibility
8  of LIBOR. That's what that note says?
9  A. That's what that person at that time said, yes, but
10     there's no -- there is nothing that is wrong with that.
11 Q. So one bank can have regard to another bank's rate?
12 A. No.
13 Q. How would it otherwise then dilute the credibility of
14     LIBOR?
15 A. I don't know. In my view I think the fact that in
16     a stressed market if one bank is putting in a rate
17     that's significantly different to another bank, it
18     actually underlines the credibility of LIBOR because
19     LIBOR is reflecting a very tiered market.
20 Q. Exactly. This -- exactly, and this quote that you have
21     recorded is contradicting that that you've just said?
22 A. Well, that's the view of one person at the meeting.
23 Q. Thank you. The next line:
24     "Dollar LIBOR is most out of line."
25     Is that what that says?

**Page 151**

1  A. Yes.
2  Q. "Due to ...", sorry, I can't read your writing?
3  A. I think that says:
4      "Due to desire in Europe for dollars."
5  Q. "RBS US banks have access to dollars but will not go
6  offshore."
7      Correct me if I'm wrong, is that a reference to the
8  difference between US dollars and availability for panel
9  banks that are American and US European dollars for
10 non-American names?
11 A. That might be what that's a reference to, but you're not
12     supposed to -- you're not supposed to, in line with the
13     definition, quote the rate at which you can borrow
14     dollars in the US.
15 Q. Because it's a London rate?
16 A. Because it's a London rate. Nevertheless, if you are --
17     at the moment LIBORs are basically all about how risky
18     you are. So the rate at which people will lend to you
19     is based on how risky you are. Now, if whoever is
20     potentially lending knows that you as a bank can, as
21     a bank, access US dollars in the US, you're less risky
22     so you might quite legitimately pick up dollars in
23     London at a slightly lower rate and there's nothing
24     problematic with that.
25 Q. Thank you.

**Page 152**

1  "Miles ..."
2      The next entry, can you read that to us?
3  A. "You can't post a high LIBOR as the market will assume
4      you have a funding problem. You should post your real
5      rates."
6  Q. So that reflects the conversation that you had had with
7  him on the telephone some time before; in other words,
8  (i) here you agree you should post your real rates and
9  he's saying, "We are"?
10 A. Hmm, hmm.
11 Q. "(ii) others are not"?
12 A. Well, I think he's discussing what Barclays were
13     perceived to have happened to them earlier in the year,
14     which is that they put in a high LIBOR rate and at the
15     time they attracted some comment from the market saying,
16     "I wonder if Barclays has a problem?" but he also says,
17     "You should post your real rates".
18 Q. Can you read the next entry, please?
19 A. "Tony Miller [presumably the missing word is 'said'] but
20     you have to have a predictable rate or people can't use
21     a LIBOR curve."
22 Q. Carry on.
23 A. "This leads to a suggestion that derivative traders need
24     a derivative rate."
25 Q. Then ...?

Day 9          R v Hayes          8 June 2015

**Page 153**

1   A. "Look to the OIS rate?"

2   Q. What did you understand that to be a reference to?

3   A. I think that is a reference to a conversation that

4    really took shape throughout 2008 which is can LIBOR,

5    which is used for such a huge number of purposes by

6    people all around the world, really be fit for purpose?

7    Should there be rates that are specifically created for

8    this person to do this and that person to do that?

9   Q. Now, others can ask you about other aspects of your

10   note. I just want to take you over the page, please.

11   Just below "all due to one month in dollar", do you see

12   at the bottom there:

13    "Broker allegedly ..."

14    Can you help us with what says there, please.

15   A. "Broker allegedly told a bank their line of credit would

16    be removed if they didn't indicate rates lower."

17   Q. What's that a reference to?

18   A. That would seem to be somebody saying that allegedly

19    a broker has told a bank that they would have to show

20    lower rates, otherwise their line of credit -- their

21    ability to borrow from somebody would be taken away.

22   Q. Thank you very much. I just want to briefly now show

23   you very quickly an e-mail which is JEX/036, just to

24   reference a date. It's the very top, Mr Ewan. This is

25   when Mr Curtler, can you confirm, becomes part of the

**Page 154**

1   FXMMC committee on 12 December, or about then, 2007?

2   A. Yes.

3   Q. Thank you.

4    JEX/039, please. This is material that I think you

5   have been shown but I just want to confirm whether you

6   saw it at the time or not. The e-mail is towards the

7   bottom. I wonder if we can just scroll down, please.

8   It's not copied immediately to you but it comes from the

9   Federal Reserve. Did you see that at the time?

10   A. I don't remember. I think it would be extremely unusual

11    if I had been. That appears to be an e-mail from the

12    New York Fed, an American -- part of the American

13    Central Bank, to the Bank of England.

14   Q. It's talking about draft documentation now in March

15   of 2008 produced by the BBA?

16   A. Yes.

17   Q. Would this have been the documentation that ultimately

18   resulted in the "Understanding and construction and

19   operation of LIBOR. Strengthening for the future"

20   in June 2008?

21   A. I think that's likely.

22   Q. Which the jury have and we'll look at in a while.

23   MR JUSTICE COOKE: So is that dating English dating or

24   American dating?

25   MR HAWES: Well, I think --

**Page 155**

1   MR JUSTICE COOKE: It comes from America.

2   MR HAWES: It does. If you scroll up, I think that puts it

3    beyond doubt.

4   MR JUSTICE COOKE: Correct.

5   MR HAWES: But it's a sequence of e-mails. My question

6    really for showing you this is the following: you were

7    starting to be responsible for the underlying drafting

8    of the document that the jury have in their jury bundles

9    at A6A, which is the document we've looked at; yes?

10   A. Yes.

11   Q. Who started that draft with you? Would you have all the

12    responsibility of that on your own or would others have

13    contributed to it?

14   A. I don't recall who first put pen to paper, but I do

15    recall that that document went through perhaps dozens of

16    drafts and that there were a lot of people involved in

17    doing drafts and being asked to give their opinions and

18    views in order to include them in the document.

19   Q. The jury have heard a little about this

20    already. Were you aware -- well, did you know that the

21    Bank of England and the Financial Services Authority, as

22    then were, did not want to be publicly associated with

23    the document?

24   A. Yes, I did.

25   Q. Were you aware that the Bank of England regarded the

**Page 156**

1   document as drafted as being inadequate?

2   A. Well, I think that entirely depends on which draft

3    you're talking about because I think that document went

4    through an awful lot of forms in the, let us say, three

5    months that it took us to get it into its final shape

6    and I believe that the New York Fed and the FSA and the

7    Bank of England and various other official bodies were

8    happy with the final draft that was released.

9   Q. But didn't want to be publicly associated with it?

10   A. No, they did not.

11   Q. That touches, I think, we agree, Mr Ewan, on that

12    tension between them not wanting to engage with LIBOR

13    but requiring you to try and look after it?

14   A. I think obviously you would need to speak to the Fed or

15    the Bank of England, but I believe that their view was

16    twofold. The first was it's a market rate and it's up

17    to the markets to fix the issue and I think the second

18    viewpoint was it would be very difficult for them to put

19    their name to a paper on LIBOR because if they did that,

20    they recognised that it would give the paper more weight

21    and everybody else would immediately ring them up and

22    say, "You've given LIBOR your endorsement, can you

23    please endorse my rate, my index?"

24   Q. You had been present at Bank of England meetings, for

25    the Money Markets meeting in particular. I just want to

39 (Pages 153 to 156)

Day 9                                R v Hayes                           8 June 2015

| | |
|---|---|
| 1 | pose a contrary position to you for your comment, |
| 2 | please. Was there reticence about association with the |
| 3 | rate because of accuracy? |
| 4 | **A. Well, you're asking me to speculate about this.** |
| 5 | Q. Was that ever expressed to you? I don't want you to |
| 6 | speculate. Was it expressed to you? |
| 7 | **A. I don't believe anybody from the official sector ever** |
| 8 | **said that to me, so whether it was the bank or the Fed** |
| 9 | **or the Swiss National Bank or whoever.** |
| 10 | MR HAWES: Right. I wonder if that's an appropriate moment, |
| 11 | my Lord? |
| 12 | MR JUSTICE COOKE: Yes. |
| 13 | MR HAWES: Thank you. |
| 14 | MR JUSTICE COOKE: Thank you very much. 10 o'clock tomorrow |
| 15 | morning, please, members of the jury. Thank you very |
| 16 | much indeed. |
| 17 | (In the absence of the jury) |
| 18 | MR HAWES: Just in terms of time, as your Lordship knows |
| 19 | we're going to review the list of documents to come |
| 20 | tonight and will try and cut those down so I'll finish |
| 21 | tomorrow. |
| 22 | MR JUSTICE COOKE: Right. Thank you. |
| 23 | (4.35 pm) |
| 24 | (The court adjourned until |
| 25 | 10.00 am on Tuesday, 9 June 2015) |

<div align="center">Page 157</div>

| | |
|---|---|
| 1 | INDEX |
| 2 | MR JOHN EWAN (continued) .............................3 |
| 3 | Cross-examination by MR HAWES ...................3 |
| 4 | |
| 5 | |
| 6 | |
| 7 | |
| 8 | |
| 9 | |
| 10 | |
| 11 | |
| 12 | |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

<div align="center">Page 158</div>

40 (Pages 157 to 158)

Merrill Corporation            www.merrillcorporation.com/mls        8th Floor, 165 Fleet Street
(+44) 207 404 1400                                                   London EC4A 2DY

**Page 1**

1    Tuesday, 9 June, 2015
2    (10.00 am)
3         (Proceedings delayed)
4    (10.17 am)
5         (In the presence of the jury)
6    MR JUSTICE COOKE:  Good morning.  Mr Hawes will continue
7      with cross-examination.
8              MR EWAN (continued)
9         Cross-examination by MR HAWES (continued)
10   MR HAWES:  Thank you, my Lord.  Mr Ewan, we were just
11     in March 2008, and I would like to now turn to JEX/040,
12     please.
13        I want to take you through only part of this
14     document, we can produce it in whole but it's just in
15     terms of timing.  This is a memo, Mr Ewan, from you to
16     Ms Knight and the wholesale and regulation team and it's
17     dated at the end of it, just to assist you, on
18     27 March 2008; okay?
19        I want to ask you about this because this is the
20     lead-up to a board meeting, I think
21     in April 2008.  Do you remember that?
22   A.  I remember there being a board meeting in April 2008.
23   Q.  Thank you.
24        This paper which you've created, I think, becomes
25     a board paper that Angela Knight adopts for the board.

**Page 2**

1         Do you see?  In other words, you've done the work and
2      then Ms Knight has taken that and provided it to the
3      board.
4    A.  Yes, I think it's very possible that she may have made
5      some drafting changes to it.
6    Q.  May have done.
7    A.  But, yes, I think this is originally from me.
8    Q.  Thank you.  So, it obviously concerns US dollar LIBOR
9      rates, as the title says, and at the very start, it says
10     on the introduction:
11        "At the most recent policy directors' working lunch
12     we were asked for bright ideas."
13        "Policy directors' working lunch" refers to what?
14   A.  Angela Knight had a -- she held, regularly, events
15     called policy directors' working lunch which would be
16     where all of the BBA policy directors that are involved
17     in all parts of the BBA's activity would meet and would
18     have a sandwich lunch.  And Angela would do a round of
19     all of the people there, and she would very often
20     discuss what she thought were the issues facing the BBA
21     and on occasion she would ask the policy directors what
22     issues or what -- what do you see going on in your
23     particular part of the BBA?
24   Q.  So, it was an internal working lunch?
25   A.  Yes.

**Page 3**

1    Q.  You've clearly noted in the memo you were asked for
2      bright ideas.  Does it follow that number of those
3      directors in the BBA were talking to you about LIBOR or
4      concerned about LIBOR?
5    A.  No.  I don't think it does.  From memory this was quite
6      early in the year and I think it was Angela asking for
7      what she thought the big issues that the BBA should
8      engage with or what issues each of the policy directors
9      were thinking about at the time.
10   Q.  The note continues:
11        "The major issue I am facing at the moment is
12     credibility of the BBA LIBOR fixings in US dollars."
13        A widely used rate, partly because of the size of
14     the US market and partly because the derivative world
15     tends to price on dollars, as we discussed yesterday.
16        Dollars being the principal area where the tension
17     in LIBOR was being experienced?
18   A.  Yes.
19   Q.  Thank you.
20        The issue the note says:
21        "I'm receiving increasing numbers of complaints from
22     users of the rates and other market practitioners that
23     US dollar LIBOR in particular is setting too low.  Some
24     of these seem compelling."
25        Does that mean by that stage you had in fact

**Page 4**

1      concluded that there was low-balling?
2    A.  No.
3    Q.  You were compelled?
4    A.  No.  It says they seem compelling, I don't think that
5      that is a statement that we are aware it's happening.
6      I think it's a statement that there are numbers of
7      comments and complaints that it is happening.
8    Q.  A note continues:
9        "The bank quoting the dollar rate is saying
10     publicly: this is the rate at which I can fund myself.
11     If that bank then goes into the market and takes funds
12     considerably above this rate it doesn't do much for our
13     credibility as the arbiter of the rates or the bank's
14     credibility."
15        That is type 2, isn't it?
16   A.  Yes, it is.
17   Q.  "I am told that such mismatches between what a bank
18     quotes and then later deals that are happening
19     frequently and the discrepancy is often 20 to 30 basis
20     points."
21        Now, that reflects the intelligence and the
22     information that you have received, and we looked at
23     yesterday, throughout 2007, doesn't it?
24   A.  I think that this -- the reason why this happened at
25     this time was it was in 2000 -- it was in very late 2007

1 (Pages 1 to 4)

**Page 5**

1     and early 2008 that the level of comments were
2     increasing, and the issue that I had was that there were
3     an awful lot of people commenting about LIBOR, and
4     I thought that many of these were from people who just
5     didn't like the level of the rates.
6  Q. If we divide them, you, as we saw yesterday, had
7     received comments from individuals who were not panel
8     bank; yes?
9  A. Yes.
10 Q. Who you have described as not liking the rate; yes?
11 A. Yes.
12 Q. That you had also received comments from members of the
13    FXMMC to the same effect, hadn't you?
14 A. We had received comments that they thought it happened,
15    but, as we've explored at length, we didn't have
16    a smoking gun.
17 Q. The note continues:
18    "This is of concern to the BBA because if true this
19    could very easily and very rapidly wreck the reputation
20    of the rates and damage the reputation of the BBA as
21    a whole, especially in these times of heightened
22    scrutiny of banks and concern about the money markets.
23    If the reputation of LIBOR is damaged it will not do the
24    wholesale interbank market any good and will encourage
25    participants to look for an alternative benchmark which

**Page 6**

1     would compromise a rapidly growing revenue stream for
2     the BBA."
3     One of the issues I touched on with you yesterday is
4     there was a tension within the BBA, wasn't there, about
5     losing LIBOR commercially?
6  A. That was vastly outweighed by our concerns that -- about
7     ensuring that the rate was accurate.
8  Q. It might have been outweighed by your concerns of the
9     accuracy of the rate, but it was sufficient, wasn't it
10    Mr Ewan, for you to note it fairly quickly in the issues
11    document that we're looking at.
12 A. Well, it comes below my concerns about the accuracy of
13    the rate. Yes, the BBA was making a proportion of its
14    revenue from LIBOR, but it was not the main way that the
15    BBA was funded, it was one of the ways in which the BBA
16    made income.
17 Q. The note continues:
18    "Banks will not be easily persuaded to alter their
19    quoting policy because (1) if a contributor suddenly
20    quotes a higher or 'more realistic' rate it will
21    immediately draw attention to itself and potentially
22    start rumours about liquidity or solvency problems at
23    the bank. No one bank will break ranks."
24    "More realistic rate" is accuracy, isn't it,
25    Mr Ewan?

**Page 7**

1  A. That is me commenting on the comments that I have
2     received from users or other people in the market. The
3     reason I don't -- and that is why it is in quotation
4     marks because it's not something that I personally have
5     said it is reported commentary from other people who
6     have said it to me.
7  Q. It had been said, as we looked at on a number of
8     occasions yesterday, more than once, however, hadn't it?
9  A. Yes.
10 Q. In 2007 you were, if I may generalise it, being told
11    this quite frequently?
12 A. Yes, we were also being told quite frequently that the
13    rates were accurate.
14 Q. Number 2:
15    "Banks quoting LIBOR use it as the basis for their
16    internal and external funding rates. It will cost
17    a bank's treasury money if it increases its rates."
18    What does the second sentence mean?
19 A. Well, I think it's -- the meaning is fairly clear.
20    However, I haven't since reflected on that sentence and
21    I'm not sure if it is in fact accurate.
22 Q. Well, you wrote this at the time; yes?
23 A. Yes.
24 Q. You must have been satisfied about its accuracy at the
25    time because you are writing it to your CEO; yes?

**Page 8**

1  A. Yes.
2  Q. So you are concerned about its accuracy now, is it
3     because you are looking at the consequences of the
4     meaning of that sentence?
5  A. No. It's because I'm not a bank treasurer and I'm
6     trying to think through whether that would be the case
7     and without having deep and expert knowledge about the
8     way that banks' internal treasury functions work, I'm
9     not sure it would be something that I could state with
10    certainty.
11 Q. Well, let's put it this way, Mr Ewan, you wouldn't have
12    made that sentence up, would you?
13 A. No.
14 Q. It would have reflected the information that you were
15    receiving at the time.
16 A. Yes, I think that's fair.
17 Q. So even if you weren't sure about its meaning, you
18    regarded it as being sufficiently important to put it
19    into this memo?
20 A. Yes.
21 Q. Because I am going to suggest it means, doesn't it, that
22    the treasury within a bank is making commercial profit
23    from LIBOR?
24 A. You would need to ask a bank treasurer about that.
25 Q. Well, your sentence helps us, doesn't it:

2 (Pages 5 to 8)

**Page 9**

1    "It will cost if it increases its rates."
2    A. You would need to ask a bank treasurer.
3    Q. Well, can you not understand the meaning of the sentence
4        that you wrote?
5    A. Yes, I understand it, it's fairly simple English words,
6        but looking back on it now, I don't think, without
7        speaking to bank treasurers, that I could say, hand on
8        heart, that that's actually the case.
9    Q. In fairness to you let's look at paragraph 3:
10        "When pressed all contributors state that they
11        currently quote accurate rates, genuinely based on their
12        position."
13        Right, the evidence you have given this morning and
14        yesterday:
15        "Rapidly changing their pattern of quoting could be
16        seen as an admission that previous contributions were
17        not accurate."
18        If we turn over the page, you proffer two solutions,
19        solution 1, the carrot and solution 2, the stick and
20        we'll look at both of them.
21        The carrot:
22        "Co-ordinated action by a large number of panel
23        banks directed from the most senior level.  If I call
24        someone on a desk and ask them to change their quote,
25        the dealer will refuse for the reasons given above.

**Page 10**

1    Banks must therefore be persuaded that it is in their
2    collective interest to take action on this.  There are
3    a number of arguments that might appeal, the interbank
4    market is dysfunctional at the moment.  One reason for
5    this might be that the interbank market prices
6    specifically for LIBOR and if the LIBOR rates are not
7    representative how can the market function?  Moving to
8    more representative quotes will help this."
9        Pausing there, are you suggesting to your
10    Chief Executive officer, Ms Knight, that there should be
11    co-ordinated action with a number of banks directed at
12    the senior level to try to get them to change their
13    rates?
14   A. What I am suggesting is that there should be
15        co-ordinated effort to make sure that the rates are
16        accurate and quoted following the LIBOR definition.
17   Q. We're in a position where the dollar LIBOR -- or
18        certainly -- you are being told firstly that the rates
19        are not reflective of where people are borrowing; yes?
20   A. That, yes, that comment was given to the BBA.
21   Q. Secondly, that you regard that as being damaging to the
22        accuracy of the rate; yes?
23   A. I don't know what an open "accurate" mark is.  For two
24        reasons: the first is I never borrowed money in the
25        interbank cash market.  And, number 2, the rate -- the

**Page 11**

1    market was so dysfunctional, so frozen, there was so
2    little cash trading that it was very -- the phrase
3    "accurate" is very, very difficult at this point in time
4    to know, which is why -- we keep on going back to
5    this -- our -- what we end up -- leaving this internal
6    memo to one side, if I may, what we actually do is try
7    very hard to persuade banks that they must quote
8    following the definition.
9    Q. Your concerns are about the accuracy of the rate and the
10        reputation of the benchmark.
11   A. Yes.
12   Q. You don't know, as you've just said, what would be the
13        accurate rate; yes?
14   A. That's correct.
15   Q. But you are being told by people on your FX committee,
16        as we looked at, that the rates were not accurate.
17   A. And various people would say the rates are too high and
18        others would say they're too low, because where there
19        isn't an observable market that is transacting regularly
20        it's very hard to know.
21        Now, in that situation, when people are saying,
22        "It's too high" or, "It's too low", one of them can be
23        right, they can't both be right, and so we don't know,
24        but what we're trying to do is get people to quote
25        accurate rates.

**Page 12**

1    Q. If you don't know, as you've just said to the jury, what
2        the accurate rate was, why would there need to be the
3        carrot, as described here, of collecting the large
4        number of panel banks and directing -- your words --
5        from the most senior level?
6    A. Because there is commentary that the rates are not
7        accurate.  We don't know for certain whether that's
8        true, but there is enough commentary to make it an issue
9        of concern for somebody who wants to run an accurate the
10        benchmark for the benefit of the markets and we regarded
11        this as being of sufficient concern that we wanted to
12        ensure that the rates were being quoted accurately.
13        We didn't want to single out one particular bank
14        because that -- we -- that wasn't felt to be
15        appropriate.  So, our view was the correct way to
16        proceed would be to talk to everybody at the same time
17        and give them the same message, and --
18   Q. So, you are recommending, Mr Ewan, as we see in this
19        note, just using your language that you've just used,
20        that you do sit people down and talk to them to try, as
21        you say here, to persuade them to get a more accurate
22        rate?
23   A. We don't know what the accurate rate is.  We face
24        continual commentary that the rates may not be accurate.
25        These are of sufficient -- these are sufficiently common

Merrill Corporation              www.merrillcorporation.com/mls         8th Floor, 165 Fleet Street
(+44) 207 404 1400                                                      London EC4A 2DY

**Page 13**

1   that we feel we have to take action.  The action that we
2   decided that we needed to take was to give all of the
3   banks the definition at the senior level, so everybody
4   in the banks knows that what we're trying to do, and try
5   to ensure that banks post following the definition.
6   Q.  Let's move on.  Two:
7        "If the BBA were posting real US dollar rates it
8   would demonstrate to authorities worldwide how serious
9   the problems are and may influence their responses to
10  the issues."
11       "Real" there means what?
12  A.  Again, we come back to this idea that nobody knows what
13  an accurate rate is because there isn't a liquid market
14  and banks aren't doing interbank deals.
15  Q.  Paragraph 3, I'm not going to take you entirely through
16  it because it repeats the issue of basis points from
17  credibility.  I want to ask you about the last sentence:
18       "If we can orchestrate co-ordinated movement, no one
19  bank need be out of line with the rest of the
20  contributors."
21       Did the BBA orchestrate co-ordinated movement?
22  A.  No.
23  Q.  Did the BBA try to orchestrate co-ordinated movement?
24  A.  The BBA -- the BBA in public, or in private, said
25  nothing to the banks other than, "Please can you quote

**Page 14**

1   an accurate rate."
2   Q.  The stick, solution 2:
3        "There is no requirement for banks to deal at the
4   prices they quote, and indeed we could not create the
5   full suite of rates if we introduce this, as no
6   contributor bank will require funds each day for all the
7   currencies and maturities that they quote."
8        That's a reference to the different number of tenors
9   that you have and currencies that you have, is that
10  right Mr Ewan?
11  A.  Correct.
12  Q.  "However, we could let it be known that we are
13  considering recommending to the FXMMC a policy whereby
14  banks could be asked periodically to show proof that
15  they have dealt recent light or very close to the prices
16  they contribute in the liquid tenors, say overnight,
17  3-month and 12-month.  If a contributor cannot provide
18  evidence for this, we would recommend to the FXMMC that
19  they be removed from the panel.  This would be highly
20  embarrassing and very damaging for a bank's reputation.
21       "The draw back to this is that the FXMMC committee
22  largely consists of the major contributors to the rates,
23  who are also our largest members, and they might not
24  approve of this idea."
25       Was the second paragraph implemented?

**Page 15**

1   A.  No.
2   Q.  Because?
3        (Pause)
4        Because of the third paragraph?
5   A.  I think so, yes.
6   Q.  Conclusion --
7   A.  Sorry, if you just -- banks were, at the time, voluntary
8   members of the LIBOR contributing panels.  There is now
9   in law a requirement for banks to contribute to LIBOR,
10  there was not then.  If we made it difficult or arduous
11  to be a LIBOR panel contributor the problem was that all
12  the banks might just suddenly say, "I don't want to do
13  this any more", and then there wouldn't be a LIBOR rate,
14  and I was being told by everybody, including central
15  banks and regulators, that it is very important that
16  there is a LIBOR rate in the market every day.
17  Q.  Mr Ewan, that final paragraph that I've just read to you
18  doesn't reflect, with respect, what you've just told the
19  jury.  What it reflects, if I may suggest, is the
20  tension by the fact that you were effectively upsetting
21  your members?
22  A.  So, I don't need to tell Angela in a memo that, because
23  she knows it.
24  Q.  Well, you told her about your largest members, but you
25  didn't tell her about the evidence that you have just

**Page 16**

1   given to the jury.
2   A.  I --
3   Q.  She would know this, wouldn't she?
4   A.  What that the FX and MM committee consists largely of
5   the major contributors to the rates?  Yes, she would
6   know that.
7   Q.  Yes, yes.  What you are doing there is highlighting to
8   her the clear tension about your membership.
9   A.  Yes, there is a tension.  And with the benefit of 20/20
10  hindsight it turns out that, you know what, you probably
11  shouldn't have major benchmarks being run by industry
12  trade associations and LIBOR no longer is.
13       At the time, we were in the position that we were
14  in.  We couldn't go and get LIBOR submissions from
15  a group of people who weren't members of the BBA because
16  that group does not exist.  Our -- we -- from the very
17  beginning our sole concern was to have accurate LIBOR
18  rates.  Whatever accurate might mean, we wanted banks to
19  follow the definition of LIBOR.
20  Q.  Let's look at your conclusion:
21       "We need to address this issue rapidly.  Right now
22  the reputation of BBA LIBOR is being damaged and this
23  will directly influence our ability to continue to
24  profit from the data."
25       What does that mean?

4 (Pages 13 to 16)

1    A.  I think the meaning of that is quite clear.  But again
2         within the context this is a memo whose overarching
3         purpose is to try and figure out a way of getting the
4         banks to contribute according to the definition.
5    Q.  The note continues:
6            "I suggest we propose solution 1 to the next meeting
7         of the BBA board, and if this does not convince members
8         to take action, raise the possibility of solution 2."
9            In other words, may I suggest, it's the BBA seeking
10        the board's sanction for these points; yes?  But you are
11        driving it, the BBA are driving it.
12   A.  Well, LIBOR is owned by the BBA, but the -- the --
13        whilst the BBA owns it, it doesn't control it.  It is
14        controlled by the Foreign Exchange and Money Markets
15        committee, or at least the maintenance of the definition
16        is controlled by the FX and money markets committee.
17   Q.  It's an important distinction, isn't it?  The FXMMC
18        controlled the definition --
19   A.  Yes.
20   Q.  -- they didn't control the product, you did, the BBA
21        did.
22   A.  Yes, that's true.  But whilst we controlled the product,
23        we were clear that we produced it as a service to the
24        markets for the benefit of the market.
25   Q.  No dispute, but it's a commercial product which the BBA

Page 17

1         had a vested interest in?
2    A.  It did have a vested interest in it, it had a vested
3         interest in making sure that product was as good as
4         possible.
5    Q.  Final sentence, in fairness to you so it's there:
6            "The CEOs or the chairman of the banks on the FX
7         committee make up the majority of the BBA board and
8         I believe it's these individuals alone who have the
9         authority and strategic outlook necessary to effect this
10        change."
11           Now, did you attend the board meeting?
12   A.  I believe I did.
13   Q.  We'll come to that in a moment, but I just don't want to
14        take it out of chronological order.  I wonder if we
15        could now look at JEX/042.
16           Before we go to the content of this document,
17        Mr Ewan, I hope you'll agree the 2000 -- this is the
18        start of the 2008 relationship visits which had started
19        before the board meeting, I think it was on or about
20        16 April; okay?
21   A.  Yes.
22   Q.  The 2008 relationship visits in the way in which they
23        were recorded were slightly different from the ones that
24        we've looked at with the jury for 2007, 6 and 5.  Do you
25        agree with that?  They weren't in one compendious

Page 18

1         document.
2    A.  Well, I would have assumed that they would have been
3         later compiled into one because that was the purpose for
4         the consideration of the wider Foreign Exchange and
5         Money Markets committee.
6    Q.  Well, they are presented in these ways as single sheets.
7         There is a summary that we'll look at but it's not in
8         the same format as 6 and 7 and I wanted to know: was
9         there a document produced in the same way as we've seen
10        for 2006 and 2007?
11   A.  I can't remember.
12   Q.  All right.  I only want to touch very quickly on some of
13        the matters in here, again they can be available to be
14        read entirely if necessary.  The second response, this
15        is JP Morgan as we know on 1 April, you are present,
16        Peter Denton, who I think at this stage is your
17        assistant, is that right?
18   A.  Yes.
19   Q.  The two individuals from JP Morgan:
20           "There is a major difference between this year and
21        last year, there is very little activity in the cash
22        markets at the moment, it's dry and LIBOR figure is
23        miles away.  This is our big concern regarding LIBOR.
24        People are only dealing very short in the cash markets
25        and there is little from three months and beyond if any.

Page 19

1            "LIBOR is inaccurate and does not reflect actual
2         market conditions ... indicates a trade can be made at
3         a level but this is inaccurate as now trading happens at
4         LIBOR plus X amount of basis point.  LIBOR has become
5         more of a consensus."
6            Well now, what does that mean?
7    A.  I think that is a description of type 1 behaviour.  In
8         other words, there's no -- there is very little, as Fred
9         says, there is very little cash available in three
10        months or longer tenors than three months and so banks
11        are having to form a view of where they would get money
12        if -- if there was any.
13   Q.  It's, if I may suggest, not type 1, is it, Mr Ewan?
14        Because type 1 would have required the submitter to seek
15        alternative sources of information as to the value of
16        the borrowing and his submission, but it would have been
17        an individual decision by each submitter, wouldn't it?
18   A.  Yes.
19   Q.  Type 1 would require an individual decision.
20   A.  Yes.
21   Q.  You are being told that LIBOR is more of a consensus,
22        which is not an individual decision.
23   A.  That could be a consensus within JP Morgan.
24   Q.  Well, that's not what your note says.
25   A.  I --

Page 20

5 (Pages 17 to 20)

| | |
|---|---|
| 1  Q. Does it? | 1  Q. All right.  I just want to pick out something else |
| 2  A. I think that's -- | 2     quickly from this note, if we can scroll down, please, |
| 3  Q. It's not qualified in that way. | 3     through the next page and on to the next one, please. |
| 4  A. It's not qualified in that way so you know you have put | 4     Thank you. |
| 5     one construction on that and I think it has another. | 5     Do you see in the middle of the page just by the |
| 6  Q. Well, forgive me: | 6     hole-punch, "Possibly make anonymous"?  Now, that is |
| 7     "LIBOR has become more of a consensus." | 7     a reference, isn't it, to the discussions that were then |
| 8     I suggest it's difficult to construct that any other | 8     ongoing leading up to the consultation document as to |
| 9     way, isn't it? | 9     whether the rates submitted by the banks could be made |
| 10 A. That's -- I think, that that means that JP Morgan are | 10    anonymous because of the effect of low-balling. |
| 11    having -- because they can't place -- they can't submit | 11    In other words, people were seeing the rates the |
| 12    what they've just traded because they haven't just | 12    banks were submitting and it was being associated with |
| 13    traded, so they're having to work out where their | 13    credibility within the market. |
| 14    submission would be. | 14 A. I think that that is -- so that was -- there was |
| 15 Q. Middle of the page, I am not going to take you through | 15    widespread concern about the fact that there would be |
| 16    all of this, if we could just scroll down the page, | 16    a temptation to low-ball.  This is a theoretical way of |
| 17    please, where it says: | 17    removing that concern and we should note that it wasn't, |
| 18    "The LIBOR the benchmark is used and included in | 18    in fact, ever acted upon precisely because in the view |
| 19    other processes such as derivative trading where it | 19    of the market as a whole there should be transparency. |
| 20    still works as you only need the figure, but it is | 20 Q. I don't dispute that Mr Ewan, and I think this was |
| 21    flawed in the interbank loans as the rate determines the | 21    a subject that was taken to the FXMMC, in fairness to |
| 22    outcome and this is why the market is drying up." | 22    you, and they rejected it, yes? |
| 23    What do you understand the second sentence to mean? | 23 A. Not just the Foreign Exchange and Money Markets |
| 24 A. I -- I'm not sure, looking back, I could say exactly | 24    committee, I believe it was also in the consultation |
| 25    what that means. | 25    document that we put out in -- a little later in 2008 |
| Page 21 | Page 23 |

| | |
|---|---|
| 1  Q. Well, your response to it is: | 1     and I believe that the balance of responses said that |
| 2     "Considering this do you consider LIBOR rate dead?" | 2     there shouldn't be anonymisation. |
| 3     Does that help you now? | 3  Q. Yes.  I just wanted to set the context as to why its |
| 4  A. I think that question is -- I think that statement -- | 4     referenced there, "Possibly make anonymous".  In other |
| 5     question, sorry, is if we can't set accurate LIBORs | 5     words, this was something being discussed leading up to |
| 6     according to the definition should we stop setting | 6     the document that you were then going to circulate and |
| 7     LIBOR? | 7     it was as you've just said going into the consultation |
| 8  Q. Well, does this note represent an abbreviated | 8     for people to debate about; okay? |
| 9     aide-memoire of the discussion that you were having? | 9  A. Yes. |
| 10 A. Yes. | 10 Q. But it's the response I want to turn to: |
| 11 Q. Do you say that in that note? | 11    "Barclays couldn't show as if they did it would have |
| 12 A. A note is taken of it, I don't think -- I think this | 12    caused a run on the bank." |
| 13    note was probably written by Peter, I don't dispute that | 13    Then also JP Morgan: |
| 14    he would -- I mean, he wouldn't have just made that up. | 14    "Problem, they can then report false rates at little |
| 15    So, yes, I think I probably did say, "Do you consider | 15    to no risk for their own gain." |
| 16    the rate to be dead". | 16    Your response: |
| 17 Q. Forgive me, you misunderstood my question.  You've given | 17    "Yes, could be more cheating, especially by treasury |
| 18    evidence that you want to qualify that statement.  My | 18    departments who want lower prices." |
| 19    question is: do we see in this note you qualifying that | 19    It's your response I want to ask you about, what do |
| 20    statement? | 20    you mean by "more cheating"? |
| 21 A. No, because it's a note rather than a verbatim record of | 21 A. I think this a shortened note of a longer conversation, |
| 22    everything that was said. | 22    and I think if we were able to see a verbatim record we |
| 23 Q. You are saying you did say that, at the time, to | 23    would see that that statement, I'm sure, would have been |
| 24    JP Morgan, are you? | 24    a paraphrase of what I would actually have said. |
| 25 A. I don't remember. | 25 Q. So, you are not saying you said the words "more |
| Page 22 | Page 24 |

| | Page 25 | | Page 27 |
|---|---|---|---|
| 1 | cheating"? | 1 | attested that is what they would do. |

**Page 25**

1    cheating"?
2    A. I don't remember.
3    Q. Let's be clear about this: you will have seen this note
4       after this meeting?
5    A. Yes, probably.
6    Q. You didn't qualify it in any way?
7    A. No, you're right, I didn't.
8    Q. You didn't correct it?
9    A. No.
10   Q. You didn't say to your colleague, "Hold on a minute, I
11      don't think I said that."
12   A. No, because at the time I was extremely busy trying to
13      do other bigger, more important things, like prepare the
14      board paper for the meeting that happens a week or two
15      after this conversation.
16   Q. We have a reference again to treasury departments who
17      want lower prices. Why would you have said that?
18   A. Because if there was a lower LIBOR rate, perhaps
19      a treasury department could borrow at a lower rate.
20   Q. The treasury department is where the submitters are
21      usually located, isn't it?
22   A. Yes, it's not difficult to theorise that a treasury
23      department might want to borrow at a lower rate, that's
24      quite obvious, but this is -- that -- this is
25      a theoretical discussion about what might happen if the

**Page 26**

1    LIBOR submissions were anonymised which is not something
2       that ever happened, it's not difficult to imagine what
3       might happen if you did do that.
4    Q. All right, let's take your context, but we're talking
5       about theoretical anonymisation of the rates; yes? You
6       say your comment should be viewed in that light.
7       But the treasury comment is the one that we have
8       seen reflected in the note that you sent to your CEO.
9       It isn't qualified in that way, is it?
10   A. I don't think it needed to be because this entire
11      process, its overarching single goal is to try and
12      ensure banks quote following the LIBOR definition.
13   Q. You see, you have treasury departments where submitters
14      are present and working, and a relationship between the
15      submitter and their department, and prices and LIBOR,
16      haven't you?
17   A. Yes.
18   Q. And you knew that?
19   A. So, the way the -- the people in the bank who know, or
20      should best know, what the cost of LIBOR is and are best
21      able to provide a LIBOR rate within the confines of the
22      definition are people who work in the treasury. And
23      these people, when they submit LIBOR, are agreeing to
24      submit an accurate rate, and the ultimate outcome of our
25      consultation process is that the banks voluntarily

**Page 27**

1    attested that is what they would do.
2    Q. Let's look very quickly then, please, at JEX044. I only
3       want to ask you two or three things about this note.
4       Again, if we can just scroll it down, this is your
5       relationship visit with one of the Japanese banks; yes?
6    A. Yes.
7    Q. And it's dated -- I can tell you -- I hope you accept
8       from me -- 3 April 2008; okay?
9    A. Yes.
10   Q. Do you see the third highlighted "LIBOR" under black in
11      the top sentence? That sentence:
12         "This point was developed further by stating reasons
13      why LIBOR rates in US dollar are too low; prestige,
14      treasury, et cetera. Yet everyone is aware that this is
15      not correct and causes a drop in credibility. Such as
16      Barclays quotes being quite high, but this is not down
17      to liquidity problems but more down to 'telling the
18      truth'."
19         Now, we don't know who said that but let's assume,
20      shall we, that you are being told that?
21   A. Yes.
22   Q. So, you are being told yet again the dollar is too low
23      because of prestige, that is type 2, isn't it? Type 2
24      low-balling; yes? Type 2 low-balling, Mr Ewan?
25   A. Forgive me, I'm reading the paragraph.

**Page 28**

1       (Pause)
2       Right, so --
3    Q. My question, prestige, type 2 low-balling?
4    A. So, so, let's -- can I just look at the -- right. So
5       this is Mizuho, as we said, and we think this is
6       somebody at Mizuho talking to me and Peter. Now, they
7       say Mizuho is not a US dollar bank. That means that
8       they are not active in the market.
9    Q. Yes.
10   A. They actually don't know what's going on because they
11      don't transact dollars in the London market. So --
12   Q. Well --
13   A. They don't --
14   Q. Mr Ewan, it doesn't mean that, does it?
15   A. Okay, they're not a major player.
16   Q. No, it doesn't mean that either. It means they're not
17      on the panel.
18   A. Yes, and the panel is selected specifically to pick the
19      largest players in the London dollar market.
20   Q. All right. So, does that follow then, Mr Ewan, that you
21      are saying this is one of the outsiders to the panel who
22      may be critical of the way in which US dollar appears?
23   A. Yes.
24   Q. All right, we take it on that basis.
25      They are nevertheless saying to you as an outsider

7 (Pages 25 to 28)

1   to the panel, US dollars are too low prestige, which
2   I suggest is type 2 low-balling.
3   A. I don't think that that's necessarily the case.
4   These -- this is a bank that is not a major player in
5   the dollar market.
6   Q. So --
7   A. You can infer from that --
8   Q. So, forgive me for one moment --
9   A. You can infer from that, if I may, you can infer from
10  that a number of things. One of the things is that they
11  will almost certainly have to pay more on the occasions
12  in which they do borrow dollars in the London market.
13  Now, that -- that being the case, they would be
14  likely to be of the view that dollars are too low. The
15  prestige issue is they have less prestige. I mean it
16  follows that the biggest, strongest, most active banks
17  can borrow at a lower rate than other banks. I think
18  that this is Mizuho complaining about the fact that in
19  essence they are upset because they can't borrow dollars
20  as cheaply as panel banks.
21  Q. So does it follow from that, that you would give this
22  expression of concern about prestige, little weight?
23  From the explanation you have just given, does it follow
24  that what we are reading there, the BBA would not have
25  given significant weight to?

Page 29

1   A. I think it's -- that is not the case because at -- when
2   is this? In April we are in the process of formulating
3   our consultation and the paper to the board to -- which
4   is -- whose central theme is to try and get banks to
5   contribute to the LIBOR rates following the LIBOR
6   definition.
7   So, I don't think it is at all fair to say that we
8   are discounting anybody's opinions.
9   Q. Treasury. Does it mean in that context where it appears
10  in this document?
11  A. I'm -- there's -- there's not enough context around that
12  for me to reconstruct, 7 years later, exactly what was
13  being suggested there, I don't think.
14  Q. They are clearly telling you on the note, aren't they,
15  that everyone is aware that the rate in US dollar LIBOR
16  is not correct and causes a drop in credibility.
17  A. They are telling us that they don't like the LIBOR
18  rates.
19  Now, we knew that a lot of people didn't like the
20  LIBOR rates. We were therefore trying very hard to get
21  in place a structure and a process whereby everybody
22  could be happy that banks were submitting LIBOR
23  according to the LIBOR definition.
24  Q. Forgive me, does the note say they don't like the rates?
25  It's a straightforward question: does the note say that

Page 30

1   they don't like the rates?
2   A. No, I am inferring it. I am inferring it.
3   Q. This is the BBA's note of the conversation that has been
4   had. Quite straightforward, Mr Ewan, isn't it?
5   Everyone is aware that this is not correct and it causes
6   a drop in credibility.
7   They provide an explanation:
8   "Barclays quote being quite high but this not down
9   to liquidity problems more down to 'telling the truth'."
10  In other words, Barclays were quoting high at that
11  stage, but were being crucified in the media for doing
12  so, no one else was. That's what that is saying, isn't
13  it? That's what that is telling you.
14  A. It is a report of a period in which this bank would very
15  likely have wanted to have seen significantly higher
16  LIBOR dollar rates for its own ends. I think --
17  Q. It continues doesn't it:
18  "The fundamental problem with the market is down to
19  confidence, this comes down to one bank's confidence in
20  every other bank in the market, rather than
21  historically, the loss of confidence in the markets
22  generally."
23  They are not talking in a self-interested way to
24  you, are they, Mr Ewan? They are reflecting their view
25  of the market at that time.

Page 31

1   A. Yes, it's their view.
2   Q. They actually say, don't they, third paragraph down
3   after the confidence:
4   "Mizuho, being a Japanese bank, are fairing better
5   than other banks and are in front of the curve."
6   If we just highlight the front of that first
7   paragraph, please.
8   So, they are saying the opposite of what you are now
9   telling the jury.
10  A. No, because I don't think -- I think this funding
11  issue -- the conversation above is a reference to dollar
12  and Mizuho is a Japanese bank that funds in Japan in
13  yen, I believe. I don't know for certain, but that is
14  my understanding about the way that Japanese banks
15  behaved at the time.
16  Q. I wonder if we can turn, please, to JEX/045, please.
17  This is your meeting with Abbey.
18  A. Yes.
19  Q. Same date, 3 April 2008. We can deal with this, I hope,
20  fairly quickly. The only thing I want to highlight is
21  in that second paragraph you see where it says:
22  "Abbey feels this is not a realistic --"
23  No, above that please:
24  "Abbey feels that this is not a realistic view and
25  the market is inaccurate."

Page 32

8 (Pages 29 to 32)

| | |
|---|---|
| 1   Let's look at it in its context:<br>2   "One month ago there were offers at 25-28 basis<br>3   points above LIBOR for strips, while at the moment<br>4   offers are more 30-33. However, there is a cash market<br>5   for the short-term, less than three months. Abbey feels<br>6   this is not a realistic view and the market is<br>7   inaccurate."<br>8   Let's put it in its context in fairness to you:<br>9   "However, they also argued that it can be viewed as<br>10  realistic as there are only (in relative terms) dealings<br>11  in the short-term and not medium too long which<br>12  represents the general feeling in the market at the<br>13  moment, but even in short-term you still have to bid<br>14  over the odds (referring to LIBOR) to secure."<br>15  You are being told again on the same day by<br>16  a different organisation, panel bank or otherwise, that<br>17  the market is not accurate.<br>18  **A. So, once again let's look at the context. Abbey, if**<br>19  **I recall, at the time, only contributed to sterling, and**<br>20  **I think, it's not said, but I think this is probably**<br>21  **a conversation about dollars.**<br>22  **In that Abbey is not a LIBOR dollar panelist bank,**<br>23  **if they are saying they have to bid over the odds that**<br>24  **doesn't give me any problem whatsoever. LIBOR is**<br>25  **designed to be the biggest, strongest banks that can** | 1   She talks about, again reflecting of your note, the<br>2   reputation of LIBOR is damaged and so on and so forth.<br>3   And the market is dysfunctional. Do you see those<br>4   references?<br>5   A. Yes.<br>6   Q. Then we come to the recommendations. Now, the<br>7   recommendations are not your carrot and stick note, but<br>8   they draw upon some of your recommendations to her in<br>9   a different way. Do you understand?<br>10  A. Yes.<br>11  Q. Would you have seen this board document? Because you<br>12  attended the board.<br>13  **A. Probably.**<br>14  Q. I wonder if we can just scroll down. Thank you.<br>15  The recommendations that Ms Knight is making to the<br>16  board are, firstly:<br>17  "Co-ordinated action by a large number of panel<br>18  banks, directed from the most senior level."<br>19  Now, if we remember, that was your recommendation<br>20  verbatim. Do you remember that or not? Do you want to<br>21  look at your note beside it?<br>22  **A. Yes, if -- I might be able to turn back to that.**<br>23  MR CHAWLA: Page 166 of your file.<br>24  **A. Thank you.**<br>25  MR HAWES: I wonder if we could produce -- is it 166 or 161? |
| Page 33 | Page 35 |
| 1   **secure funding at the lowest levels and everybody else**<br>2   **in the market in times of stress, pays over the odds.**<br>3   **So, it pays above LIBOR, they pay LIBOR plus**<br>4   **an amount. That's indicative of the rate doing what it**<br>5   **should be doing.**<br>6   Q. I am coming away for one moment and I wonder if we could<br>7   just put on to the screen from the larger bundles 449,<br>8   please.<br>9   I just want to show you this, Mr Ewan for context<br>10  because we are now leading up to the board meeting;<br>11  okay? I showed you and I asked you questions about your<br>12  memo this morning. Just when we get the opportunity to<br>13  put it on the screen for one moment. It is 449, please.<br>14  Thank you. Now, this I think the jury have seen<br>15  previously but it is the document that we see that goes<br>16  from Ms Knight to the board. And it draws from the<br>17  document I have asked you questions about this morning,<br>18  do you understand? Do you remember the memo that you<br>19  sent to Ms Knight?<br>20  A. Yes.<br>21  Q. Right. You can see, I think, the first paragraph is<br>22  very similar to that which you set out to her in your<br>23  memo; okay?<br>24  A. Yes.<br>25  Q. We've been through that already. | 1   A. 166.<br>2   MR HAWES: Thank you. 166 beside it, please, which is<br>3   JEX/040.<br>4   THE OPERATOR: I can't do it with this.<br>5   MR HAWES: All right, let Mr Ewan see if he can see it in<br>6   his hard copy. Correct me if I'm wrong, Mr Ewan, but my<br>7   memory of it is, and it is only my memory, paragraph 1,<br>8   sentence 1, is yours.<br>9   A. Yes.<br>10  Q. Thank you.<br>11  So, your recommendation was being put to the board<br>12  for a co-ordinated action of meeting, co-ordinated<br>13  action, of the panel banks at the most senior level, she<br>14  elaborates on that, which is:<br>15  "Chairman and CEOs [as we see in this note] should<br>16  be apprised of the problem and request that their staff<br>17  reflect the actual level of their current US dollar<br>18  fixings when they contribute their rate."<br>19  Yes?<br>20  **A. So, the co-ordination there refers to all banks being**<br>21  **told at the same time, "Please quote LIBOR according to**<br>22  **the definition."**<br>23  Q. Well, was it slightly more than that, Mr Ewan? Was it,<br>24  "Please quote LIBOR, but with a view to increasing the<br>25  rates"? Because they were not reflective of the market. |
| Page 34 | Page 36 |

9 (Pages 33 to 36)

**Page 37**

1    A.  I do not recall exactly what was given to the banks at
2        the -- but I am certain that, because the BBA does not
3        know what an accurate LIBOR is.
4    Q.  Yes, you have said that.
5    A.  Yes.  And so, the instruction is, "Please submit rates
6        in line with the definition which will therefore
7        obviously be accurate", whatever that means.
8    Q.  She continues:
9            "If we can orchestrate co-ordinated movement no
10       single bank need be out of line with the rest of the
11       contributors."
12           Again, I suggest that is taken from the note that we
13       looked at this morning, verbatim.
14   A.  So again, the BBA has had an awful lot of commentary
15       that the rates aren't accurate, and --
16   Q.  Forgive me, Mr Ewan, my question is: is that sentence
17       taken from your note?
18   A.  Sorry, which sentence?
19   Q.  "If we can orchestrate co-ordinated movement, no single
20       bank need be out of line with the rest of the
21       contributors."
22           Paragraph 3 of your note, the carrot and stick note;
23       yes?
24   A.  Yes.
25   Q.  "If we can orchestrate co-ordinated movement no one bank

**Page 38**

1        need be out of line with the rest of the contributors."
2            In other words, it's verbatim.  Ms Knight has taken
3        your comment verbatim and sent it to the board.  Do you
4        agree?
5    A.  I haven't found it yet.
6    Q.  Paragraph 3 of your carrot and stick note.  Final
7        sentence.
8    A.  Well, if I'm looking at -- counting paragraphs the final
9        sentence begins, "I am told such mismatches ... ".
10   Q.  Just above "solution to the stick".  166 -- thank you --
11       166, I'm very grateful.
12   A.  Yes, I have it.
13   Q.  Do you have it?
14   A.  Yes.
15   Q.  Bottom of paragraph 3?
16   A.  Yes, I've got it.
17   Q.  Taken verbatim.  Do we agree?
18   A.  That sentence is taken verbatim, yes.
19   Q.  Thank you.  So, she is recommending to the board
20       co-ordinated activity to orchestrate movement?
21   A.  There is a perception at the moment, in this time, that
22       the LIBORs are not accurate.  The only orchestration --
23   Q.  Mr Ewan --
24   A.  -- the only orchestration, if I may, is to try to get
25       all of the banks at a senior level to ensure that their

**Page 39**

1        contributors are submitting rates that they believe are
2        in line with the definition.
3            I accept that that is something that we are trying
4        to do with all of the banks together, but that is the
5        extent of the co-ordination or orchestration.
6    Q.  It is:
7            "Orchestrate co-ordinated movement so that no bank
8        needs to be [your words] out of line."
9            What does "out of line" mean?
10   A.  It's very difficult to say because we do not -- the
11       BBA -- right, the BBA doesn't know exactly what the
12       correct number for LIBOR is, it merely has to try and
13       ensure that banks follow the definition.  We are being
14       told, however, a lot that the rates are not reflective
15       of what is really going on.
16   Q.  The truth is, I suggest, that "out of line" means that
17       you wanted the rates to increase?
18   A.  No.  I don't accept that.
19   Q.  And that the orchestrated co-ordinated movement was to
20       try to get the senior heads of the banks together to
21       bring that about?
22   A.  The BBA had no reason whatsoever to try and move the
23       LIBOR rates up or down, it mattered not to the BBA.
24       What mattered to the BBA was that there was commentary
25       that the rates were not accurate, whatever that might

**Page 40**

1        mean, and we wanted to ensure that the rates were being
2        quoted in line with the definition.
3    Q.  Well, it must concern price, mustn't it?  "Out of line"
4        must concern price.  Do we consider --
5    A.  LIBOR is not a price, LIBOR is a simple number.
6    Q.  All right.  It must concern, then, the simple number.
7        Your words.  Out of line must concern that simple
8        number.
9    A.  Which is -- we are being continually --
10   Q.  Can we just agree on that; yes?
11   A.  -- we are being continually told that the rates are not
12       accurate.  We want to ensure that the rates are quoted
13       in line with the definition, i.e. are accurate, whatever
14       that means.
15   Q.  Out of line is, I suggest, about the rate at which one
16       is quoting because if we look at (2) she has adopted
17       your stick:
18           "If (1) does not succeed, we should consider
19       amending our procedures to hold spot-checks on panel
20       members to ensure that they have dealt recently at, or
21       very close, to the prices they contribute to the BBA
22       LIBOR fixings at least at the headline rates.  Failure
23       to comply could result in expulsion from the panel.
24       (There is currently no requirement for the banks to deal
25       at the prices they quote)."

Merrill Corporation                www.merrillcorporation.com/mls                8th Floor, 165 Fleet Street
(+44) 207 404 1400                                                              London EC4A 2DY

| | |
|---|---|
| 1       Again taken from your note. | 1       before the board sits? |
| 2   **A. Yes.** | 2   **A. Yes.** |
| 3   Q. It is the correlation between paragraph 1 and | 3   Q. My first question before we look at the letter itself: |
| 4       paragraph 2, "If (1) does not succeed". In other | 4       why is Mr Merriman writing this and not you? |
| 5       words: if they don't come back into line this is what | 5   **A. Perhaps he was asked to by Angela. Perhaps he did it** |
| 6       we're going to do. | 6       **off his own bat, I don't know.** |
| 7   **A. And so, if we do, and the banks are, as we would like** | 7   Q. If we scroll down, please. I only want to highlight |
| 8       **them to do, quoting within the definition of LIBOR,** | 8       some aspects of this but in fairness to you I think we |
| 9       **there won't be a problem.** | 9       are going to have to looked at this in totality. |
| 10   Q. This board meeting, is this the occasion when the BBA | 10       This is a draft; okay? Do you know whether you |
| 11       required the members of the Board to start to sign | 11       letter of this type was sent? |
| 12       non-disclosure agreements or did that come later? | 12   **A. I believe it was. I don't know what exactly I --** |
| 13   **A. I couldn't comment, I don't -- I don't remember the** | 13       **I don't know in -- for sure what was sent.** |
| 14       **board being asked to sign that. That's -- I wasn't** | 14   Q. All right. I wanted to show you this because of another |
| 15       **the -- a member of the Board.** | 15       document we're coming on to in a moment. Was this draft |
| 16   MR HAWES: I wonder if that is an appropriate moment because | 16       in this format or a draft of this type given to the |
| 17       I just want to put on the system, my Lord, another | 17       board meeting? |
| 18       document which is not immediately in front of you and | 18   **A. I'm -- I'm not sure.** |
| 19       will take a moment to load up in any event. | 19   Q. All right. It says: |
| 20   MR JUSTICE COOKE: 10 minutes, please, members of the jury. | 20       "Dear CEO, maintaining the integrity of LIBOR |
| 21   (11.33 am) | 21       fixings. |
| 22       (A short break) | 22       "As you are well aware, the current turmoil in |
| 23   (11.50 am) | 23       financial markets has led to a large number of anomalies |
| 24   MR HAWES: Thank you, my Lord. | 24       and unexpected behaviours. This is now leading to |
| 25       This is for your Lordship's note, I think we are | 25       widespread concerns from a number of market participants |
| Page 41 | Page 43 |

| | |
|---|---|
| 1       going to have a hard copy of this, D15. | 1       that BBA LIBOR panel banks are floating one rate to be |
| 2       I just want to show you a last document, Mr Ewan, | 2       included in the fixings on a daily basis and then |
| 3       before we get to the board meeting itself; okay? | 3       entering the markets to obtain funds at another (very |
| 4       I think, so correct me if I'm wrong, the board meeting | 4       often 20 to 30 basis points above the quoted fixing |
| 5       is this date: 16 April 2008. | 5       rate). While we appreciate that current liquidity in |
| 6   **A. I believe so.** | 6       financial markets is abnormal we are nonetheless very |
| 7   Q. Thank you. | 7       much concerned that the integrity of the LIBOR fixings |
| 8       The board meetings were held at what time? During | 8       process should not be compromised nor markets misled. |
| 9       the day or the evening? | 9       "As you are also aware, BBA LIBOR fixings are relied |
| 10   **A. During the working day.** | 10       on exhaustively to price a wide range of global |
| 11   Q. But they wouldn't -- what I am trying to establish is, | 11       financial products and instruments. Perhaps upwards of |
| 12       is this e-mail being circulated in advance of that | 12       50 per cent of global swaps activity is priced according |
| 13       meeting? | 13       to this indicator, and a significant number of US |
| 14   **A. I couldn't say.** | 14       mortgage products are also aligned according to the US |
| 15   Q. All right. Let's look at it. This is from | 15       dollar LIBOR the benchmark. As a result we believe that |
| 16       Alex Merriman to you and to Ms Knight and the other | 16       the recent events may be compromising the integrity of |
| 17       individuals mentioned there. Are they all internal BBA | 17       the LIBOR fixings (primarily in US dollars but also in |
| 18       individuals? | 18       other currencies as well), and therefore are also |
| 19   **A. Yes.** | 19       affecting one of the pillars of the financial system |
| 20   Q. The subject matter is: letter to panel bank CEOs on | 20       itself. In current circumstances we do not believe that |
| 21       integrity of the LIBOR fixings: | 21       a widely used and dependable financial indicator being |
| 22       "As mentioned earlier [he writes] this morning, here | 22       compromised in this way is at all helpful, and indeed it |
| 23       the draft that I had in my head to wave in front of the | 23       is detrimental to the reputation of the panel |
| 24       board later." | 24       contributors, the LIBOR fixings process, and indeed that |
| 25       So, it implies, doesn't it, that this is written | 25       of the BBA itself, as the custodian and guardian of the |
| Page 42 | Page 44 |

11 (Pages 41 to 44)

Day 10                           R v Hayes                      9 June 2015

**Page 45**

1    BBA LIBOR fixings.
2        "These issues were discussed at a BBA board meeting
3    on 16 April ..."
4        Just pause there, this is being circulated as we've
5    just looked at by Mr Merriman in advance of the meeting.
6    A.  Mm-hm.
7    Q.  Hence my question: was this given to the meeting to look
8    at.  All right?  That's why I asked you the question.
9    A.  I understand the question and I -- I don't know whether
10       it was or not.
11   Q.  "These issues were discussed at the BBA board meeting on
12       16 April, and bank CEOs have agreed that the following
13       action will now be taken by the BBA, which will: (i)
14       bring forward its annual review of BBA panel banks
15       from June to May; (ii) review aspects of the BBA LIBOR
16       framework including definitions; (iii) examine
17       thoroughly all of the individual market data it receives
18       via its market surveillance tool; (iv) investigate any
19       continuing anomalies in market behaviour, by BBA LIBOR
20       panel banks;
21           "In order to consider whether it would be
22       appropriate to remove particular contributing banks from
23       the relevant panel (S)."
24           Over the page, please:
25           "I hope you agree that this action is justified at

**Page 46**

1    this time, and I should welcome your confirmation that
2    you have brought this letter to the attention of your
3    relevant treasury executives and dealing desks, and that
4    it is being acted upon.  This letter is also being
5    widely shared with central banks and regulators
6    worldwide, as well as those entities/organisations that
7    have been in touch with the BBA about the current
8    problems, and media."
9        Then it was designed to be sent by Angela, as you
10   can see, Angela Knight; yes?
11   A.  Yes.
12   Q.  So in advance of the board meeting, the BBA had already
13       devised, if I may suggest, the route forward that you
14       wanted the board to take, set out in those (i) to (iv)?
15   A.  I don't believe, in general, it is unusual for the
16       secretariat of a committee to create a -- a straw man
17       document.
18       But I'm -- the BBA would not be able to, in any way,
19       push this through if the board decided that they wanted
20       to do something else or something different.
21   Q.  Well, let's see if we can agree to this extent; the BBA
22       was trying to set the agenda for the agreement of the
23       board.
24   A.  Well, what that letter is, is Alex Merriman, whether
25       because he has been asked or whether because he is doing

**Page 47**

1    it off his own bat, writing down a -- off the top of his
2    head, I think he used the phrase or something along
3    those lines, a suggestion for a draft that could be put
4    to the board.
5    Q.  Can we go, please, to JEX/048.
6        I think just to assist us, we have audio for this.
7    I think it's JEX/028.  I wonder if we could play that
8    and then follow this on the screen.
9            (Audio transcript played)
10       That is a long conversation, Mr Ewan, which we have
11       played because of its length.  A number of questions
12       arise from it.  Do you remember the carrot and stick
13       document that we looked at this morning; yes?
14   A.  Yes.
15   Q.  "If we can orchestrate co-ordinated movement no one bank
16       need be out of line with the rest of the contributors."
17       You gave evidence, I think, this morning, that that
18       didn't amount to what it was effectively saying, it was
19       something different about the true rate --
20   A.  Hold on --
21   Q.  Hold on, the question is: how is that consistent with
22       you telling Mr Storey at Barclays that the board had
23       quietly agreed, your words, to "float the dollar rate
24       up"?
25   A.  I think the board had discussed that.  I don't think it

**Page 48**

1    was agreed.  I don't recall, precisely, any
2    conversations at that board.
3    Q.  The words "board members" and "strategy" were discussed
4    with regard to floating the dollar rate up.
5        Do you remember that being discussed at the board?
6    A.  I don't.
7    Q.  You don't.
8        So, why are you telling Mr Storey that day, after
9    the event, that the idea is to float the dollar rate up?
10   A.  I don't remember now, seven years later, the
11       conversations.  I think what I said was: it was
12       discussed.  I don't know whether -- I don't recall
13       whether there was any action on the back of that.
14   Q.  That there would be "preparing" of senior management.
15       What does that concern?
16   A.  I don't remember.
17   Q.  The news story that is referred to in this telephone
18       conversation was on Bloomberg, is that right?
19   A.  That seems to be what -- yes, that's what I am saying.
20   Q.  And do you have a recollection of what the Bloomberg
21       news story was?
22   A.  No.
23   Q.  Did it concern the threat of sanctions that we have seen
24       in the three documents, your carrot and stick document,
25       Angela Knight's document to the board and the draft

12 (Pages 45 to 48)

Day 10                     R v Hayes                     9 June 2015

| | |
|---|---|
| 1      letter? | 1    Q. The OIS rate, I suggest, was constant, it was LIBOR |
| 2    A. It may well have done. | 2      that -- |
| 3    Q. And it had, as Miles Storey said, the effect of raising | 3    A. No, that is simply incorrect, there is one LIBOR rate |
| 4      the rate by 10 basis points. Dollar rate. | 4      set on a business day at 11 o'clock in London and that |
| 5      (Pause) | 5      is the only rate that is set until the next business |
| 6      We just heard it. | 6      day. |
| 7    A. Yes, I'd just like to ... | 7    Q. Do you have a memory of the next day after 16 April, |
| 8      (Pause) | 8      when this conversation is, as to what effect, if any, |
| 9      No, it's not the -- it's nothing to do with LIBOR, | 9      there was on the dollar LIBOR. |
| 10     what he says is the OIS LIBOR spreads popped 10 basis | 10    A. I don't. |
| 11     points. That's an OIS -- that is the difference between | 11    Q. Because I am going to suggest there was a blip, it went |
| 12     the OIS rate and the LIBOR rate, that's nothing to do | 12      up, quite a lot. |
| 13     with LIBOR. | 13    A. I -- I'm prepared to believe that might be the case. |
| 14    Q. Based on what? | 14      I don't remember. |
| 15    A. What Miles is saying, based on a new story. | 15    Q. In other words, what Miles Storey is saying to you in |
| 16    Q. The new story concerned what? | 16      this transcript comes to pass. It does have an effect |
| 17    A. I assume LIBOR. No hold on, hold on, this is a very, | 17      through the media. |
| 18     very important point here, right? Because if this | 18    A. I -- I can't comment, I don't know. I don't know |
| 19     conversation is taking place at 5.20 -- 5.26 pm, | 19      exactly what was going through the minds of the LIBOR |
| 20     on April 16, LIBOR has set for the day. There is | 20      contributing banks on the April 16 and April 17, seven |
| 21     a LIBOR rate for the day and that is the only LIBOR rate | 21      years ago. |
| 22     that is published. | 22    Q. Slightly different area. I have shown you this morning |
| 23      OIS is a different derivative market that moves and | 23      the three documents as we've touched on, your carrot and |
| 24     goes up and down throughout the day and it's not one | 24      stick document, let's call it that. Angela Knight's |
| 25     that the BBA has any involvement with whatsoever. | 25      take on that sent to the board and the draft letter that |
| Page 49 | Page 51 |
| 1      If a completely different rate moves it's quite | 1      Alex Merriman had provided. All right? Those three |
| 2     accurate to say, as it may have been at the time, the | 2      documents. |
| 3     spread between OIS and LIBOR moved or popped 10 basis | 3    A. Yes. |
| 4     points. That's not saying anything at all about LIBOR | 4    Q. Which document are you referring to in this transcript, |
| 5     moving. | 5      if it is one of those three, that would be your worst |
| 6    Q. Forgive me, we can look at the document if we need to | 6      nightmare if it came out? |
| 7     but we've just heard it, isn't Miles Storey saying to | 7    A. I -- I don't know. |
| 8     you: | 8    Q. Miles is talking to you about a document that has been |
| 9      "Coincidentally, the release of the news may have | 9      passed to him, bottom of page 2 -- I'm very grateful -- |
| 10     some of the effect that you are trying to achieve." | 10      of that transcript. I wonder if we could just -- thank |
| 11      He says that, doesn't he? | 11      you -- take the jury to that as well, please. Thank you |
| 12    A. He says that. I have -- | 12      very much. |
| 13    Q. Which is LIBOR? | 13      So, a journalist has taken something, put something |
| 14    A. Right. | 14      into the media, yes? |
| 15    Q. Which is LIBOR, isn't it, Mr Ewan? | 15    A. Mm-hm. |
| 16    A. No, no, no, no, this is important. He is saying that | 16    Q. But Miles Storey at Barclays Bank has a document in his |
| 17     a rate -- sorry, a spread between OIS and LIBOR has | 17      possession. I want to know if you can assist us as to |
| 18     moved. LIBOR has not moved. | 18      which of those three documents -- or whether it was |
| 19      Now, there's a second thing that you say which is | 19      another document -- he had in his possession. |
| 20     the effect that Miles says that, "I wish to have | 20    MR JUSTICE COOKE: Doesn't the document tell us? |
| 21     an effect", which is for dollar LIBORs to move. | 21    MR HAWES: It doesn't. |
| 22      Now, he says that, and I accept that I do not | 22    MR JUSTICE COOKE: Thank you. |
| 23     contradict that on the call, but I don't care at what | 23    A. I would assume -- frankly, I'm not sure that it matters. |
| 24     level dollar LIBOR is set, I just want them to be set in | 24      If the question is: what is my worst nightmare? It's |
| 25     line with the definition. | 25      whichever one it is being reported as Foreign Exchange |
| Page 50 | Page 52 |

13 (Pages 49 to 52)

**Page 53**

1  and Money Market policy without the Foreign Exchange and
2  Money Market committee having agreed to it.  Because
3  that would be -- that would not be correct because it's
4  The Foreign Exchange and Money Markets committee's job
5  to run LIBOR.
6  Q.  Isn't it the board notification that he has in his
7     possession?  In other words, the documents that were
8     before the board?
9  A.  Probably.
10  MR JUSTICE COOKE:  I think you should direct him to page 1,
11     if I may say so, Mr Hawes.
12  MR HAWES:  Sorry, my Lord.
13     If one looks at page 1.
14  A.  So, it's Angela's board memo.
15  Q.  Within which, taken from your original document, there
16     was a concession that there were concerns about the
17     market.
18  A.  Well, we're in the teeth of a credit crunch, yes,
19     there's concern about the market.
20  Q.  And the extracts that we looked at where you -- because
21     she adopts it verbatim -- are suggesting as
22     an organisation, the orchestrated, co-ordinated movement
23     where no one bank need be out of line with the rest of
24     the contributors.
25  A.  So once again, at the top of that document the first

**Page 54**

1     thing I say, if I recall, is that I have serious
2     concerns that the -- that the dollar LIBORs may not be
3     being set in line with the definition, and I believe
4     that the only orchestration that I suggest is to give
5     the contributing banks at a very senior level the
6     definition and say, "Please can you follow this."
7  Q.  It has gone slightly further than that, because you have
8     told Mr Storey that you have gone slightly further than
9     that, Mr Ewan?
10  A.  I don't accept that.
11  Q.  Well, this is your telephone conversation.
12  A.  At which I am asked: what have a bunch of other people
13     said?  And I report on what a bunch of other people have
14     discussed and we don't even get as far as whether
15     they've agreed it.
16  Q.  What does, "No one's clean now" mean:
17     "No one's clean clean now, Miles".
18  A.  I think that is an attempt at gallow's humour because
19     Miles and I both know that there have been a lot of
20     reports that LIBORs are not being set accurately.
21  Q.  Well, is it just reports that are not being set
22     accurately?  Or is it -- just listen to my question --
23     are you accepting with Miles Storey on this transcript
24     that you know they are not being set accurately?
25  A.  I don't know that LIBORs are being set inaccurately

**Page 55**

1     because I haven't seen trade tickets of banks where they
2     are dealing away from their LIBOR rates.  I have,
3     however, throughout 2007 and 2008, heard continuing
4     grumbles about the accuracy of LIBOR and I just want
5     LIBOR to be set in accordance with the definition.
6  Q.  Can I take you to page 6 of that document, please.  Of
7     the transcript.  The second entry there.  The discussion
8     was:
9        "I mean everybody at the board, everybody who was at
10     the board recognised, you know, that this the, you know,
11     there was an issue.
12        "I think there is a recognition that this is one
13     that is best dealt with quietly.  It needs to be dealt
14     with at a high level, so the board members were going to
15     have a word with their people who sort of quote the
16     rates and also create the strategy.  I think the idea
17     was that it's unusual because it's not something that's
18     connected to the credit crunch because dollars, the euro
19     and sterling don't show the same effect."
20        Pausing there, you wouldn't have said that to
21     Miles Storey at that stage unless there had been some
22     agreement at the board meeting that that is what was
23     going to happen, would you?
24  A.  So, I think the key point is to investigate is there
25     anything that makes dollars unique?  So, try and figure

**Page 56**

1     out: is there a central problem?  Is LIBOR being quoted
2     in line with the definition?
3  Q.  Forgive me, Mr Ewan, my question is you wouldn't have
4     said that unless there had been some agreement at the
5     board meeting that what you have described there was
6     going to take place.
7  A.  There may have been.  I don't recall exactly what
8     happened at the board -- I don't, in fact, recall
9     anything that happened at that board meeting.
10  Q.  The intention as we see below Miles's entry:
11        "So the idea (you say) is to investigate if there is
12     anything that makes dollars unique and if it's not the
13     case see if we can gradually float the dollar rate
14     slightly, gently up."
15        That was the agreement that appears to have been
16     arrived at the board.
17  A.  And then we have a long piece where Miles discusses
18     issues that it must be -- that there cannot be
19     collusion.
20  Q.  Yes.  We'll come to that in a moment.  Can you just
21     focus on this for one moment, please?  I am looking at
22     the meeting.  At the meeting --
23  A.  I can't recall.  I accept it may have been discussed.
24  Q.  With the intention to float the dollar rate slightly up.
25  A.  Right.

14 (Pages 53 to 56)

1    Q. Do you agree?
2    A. No, because it's: investigate if there is anything that
3       makes dollars unique.  And if that's not the case then
4       we go on to see if the dollars can be floated up.
5    Q. Now --
6    A. But I don't accept that necessarily that ever -- I don't
7       accept that there was necessarily any central strategy
8       to try and float the dollars up.
9    Q. All right.  And then, in fairness to you, you rightly
10      say that Miles draws to your attention concern on his
11      part about collusion which is mentioned and we've heard
12      in the transcript; yes?
13   A. Mm-hm.
14   Q. But in general terms -- we can look at the details, if
15      necessary -- there is a discussion of who was present at
16      the meeting, were they panel banks, were they not.  And
17      Miles is suggesting to you, you need at least the panel
18      banks to have the effect.
19   A. Yes, you would, and we also discuss that there can't be
20      a concerted movement because that would be -- that would
21      be wrong.
22   Q. Well, he suggests that, doesn't he?
23   A. Well, yes, and he happens to also be -- be chairman of
24      the Foreign Exchange and Money Markets committee,
25      I think, at this point.

1    Q. But the meeting had already completed, hadn't it?
2    A. Yes.
3    Q. And I want to understand from your perspective whether
4       you knew steps were being taken by the participants in
5       that meeting in accordance with the agreement that
6       appears to have been reached.
7    A. Right I'm not -- I'm not -- I don't accept that there
8       has been an agreement reached and I think we can --
9       I think it's fair to state that when Miles raises the
10      issue I agree with him that collusion is a problem,
11      there should not be collusion and we can't have that.
12   Q. I am going to paraphrase, but if I do it inaccurately
13      I'll be corrected by my Lord or the Crown.  He does say
14      that, but then he suggests a more indirect way in which
15      influence might be exerted.  In other words, through the
16      people effectively doing the rates.
17   A. Doesn't he actually suggest that there should be direct
18      discussions between the BBA and individual banks --
19   Q. Yes.
20   A. -- on a -- in order to get them to back their LIBORs.
21      I.e. to give the BBA evidence that they are.  Because
22      it's -- because Miles again, just like I don't, doesn't
23      know what the true rate is for another bank, and so the
24      suggestion that he makes is that the BBA should go to
25      individual banks and say, "Okay, if you think that this

1       is what your LIBOR is, can you please show me a trade
2       that you've done that reflects this?"
3    Q. If you look at page 11, internal page 11 of that
4       document.  At the top.  He has given you -- he has made
5       the comment at the top:
6          "Get around the sort of collusion bit."
7    A. Exactly, going and speaking bilaterally to banks
8       saying: can you please demonstrate to me that your quote
9       for LIBOR today is accurate.
10         Me -- is a method of operating that absolutely
11      wouldn't be collusive, because that's an individual
12      conversation with the BBA going into a bank saying,
13      "Please can you give me evidence that your LIBOR rates
14      are being quoted in line with the definition."
15   Q. You raise the issue, because on this page you are
16      talking about adopting collusion and concerns about it,
17      in the middle of the page you say:
18         "My -- I mean, my take on that, Miles, is that if we
19      have a quiet conversation with a bank and then the next
20      day their LIBOR quote jumps 20 basis points.  I think
21      a journalist would ask two questions, one, are you
22      having trouble funding yourself, if not, 2, were you
23      effectively lying beforehand?"
24         So, the quiet conversation, the bilateral
25      conversation that you have referred to, you didn't raise

1       there with him the collusion point that he was making to
2       you in saying, "Yes, it's wrong."  The points that you
3       drew to his attention were that the banks wouldn't do it
4       anyway for those reasons that you've set out.
5    A. Again, this is one of the central difficulties that BBA
6       faced in trying to operate a market rate which was
7       contributed to by our members.
8    Q. How extensive was the discussion at the board meeting
9       about these events that you are talking to Miles Storey
10      about?
11   A. I already said I don't recall the conversations at the
12      board.
13   Q. This is a pivotal time, isn't it, you are concerned
14      about the integrity of the rate?  You have, as we have
15      looked at many times now, lots of reports about the
16      quality and accuracy of the rate; yes?
17   A. Yes.
18   Q. You've written your carrot and stick document.  Angela
19      Knight has adopted the carrot and stick to an extent,
20      circulated that to the board; yes?
21   A. Yes.
22   Q. This is a critical time in your role as the director of
23      the BBA.
24   A. Right.
25   Q. Of the LIBOR rate.

| | |
|---|---|
| **Page 61** | **Page 63** |

**Page 61**

1    **A. I already remember all those events because I have been**
2    **shown many pages that demonstrate it happened, I don't**
3    **recall individual conversations. I couldn't reconstruct**
4    **a conversation that took place about anything seven**
5    **years ago.**
6    Q. Let's look at 1214 -- sorry -- JEX/048, please. Sorry,
7    that's -- sorry, JEX/049. My fault, sorry.
8    Now, these are the minutes, Mr Ewan -- all right? --
9    of that board meeting. Okay? The meeting that had
10   taken place before the call that we've just heard.
11   **A. Yes.**
12   Q. There are two issues that I want to ask you about in
13   relation to that. If we can scroll, please, to the
14   third page. Thank you:
15   "Money market issues."
16   There was a paper on frameworks, that's fine.
17   I want to ask you about the next paragraph:
18   "All present agreed that setting accurate LIBOR is
19   reputationally important for contributor banks as well
20   as the rates themselves. Board members asked for a list
21   of members of the supervisory committee for the rates to
22   be circulated, in confidence (attached as appendix I).
23   In order to help quell uncertainty in the market the BBA
24   was asked to bring forward the scheduled annual review
25   of LIBOR. This will now take place on May 30."

**Page 63**

1   Q. Yes. You've agreed, Mr Ewan, however that section that
2   we are looking at does not reflect the nature of
3   conversations that were had at that meeting.
4   **A. Well --**
5   Q. Do you agree that at least?
6   **A. I don't think -- well, I don't think that there is**
7   **anything in the minutes that is inaccurate, but I accept**
8   **that they don't reflect the entire of the conversation**
9   **about anything that happened at the board that**
10  **afternoon.**
11  Q. Do you remember an individual from distribution, one of
12  the bank's present, I am not suggesting the person that
13  is listed as being present, but an individual from
14  Deutsche, telling the board that derivatives regularly
15  affected LIBOR fixings?
16  **A. I already said I don't recall the conversations at that**
17  **board.**
18  Q. You have no recollection? It's quite a specific
19  allegation, you have no recollection that someone was
20  saying from Deutsche that derivatives have always had
21  an effect on, or affected, LIBOR fixings?
22  **A. I have already said, I don't recall any of the**
23  **conversation at that board meeting.**
24  Q. Can we look, please, at PMC/1583.
25  I wonder if we could play, please, beside it,

**Page 62**

1   Now, have a look at the rest of the note if you care
2   to, but would you agree that that is the only reference
3   in that minute to the LIBOR discussions?
4   **A. Yes.**
5   Q. It does not, does it, reflect the nature of the
6   conversations that were had with the senior CEOs and
7   treasurers of the bank?
8   **A. Okay, I accept that it's different to it -- the written**
9   **note there, it's essentially one paragraph, doesn't**
10  **contain all of the discussion that I reflected to**
11  **Miles Storey.**
12  Q. I just want to understand, was that not noted for
13  a particular reason?
14  **A. I couldn't say. I -- I don't believe I was responsible**
15  **for the minutes of this meeting.**
16  Q. Well, let's not beat about the bush, was the
17  conversation had with the CEOs off record?
18  **A. What do you mean by "off record"?**
19  Q. Well, do you not understand the meaning of the word "off
20  record"? In other words, not officially recorded, we
21  will have a quiet conversation.
22  **A. Well, this is a 3-page document that reflects two hours,**
23  **one assumes of conversations. I think the boards lasted**
24  **for an hour or two hours, so not everything is minuted.**
25  **I mean that's -- that's commonplace.**

**Page 64**

1   PMC/1582.
2   MR CHAWLA: Page 214.
3   MR JUSTICE COOKE: Thank you.
4   (Audio transcript played)
5   MR HAWES: I wonder if we could pause at that point. It
6   goes on for a few more pages and I note the time.
7   MR JUSTICE COOKE: It is probably sensible just to finish
8   the recording, isn't it?
9   MR HAWES: Yes.
10  (Audio transcript continued)
11  MR HAWES: A convenient moment, my Lord?
12  MR JUSTICE COOKE: If that works for you.
13  MR HAWES: Yes. Certainly, I'll ask questions after lunch.
14  MR JUSTICE COOKE: Very good. 2.10 pm, please, members of
15  the jury. Thank you very much.
16  (1.15 pm)
17  (The short adjournment)
18  (2.10 pm)
19  (Proceedings delayed)
20  (2.20 pm)
21  MR HAWES: I wonder if we can have PMC/1583 on the screen,
22  please. Just whilst that is being brought up, Mr Ewan,
23  I did just want to correct one thing. I suggested to
24  you -- and I correct myself -- I suggested to you this
25  was a person from Deutsche, all right? I may have been

1    in error about that, but I want to ask you again about
2    the meeting at the board that this is talking about.  So
3    if we turn to page 5 of that transcript, please, and
4    towards the bottom part of that.
5         Now, we can see just where the hand was there, where
6    it talks about manipulating.  Do you see that?  No, go
7    up slightly, please, just in the middle of the page.
8    Now, the talk that some institutions are manipulating
9    LIBORs.  Do you see that, Mr Ewan?
10   **A.  Yes.**
11   Q.  This is him talking to you.  I have had it all played,
12   so the context is fair and accurate to you because of
13   your responses to this, okay?  Do you understand?
14   **A.  Yes.**
15   Q.  It continues:
16       "I think there is someone from the BBA that was in
17   a meeting with, as I said, Charles Aldington,
18   yesterday."
19       Just pausing there, he is the chair of Deutsche, is
20   that right?
21   **A.  I think elsewhere Mr Nicholls says that**
22   **Charles Aldington is the chairman of Deutsche Bank UK.**
23   Q.  Yes.  And he was present -- we can go back to
24   the minutes if you require us to -- but he was present
25   at the minutes we looked at this morning; okay?

1    **A.  Okay.**
2    Q.  "... That described himself as a former trader and he
3    knows how these things work, and guys are manipulating
4    it to make PNL."
5        I suggest that means profit and loss.
6    **A.  Yes.**
7    Q.  ".. Is, you know, so far from factual, and I suggest
8    that you know and I don't know who, who it was that
9    makes those representations but if you're going to be
10   a top trader then you're not going to be you know making
11   those types of comments ..."
12       Now, I asked you this morning about whether
13   someone -- I put it as someone from Deutsche but I may
14   be in error about that, okay -- had made a comment to
15   that effect at the board meeting.
16       Does this help you remember that event?
17   **A.  No.**
18   Q.  You respond:
19       "I think that, I think that, well, he, he was
20   a number of years ago and I think possible and, you
21   know, I don't necessarily think he's wrong, I think the
22   games moved since when he was in the game a decade or
23   15 years ago."
24       Who is the "he"?
25   **A.  I'm afraid I don't remember.**

1    Q.  You clearly knew at the time.
2        (Pause)
3    **A.  I think probably, but I may have been speculating at the**
4    **time.  I --**
5    Q.  Well, you're reflecting on a conversation that you had
6    heard, I suggest -- you can disagree with me if you
7    choose to -- had taken place at the board meeting the
8    day before.
9    **A.  That may be.  I don't have a recollection of the**
10   **specifics of the conversation, and I don't think there**
11   **is enough information here for us to reconstruct it with**
12   **any certainty.**
13   Q.  Well, I want to just ask you about that.  Have you ever
14   seen a note of the board meeting in which that comment,
15   made by whoever he is, has been recorded?
16   **A.  I don't think I have.**
17   Q.  But it clearly was said because you are saying that to
18   Mr Nicholls.
19   **A.  I think that's the case, but I can't be certain.**
20   Q.  What did you mean by, "I don't necessarily think he's
21   wrong"?
22   **A.  I don't know.**
23   Q.  Because that would disclose, I suggest, Mr Ewan,
24   knowledge of type 3 activity, wouldn't it?
25   **A.  I -- I don't remember.**

1    Q.  Let's look at the face of the document.  Put it in its
2    proper context.  The gentleman from Deutsche is
3    suggesting, in fact, this doesn't take place; okay?
4    **A.  Right.**
5    Q.  So, your point is that no bank ever admits it; yes?
6        Your point being that there was never any admission
7    by anyone to you about this type of activity.  Do you
8    understand?
9    **A.  Banks colluding together to --**
10   Q.  Yes.
11   **A.  I don't believe I ever came across that.**
12   Q.  Right, and on the face of the transcript he is saying,
13   in essence, this is so far from the truth; yes?
14   **A.  That there is --**
15   Q.  Gentlemen here, saying to you it is so far from the
16   truth.
17   **A.  Yes, so he is saying he doesn't believe it happens.**
18   Q.  But the point about this transcript shows, I suggest,
19   that there was that disclosure the day before.
20   **A.  I don't know.**
21   Q.  Well, when he raises it about the meeting the day
22   before, you're not saying to him, are you, "I don't know
23   what you're talking about"?  What you are saying, and
24   I paraphrase it is, "Well, I think he's been out the
25   market for a number of years", whoever "he" is; yes?

**Page 69**

```
 1    I mean, I am paraphrasing it but isn't that the purpose
 2    for the --
 3  A. Okay, I don't recall the details of what happened at
 4    that meeting.
 5  Q. All right. So, you don't recall the detail at that
 6    meeting. Looking at this note now, you clearly didn't
 7    contradict this gentleman when he said, "That event had
 8    taken place at the board meeting".
 9  A. That's correct, I didn't contradict him.
10  Q. And indeed you say, "I don't necessarily think he's
11    wrong". That's a reference to fixing against
12    derivatives for profit and loss, the game's moved since
13    when he was in the game a decade or 15 years ago.
14    Yes?
15  A. That's what the transcript of this conversation says,
16    correct.
17  MR CHAWLA: My Lord, sorry just to be accurate, I don't
18    think there's a reference to fixing against derivatives
19    there.
20  MR HAWES: "Guys are manipulating [put it in its proper
21    context] to make profit and loss."
22    What did you understand that to mean?
23  A. I don't -- I don't know.
24  Q. Moving LIBORs to make profit and loss, isn't it?
25  A. That's what he says.
```

**Page 70**

```
 1  Q. And at that stage, you are saying to him you didn't
 2    necessarily think that he was wrong in the comments that
 3    he was making that the game had moved on. In other
 4    words, you recognised the possibility of manipulation
 5    for profit and loss.
 6  A. Well, there's not -- I don't think I necessarily focused
 7    on the PNL, but as we know at the time we had a number
 8    of reports that the LIBORs – LIBORs were inaccurate,
 9    that there was type 2 behaviour or low-balling which is
10    manipulation. I -- and that's why we had the
11    consultation and took all the action that we took to try
12    and ensure that LIBORs were quoted in line with the
13    definition.
14  Q. I wonder if we can now turn, please, to JEX/052. If we
15    look at the bottom e-mail first, please. Actually, if
16    we can just scroll -- thank you -- to the top of that
17    header, please. Over the next page. No, over the next
18    page. Thank you.
19    Now, this is 17 April. The Bloomberg story on
20    dollar rates. And the story appears below but I don't
21    need to take you to that necessarily, it's your comment
22    at the top. This is internal, isn't it, to the BBA
23    members, Mr Ewan, is that right?
24  A. Yes.
25  Q. "This is exactly the story we thought they'd run and
```

**Page 71**

```
 1    they missed the fact that 12-month dollars jump 20 basis
 2    points."
 3    That refers, doesn't it, back to the conversation
 4    that we looked at and heard this morning between you and
 5    Mr Storey. And the increase of the dollar rate.
 6  A. Yes.
 7  Q. Do you agree with that?
 8  A. I think it probably is.
 9  Q. If we scroll up, please. No, into the middle, please.
10    Thank you. Alex Merriman to you at 12.40 pm of the same
11    day quotes:
12    "Not an altogether negative story. Think again, we
13    have done something positive to shake up the market, no
14    matter what our colluding members think."
15    If we go to the top of the page, you respond to
16    that:
17    "Alex, I think you might want to ask Richard or Dave
18    to retract or completely delete the e-mail below.
19    "Of course your e-mail is internal, but it would be
20    too easy for any recipient to accidentally forward it
21    out of the company. This sort of thing has happened to
22    me before.
23    "I'm paranoid about this, I know, but as we've seen
24    lately, reputations can be tarnished without evidence at
25    the moment."
```

**Page 72**

```
 1    Why were you so concerned about Mr Merriman
 2    describing your members as "colluding"?
 3  A. Because I don't think we had any evidence that our
 4    members were colluding.
 5    However, if an e-mail from a member of the BBA to
 6    another member of the BBA says that there is collusion,
 7    my view was that would be reported as: the members are
 8    colluding. I actually note that my worry is because
 9    reputations can be tarnished without evidence.
10  Q. Firstly, whose reputations are you talking about there?
11  A. LIBORs, individuals at the BBA, BBA member banks.
12  Q. Because the day before at the board meeting, as we've
13    looked at this morning, I suggest not recorded, was
14    evidence of an agreement, to use your words, to "float
15    the dollar rate".
16  A. I don't accept that that was ever agreed on, and I state
17    again that my comment was, "Reputations can be
18    tarnished without evidence", means that I do not think
19    that there is evidence. However, it would be taken as
20    evidence if it was shown to a journalist, for example.
21  Q. Well, let me ask you this, let me rephrase the
22    question: why would Alex Merriman write to you in those
23    terms? Why would he use that word?
24  A. I don't know. You would need to ask Alex.
25  Q. Yes. It's an unusual word to use, isn't it?
```

18 (Pages 69 to 72)

**Page 73**

1   A. I really don't think I can comment on what somebody else
2     has written.
3   Q. No, but the point is this, Mr Ewan: what was taking
4     place internally and knowingly taking place internally
5     at the BBA on 16 and 17 April that you can assist us
6     with, that's why I asked the question. Of course, you
7     can't know precisely why you used it, but does that
8     reflect what the view was internally at the BBA at that
9     stage?
10  A. My view at that stage was that, as was discussed in the
11    conversation with Miles Storey, that we went through
12    this morning, is that any action taken collectively to
13    try and move LIBOR rates in one direction or another
14    would be wrong.
15  Q. Who are Richard and Dave?
16  A. I think that is probably the -- the BBA IT guys.
17  Q. Can we move, please, to JEX/054. Around the same time,
18    same date, you, Mr Ewan -- I'm afraid we don't have this
19    in audio. We'll just have to read through it.
20       Clive Jones this was who?
21  A. Clive Jones was the Foreign Exchange and Money Markets
22    committee member from Lloyd's.
23  Q. Thank you.
24       (Transcript read)
25  Q. Just turning back to page 4 of that. Firstly, I should

**Page 74**

1    ask you, the document that is being toned down, do you
2    know what it is?
3  A. I couldn't say for certain, but I'll accept that it is
4    likely to be one of the documents that we spoke about
5    this morning.
6  Q. Thank you.
7       He is, at page 4, internal page 4 of 5, so if we
8    can -- towards the bottom of that. Thank you:
9       "We've talked about this before, it's not exactly
10    the definition but it's the spirit of the definition."
11       Now, did you get that from him or did he get that
12    from you?
13  A. Get -- get what?
14  Q. The "spirit of the definition".
15  A. I -- what do you mean by, "Did he get the spirit of the
16    definition"?
17  Q. Well it's an expression, isn't it, you've used it in
18    evidence to my learned friend and you've used it in
19    evidence when I've been asking you questions? I want to
20    ask where the expression comes from. Is it yours, is
21    it's his, is it someone elses?
22  A. I couldn't tell you who first used that expression.
23  Q. Clearly, he is saying, "Not exactly the definition". In
24    their approach to their LIBORs.
25  A. So, the definition would be a -- perfectly following the

**Page 75**

1    definition would be what he describes at line 108 to 111
2    on that page.
3  Q. Yes.
4  A. And he's saying, "You can't do that because there aren't
5    offers in the market of three or four hundred million in
6    whatever currency at a 1 year tenor."
7       So, we've discussed this idea about the spirit of
8    the definition which he identifies as something that
9    means you have a -- and at line 129 -- a "significant
10    degree of integrity".
11  Q. Do you remember I asked you at the outset, when I was
12    asking you questions, to focus on some of the answers
13    that you had given to my learned friend, one of which
14    was: were you ever prepared to let the definition be
15    ignored or not adhered to?
16  A. And I think we described at length that we felt that
17    there was, implicit within the definition, a concept of
18    the spirit which we also never managed to quite quantify
19    because it's a spirit, it's not a -- it's not something
20    that you can define. But I think this is what Clive is
21    speaking about. And I think if you are within the
22    spirit of the definition I don't think you are allowing
23    the definition of LIBOR to be ignored.
24  Q. Well, it's a question I have asked you before, but who
25    determines it?

**Page 76**

1  A. And again, we discussed this at some considerable
2    length, and it is not -- ultimately it's determined, I
3    guess, by the Foreign Exchange and Money Markets
4    committee as we've said because they're the people who
5    are to act if they feel that people aren't operating
6    within the spirit of the definition or the definition.
7  Q. Can we go to JEX/055, please. Just so you can see what
8    this is, Mr Ewan, this is I think, I suggest, obviously
9    it's a summary, of the 2008 panel bank review, as you
10    can see at the top; yes?
11  A. Yes.
12  Q. Did you prepare this?
13  A. I doubt it.
14  Q. But it reflects the meetings -- some of which we're
15    going to look at, but not in great length, we've looked
16    at one already -- it reflects the panel bank meetings
17    that you were having over this time.
18  A. Yes.
19  Q. Let's just touch on one or two matters in it. At the
20    very start:
21       "A general consensus is that US dollar LIBOR is
22    currently inaccurate by 20-30 basis points while pound
23    and euro is, within reason, reliably accurate. This is
24    due to current market pressures leading banks to post
25    artificially low rates to protect themselves, causing

Merrill Corporation     www.merrillcorporation.com/mls     8th Floor, 165 Fleet Street
(+44) 207 404 1400                                           London EC4A 2DY

1    many questions US dollar LIBOR reliability."
2        "Artificially" means what?
3    A. I don't know.
4    Q. Well, it means not accurate, doesn't it?
5    A. So, I think this comes back to -- it's -- it was, at the
6       time, very difficult to actually state that in
7       a completely quantifiable way because we didn't know
8       exactly what an accurate LIBOR would be.
9    Q. You didn't know what an accurate LIBOR was going to be
10      but you did know it was artificial.
11   A. That may mean that it's artificial because there isn't
12      a cash market and LIBOR is a cash rate.
13   Q. I just want to deal with that sentence, as well. You or
14      your colleague has summarised it as US dollar, pounds
15      and euros. Those were the big, main currencies that the
16      banks traded?
17   A. Dollar, sterling and euro?
18   Q. Yes.
19   A. Yes, I think so.
20   Q. Thank you.
21       Under the template of discussions we have LIBOR
22      fixings, this is what you looked at with the panel banks
23      I understand; yes?
24   A. Yes.
25   Q. So, you would have asked them about their perceptions.

Page 77

1        You then refer to a lack of confidence in the middle
2    of the page.
3        Then what effect that has from a banking
4    perspective, for the banks, due to them not knowing
5    their own debt. Continually increasing write-offs and
6    possible defaults of markets, the central banks and the
7    regulatory bodies.
8        And below that, that there is a fundamental
9    dislocation between lenders and borrowers and that banks
10   are risk-averse and less willing to lend, so if they do
11   it must be at a price that covers the increased risk of
12   an unsecured loan.
13       The bullet below that -- but if there's anything you
14   want to pick out of that please Mr Ewan please do so:
15       "But are these funds really that expensive and even
16   100 basis points for long-term loan. If it keeps the
17   balance sheet in good health and the knock-on in
18   confidence short as little to long term health."
19       I want to go over the page please and focus on the
20   market fixings:
21       "Pound and euro are relatively accurate. Dollar
22   LIBOR rates are currently artificially low by 20-30
23   basis points.
24       "Evidence shown to prove banks submitting their
25   offered rate and then enter the market at a higher rate,

Page 79

1        Specifically about US dollar LIBOR rates setting, and
2    a review presumably of that year. Do we agree?
3    A. Yes.
4    Q. Thank you.
5        If we turn over the page, just so that in fairness
6    to you we can look at the market conditions you've
7    recorded:
8        "Current market conditions have led to high priority
9    placed upon banks' own balance sheet. Drying up on
10   interbank lending and a reduction in confidence in all
11   areas. Balance sheets are large and require higher
12   maintenance causing increased pressure. Tight control
13   needed to avoid being presented by media as in trouble.
14   Funding being hoarded but balance sheet in good light
15   causing [then we can see the causes] massive demand on
16   central bank money. Not being recycled around financial
17   systems. Banks willing to pay over the odds to secure
18   funding. Not willing to loan unsecured funds. Once
19   balance sheets become longer, this will release pressure
20   and help towards alleviating the current situation.
21       "Interbank money market is all but dried up beyond
22   three months."
23       I'm not going to take you through those, but you've
24   given explanations and examples of why the interbank
25   money has dried up.

Page 78

1    LIBOR plus X basis points. Media attention has brought
2    this into limelight.
3        "Daily spread between panel bank contributions are
4    too narrow.
5        "Banks moving in pack mentality.
6        "Submissions now based on what considered market
7    average.
8        "Shown by very narrow spreads on daily quotes.
9        "Triple A banks have higher submissions than lower
10   rate banks which is not an anomaly."
11       You or someone has noted in this summary:
12       "Evidence shown to prove that banks are submitting
13   their offered rate and then entering the market at
14   a higher rate."
15       What evidence was shown?
16   A. I don't think that I ever -- have ever said that I have
17      seen evidence, and I don't think that I wrote this
18      document.
19   Q. Well, you would have been at these meetings.
20   A. That doesn't mean that I agree with this summary.
21   Q. Right, let's look below.
22       "Problems with submissions may be caused by ...
23   Impossible to accurately quote beyond 3-month maturity
24   as no deals executed.
25       "Submissions based upon a 'best' guess as no deals

Page 80

20 (Pages 77 to 80)

| | |
|---|---|
| 1 to reference. | 1 Q. So, correct me if I'm wrong, let me understand what |
| 2 "Underlying incentive to quote low. | 2 you're saying. The person who may want to answer to |
| 3 "Favour treasury. | 3 this document is either Mr Merriman; yes? Or Ms Knight. |
| 4 "Favour derivatives. | 4 Because this is not your document. |
| 5 "Little to no accountability." | 5 **A. Yes. I also don't think either of them wrote it.** |
| 6 Now, was that said to you at the relationship | 6 Q. Well, who do you think wrote it? |
| 7 meeting, as summarised here? | 7 **A. Well, I -- I am --** |
| 8 **A. I -- I while agree that, yes, there could be -- some** | 8 Q. I can assist you, why don't you look at the footer of |
| 9 **people could say that there is an incentive to quote** | 9 the document? |
| 10 **low.** | 10 **A. I was going to say it looks like it has been retrieved** |
| 11 Q. What does "favour treasury" -- we have the reference to | 11 **from Peter Denton's drive.** |
| 12 "treasury" again -- what does that mean? | 12 Q. And Peter Denton, as we know, was your assistant. |
| 13 **A. I don't know.** | 13 **A. Yes, he was probably in his first year at the job at** |
| 14 Q. What is the meaning of the word "favour derivatives"? | 14 **that point.** |
| 15 **A. It could mean that there is an incentive to quote low** | 15 Q. And was this document written for the FX committee? |
| 16 **because it -- it means that the cost of funds to the** | 16 **A. That's what these documents ultimately were for, yes.** |
| 17 **treasury goes down.** | 17 Q. Yes. And I'm assuming as the secretariat to the FX |
| 18 Q. It creates a link, doesn't it, Mr Ewan, between the | 18 committee you wouldn't have put something in front of |
| 19 LIBOR submission and a commercial incentive. Would you | 19 them from the BBA's perspective unless you had read it? |
| 20 agree with that proposition or not? | 20 **A. Okay. I'm -- but --** |
| 21 **A. Yes, I grant that it could.** | 21 Q. Well, is that accurate or not? Would you have put |
| 22 Q. Therefore LIBORs were not devoid of commercial pressure | 22 something in front of the FX committee, as its |
| 23 Or LIBOR fixings were not devoid of commercial pressure. | 23 secretariat, unless you had read it? |
| 24 Would you agree? | 24 **A. No.** |
| 25 **A. Yes, but I don't think it's fair to say that therefore** | 25 Q. So, if this document has been prepared by Mr Denton, for |
| Page 81 | Page 83 |
| 1 **the banks would have quoted artificially low. They knew** | 1 the purposes of putting it in front of the committee, |
| 2 **what the definition was and they knew what was expected** | 2 you would have read it? |
| 3 **of them.** | 3 **A. Yes, and I would therefore suggest that this is not** |
| 4 Q. But here you are recording -- | 4 **a document that in this form, would have been shown to** |
| 5 **A. I'm not recording this, I don't think I wrote this** | 5 **the committee because, as I have said, I don't think** |
| 6 **document.** | 6 **I had evidence that banks were submitting rates and then** |
| 7 Q. All right. It is a BBA document that records, | 7 **taking money at a higher rate.** |
| 8 concerning LIBOR, for which you are in charge, the | 8 Q. I think I should ask you, just for clarity's sake, would |
| 9 underlying incentive to quote low for commercial | 9 this not have gone in front of the FX committee in this |
| 10 reasons. | 10 format, because it was too blunt? |
| 11 **A. Well, I'm not sure that, at this point, you could say** | 11 **A. No. That's not what I'm saying.** |
| 12 **that I am in charge. I would certainly grant that** | 12 Q. Well, I know it's not what you're saying but I want you |
| 13 **I worked on LIBOR at this time, and I think if anybody** | 13 to ask you to clarify it. Would it have not have gone |
| 14 **is in charge of LIBOR it's the committee.** | 14 in this format because it was too blunt? |
| 15 Q. Well, this is 2008, you've been in your employment since | 15 **A. No, it would not have gone in this format because** |
| 16 2006. As I understand it, Mr Merriman has relinquished | 16 **I don't think that I could demonstrate that some of the** |
| 17 control, from the BBA's perspective, of LIBOR and that | 17 **comments in this are accurate.** |
| 18 has fallen to you; correct? | 18 Q. Can we just look at the footer again for one moment. |
| 19 **A. I think for the entire period that Alex Merriman was at** | 19 This is the final version. |
| 20 **the BBA -- as the executive director, my manager,** | 20 **A. Well, Peter Denton may have thought it was the final** |
| 21 **I think it was within his portfolio of jobs -- of roles** | 21 **version.** |
| 22 **the whole time. I couldn't aver that without seeing his** | 22 Q. I am going to ask you: does that mean there were |
| 23 **job description or whatever.** | 23 a number of iterations of this document before it was |
| 24 **And certainly by this point the CEO of the BBA is** | 24 given that title? |
| 25 **taking a deep and personal interest in LIBOR. So --** | 25 **A. I don't know.** |
| Page 82 | Page 84 |

21 (Pages 81 to 84)

**Page 85**

1  Q.  It clearly, as I've suggested to you, identifies
2      commercial incentives are related to LIBOR fixings.
3      I think you agree with that now, don't you?
4  **A.  Yes, I don't -- yes.  I won't -- but that doesn't mean**
5      **it would be right for a bank to submit a lower LIBOR**
6      **rate or a different -- anyway, a different LIBOR rate,**
7      **higher or lower, to the way its actual cost of funds.**
8  Q.  Just bear with me for one moment, please.
9      (Pause)
10     I wonder now if we can turn, please, to JEX/57.
11     I wonder if we could just go to the bottom of that
12     e-mail chain first, please.  Thank you.  No, slightly
13     above.  Thank you.
14     This is initially Simon Hill's internal to
15     Mr Merriman, and I am showing you this, Mr Ewan, because
16     you will get copied into the e-mail chain eventually;
17     okay?  But in the first instance it's him to Mr Merriman
18     only; all right?
19     But just to satisfy yourself on the printed
20     document, you do appear above within the chain.  Are you
21     happy with that?
22 **A.  Yes.**
23 Q.  Thank you.
24     "Hi Alex, just [I should say this is 25 April] just
25     attended the GAG at which the subject of LIBOR came up.

**Page 86**

1      Angela mentioned your chat with the Fed last Friday and
2      said he would let the BOE know who you had spoken to.
3      Did you do a short note on the conversation?  Members
4      were supportive of LIBOR recognising that there was no
5      alternative and the BOE [I think that means does] does
6      not want the LIBOR boat to be rocked when markets are so
7      sensitive and asked what, if anything, could be done by
8      them to be supportive."
9      If we move up, you are then copied into the next
10     e-mail, do you see yourself there?  That's all internal
11     BBA.
12 **A.  Yes.**
13 Q.  "Simon I sent a short e-mail around to exec on Tuesday,
14     I spoke to Matt Ruskin [junior official I think] Jon was
15     also going to see if he could meet up with the Fed while
16     in the States, so we'll report back to the bank on
17     Monday when Jon is back.
18     "On publicity I absolutely agree that we should say
19     as little as possible going forward on LIBOR other than
20     correct incorrect market comments, and Jon and I will
21     think about what the bank can do to help.  Alex."
22     Then above that, so we see it all in its context,
23     this is to "All", above, which includes you again.  This
24     is from Angela Knight.
25     If we can scroll down slightly:

**Page 87**

1      "All, have you seen my e-mail about LIBOR?  It
2      should have gone around today.  The issue won't mend on
3      its own.  We need to handle it and that includes canning
4      the journos and finding credible ways of saying that we
5      have fixed it.  I will send my e-mail again.  Thanks,
6      Angela."
7      Then finally your e-mail in this chain, this is to
8      Angela but the other recipients:
9      "All, I met several representatives of the Fed
10     yesterday and we had a very positive discussion.  They
11     have concerns about LIBOR but would rather participate
12     in a process to ensure it is accurate going forward and
13     try and replace it.  The CME feels the same."
14 **A.  Chicago Mercantile Exchange.**
15 Q.  They are an exchange that deals significantly in
16     derivatives, is that right?
17 **A.  Correct.**
18 Q.  "In our travels around the city talking to contributor
19     banks, Peter and I have discussed many ideas to ensure
20     that the rates are accurate going forward.  I will have
21     a paper discussing these completed early next week.
22     "I spoke to Brian M yesterday and asked him to talk
23     to some senior members of the FX and Money Markets who
24     run the committee about what they think we should say in
25     the press.

**Page 88**

1      "Everyone in the market now thinks dollar BBA LIBOR
2      is accurate, but I am certain that if we put out
3      a statement saying this, Gill Tett at the FT will see it
4      as a challenge.  As we know, she can easily find people
5      who will disagree, either because they are invested in
6      an alternative or because they don't like rates or
7      whatever.  If there is to be a debate about this, I
8      don't see how holding it in the FT, which we have seen
9      distorts and sensationalises the issues, will help.
10     "We haven't been in the press for a couple of days,
11     so right now I think we should let sleeping dogs lie.
12     The BOE, Fed and other regulators get rattled when they
13     see this discussed in the press as they assume if there
14     is smoke there must be fire.
15     "I am meeting Carrick of the WSJ and Gill at the FT
16     next week and will try to calm them."
17     At that stage you were in the United States, do we
18     agree?
19 **A.  Yes.**
20 Q.  The Federal Bank of New York had expressed to you
21     concerns about the accuracy of LIBOR.
22 **A.  It doesn't say anything about -- they have expressed**
23     **concerns about LIBOR but it's not specific that they are**
24     **about the accuracy.**
25 Q.  I accept that, it's not considered fact, but it says

22 (Pages 85 to 88)

1    they have concerns about LIBOR.
2    A.  Yes.
3    Q.  So, what could that possibly mean in this context?
4    A.  Well, in this context, which seems to be a discussion
5        about the media presentation -- media's commentary on
6        LIBOR -- I imagine their concerns are: is what we're
7        reading in the press true?
8    Q.  And this, if I may suggest, illustrates the type of
9        activity that was going on within the BBA to try to
10       manage the publicity about LIBOR.  Would you agree with
11       that?
12   A.  Certainly we wanted to try and manage the press -- the
13       way that the press was writing about LIBOR, yes.
14   Q.  If I were to suggest there is a fracture between the
15       managing of the press and what you were being told by
16       your own members, would you agree with that?
17   A.  I'm not sure I precisely understand what you mean by
18       "fracture".
19   Q.  Well, there's a difference?
20   A.  Yes, I will -- yes, I will happily allow that.
21   Q.  I mean --
22   A.  Because at this time we have seen a number of cases
23       where it was widely believed at the time, including
24       I think perhaps in the BBA, that otherwise perfectly
25       healthy banks had been broken by sensationalistic media

Page 89

1        reporting.  So there was a particular concern about the
2        way that the media wrote about financial issues.
3    Q.  Just bear with me for one moment, please.
4        I am going to jump some documents, so I wonder if we
5        can go to JEX/063.
6        Now, this is an internal BBA e-mail on 2 May.  Would
7        you have been on the BBA distribution list?
8    A.  Probably.
9    Q.  This is Ms Knight, although it's sent Helena Dillon
10       I think her name is.  Was one of her PAs, is that right?
11   A.  Correct.
12   Q.  2 May 2008, "Dear all", this is internal, do we agree?
13   A.  Er --
14   Q.  Internal only?
15   A.  I don't think this is internal only, no.
16   Q.  So, this is -- on the distribution list you could have
17       who, then, precisely?
18   A.  I don't know.  I am merely commenting, I don't think
19       it's internal because the last sentence in paragraph 1
20       says:
21       "The Foreign Exchange and Money Markets committee on
22       which each of your organisations have a seat."
23       Which seems to indicate it's not an internal
24       document.
25   Q.  Yes.

Page 90

1        "Dear all, as you know, we discussed LIBOR at the
2        board meeting in April, primarily in respect of some of
3        the inaccuracies for contributing banks relating to the
4        dollar rate.  Due to the high levels of volatility and
5        uncertainty in the markets the BBA has brought forward
6        the full review of LIBOR and although not concluded we
7        are shortly going to provide analysis and recommend some
8        changes.  Particularly in respect of increasing the
9        numbers of contributors and looking at the median
10       collection rather than the current average.  There may
11       be some other changes, as well, surrounding definitions.
12       These will be [I think taken it should be] taken to the
13       FXMMC on which each of your organisations have a seat.
14       "Following that board meeting the announcement of
15       the review and my subsequent letter to each of the
16       contributors, the dollar LIBOR rate improved, and by
17       this I mean it drifted upwards to what was considered to
18       be a more accurate market rate.  However, unfortunately
19       it has not stayed there.
20       "Over the last few days we have had a number of
21       calls, particularly from brokers and the derivatives
22       community, commenting on the rate contributions of some
23       of the banks and others tell us is not possible to
24       borrow at a rate even near that of dollar LIBOR.
25       "In a nutshell they consider that the rates are

Page 91

1        inappropriately low and that in some instances they have
2        given us the names of banks that posted one rate and
3        subsequently borrowed at a materially higher rate.  As
4        a result we have had another flurry of articles about
5        LIBOR, both in the Wall Street journal and the FT."
6        I think it should say:
7        "In addition we are now receiving anecdotal stories
8        that as it is not possible to find funds at the dollar
9        rate then other benchmarks need to be used.
10       "I am well aware that the real concern can often
11       be -- and particularly at trading desk level -- that if
12       a bank posts a rate that is not in with the pack then it
13       may get crucified in the press and there is of course a
14       need for your treasury department to square their book
15       each day.  However, there is now a real issue.
16       "Lastly, I am told that a number of you have either
17       contacted directly or been contacted by████ with a view
18       to participating in their rival index.  I am further
19       informed that at least two of the banks on this e-mail
20       have actually actively asked████to commence this
21       alternative to LIBOR.  This fills me with concern.
22       I was under the impression that the agreement was that
23       we got accuracy into LIBOR through ensuring that the
24       rates the contributing banks posted were accurate and on
25       a continuous basis.  I was not of the understanding that

Page 92

23 (Pages 89 to 92)

| | |
|---|---|
| 1  the accuracy was merely intended to last for a few days | 1  and that is -- |
| 2  and that there was active consideration in providing | 2  Q.  Sorry, I cut you off.  Sorry.  Carry on. |
| 3  an alternative." | 3  A.  -- and that is what I was trying extremely hard to do |
| 4    Can I ask you again -- sorry, I was over the page: | 4  throughout 2007 and 2008. |
| 5    "Can I ask you again that you do what is necessary | 5  Q.  In the middle of that, following the board meeting, |
| 6  with the your organisation to effect appropriate rates | 6  that's why I suggested to you it harks back to your |
| 7  to be set and perhaps I could also suggest that as | 7  conversation with Mr Storey that the dollar LIBOR rate |
| 8  a next step we ask for the treasurers of all the | 8  improved; that relates to the release of the publicity, |
| 9  contributing banks to come to a meeting at the BBA at | 9  that relates to the fact that Bloomberg had put |
| 10  some point in the next 7 to 10 days.  I would be | 10  something out on the wires, and it harks back to the |
| 11  grateful for your comments." | 11  conversation that you were having with Miles Storey that |
| 12    Can I go back to the beginning of that document, | 12  we heard this morning. |
| 13  please, Mr Ewan.  I just want to touch on it so your | 13  A.  Where we both agreed that it would be deeply |
| 14  evidence is clear.  In respect of some of the | 14  inappropriate to collude in any way to try and affect |
| 15  inaccuracies in quotes from contributing banks what, if | 15  the dollar rates. |
| 16  anything, do you say about that? | 16  Q.  Well, I'll leave that. |
| 17  A.  Well, what I would say about this entire note is that it | 17    She also expresses concern, which is the other thing |
| 18  was written by Angela Knight and I think it would be | 18  that drives this letter, I suggest, that others may be |
| 19  appropriate, if anyone is to comment on this, for Angela | 19  abandoning the LIBOR rate and going to an alternative. |
| 20  to -- Knight herself to comment on it. | 20  A.  Yes. |
| 21  Q.  I accept Angela Knight was above you in terms of she was | 21  Q.  Is that reflecting the commercial side of the BBA's |
| 22  the head of the BBA; yes? | 22  concern about LIBOR? |
| 23  A.  Yes. | 23  A.  I don't think that's a commercial concern, I think it |
| 24  Q.  The CEO.  But you had responsibility for LIBOR within | 24  may be a reputational concern.  However, I recall that |
| 25  the BBA; yes?  That was your job. | 25  when I was asked -- when I was discussing with Angela |
| Page 93 | Page 95 |
| 1  A.  Yes.  And, as I've said, Angela Knight was, by this | 1  Knight the appropriate line to take, when discussing |
| 2  point, fully engaged and was very hands on, and this is | 2  this ████ rate, was that the BBA welcomed the |
| 3  Angela Knight writing a note to the contributing banks. | 3  competition and it was perfectly appropriate for there |
| 4  And I don't have any precise memory, but it would have | 4  to be more than one rate.  And I believe, I shouldn't |
| 5  been unusual for Angela to have -- well, there was no | 5  show you examples, but I believe I am quoted saying that |
| 6  requirement for Angela to consult with me.  She was the | 6  or words to that effect. |
| 7  Chief Executive and she was -- | 7  Q.  Turn to JEX/065, please.  I want to just touch on this, |
| 8  Q.  The point, Mr Ewan, is this: is she, as the CEO of the | 8  the jury will understand why.  This was one of the |
| 9  BBA, inaccurately reflecting the position at the time? | 9  relationship meetings that you had and present at that |
| 10  She's not going to is she?  She's the CEO of the BBA. | 10  meeting was Mr Thursfield; all right? |
| 11  A.  I'm not -- I -- I'm sorry, I believe if you want to -- | 11  A.  Yes. |
| 12  I mean, I don't know exactly how this works, but if you | 12  Q.  He was a member of the FXMMC? |
| 13  want to ask questions about something that Angela Knight | 13  A.  Yes. |
| 14  wrote is it not more appropriate to ask these questions | 14  Q.  I just want to touch on what was said to you at the |
| 15  of Angela Knight? | 15  particular meeting with Citibank. |
| 16  Q.  I'll resist responding to that. | 16    "LIBOR is but one factor in the current crisis. |
| 17    Was she accurate in her note about the inaccuracies | 17  Everything effected.  LIBOR reflects current stress. |
| 18  for contributing banks on the dollar rate? | 18  Markets frozen especially in US dollar.  1 month only |
| 19  A.  I have -- | 19  because of Taff auction." |
| 20  Q.  It's a theme, isn't it? | 20    Just pausing there, Taff auction is what? |
| 21  A.  It is a theme, yes.  Absolutely it's a theme and I've | 21  A.  It's funding provided by the US central bank to US |
| 22  not -- I've not for a moment sought to say anything | 22  market participants. |
| 23  other than we were very concerned about what we were | 23  Q.  Thank you. |
| 24  hearing going on in the market and we wanted to ensure | 24    "Cannot fix a frozen market so LIBOR is wrong. |
| 25  that banks were quoting LIBOR to the LIBOR definition | 25    "Brokers are not a reliable source for quoting LIBOR |
| Page 94 | Page 96 |

<div align="right">24 (Pages 93 to 96)</div>

| | |
|---|---|
| 1   rates. Brokers are not seeing any movement. More money | 1   accuracy? |
| 2   to be made from higher LIBOR. Incentive to quote | 2   **A. I -- I cannot say for absolute certain because I don't** |
| 3   lower." | 3   **recall the conversations that we had on that particular** |
| 4        Now, the last two bullet points, do you now | 4   **day.** |
| 5   understand what "more money to be made from higher | 5   Q. Would you have taken your own notes of the meeting? |
| 6   LIBOR" meant? | 6   **A. Probably not, because again this looks like this was** |
| 7   **A. He is suggesting that you can make more money if you** | 7   **written by Peter Denton.** |
| 8   **quote a higher LIBOR.** | 8   Q. But Peter Denton and you would go to the meetings |
| 9   Q. And? | 9   together, you would never go singly on your own, I'm |
| 10  **A. And there is an incentive to quote lower.** | 10  assuming? |
| 11  Q. Well, are the two related to one another? | 11  **A. I might have done but typically we would try to go** |
| 12  **A. Well, I'm -- in.** | 12  **together.** |
| 13  Q. In other words, could you make more money if you quote | 13  Q. Yes. The very tail end of that document, please, just at |
| 14  higher but there is an incentive to quote lower because | 14  the bottom of that page: |
| 15  of reputational risk? | 15       "Do not feed a big reaction will help LIBOR. |
| 16  **A. That may well be what he meant, yes. That's a fair** | 16       "May be better to tighten up definition." |
| 17  **reading.** | 17       What's that a reference to? |
| 18  Q. Others can deal with other points if they want to, but | 18  **A. Again, I think probably this harks back to there needs** |
| 19  I just want to reference the last thing, we need to | 19  **to be guidance around submission instructions, what --** |
| 20  address, in the middle of this note: | 20  **how you go about formulating a rate when there is no** |
| 21       "Need to address the stigma attached with quoting | 21  **cash market.** |
| 22  high to remove pack mentality." | 22  Q. I just want to ask you one more question on this |
| 23       When you met with those individuals from Citi does | 23  document, over the page, please. The last bullet point: |
| 24  that mean they were accepting that there was the | 24       "Arrange specific job roles for those who submit |
| 25  existence of low-balling? | 25  rates." |
| Page 97 | Page 99 |

| | |
|---|---|
| 1   **A. No, I think it means that they observed that there is** | 1        Is that a reference to the role of the submitter? |
| 2   **a possibility that if you quote high questions will be** | 2   **A. Yes.** |
| 3   **asked about you in the media.** | 3   Q. Is that a reference to the conflict that a submitter |
| 4   Q. Move down the page, please, bearing in mind this is now | 4   faced at that time? |
| 5   2008: | 5   **A. Well, we -- we believed that the submitters were people** |
| 6        "Current LIBOR submission instructions too vague. | 6   **who worked in banks' treasury departments and we later** |
| 7        "Need to tighten. | 7   **codified that and said they had to be.** |
| 8        "Banks using different methods." | 8   Q. Well, we'll come on to the codification of that because |
| 9        What does that mean? | 9   that was amended, wasn't it, slightly? |
| 10  **A. At this time -- so, we are still --** | 10  **A. Precisely what do you mean it "was amended"?** |
| 11  Q. 2008. | 11  Q. Well, we'll look at the documents, so let's not take it |
| 12  **A. -- in 2008, so there is a credit crunch, there is very,** | 12  out of turn. I wonder if that's an appropriate point to |
| 13  **very little money available. Banks are having to do** | 13  take the short break this afternoon, my Lord? |
| 14  **their best to quote a LIBOR that is within the spirit of** | 14  MR JUSTICE COOKE: Yes, thank you. |
| 15  **the definition. At this point, this precise point,** | 15  MR HAWES: Thank you. |
| 16  **there isn't explicit guidance as to how you might do** | 16  MR JUSTICE COOKE: Five minutes, please. |
| 17  **that, and I think if we advance through the records we** | 17  (3.30 pm) |
| 18  **will find that actually the FX and Money Market** | 18        (A short break) |
| 19  **committee did devise guidance about how to do that.** | 19  (3.40 pm) |
| 20  Q. Were you at this meeting? You would have been at -- | 20  MR HAWES: I wonder, please, if we could have JEX/069. |
| 21  **A. I suspect so, yes, almost certainly, yes.** | 21        Now, this is an internal note, Mr Ewan, from the |
| 22  Q. And you agree the note we are now looking at here is | 22  Bank of England and it reflects a call that is with you; |
| 23  accurate? | 23  yes? |
| 24  **A. Erm --** | 24  **A. Right.** |
| 25  Q. I know it's a bullet point note, but do you agree its | 25  Q. I want to ask you about it, this is the lead up or very |
| Page 98 | Page 100 |

| | |
|---|---|
| 1  close to the lead-up for the publication of the | 1   A.  I was unaware at the time that -- that that was a view |
| 2  strengthening for the future document that the jury have | 2       within the bank.  I -- my recall is that by the time we |
| 3  in their bundle.  All right?  This document. | 3       actually got to a position where we published it, the |
| 4   A.  Yes. | 4       bank were happy and supportive of the contents, but that |
| 5   Q.  That was publicised and has gone into the jury's | 5       they wouldn't let us put their name on it.  And the |
| 6       documents. | 6       reason for that being, as I think we've touched on |
| 7           As we can see: | 7       before, that they thought it was (a) a market issue, the |
| 8           "Apologies that this came late for the call with | 8       market rate, so that's for the market to fix it, and |
| 9       Knight, but I finally got through to Mr Ewan. | 9       that (b) if the bank had their name on it it would |
| 10          "Readout from yesterday's meeting with banks is that | 10      somehow be an endorsement from the Bank of England and |
| 11      evolution rather than revolution is most likely for | 11      that if we got one that everybody else would want one |
| 12      LIBOR. | 12      too. |
| 13          "BBA don't expect a root and branch review.  Mr Ewan | 13  Q.  We know that this was published on 10 June 2008, this |
| 14      said -- off the record -- he expects there would be | 14      document, strengthening LIBOR. |
| 15      a clarification of definition plus some BBA education | 15          You know now, I suspect, but I want to clarify it |
| 16      road show. | 16      with you, that the Governor on 31 May 2008 described it |
| 17          "Also BBA would like panel banks to have to defend | 17      as being "wholly inadequate".  Would you agree with |
| 18      submissions at their MM FX MC if they receive | 18      that? |
| 19      complaints. | 19  A.  I have since seen that, yes. |
| 20          "Anything more than clarification would probably be | 20  Q.  And he was asking those within the bank, "What should we |
| 21      preceded by a wider consultation.  (that was what | 21      do?"  My question is: what did the bank encourage you to |
| 22      happened following the significant previous change in | 22      do apart from taking themselves off of this document as |
| 23      definition in 1998)." | 23      you've described? |
| 24          "Ewan is meeting LIFFE to discuss exchange traded | 24  A.  I can't remember exactly but I remember that the |
| 25      Sonia --" | 25      document was drafted and redrafted many times right up |
| Page 101 | Page 103 |

| | |
|---|---|
| 1           Should that be derivative? | 1       until the day of publication, and I also think that when |
| 2   A.  Probably, yes. | 2       I saw the governor's comment, it might have been that he |
| 3   Q.  "Same people we know from the MMLG", which is the money | 3       had not quite grasped fully what the contents of the |
| 4       markets, is that the liaison group? | 4       document were but that's -- that's to one side. |
| 5   A.  That's correct. | 5           But, you know, we were not being told by the people |
| 6   Q.  The Bank of England group that you also occasionally sat | 6       that we were dealing with at the bank which, wasn't the |
| 7       on? | 7       governor, and it wasn't Paul Tucker, but they were |
| 8   A.  Yes. | 8       saying that they were supportive of what we were trying |
| 9   Q.  Thank you: | 9       to do. |
| 10          "Who are coming into the bank next week." | 10  Q.  Well, that's what I was going to ask you.  So, your |
| 11          This reflects conversation -- did you have that with | 11      direct contacts with the individuals at the bank did not |
| 12      Mr Tucker or did you have that with someone else?  The | 12      disclose their internal view of your document to you? |
| 13      reason I ask is because the sender is redacted. | 13  A.  That's correct. |
| 14  A.  I don't think it's likely that it would have been | 14  Q.  Were you aware, for instance, of any disclosure of that |
| 15      a conversation between me and Paul Tucker, I think it's | 15      type -- I don't want to be rude to you -- but higher up |
| 16      more likely it's somebody else and it's being sent by | 16      between Angela Knight and the bank? |
| 17      that person to Mike Cross and Paul Tucker for their | 17  A.  Well, if it happened Angela didn't tell me. |
| 18      information with some other people copied in. | 18  Q.  That's fine, thank you very much. |
| 19  Q.  The documents that the jury have looked at -- I am not | 19      Thank you. |
| 20      going to take you through those; okay?  Because we can | 20      We know that obviously this was a consultation; yes? |
| 21      clearly see what it says. | 21  A.  Yes. |
| 22  A.  Okay. | 22  Q.  10 June.  As I say, I'm not going to take you to it, but |
| 23  Q.  Were you aware of the Bank of England's view that this | 23      I do want to take you to one of the responses to it. |
| 24      was inadequate in terms of its governance, in terms of | 24      It's not in my Lord's documents, I wonder if we can go |
| 25      its rigour? | 25      to the original documents and, firstly, page 1681 of the |
| Page 102 | Page 104 |

1  original documents.  Just take a moment to put this on
2  your screen.  It's not in front of you, Mr Ewan, I'm
3  afraid, it's not in the index.
4        Whilst that is being found, if I can ask you these
5  initial questions: we've touched on the CME, who are
6  they?
7  **A.  Chicago Mercantile Exchange.**
8  Q.  Do you have a memory of their response to this
9  consultation process?  I mean, firstly, they responded.
10 **A.  Yes, they did.**
11       **I recall that they were keen that the calculation**
12 **moved to a median rather than an average.**
13 Q.  Thank you.
14       I just want to show you this head page, there's
15 nothing in it, but just to identify that that's where it
16 has come from and the date: 3 July 2008.
17       This, as you can see:
18       "Greetings John, BBA's recent consultation paper."
19       Is the beginning of their response to you; yes?
20 **A.  Yes.**
21 Q.  I wonder if we can scroll down to 7B, which should be at
22 page 1687.
23       You can see, as we scroll down, they gave
24 a significant response to the elements of the
25 consultation that you were asking questions about; yes?

Page 105

1  **A.  Yes.**
2  Q.  Thank you.
3        This 7B is talking about the impact of the current
4  diminished credit capacity of the market and it says:
5        "LIBOR users should have the clear understanding of
6  how the benchmark mechanisms functions in all market
7  conditions either placid or strained.  This too deserves
8  emphasis in any educational or promotional effort on
9  behalf of LIBOR."
10       I wanted to take you to the 7B(ii), which is in the
11 middle there:
12       "Worth adding is that, when seen from the vantage of
13 any individual contributor panelist, diminished market
14 credit capacity is likely to manifest itself in
15 unusually wide dispersion among the offered rates at
16 which the individual panelist might borrow in reasonable
17 size on any given day, at any given tenor.  One would
18 expect to encounter dispersion of this type whenever
19 there is uncertainty and legitimate difference of
20 opinion about credit worthiness of any one market
21 participant among other market participants who must
22 choose whether or not to lend to it."
23       They are there, aren't they, Mr Ewan, I suggest
24 describing the range that one would experience in
25 a market where there is diminished credit capacity?

Page 106

1  **A.  What you've described before as "credit tiering".**
2  Q.  Credit tiering.  Thank you.
3  **A.  Yes.**
4  Q.  "Dispersion of this type might answer, at least in part,
5  the frequent accusation that contributor panelists
6  habitually submit false or biased responses to the daily
7  LIBOR survey.  A contributor panelist who can borrow in
8  reasonable market size at any one of a wide range of
9  offered rates commits no falsehood if she bases her
10 response to the daily LIBOR survey upon the lowest of
11 these or the highest (or any other arbitrary selection
12 from nothing them)."
13       Do you agree with that proposition?
14       (Pause)
15       What they are saying is:
16       "In a reasonable market size a range of offered
17 rates, no falsehood, [it is in the female] she bases her
18 response to the daily LIBOR survey on the lowest of
19 these or the highest of these or any arbitrary selection
20 from among them."
21 **A.  That is fine as far as what Fred Stern is saying, which**
22 **is perfectly consistent with the definition.**
23 Q.  Thank you.
24 **A.  That a bank -- if a bank gets shown money in reasonable**
25 **market size at a number of rates, you're not -- you're**

Page 107

1  **not outside of the definition if you say you're one the**
2  **lower ones or one of the higher ones.  What I would**
3  **suggest is that it would be unusual for there to be**
4  **a notable dispersion between the highest and the lowest**
5  **rates at which a bank is offered money, and -- but there**
6  **is a final component to the definition which is a bank**
7  **can't submit a range, it has to submit one number --**
8  Q.  Yes.
9
10 **A.  -- every day.  And so that's why the LIBOR question**
11 **isn't, "Where did you last borrow money?"  So in order**
12 **to arrive at that one -- that one number, the question**
13 **is: where do you think you would be lent money?  And**
14 **there can only be one answer to that and it should be**
15 **where you think an unnamed counterparty would offer you**
16 **money.**
17 Q.  We don't disagree it has to be one figure that is
18 submitted --
19 **A.  Mm-hm.**
20 Q.  -- would you agree with the proposition that you funnel
21 down to that one figure?
22 **A.  You should be using all of the information available to**
23 **you to get to that one figure, yes.**
24 Q.  Which the is the funnelling down process.
25 **A.  I don't know that it's a funnelling down process.**

Page 108

27 (Pages 105 to 108)

1     It's -- but it's -- but yes, there should be a -- a --
2     a process at the bank that lays out how you arrive at
3     your number, whether it's a funnelling down or
4     an iteration or what evidence, however you want to
5     describe it, but there should be a process for doing it.
6   Q. Yes.
7   A. Does that answer your question?
8   Q. Thank you.
9       I wonder if we can please look at JEX/083. We are
10      now at the tail end of September 2008, and the only
11      reason I want to shown you this particular document, and
12      you are familiar with this, I think, Mr Ewan, was that
13      the United States Commodity Futures and Trading
14      Commission made contact with you, as you can see there,
15      as the director, and Angela Knight, concerning LIBOR.
16      Is that right?
17  A. Yes.
18  Q. If we scroll down the page, please -- we don't need to
19      read all of this -- over the page, please. "Activity
20      under review", do you see the title there?
21  A. Yes.
22  Q. "As my colleagues informed you, the CFTC currently is
23      conducting a review into whether banks who submit
24      borrowing rate information used in the calculation of
25      LIBOR for the US dollar panel may have under-reported

1   regulatory politics. The US Treasury wants to merge the
2   CFTC and the SEC.
3       The SEC being?
4   A. The Securities and Exchange Commission, another US
5       regulator.
6   Q. Thank you:
7       "CFTC is naturally not keen on this and so to
8   demonstrate its usefulness it has been very active and
9   expansionist of late and has been flexing its muscles
10  overseas. Notably imposing limits on speculative oil
11  trading in the Intercontinental Exchange in London, and
12  Dubai exchange, earlier this summer as oil prices
13  spiked.
14      "(3) I strongly suspect that there is a tension
15  between the CFTC and FSA. The FSA is responsible for
16  overseeing the ICE".
17      ICE being?
18  A. Intercontinental Exchange.
19  Q. Thank you:
20      "And did not want limits placed on speculative oil
21  trading as they were convinced, probably correctly, that
22  speculative trading in oil futures does not materially
23  affect the spot price. Nonetheless, the FSA agreed to
24  send daily information on trading to the CFTC and was
25  forced to issue statements repeatedly that they enjoyed

1   their borrowing rates."
2       They thereafter, as we can see -- we don't have to
3   read it all -- but they ask for a significant amount of
4   material to be supplied to them. Do you remember that?
5   A. Yes.
6   Q. And I think your response to that was to say that it
7       would be more appropriate for that request to be
8       supplied through the Financial Services Authority as it
9       then was. Is that right?
10  A. That's correct.
11  Q. I wonder if we can now turn, please, also to JEX/084.
12      If we can go down the document, please, slightly down
13      below that. Thank you.
14      I just want to touch -- is that the end of the
15      document? Thank you, into the middle e-mail there from
16      you.
17      This is 12 September. You to Angela Knight and
18      Alex Merriman, copying in Sally Scutt, confidential law
19      enforcement correspondence.
20      "All, a number of thoughts occur to me.
21      "(1) it's not immediately clear that any of this
22  falls within the CFTC's jurisdiction, perhaps this is
23  why they open with impressive legalese(?), but request
24  rather than demand information.
25      "(2) This regulation may be spurred by part of the

1   good relations with the CFTC.
2       "(4) Angela, I agree we need clarity over which US
3   regulator has responsibility for this. The CFTC may
4   have some claim as they are one of CME's regulators."
5       We pause, that being the exchange we just looked at
6   and the response:
7       "And as such are interested in the LIBOR futures and
8   options that trade there. We should certainly consider
9   discussing this with the CME -- interest rate
10  derivatives account for 40 per cent of the group's
11  revenue and LIBOR derivatives are their bead and butter.
12  The CME will therefore naturally be keen that nothing
13  interferes with this and I know that the CME has very
14  close relations with the CFTC.
15      "(5) I wonder whether we might as the Fed for their
16  view on the CFTC's review of LIBOR contributions, or is
17  this a genie we may not be able to put back in the
18  bottle?
19      "(6) I agree that this absolutely must not leak and
20  so I don't think that we can tell the FX and MM
21  committee at this point. Angela, should we tell the
22  board?
23      "(7) Clearly we discussed this with our lawyers. We
24  need to decide with our lawyers, we have been deeply
25  unimpressed with Clifford Chance's input into the

Page 113

1  development of LIBOR governors and whilst they are no
2  doubt a big beast with a fearsome name the beast seems
3  to be hibernating. I asked Habib."
4      Is Habib Montani the partner at Clifford Chance you
5  were dealing with?
6  **A. I believe so, yes.**
7  Q. "About this specific issue in July and following their
8  initial conference call and he promised to let me know
9  that whether the CFTC has the power in this area but I
10  have heard nothing. That said my usual lawyers don't
11  have transatlantic reach. We could ask the CME who they
12  use as they will be immediately up to speed.
13      "Shall we get together to discuss our first moves
14  Monday morning?
15      "Regards, John."
16      She responds -- if we scroll to the top of that
17  e-mail, please. This is to you, from Sally:
18      "I think we should not discuss this with anyone,
19  particularly CME, until we have a better understanding
20  of all the details from a regulatory lawyer. Also, we
21  should not ask CME about their lawyer. It should be
22  Clifford Chance because they have a better understanding
23  of LIBOR through the governance project. However,
24  advice on this particular subject needs to be the best,
25  paid for and from someone with specific experience of

Page 114

1  the US.
2      "Perhaps it would be worth Alex giving Habib a call.
3  If Habib thinks this would be a conflict for them, given
4  their other work, then Freshfields or Allen & Overy may
5  be better.
6      "I would be happy to call Tom Horotis(?) in Angela's
7  absence if you would like me to. Sally."
8      If we go further up, the chain continues to you from
9  Angela:
10      "All, I have just picked up the exchange of e-mails.
11  I agree with Sally, we use our lawyers, consult them
12  first before anything else and use Clifford Chance."
13      When the CFTC first arrived you clearly questioned
14  their jurisdiction to look at this particular matter.
15  Would you agree?
16  **A. Yes.**
17  Q. And at that stage, as you've indicated, you wanted the
18  inquiry, which in fact then happened, to be processed
19  through the Financial Services Authority, the UK
20  regulator at that stage?
21  **A. Well actually, that suggestion didn't come from me.**
22      **I think that was Angela.**
23  Q. But the BBA stance, let's put it that way.
24  **A. Credit.**
25  Q. Through the UK regulator.

Page 115

1  **A. Correct.**
2  Q. Although, they weren't the regulator, in fact, of LIBOR?
3  **A. Because LIBOR wasn't regulated.**
4  Q. Yes. But regulator to regulator correspondence rather
5  than overseas regulator to you?
6  **A. Well, I think that was the suggestion that -- that the**
7      **CFTC would write to the FSA and the FSA would write to**
8      **the BBA.**
9  Q. Do you agree with that?
10  **A. Yes.**
11  Q. But the FSA, at that stage on your analysis, were not
12  interested in LIBOR?
13  **A. I think they were interested, but I don't think that**
14      **they were interested in regulating it.**
15  Q. They weren't interested, I am going to suggest, in
16  investigating it?
17  **A. Erm -- I --**
18  MR CHAWLA: I don't think he can answer that.
19  Q. All right.
20      Can we now go, please, to JEX/089.
21      If you would just allow me a moment. Is that
22  JEX/089? Can you scroll down that page, please? It's
23  the wrong reference. Just allow me a moment.
24      I wonder if you could put up on the screen 1244 from
25  the original documentation. Thank you.

Page 116

1      Just look at the head page, I am not going to ask
2  you all of the detail about this, Mr Ewan, because it's
3  quite a long transcript. We are now in October 2008.
4  This is a further conversation between you and
5  Mr Storey; all right?
6  **A. Yes.**
7  Q. Do you agree with that?
8  **A. Yes.**
9  Q. I wonder if we can turn, please, to internal page 8
10  within that document.
11      Now, this a conversation that we can see starting
12  there. Mr Storey is talking to you at the top about
13  LIBOR; all right? And it reflects, as we can see, the
14  reoccurring theme, so he said:
15      "Yeah, fine. LIBOR, whether the LIBOR is 4 per
16  cent, 5 per cent or 6 per cent it's fundamental point is
17  people aren't lending money in term."
18      Just pausing there, he's saying there's still not
19  liquidity in the market in 2008.
20  **A. Correct.**
21  Q. We agree.
22      (Transcript read)
23      I have shown you that transcript for two reasons.
24      How did you move the rate with WestLB, Mr Ewan?
25  **A. Okay, that's -- I think that's a reference – and**

29 (Pages 113 to 116)

**Page 117**

1  I wouldn't swear to this -- but I believe that's
2  a reference to -- there was some question around
3  WestLB's rates, and I can't remember where it came from,
4  when I was one of the committee members or a market
5  comment or -- or whatever.  But I recall, with the aid
6  of this note, that on one occasion I spoke to WestLB and
7  asked them about the accuracy of their rates, and then
8  the next day their rates moved.
9  Q.  Do you agree he, perhaps in jest -- but I want to ask
10  you about that -- postulates again the theory of putting
11  people together to move the rate?
12  A.  Yes, and I think that that is very clearly a thought
13  exercise.  And there are references throughout that to
14  it being fibbing, and there's an inference that it would
15  be unprincipled.  And I think it's quite clear that
16  neither Miles nor I would ever suggest that the banks
17  should get together and just agree in a room to just
18  change the rates.
19  Q.  I think he uses the word "can't discount the
20  possibility" at one stage, and that's why I put it in
21  the way I did.  Is that a jest or is that serious?
22  A.  It was not serious.
23  Q.  Let's move on.
24     I want to look at JEX091.  We are still
25  in October 2008.  Now, this is from Mr Koutsogiannis at

**Page 118**

1     UBS to you, yes?
2  A.  Yes.
3  Q.  This is now October 2008, and it is in response to
4  a separate paper called the "BBA LIBOR scrutiny", yes?
5  A.  Yes.
6  Q.  This is UBS's questions and points raised, as the title
7  suggests.  And it says:
8     "John, after discussing some points with my internal
9  legal and compliance, please find attached some
10  responses that we would like both yourselves at the BBA,
11  the committee and Clifford Chance to opine on.
12     "Please pay special attention to the comments in the
13  appendix as this is a reoccurring theme and something
14  that we have highlighted before that we feel is still
15  left unresolved.
16     "If anything is unclear please let me know and we
17  can discuss at the meeting tomorrow.
18     "Kind regards, Pete."
19     Sorry, Mr Ewan, I didn't appreciate you did not have
20  it.  Do you have it in front of you?
21  A.  I have it here.
22  Q.  Thank you very much.
23     I wonder if we can turn, please, within that
24  document electronically to page 19 of it.  This is part
25  of the attachment, Mr Ewan.  There are lots of track

**Page 119**

1  changes.  If I can summarise it, it's a very long
2  document that sends your document back with UBS's track
3  changes in it.  Do you agree with that as a summary?
4  A.  Yes.
5  Q.  I want to just focus on this particular part of the
6  document which is paragraph 2 -- firstly your
7  paragraph 2 in black:
8     "The rate at which each contributor submits must be
9  formed from that bank's perception of its cost of funds
10  in the interbank market, and not set in reference to
11  information supplied by any individual or institution
12  outside that area of the contributing bank that has the
13  primary responsibility for managing that bank's cash."
14     Namely, cash rate.  Do we agree?
15  A.  Yes.  Yes, yes.
16  Q.  UBS's response in the purple, which are track changes:
17     "As previously indicated to the BBA, UBS has
18  particular concerns as to the formulation of the second
19  half of this sentence.  We would propose that the BBA
20  replaces the current formulation of clause 2 of the
21  terms of reference with the following:
22     "The rate at which each contributor submits must be
23  formed from that bank's perception of its cost of funds
24  in the interbank market.  The area of the contributing
25  bank that has the primary responsibility for managing

**Page 120**

1  that bank's cash will be solely responsible for the
2  calculation and accuracy of the rate [yours]."
3     Their response:
4     "We believe that there is a fundamental conceptual
5  difficulty with the proposed current wording of clause 2
6  provided by the BBA.  We believe that all banks accept
7  that accountability for the submitted rates should rest
8  solely with the cash trading desks.  However, the cash
9  trading desks do not work in a vacuum and their
10  'perception' of the rate at which the bank can borrow at
11  any given time is bound to be directly" --
12  A.  "Indirectly".  Forgive me.
13  Q.  I apologise:
14     "... indirectly influenced by the 'information' that
15  they receive during the ordinary course of their working
16  days from a variety of sources.  This information may be
17  sourced from the media or through their interaction with
18  other parts of the bank or the market in the proper
19  discharge of their many daily functions as a busy cash
20  trading desk.  We therefore consider that the current
21  proposed wording of the BBA does not accurately reflect
22  the reality of the situation and that, as a practical
23  matter, it would be impossible for the cash desk to
24  analyse the source of all the information on which its
25  good faith exception of the bank's cost of borrowing

30 (Pages 117 to 120)

**Page 121**

1    cash is based.  We hope that the proposed reformulation
2    above, however, does not (sic) capture the concept that
3    the BBA are asking the contributor banks to agree to,
4    i.e. that the cash desk takes full responsibility for
5    the submitted rate, and that this should not be
6    contributed or in duly influenced by other areas of the
7    bank or outside institutions.  UBS considers that many
8    current contributor banks may have problems signing the
9    terms of reference in their current formulation if
10    clause 2 remains unchanged."
11    Now, I have taken you to this, Mr Ewan, for two
12    reasons -- three reasons, in fact -- you have indicated
13    just a little while ago that you got them to sign up
14    because it was the cash desk.  Do you remember?  And
15    I said, well, it wasn't quite right.
16    **A.  Yes, we touched on that.**
17    Q.  The proposed amendments, which are that the bank's cash
18    will be solely responsible for the calculation, and the
19    formulation that was given by UBS, was the formulation
20    that was adopted by the FXMMC.  Do you remember that?
21    **A.  I -- I was trying to remember which one was finally used**
22    **and I couldn't.  But, I mean, I will accept if you tell**
23    **me that that's the one that was – that was adopted,**
24    **I'll – I'll quite happily accept that.**
25    Q.  So the broad points I just want to establish with you is

**Page 122**

1    that UBS were saying it is not just simply the
2    information within the cash desk itself that lends to
3    the information of the fixing of a LIBOR.  "And we
4    can't," they were saying, sign up to the documentation
5    that the BBA were then requiring to say it was the case
6    that that's all they sourced before they submitted their
7    LIBORs.
8    Do you agree?
9    **A.  I -- I'm sorry, I didn't realise there was a question**
10    **there.**
11    Q.  They have set out, haven't they, precisely the very
12    things that you've described a submitter would do,
13    market colour, access to information, and so on and so
14    forth?
15    **A.  Yes, and I -- yes.**
16    Q.  Moving on to a slightly different topic.  If we can
17    look, please, at JEX/093.  I have almost finished the
18    documents, Mr Ewan.
19    Now, I am not sure that is the right reference.  Can
20    you scroll down, please? (Pause). Thank you. Yes,
21    thank you very much.  I just wanted to touch on this.
22    This is in November 2008, and you have talked about
23    the way the BBA promulgates the definition, the
24    understanding of the definition within the market.  Yes?
25    **A.  Yes.**

**Page 123**

1    Q.  The fact that the definition was on the website.
2    Therefore it's suggested that everyone understood what
3    the definition stood for.  Yes?
4    **A.  Yes.**
5    Q.  This is from Paul Fisher, who is at the Bank of England.
6    What responsibility did Mr Fisher have?  Do you know?
7    **A.  I believe at the time he was a -- a director of the**
8    **bank's money market division.  I think he was also, at**
9    **that point, the chair of one of the bank committees that**
10    **the BBA attended.**
11    Q.  He was quite high in the bank?
12    **A.  Yes.**
13    Q.  "John [this is to you only], LIBOR definitions.  This is
14    a personal email rather than an official bank line
15    following a difficult evening.
16    "The definition of LIBOR in your consultation
17    paper..."
18    Just pausing there, there was a further consultation
19    at this stage, is that right?  Clearly.
20    **A.  Yes.**
21    Q.  "Is the rate at which the individual contributor bank
22    could borrow funds, were it to do so, by asking for and
23    then accepting interbank offers in a reasonable market
24    size just prior to eleven o'clock London time.
25    "I have to say it took me a long time to find that

**Page 124**

1    on your website (I only found it within a consultation
2    paper), and when I looked under the tab for 'definition'
3    what it actually says is:
4    "BBA LIBOR is the BBA fixing of the London interbank
5    offered rate.  It was based on offered interbank deposit
6    rates, and contributed in accordance with the
7    instructions to BBA LIBOR contributor banks.
8    "Which is ambiguous, to say the least.  And when I
9    looked to Wikipedia [it gives a reference], it gives a
10    daily reference rate based on the interest rates at
11    which offered to lend unsecured loan funds to other
12    banks, which seemed clearer but entirely wrong in
13    current conditions.
14    "All of this was sparked by reading some Goldmans
15    research..."
16    "Goldmans" being a reference, I would suggest, to
17    Goldman Sachs, the investment bank?
18    **A.  Correct.**
19    Q.  "...which assumed that LIBOR was the rate at which banks
20    would lend, not the rate at which they could borrow.
21    "If Goldmans can get it wrong maybe there's
22    a complete lack of public understanding?  If so, I would
23    start by putting the official definition in pride of
24    place on the BBA website, and then get someone's son or
25    daughter to edit the Wikipedia."

31 (Pages 121 to 124)

1    It was clear, therefore, even at that stage, to a
2  senior member of the Bank of England, that there wasn't
3  the clarity in the publication of the rate from the BBA
4  on its website.  Do you agree?
5  **A.  Erm --**
6  Q.  This is in November 2008.
7  **A.  I -- I think it's surprising.  I would have had no**
8  **hesitation in saying it would be easy to find the**
9  **definition.  I mean the LIBOR website went through**
10 **a number of changes.  It's possible that there was**
11 **a dropped or broken link.  I do recall this because**
12 **I remember, after getting this, I distinctly remember**
13 **going and setting myself up a Wikipedia account**
14 **specifically so I could edit what Wikipedia said about**
15 **the LIBOR rate.**
16 Q.  The point is, Mr Ewan, it -- and forgive me for
17   suggesting -- but the clarity of the definition from the
18   public perception of the BBA on its website is not as
19   clear as evidenced by that e-mail as it is suggested it
20   was.  Put it that way.  You either agree or disagree.
21 **A.  I'd quite like to, actually, if it would be possible, go**
22 **back and look at the 2008 website, because I would**
23 **have -- I did not think it was hard to find.  And**
24 **considering that we'd spent the previous six months**
25 **engaged in consultation with the market and talking to**

1  **journalists and putting out papers, I -- I don't know**
2  **what more we could have done.**
3  Q.  I hope your Lordship and the jury will forgive me,
4    I have two more documents that I would just like to deal
5    with and then I'm finished.  Three more points in those
6    documents.  Can we look, please, at JEX/095.
7      This returns to the issue -- I am only doing it
8    chronologically, Mr Ewan -- but I want to look at
9    paragraph 2.  It turns to the issue of the then ongoing
10   CFTC investigation.
11     "I saw David Bailey...."
12     This is an e-mail from Sally Scutt to you:
13     "I saw David Bailey (capital markets sector leader)
14   and Douglas Hull at the FSA yesterday.  We also think
15   that the governance and scrutiny paper was very good."
16     That is a reference to the later papers that we've
17   just -- we've just talked about.  Yes?
18 **A.  Yes, okay.**
19 Q.  "Predictably they asked us to remove an explicit
20   reference to the FSA, which I have done."
21     Same issue again, papers coming out, FSA not wanting
22   to be publicly associated with it?
23 **A.  Yes.**
24 Q.  Thank you.
25     "They raised the issue of the US regulatory interest

1  in LIBOR.  In their view the interest stems more from
2  posturing for the domestic market ...(Reading to the
3  words)... standing in the anticipated US regulatory
4  shakeout than any real worries about LIBOR.  The FSA
5  also think that the CFTC claim to have any oversight of
6  LIBOR may be rather tenuous.  I also discovered that the
7  FSA sees no reason for a parallel investigation for
8  a number of reasons.  Firstly, in their view, we do not
9  fall within their ambit.  And, secondly, the market
10 tells them that LIBOR is not broken."
11   Hence why I suggested, Mr Ewan, that the FSA at that
12   time were not interested in an investigation of LIBOR.
13 **A.  Okay.  Well, that is a report from Sally Scutt of**
14 **something that she says was said to her by the FSA.**
15 Q.  I would like now, please, to look at JEX/096.  I just
16   need to touch on this.  This is a transcript of the
17   conversation on 21 May 2009.  I would like to, within
18   that document, please go to page 3 of it.  It starts at
19   the top:
20     "Very specifically, I mean again you know I've
21   actually spoken to RBC just recently because I went
22   round and had a relationship visit with them quite
23   recently.  Their view is of a very very tight definition
24   of LIBOR which is not where somebody has recently
25   offered you cash, it's where you can stand up at 11 am

1  in London and say, 'Go on then, fill me', and you would
2  get right then."
3    Mr Thursfield says:
4    "Okay, so it's an interpretation difference
5  primarily then."
6    "That's exactly what it is.  In fact, we need to
7  have a discussion of that at the Foreign Exchange and
8  Money Markets committee."
9    "Okey-dokey."
10   "My view is, because I'm not going to be there, but
11 my view is that you -- I don't know our interpretation
12 would be we also take into account where we are given
13 and imply an offer from that."
14   "Mm."
15   "As well, where we could actually, we definitely
16 don't rely on where if we called a broker we would
17 definitely get an offer at that particular time.  But
18 it's where we imply an offer would be forthcoming."
19   "Sure."
20   "Have a reasonable expectation, so long as we are
21 reasonably patient enough.  Obviously you want the money
22 in huge amount there and then, you'll have to pay a bit
23 more [for it]."
24   "But I don't think that's really the common view on
25 where it is.  I mean, there have been large amounts of

Merrill Corporation                www.merrillcorporation.com/mls                8th Floor, 165 Fleet Street
(+44) 207 404 1400                                                                London EC4A 2DY

**Page 129**

1   primary CD issuance particularly."
2       "Probably more so than cash deposits and going to
3   bank counterparties at significant sub-LIBOR levels.
4   That would be my view, and that's obviously behind the
5   push lower overall."
6       The transcript finishes a page over.
7       My question is this.  There was a difference between
8   the panel bank's interpretation of the definition.
9   A. It is a very fine point.  But, yes, there is.
10  Q. And despite the definition's simplicity and the way it
11  is phrased, it was clear, even for Mr Thursfield, who
12  was -- this is in 2009 -- a long-standing member of the
13  FXMMC, a different approach to the question compared to
14  that which you have touched on from RBC?
15  A. Yes.
16  Q. One moment.
17      The last document I would like to put to you,
18  please, is JEX/099.
19      I only want to put this to you, Mr Ewan because you
20  are part of the BBA, okay?  I think we've clarified
21  whose hand this document is in and I am going to look at
22  my learned friends who aren't going to tell me.
23  Mr Kearney's hand.  Thank you.  Mr Kearney's hand.
24      I just want to establish that this would have been
25  one of the meetings that the BBA had on 25 February as

**Page 130**

1   it's dated in 2010.
2       Would you have been at that meeting with UBS?
3   A. Yes.
4   Q. It touches on, as we can see, at the second number 1 in
5   the chapter in the gutter:
6       "The SEC got in touch with UBS asking for large
7   amounts of data.  Follow on from CFTC request last year.
8   SEC asked UBS why they weren't helpful with CFTC.  UBS
9   asked the SEC to contact LIBOR native regulator.  Reply
10  was that UBS were being obstructive."
11      Do you remember this conversation?
12  A. I -- I don't.
13  Q. But I reflects, does it, the stance that the BBA had
14  taken in this country, which was information through the
15  FSA, FCA?
16  A. Well, the BBA did take the view that the appropriate way
17  for that request to come was via the UK regulator,
18  whether or not the UK regulator actually regulated
19  LIBOR.
20  Q. UBS have -- it's recorded here under the arrow that we
21  see just on that left-hand side -- UBS suggest that the
22  SEC want to create bigger index and affiliate and want
23  to discredit LIBOR before releasing the index to the
24  market.
25      Was there any credible basis for that suggestion by

**Page 131**

1   UBS that you were aware of anyway?
2   A. I certainly had -- I do not recall ever seeing that
3   reported or said to me anywhere other than the record of
4   this conversation here.
5   Q. Do you have a memory of this meeting?
6   A. I don't.
7   MR HAWES:  Would your Lordship just allow me one moment.
8   (Pause)  I have concluded what I have at the moment to
9   cross-examine Mr Ewan about, but there may be an issue
10  of disclosure that I need to resolve overnight with my
11  learned friend.  I anticipate there may be some
12  re-examination in any event.
13  MR CHAWLA:  Yes, but about 20 minutes or so.  I am in
14  my Lord's hands.
15  MR JUSTICE COOKE:  You don't wish to do that tonight then?
16  MR HAWES:  I'm afraid not.  I am sorry to Mr Ewan, I tried
17  to get him done today.  But on that basis, if Mr Ewan
18  unfortunately has to come back tomorrow, would
19  your Lordship just allow me to formally leave it open on
20  that one issue that I need to discuss with my learned
21  friend?
22  MR JUSTICE COOKE:  Yes.
23  MR HAWES:  Other than that, that would be the only matter.
24  Thank you.
25  MR JUSTICE COOKE:  Yes.  All right, members of the jury,

**Page 132**

1   thank you very much.  Ten o'clock tomorrow morning,
2   please.
3       (In the absence of the jury)
4   MR HAWES:  Can I just detain your Lordship one moment in the
5   absence, obviously, of Mr Ewan.  He can be released,
6   subject to your Lordship.
7   MR JUSTICE COOKE:  Yes.  Would you mind leaving, Mr Ewan?
8   Ten o'clock tomorrow, please.  Not for long, it is
9   hoped.
10  THE WITNESS:  It is hoped.
11      (The witness withdrew)
12      Housekeeping
13  MR HAWES:  I just wanted to detain your Lordship because
14  obviously, in the course of my cross-examination, the
15  board meeting in 2008, we understand there is a note in
16  Mr Ewan's -- we don't have it -- but we understand there
17  is a note in Mr Ewan's hand of that meeting.  I think at
18  the moment the Crown's view is it is not disclosable.
19  I want to just review precisely what he said about
20  whether a note was taken or not, so I don't want to
21  argue the point now.  I wanted your Lordship to
22  understand that was the issue, because if there is
23  a hand note, subject to a review of what he said about
24  it, it may well be that I would ask your Lordship, if
25  the Crown are not prepared to disclose it, to at least

33 (Pages 129 to 132)

```
 1      look at it.
 2         That was the issue.
 3   MR JUSTICE COOKE:  Right.  And working on the assumption
 4      that Mr Ewan will be through in, say, half an hour,
 5      where else do we go tomorrow then?
 6   MS JONES:  My Lord, we then return to, I'm afraid, a bit of
 7      reading and we start with the admissions, which I think
 8      will take a couple of hours to go through because it's
 9      moving through some of the documents.
10   MR JUSTICE COOKE:  That is what was down for this afternoon
11      so to speak.
12   MS JONES:  That's right.  We'll pick back up with the
13      graphics and start dealing with the communications.  So,
14      in effect, on my calculation, we are about half a day
15      out.
16   MR JUSTICE COOKE:  Yes.  Yes, very good.  Thank you.
17   (4.45 pm)
18            (The court adjourned until
19        Wednesday, 10 June 2015 at 10.00 am)
20
21
22
23
24
25
```

Page 133

```
 1      I N D E X
 2
     MR EWAN (continued) ..................................1
 3      Cross-examination by MR HAWES (continued) ........1
 4   Housekeeping ......................................132
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 134

Merrill Corporation                www.merrillcorporation.com/mls              8th Floor, 165 Fleet Street
(+44) 207 404 1400                                                            London EC4A 2DY

Day 11                          R v Hayes                        10 June 2015

**Page 1**

```
1                Wednesday, 10 June 2015
2    10.00 am)
3         (In the absence of the jury)
4    MR JUSTICE COOKE:  Can I just mention two timetabling
5    issues. (i) tomorrow I need to rise at 4.15 at the
6    latest. (ii) a juror is moving house some time next
7    week which may present a slight difficulty, probably
8    I think on the Thursday.  Quite how we'll cope with that
9    remains to be seen.
10   MR HAWES:  Thank you, my Lord.
11        (In the presence of the jury)
12   MR JUSTICE COOKE:  Good morning.
13   MR HAWES:  My Lord, I formally left open the possibility of
14   further questions but I have no further questions for
15   Mr Ewan.
16   MR JUSTICE COOKE:  Thank you very much.
17             MR JOHN EWAN (continued)
18           Re-examination by MR CHAWLA
19   MR CHAWLA:  Mr Ewan, can we just go back, please, because
20   back on Monday we were taken through some of the detail
21   of the relationship visits in 2005 and 2006.  We looked
22   at some of the detail of 2007 and I'll come to 2008 just
23   in a few minutes.
24       But those visits, just in general terms, what was
25   the point of them?
```

**Page 2**

```
1    A.  They were a custom that I inherited.  They were -- so
2    I don't know what the original purpose of going around
3    to the relationship visits was.  It was something that
4    had been in place -- or it was in place in 2005.
5    I don't know what happened prior to that and I think
6    that they were an information-gathering exercise.
7    I don't think that originally they were supposed to
8    be tightly focused on LIBOR.  I think that they were just
9    part of the -- of what the BBA did in order to lobby
10   effectively.  They would seek to gain information on
11   what market participants were thinking about issues of
12   the day.
13   Q.  So if we just look, for example can we have, please,
14   JEX/1 on the screen.  Can we turn, please, to the
15   internal numbering 11, Appendix A.  So the questions
16   there -- and I appreciate you have inherited this.  You
17   had been there a couple of weeks only at this stage, but
18   at number 2, first of all the panel process:
19       "Does anything need fixing?
20       "View of the quality of market fixings, generally
21   and specifically.
22       "Any other observation on LIBOR?  Can the definition
23   be improved?"
24       A number of issues that arise out of that.
25   Throughout the time that you were at the BBA, were you
```

**Page 3**

```
1    looking at whether the definition could be improved?
2    A.  Yes.  The definition was -- I believe it was a standing
3    item on the annual review that the Foreign Exchange and
4    Money Markets Committee took in 2005, '06, '07, '08 and
5    so on.
6    Q.  Then if we look at JEX/2, please, which is the
7    relationship visits ahead of the 2006 panel review.
8    Again, if we turn in the internal numbering to the last
9    page of this, page 15.  Again, we have the agenda there.
10   Just looking at those first thee:
11       "General impressions of how BBA LIBOR panel
12   processes worked.
13       "Does anything need fixing?
14       "View of the quality of market fixings, generally
15   and specifically.
16       "Any other observations on BBA LIBOR?  Can the
17   definition be improved?"
18       So it's not quite the same, but similar?
19   A.  Yes.
20   Q.  Was this important to you within the BBA, looking at
21   these questions?
22   A.  Yes.  As I have said, it was our view at the BBA that
23   although the BBA's role in its widest sense was to lobby
24   on behalf of banks that operate in the UK, it was felt
25   to be a service to the market and I think historically,
```

**Page 4**

```
1    when LIBOR was first set up, it was given to the BBA to
2    operate it because they could operate a rate for the
3    benefit of the market.
4    Q.  All right.  If we turn to the 2007 visit.  You have been
5    asked about one or two aspects of this.  Can we go to
6    JEX/5, please.  My Lord's big numbering at the top, it's
7    33.  So we see a wide range of people that you consulted
8    with, including those who were contributors, the panel
9    banks and others.  So we see, for example, at the very
10   first one,              whom we know are brokers.
11   A.  That's correct, yes.
12   Q.  They're asked, and we can see the comments and we'll
13   just pick up some of these comments:
14       "Overall very happy with BBA LIBOR rate setting
15   without any major issues to express.
16       "Praise BBA LIBOR's efficiency and took the attitude
17   if it isn't broke, don't fix it and described it as
18   accurate as EURIBOR, although EURIBOR has 47 contributor
19   banks."
20       I'm not going to take every single word of this, but
21   that was the sentiment at least expressed here, is that
22   right?
23   A.  That's right.
24   Q.  Deutsche, we can see it's Mr Nicholls.  We heard
25   Mr Nicholls's voice yesterday.  In the second line, bear
```

1 (Pages 1 to 4)

**Page 5**

1    in mind that they're contributing to the full suite of
2    the rates:
3        "Expressed complete satisfaction with BBA LIBOR rate
4    setting."
5        So that's two consultees.
6        Over the page, BNP Paribas, the top line:
7        "Praised BBA LIBOR as an accurate, reliable fixing
8    without any major problems to convey.
9        "Mentioned how tightly tied ..." should that be?
10   A.  Yes, I assume so.
11   Q.  "... BBA LIBOR is to the actual market."
12       There's a reference to extending it to the
13   South African rand.
14       Societe Generale who contributed to three:
15       "No major problems raised with BBA LIBOR as a rate
16   fixing.  Noticed an improvement in LIBOR in terms of
17   real market accuracy and representation."
18       I should have said Yen LIBOR.  We can see it's
19   francs, euros and Japanese yen LIBOR for SocGen.
20       Over the page, and we'll just see if we can get an
21   overall impression of what you were being told in the
22   early summer of 2007.  Sumitomo, they contribute,
23   amongst others, to Yen LIBOR:
24       "Find Japanese yen very flat.  Only really utilise
25   it for funding purposes.  It tends to rise 25 basis

**Page 6**

1    points every five years then remain flat."
2        Then two bullet points down from there:
3        "BBA LIBOR isn't fully representative of the market
4    and on average tends to be too high.  This may be
5    because once upon a time it was cash dollar rated ..."
6        Then it goes on from there; yes?
7    A.  Yes.
8    Q.  At the bottom of the page, Commonwealth Bank of
9    Australia.  We can deal with this very shortly:
10       "Very happy with BBA LIBOR in general in terms to
11   the product and the processes behind it."
12       They are dealing with Australian and New Zealand
13   dollars.
14       Over the page, West LB who contribute to five
15   currencies, including the yen:
16       "Very happy with BBA LIBOR in general in terms of
17   the product and the processes behind it.  Also very
18   happy to contribute their contributions to BBA LIBOR."
19       So we'll look at the others in just a moment, but
20   was this a general theme in April of 2007 or shall we
21   look at all of them just to check?
22   A.  Well, no, I think that's fair.  I mean, in 2005 and '06
23   and '07 there was actually competition amongst banks who
24   wanted to be a contributor to BBA LIBOR.
25   Q.  Over the page, please.  ▮▮▮▮  You have two meetings

**Page 7**

1    with different people at ▮▮▮ Securities.  They're both
2    about slightly different points.  The first is:
3        "Dominated by areas and avenues of growth."
4        The second is about, towards the bottom of the page,
5    in relation to Turkish rates and the observation being
6    made:
7        "From experience in the Turkish markets a need was
8    identified for a reliable and trusted fixing that is
9    beyond repute."
10   A.  Yes.
11   Q.  Was that your view as well, that it needed to be
12   reliable and trusted and beyond repute?
13   A.  Sorry, that's a specific question about a fixing for
14   Turkish markets.
15   Q.  In terms of LIBOR generally, so far as you were
16   concerned?  I appreciate this is specifically about
17   Turkish markets.
18   A.  Yes, I think the entire of the financial markets wanted
19   accurate rates.
20   Q.  Very well.  Over the page, please.  Bank of
21   Tokyo-Mitsubishi, BOTM.  We know that they contribute,
22   amongst others, to Japanese yen:
23       "Very happy with BBA LIBOR in general in terms of
24   the product and the processes behind it.  Acknowledge
25   a general trend of improvement in terms of reliability

**Page 8**

1    and accuracy."
2        He gives more detail further down.
3        Mizuho, again we know that they contribute to yen,
4    although it's not set out there:
5        "Very happy with BBA LIBOR in general in terms of
6    the product, the processes behind it.  Are eager to
7    become contributors in the existing currencies and they
8    feel that they have significantly increased their volume
9    of deals in the last year."
10       Just to finish this off quite quickly.  We see over
11   the page, at the next page, Citigroup, similar
12   sentiments.  HSBC, similar sentiments from Mr Wood:
13       "Happy that all contributors seem to be behaving
14   themselves in terms of not quoting excessively high or
15   low."
16       Abbey:
17       "Happy with the fixing process and its fixings
18   broadly speaking.  Occasionally a group of banks seem to
19   simultaneously quote higher than the actual market
20   resulting in an excessively high LIBOR which doesn't
21   accurately represent the market."
22       That's a little qualification there to the general
23   sentiment.
24       Over the page, Barclays, Miles Storey:
25       "Happy with the process.  Looking from a position

Merrill Corporation                www.merrillcorporation.com/mls         8th Floor, 165 Fleet Street
(+44) 207 404 1400                                                        London EC4A 2DY

1    with vast experience it's currently at peak performance.
2    Although it isn't perfect, it's probably running as near
3    as to perfect as it will reach.  Rumblings from other
4    banks regarding Barclays manipulation of the rates seems
5    to have now subsided.  Mentioned it would not be
6    feasible for Barclays to be involved in a conspiracy
7    with the number of other banks that would be required in
8    order to manipulate the rates for the currencies that
9    have 16 contributors."
10       So, again, a theme with a qualification.
11       We have four more banks here.  Over the page,
12   Credit Suisse:
13       "BBA LIBOR is currently the best it's ever been in
14   terms of process, efficiency and accuracy."
15       Over the page, JP Morgan Chase:
16       "BBA LIBOR seems to be running smoothly without any
17   signs of manipulation."
18       Over the page, Lloyds TSB, Clive Jones:
19       "BBA LIBOR is running to satisfaction with a lower
20   level of complaints and rumblings than there previously
21   was."
22       Finally, in relation to this, Royal Bank of
23   Scotland:
24       "In terms of the dollar market all participants are
25   comfortable with the levels and know what to expect."

1    now to December 2007, 7 December, and this is your
2    e-mail -- we can see in fact it has your name over the
3    page -- to a whole host of people.  They include the
4    FXMMC, do they, as members?
5    **A.  That's a wider group than the Foreign Exchange and Money**
6    **Markets Committee.  That looks like -- that looks like**
7    **it's at least one representative from every bank that**
8    **contributes to any one of the individual currency**
9    **calculations.**
10   Q.  So the subject is, "Invitation from Angela Knight to
11   a discussion of BBA LIBOR":
12       "Dear BBA LIBOR contributor
13       "As you know, accurate BBA LIBOR fixings are central
14   to the ongoing health of the markets and so at this time
15   of heightened stress and scrutiny more than ever it is
16   vital that the BBA LIBOR rate setting possess is seen to
17   be transparent and robust.
18       Pausing there.  Was that your view at the time?
19   **A.  Yes.  I mean, it is my view throughout the entire**
20   **relevant period that the process must be transparent and**
21   **robust.**
22   Q.  It goes on:
23       "There has been increasingly prominent comment in
24   the market and the media on the rates and so we would
25   like to invite you to a meeting chaired by our

1    Then there are further bullet points set out.
2        Was that the general market sentiment that you
3    gleaned at that time in April, May and June of 2007?
4    **A.  Yes.  Sorry, I don't know whether it's material or not,**
5    **but just I notice on internal page 10 of that, talking**
6    **about JP Morgan Chase --**
7    Q.  So this is if you go back, please, two pages.
8    **A.  That's the one.  I think there's a typo there.  That**
9    **should read at the top David, not Davis Lally.**
10   Q.  Very well.  Thank you.
11       Once they were compiled, where did these reports go?
12   **A.  They were seen internally at the BBA and they were seen**
13   **by the Foreign Exchange and Money Markets Committee.**
14   Q.  The point of showing them to the Foreign Exchange and
15   Money Markets Committee?
16   **A.  Because they are the people who are ultimately**
17   **responsible for overseeing the rate and if there is**
18   **dissatisfaction with the rate or that users feel that it**
19   **needs to be improved or altered, they know.**
20   Q.  Very well.  Then we know that conditions became
21   significantly more difficult in the autumn of 2007.
22   **A.  Yes.**
23   Q.  We see, please, a consequence of that at JEX/034.  In
24   your bundle there, Mr Ewan, page 149.  On JEX/034 can we
25   go on to page 4 of 6.  That's it.  So we have moved on

1    Chief Executive, Angela Knight, to discuss openly the
2    integrity of the fixings and how to ensure their
3    accuracy in the future."
4        There are then proposed dates.  How usual was this
5    sort of meeting?
6    **A.  To my knowledge -- well, there hadn't been such**
7    **a meeting, I don't think, between me joining the BBA and**
8    **this occasion.  This was the first time that I think the**
9    **Chief Executive of the BBA had invited all the LIBOR**
10   **contributing banks in to discuss the rate setting**
11   **process, but, as we have touched on over the last few**
12   **days, there are throughout late 2007 and 2008, and**
13   **I think later as well, there are an increasing number of**
14   **ad hoc meetings, as well as I think we increased the**
15   **frequency of the scheduled committee meetings to**
16   **precisely address this point.**
17   Q.  When you say "address this point", what do you mean?
18   **A.  Ensuring that the BBA LIBOR rate setting process is**
19   **transparent and robust.**
20   Q.  Involving the Chief Executive of the BBA, what was the
21   purpose of that?
22   **A.  Well, Angela Knight is a -- she's a very sort of hands**
23   **on individual and she -- whilst she is responsible for**
24   **the totality of what the BBA did, whilst everything was**
25   **running smoothly and she was in general content for**

**Page 13**

1   LIBOR to be run by her junior staff that were more --
2   that were responsible for it day to day, this is
3   a reflection of the fact that she realises that LIBOR is
4   important and the importance of LIBOR, and I say,
5   I think, in the times of heightened stress, it becomes
6   more important than ever that we can set accurate rates
7   for the market and so it is a matter of personal concern
8   to her.
9   Q. Thank you. Then we go on, please, to April 2008. You
10   were taken to a fair amount of detail about that
11   yesterday, but can we just look at one or two other
12   issues that arose at that time within the context of
13   what was happening then. Can we turn, please, to
14   JEX/046. In your bundle, page 180. We looked at
15   a number of documents around this time but not
16   specifically this one yesterday.
17       Now, this is from Daniel Knight of Bank of America.
18   Can you remember who he was?
19   A. I think Dan Knight was the contributor at Bank of
20   America and I believe -- I think he was also the FX and
21   Money Markets representative from Bank of America.
22   Q. You say "contributor", was that in dollars?
23   A. Yes.
24   Q. US dollars. He says this:
25       "John, I've started receiving an increasing

**Page 14**

1   number of queries from third party banks asking me why
2   I'm setting Bank of America's US Dollar LIBOR where they
3   are. I can genuinely say that this is where we are
4   attracting funding into the bank but I can understand
5   their frustration because it is entirely clear that the
6   broker market for cash is clearly 15 to 20 basis points
7   higher than US dollars LIBOR. The reason third party
8   banks are asking is that they're clearly finding it
9   impossible to fund loan agreements denominated in US
10   dollars at LIBOR, even at the shorter end of the
11   maturity spectrum, three months and in.
12       "Yesterday's turn action facility results from the
13   Federal Reserve demonstrated that there was demand from
14   European and US banks for secured funding from the Fed
15   for 28 days at one month LIBOR plus 10 basis points ..."
16       Then it talks about the auction adding a significant
17   amount of liquidity:
18       "I know there's little point convening to discuss
19   with the panel banks. I just thought it would be useful
20   for you to know the same market dynamics (FX swap,
21   counterparts acknowledge that they issue at LIBOR plus
22   a spread) are still in operation. However, third party
23   analysts are writing about the turn auction facilities
24   saying about LIBOR and I imagine there may be financial
25   press articles to follow."

**Page 15**

1   So there you had someone and would you describe them
2   as a prime bank at the time?
3   A. Well, as we -- I don't think we have touched on this
4   precise point, but the BBA never used the term "prime
5   bank" because we -- the Foreign Exchange and Money
6   Markets Committee didn't think that they could
7   accurately describe that, but --
8   Q. Don't worry because that's then therefore a loose
9   question of mine, but they were a contributor bank
10   certainly?
11   A. Yes, and, as we have touched on, the way that the panel
12   review process is conducted is that it seeks to find the
13   largest, most active, strongest banks.
14   Q. You respond to that:
15       "I'm not surprised to hear this. I think you're
16   right that talking to the panel banks won't achieve
17   much. However, in confidence there's a meeting of the
18   BBA board next week which consists of CEOs and Chairman
19   of the majors banks and we will discuss this. In my
20   view this could be reputational issue for the banks, as
21   well as the fixings."
22   A. Yes.
23   Q. So was it always just complaints you were receiving?
24   A. Well, this isn't a complaint.
25   Q. No, well that's point.

**Page 16**

1   A. So what -- because, as I have said, the BBA's not active
2   in the market so it doesn't conduct any borrowing or
3   lending. It's a trade association so we would seek to
4   get information from people who were market
5   participants, like, for example, the Foreign Exchange
6   and Money Markets Committee. The reason that I say in
7   my e-mail back to Dan, "I'm not surprised to hear this"
8   is because what he's saying here, which is, "I'm a big,
9   strong bank, I can fund at a lower level. The markets
10   are very stressed. Other banks, who used to be able to
11   fund at the same level as me, can't and don't like it",
12   I would hear that. That was a major theme in 2007/2008.
13   Q. Very well. Let's move on then to JEX/054, which is your
14   page 235. This was a telephone conversation between you
15   and Clive Jones of Lloyds TSB. We bear in mind the
16   date, 17 April of 2008. Do you remember this is the one
17   where Mr Jones and you are talking about, if you go to
18   the end of the document just so we have it in context,
19   the fifth page of this -- your page 239 -- toning it
20   down, toning something down; yes?
21   A. Yes.
22   Q. You were being asked about what was being toned down.
23   Can we look at this and just pick out a few phrases
24   which might help us identify what you and Mr Jones are
25   here referring to because at the bottom of the page

4 (Pages 13 to 16)

1  there's clearly unhappiness about the Bloomberg article
2  and a quote that seems to have been taken out of
3  context.
4      Over the page, page 2 of 5 -- sorry, go down to the
5  first page of that, please.  At the bottom of the page
6  there's the unhappiness about the quote out of context
7  at Bloomberg.
8      Over the page, please.  Having spoken about
9  journalists, go down to the bottom, please, because
10 there Mr Jones is talking about:
11     "My view I'm trying to say if you think I'm just
12 a bloke that's flown in from some island, picked up
13 a couple of newspapers and read stuff, I would read that
14 this note is what is being referred to here.  It's going
15 along with that article because we -- so some of the
16 wording like 'unexpected behaviours' and then when --
17 then I'm not so worried about the fact that it's going
18 to go out to."
19     He clearly said "unexpected behaviours" in a way
20 which has caused the author of this, the transcriber of
21 this, to put it in inverted quotes; yes?
22 A.  Hmm, hmm.
23 Q.  Then over the page, please, he repeats, at line 81, the
24 reference to "unexpected behaviours".
25     At line 87:

Page 17

1      "We need to be really careful here and so it
2  referencing to Citi and Credit Suisse analyst reports."
3      His complaint is, at line 92:
4      "We're saying that because these people have done
5  something, they've kicked us into action, then that
6  implies there was a guilt and a requirement and it's
7  implying that the system or the process wasn't robust
8  enough to regulate itself."
9      Then you say:
10     "Okay, so if you remove all ..."
11     Mr Jones says:
12     "It's so bloody careful."
13     He suggests, at the next page:
14     "Okay, so let's kick out this reference to reports
15 crystallising in Citi and Credit."
16     There's reference then to the LIBORs, further down
17 the page, and the spirit of the definition which you
18 were asked about yesterday.
19     At 143:
20     "Okay, let's tone it down a step ahead of what might
21 come back.
22     "Sure, absolutely.  I agree with you entirely."
23     That may be "let's tone this down" as a repeat of
24 what has been said rather than "turn this down":
25     "And I might send around version 2."

Page 18

1  A.  Yes.
2  Q.  Can we please just see what is there being referred to.
3      Can we put up on screen from the large bundle page 478.
4      I'm going to ask that you at least have it in hard copy
5  form.  (Handed)
6      So this needs to be read in the context of what
7  we've just seen.  This in fact in this form a draft of
8  a letter to LIBOR contributors of 17 April 2008.  Do you
9  remember this at all?
10 A.  I remember that there was -- I remember --
11 Q.  Can we have the whole page on screen, please.
12 A.  -- there was a letter from Angela to the contributors,
13 yes.
14 Q.  Although we can see this is a draft, if we look at the
15 third page of this document, so page 480, just looking
16 at that distribution list we can see that it says:
17     "The 17 April 2008 letter went to the following ..."
18     It then gives a very wide circulation list.  Can you
19 help us, please, with that circulation list?
20 A.  I recognise almost all of the names and I think to be
21 sure -- I mean, the clue is on a couple of pages back
22 which is it's the designated senior treasury contact in
23 each LIBOR contributor bank.
24 Q.  So we've seen that at page 478.  Just to put that
25 therefore into the context of that phone call of that

Page 19

1  day.  If we just look at the document itself, go to the
2  top, please:
3      "Maintaining the integrity of BBA Dollar LIBOR.
4  Following the discussions of the BBA at the BBA board
5  meeting on April 16th 2008, I'm writing to set out the
6  steps that it has been decided the BBA should take to
7  maintain the integrity of Dollar LIBOR in particular and
8  to review generally all BBA LIBOR procedures.
9      "As you are aware, the current turmoil in financial
10 markets has led to a number of anomalies and unexpected
11 behaviours."
12     Do you recognise that expression?  We saw it on
13 the --
14 A.  Yes.  Clive referred to that, yes.
15 Q.  "Concerns have been raised by some market participants
16 and these have crystallised in the last 48 hours in
17 analyst reports by Citi and Credit Suisse."
18     So is this the document that's being referred to in
19 that phone call?
20 A.  Yes, I believe so.
21 Q.  Is this the document that Mr Jones says essentially it's
22 too strong and needs to be toned down?
23 A.  Yes.
24 Q.  Let's look at the document then:
25     "While we all appreciate that liquidity in financial

Page 20

5 (Pages 17 to 20)

1 markets is abnormal and this in turn impacts BBA LIBOR,
2 nevertheless there is a need to ensure the reputation
3 and integrity of Dollar LIBOR in particular and the
4 benchmark as a whole. BBA LIBOR fixings are relied upon
5 extensively to price global financial products and
6 instruments, including a large percentage of global
7 swaps, a significant number of US mortgage products. It
8 is therefore one of the pillars of the financial system.
9     "As of today the BBA will bring forward our
10 scheduled annual review of all the BBA LIBOR procedures
11 and processes. This is already underway but given
12 current market conditions we will expedite the review
13 process.
14     "In addition, we will also ask the Foreign Exchange
15 and Money Markets Committee which oversees the rates to
16 review aspects of the BBA LIBOR framework, including
17 definitions and the instructions to contributors,
18 examine thoroughly all the individual market data
19 received via the market surveillance tool, investigate
20 any continuing anomalies in market behaviour, take steps
21 to rectify any aspects of the process.
22     "I hope you agree that this action is appropriate
23 and justified and I will welcome an early discussion
24 with your treasury executives and dealing desk.
25     "This letter will also be shared externally

1 following the public interest in this issue."
2     Can I ask you, Mr Ewan, did you yourself play any
3 part in the drafting of that letter or was that done by
4 or on behalf of Ms Knight? Do you remember now or not?
5 **A. I don't remember specifically. It is likely that I had**
6 **some input into it, but I think a letter such as this,**
7 **that's going out underneath Angela Knight's signature,**
8 **she would certainly have had the last review of it.**
9 Q. This is the one that Mr Jones, if I paraphrase, is
10 saying, "This is just too blunt"?
11 **A. Yes.**
12 Q. Was it intended to be blunt?
13 **A. Yes.**
14 Q. We know that at that time you have referred your
15 unhappiness about the Bloomberg article which talked
16 about -- I'm not going to go back to it -- the BBA
17 saying they will throw people out of the pond if they
18 don't behave properly. Again, I'm paraphrasing.
19 **A. Right.**
20 Q. At that time, by April of 2008, what currencies did you
21 have issues with or were there concerns about or
22 concerns were raised about?
23 **A. It was overwhelmingly Dollar LIBOR.**
24 Q. Were any complaints brought to your attention about Yen
25 LIBOR?

1 **A. I don't recall.**
2 Q. Then can we turn on, please, to JEX/055. I just have
3 a couple more documents that I would like you to
4 consider. Your bundle at page 240. You were taken to
5 this document yesterday. We can see at the top it's
6 a report on 2008 panel bank review, dated 18 April
7 of 2008. The first three lines your attention was drawn
8 to:
9     "General consensus is that US Dollar LIBOR is
10 currently inaccurate by 20 to 30 basis points while
11 sterling and euros is within reason reliably accurate.
12 This is due to current market pressures leading banks to
13 post artificially low rates to protect themselves,
14 causing many to question US Dollar LIBOR reliability."
15     If we go to the bottom of that page, your attention
16 was drawn to the foot. Can we blow up the right-hand
17 side of that footnote:
18     "Summary of Panel Banks Feelings\Final 2008
19 Report.doc ..."
20     It has a date, but that's a print date so we can
21 ignore that, 3 March 2015, but your reference was drawn
22 to the fact that it was describing itself as "Final 2008
23 Report". You told us yesterday that you didn't think
24 that was the final report?
25 **A. I don't believe it is.**

1 Q. Just go on then, please. Can we look at JEX/067.
2 Sorry, before we do that, JEX/064, please, your
3 page 256. We know in fact that subsequent to the date
4 of the report we've just seen there were further
5 relationship visits so we have, for example, here, Bank
6 of Tokyo-Mitsubishi. At the footer we can see that this
7 is a document of 7 May. It's virtually impossible to
8 read but it's a bit better like that. So we can see
9 that that's part of the relationship visits.
10     At the top of that page, we can see that the comment
11 made is:
12     "BBA LIBOR as a whole has kept its role well amid
13 the current financial market crisis compared to other
14 indices. BBA needs to explain more positively about
15 current definitions and instructions to panel banks and
16 the wider public."
17     It goes on from there, together with pros and cons
18 of LIBOR, as set out by those representatives of Bank of
19 Tokyo-Mitsubishi.
20     At JEX/065, your page 258, this is a relationship
21 visit with Citibank. You were taken to this. I'm not
22 going to look at it in any detail therefore. We see at
23 the bottom of that, again in the footer -- file path is
24 probably more accurate -- 7 May 2008.
25     Then let's go on, please, to JEX/067. We now have

1    a report on 2008 panel bank review -- sorry, page 262,
2    my Lord.
3    **A. Thank you.**
4    Q. Dated 13 May of 2008. In the summary -- I'm not going
5    to go through the entirety of it -- it has:
6       "The current prices is even though unclear not
7    complete and many will continue defensive stances to
8    protect their balance sheets. The crux of the problem
9    is a lack of confidence in all areas of the market ..."
10      I suspect that should be "money markets", shouldn't
11    it?
12    **A. Yes.**
13    Q. "... which has led to interbank lending to become
14    relatively non-existent beyond three months and nearly
15    all trades are under one month unless a high premiums
16    paid. The Bank of England's new swap initiative is
17    being viewed as a positive step, as positive news but
18    many still feel it has taken too long. General
19    consensus regarding BBA LIBOR fixings are that they
20    reflect the stress in the market at the moment but US
21    Dollar LIBOR is currently inaccurate, while sterling
22    and euros is within reason reliably accurate. The
23    current market pressures and the stigma attached to
24    being a high outlier have led to reports that some banks
25    are posting artificially low rates to protect themselves

Page 25

1    **importance, the importance that it was accurate and we**
2    **wanted everybody to have a fair say, not just**
3    **participants, not contributors but everybody to get**
4    **a fair say as to, "Look, what can we do to try and**
5    **ensure that this rate is accurate in these**
6    **unprecedentedly stressed times".**
7    Q. So that takes us through the summer of 2008. Can we
8    then go, please, to JEX/091. You need to jump ahead to
9    page 347. Now, this was a response to the governance
10    and scrutiny paper from UBS, Mr Koutsogiannis; yes?
11    **A. Yes.**
12    Q. At page 18 of that document in the internal numbering --
13    your page 365 -- do you remember we looked at this
14    yesterday, where the author of the document is making
15    a suggested change to appendix 2? It was suggested, and
16    rightly, albeit with a little amplification, that what
17    is there set out was subsequently adopted. You weren't
18    clear about that yesterday, but in fact if we look at
19    appendix 2 we can see that with some amplification that
20    part at 2 was adopted in the appendix 2 terms of
21    reference.
22    **A. Okay.**
23    Q. Just for reference, rather than to go to it
24    unnecessarily, core bundle A/10 to 12, my Lord.
25      The document continues in that purple track change.

Page 27

1    but recent times have seen this situation improve. This
2    has raised questions about US Dollar LIBOR's reliability
3    highlighted in the media and suggestions offered to
4    improve the accuracy of BBA LIBOR range from a delicate
5    touch to a full upheaval."
6      I appreciate I'm only showing you the first page of
7    that. The document continues across a number of pages.
8    Can you help as to whether -- I appreciate you're
9    looking back a long period of time -- that was the final
10    version or was there still something beyond that, or can
11    you not say?
12    **A. I couldn't say but it does seem to post-date the**
13    **previous document we looked at.**
14    Q. Then we know that in the summer of 2008 there was the
15    consultation. We have the document in our core bundle.
16    How important was that consultation from your point of
17    view?
18    **A. I think it was one of the most important things I did**
19    **whilst I was at the BBA.**
20    Q. Just in a sentence or so, and I appreciate I'm asking
21    you something that may be difficult, but try if you can
22    in a sentence or so, why was it one of the most
23    important things?
24    **A. Because we understood the importance of LIBOR to the**
25    **financial markets and therefore because of its**

Page 26

1    This is from UBS. Those changes, we know, are from UBS:
2      "We believe that there is a fundamental conceptual
3    difficulty with a proposed current wording of clause 2
4    which is set out above. We believe that all banks
5    accept that accountability for the submitted rates
6    should rest solely with the cash trading desks.
7    However, the cash trading desks do not work in a vacuum
8    and their perception of the rates at which the bank can
9    borrow at any given time is bound to be indirectly
10    influenced by the information that they receive during
11    the ordinary course of their working days from a variety
12    of sources. This information may be sourced from the
13    media through their interaction with other parts of the
14    bank or the market for the proper discharge of their
15    many daily functions as a busy cash trading desk.
16      "We therefore consider that the current proposed
17    wording of the BBA does not accurately reflect the
18    reality of the situation and that as a practical matter
19    it would be impossible for the cash desk to analyse the
20    source of all the data on which good faith perception of
21    the banks' cost of borrowing cash is based."
22      Then it sets out why they hope that the
23    reformulation is effectively helpful; all right?
24    **A. Yes.**
25    Q. But it talks about the good faith perception of the

Page 28

7 (Pages 25 to 28)

R v Hayes

1   banks' cost of borrowing cash; yes?

2   **A.  Yes.**

3   Q.  How important is the fact that the perception is good

4      faith or is made in good faith?

5   **A.  Well, that's fundamental.**

6   MR CHAWLA:  Thank you, Mr Ewan.  That's all I ask.

7   MR JUSTICE COOKE:  Thank you very much.  Those are all the

8      questions for you.  You can go.

9   **A.  Thank you very much.**

10           **(The witness withdrew)**



Page 29

Page 31

Page 30

Page 32

8 (Pages 29 to 32)

# Attachment 2
# Oral Argument Transcript

1

H1QQALL-COA

1                    UNITED STATES COURT OF APPEALS

2                       FOR THE SECOND CIRCUIT

3       -----------------------------X

4       UNITED STATES OF AMERICA,

5               v.                        16-898-cr
                                          16-939-cr
6       ANTHONY ALLEN,
        et al.,
7                    Defendants,
        -----------------------------x

8

9                                        New York, N.Y.

10                                       January 26, 2017
                                         10:30 a.m.
11

12
        Before:
13
                            HON. JOSE A. CABRANES
14                           HON. GERARD E. LYNCH
                            HON. ROSEMARY S. POOLER
15
                                         Circuit Judges
16

17                          APPEARANCES

18      UNITED STATES DEPARTMENT OF JUSTICE, Criminal Division
             Attorneys for Government
19      BY:  JOHN PELLETTIERI

20      WILLKIE & GALLAGHER LLP
             Attorneys for Defendant Allen
21      BY:  MICHAEL S. SCHACHTER

22

23

24

25

H1QQALL-COA

1        JUDGE CABRANES:  We will hear counsel now in United

2    States v. Anthony Allen and Anthony Conti.

3        Mr. Schachter, while you're getting ready, permit me

4    to make a preliminary statement which is actually relevant to

5    both sides, and the government will be able to comment on this

6    when they address the Court.

7        Both sides will have the time necessary for their

8    argument.  We've given you more than usual, and you are lucky

9    that there is nothing else this morning; and I assure you, you

10    will have time necessary for your arguments.

11        That said, I have some threshold, possibly non-record

12    inquiries, by which I mean that I, speaking for myself only,

13    would welcome your description of the human and prosecutorial

14    context here.  The general public, as well as the court, are

15    entitled to understand how and why this prosecution was

16    undertaken, or any prosecution was undertaken.  And this is an

17    unusual and complicated case where the two defendants are U.K.

18    nationals, they are young and relatively low-level employees,

19    and they worked in London for a Dutch bank which may be a

20    household name in The Hague but not in my parochial American

21    world.  The case is also brought by so-called Main Justice, not

22    by a prosecutorial office, that certainly regards itself as

23    second to none in securities and financial prosecutions.

24        Now, all of this is a puzzlement to me, and

25    interesting, at least, so maybe you can give us a description

3

H1QQALL-COA

1    of what was going on here in a way that's comprehensible to

2    non-specialists.  I know you're geared up with large questions

3    of statutory construction and constitutional issues, all of

4    which we'll hear, but we want to get a little context here.

5              MR. SCHACHTER:  May it please the Courts, this is a

6    topic which I am very pleased to begin with, and the answer to

7    your Honor's question is I have not the slightest idea.

8              When I was informed that the Justice Department

9    intended to indict my client, I went to them and said, why in

10   God's name would the Justice Department need to prosecute these

11   British citizens for conduct which occurred exclusively in

12   London where the cooperating witnesses are not U.S. citizens,

13   where it is all about the alleged involvement of or it's

14   responding to questions that are posed by a British banking

15   trade organization about a rate which is set at 11:00 London

16   time, why is it necessary to drag this British citizen to stand

17   trial here thousands of miles from home and from his family?

18   He has young children.  It was a burden for his parents, who

19   are elderly and came to stay in New York for the length of this

20   trial, and to what end?  So that we can incarcerate this

21   British citizen thousands of miles from home where it would be

22   a great burden for their family to visit them?  I said why?

23   Now, there may be a circumstance --

24             JUDGE POOLER:  I don't want you to lose track of Judge

25   Cabranes' question, but were there prosecutions in Britain?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

4

H1QQALL-COA

1          MR. SCHACHTER:  Absolutely.  And what I said to the

2      justice department was there may be circumstances where no

3      other government is addressing this harm, and it is a global

4      harm, where the United States Justice Department feels that

5      they need to step in, but I noted that there were extremely

6      active British prosecutions, there were investigations being

7      undertaken of exactly the same conduct in London.  In fact,

8      there were active investigations of our clients.

9          The financial conduct authority, their version of the

10     Securities and Exchange Commission, is an issue which is

11     created by what the government did in this circumstance.  They

12     had an investigation that was active.  They knew they had an

13     active investigation.  They were working very closely with the

14     serious fraud office in the U.K.  What is the possible reason

15     why it was necessary for the United States to spend taxpayer

16     resources to prosecute this British citizen and incarcerate him

17     here in the United States?

18         JUDGE LYNCH:  Are you aware of other LIBOR-related

19     prosecutions brought in the United States?

20         MR. SCHACHTER:  Subsequent to ours.  Ours was the

21     first.  Then subsequent to that, there have been other charges

22     and there are cases pending.  There are other cases in the U.K.

23     which have been prosecuted:  Some successfully, some

24     unsuccessfully.

25         JUDGE LYNCH:  I meant here.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

H1QQALL-COA

```
 1          JUDGE CABRANES:  Where are they pending in the United
 2   States, do you know?
 3          MR. SCHACHTER:  They are brought by the fraud section.
 4   I am not positive, but I believe they were all filed in the
 5   Southern District of New York, but all being prosecuted by Main
 6   Justice with no involvement from the Southern District of New
 7   York.
 8          JUDGE LYNCH:  There were days when U.S. Attorneys for
 9   the Southern District of New York threatened to resign over
10   things like that.
11          MR. SCHACHTER:  I understand that.
12          JUDGE LYNCH:  But it isn't, after all, the sovereign
13   district.  It is a branch of the Justice Department in its own
14   little way.
15          MR. SCHACHTER:  As a very technical matter, I know
16   some former U.S. Attorneys that would maybe disagree with that
17   statement.  But, no, it was very troubling.
18          In fact, one of the central issues in our case is that
19   there is a critical witness, the LIBOR secretary from the
20   British Bankers Association, John Ewan, he absolutely would
21   have been available to us to have him testify if Mr. Allen and
22   Mr. Conti were prosecuted in the United Kingdom.  And, in fact,
23   when he testified, in some circumstances there have been
24   acquittals, according to the news reports.  This is all outside
25   the record.  But according to the news reports, it is largely
```

H1QQALL-COA

1     based on his testimony, because his testimony, which we quote

2     from his testimony in the U.K., is that in the British Bankers

3     Association's view, you commit no falsehood if you submit a

4     LIBOR rate which is anywhere within the range of reasonable

5     estimates of a bank's borrowing costs, whether it's the highest

6     or the lowest.

7              We think that if the jury here had the opportunity to

8     hear Mr. Ewan's testimony, that that would have been a basis

9     for them to acquit.  We certainly think they would have

10    acquitted.  You would have had the entity which set up this

11    construct which says this is OK with us; we don't consider it

12    to be a falsehood as long as it is a reasonable estimate of a

13    bank's borrowing costs.

14             JUDGE POOLER:  Have there been any convictions in

15    Britain?

16             MR. SCHACHTER:  Yes.

17             JUDGE POOLER:  So, in spite of this testimony, there

18    have been convictions?

19             MR. SCHACHTER:  Well, the evidence with respect to

20    certain people was mixed.  So, for example, the first

21    conviction, and the most well-known in the U.K. is that of a

22    man named Thomas Hayes.  Mr. Hayes was bribing brokers through

23    wash sales in order to get them to spread false information, in

24    order to recommend that a trader submit false information to

25    the British Bankers Association.  That's a horse of a different

H1QQALL-COA

1    color.

2            JUDGE POOLER:  It wasn't within the reasonable rates

3    is what you're saying.

4            MR. SCHACHTER:  Correct.

5            JUDGE POOLER:  And that's when it becomes false and

6    fraudulent.

7            JUDGE LYNCH:  On the record that we have, as opposed

8    to the one that we might have had if Mr. Ewan had been allowed

9    to testify, is there not plentiful evidence, including from one

10   of your experts, that what the purpose of LIBOR was, was to set

11   a benchmark for what is the best borrowing rate for the best

12   customers?

13           MR. SCHACHTER:  Well, I think it is -- aside from the

14   word "best," the purpose is to get banks to submit their

15   reasonable estimates of where they can borrow.

16           JUDGE LYNCH:  So, if I'm asked what's the best rate at

17   which -- someone says to me, you have a good credit rating.

18   I'd like to know for my purposes what a person with a good

19   credit rating could borrow at, and I know from my experience

20   that my bank would give me a loan at 5 percent.  I also know

21   that the loan shark operating out of the bar on the corner

22   would be happy to lend me money at 25 percent for two weeks.  I

23   also know that there are other lending agencies that might

24   charge 6 or 7.  I'm entitled to say 12 because that's somewhere

25   in the range?  I mean, that would be a truthful answer to that

8

H1QQALL-COA

1    question?

2              MR. SCHACHTER:  I don't know that it would be.  That's

3    not our facts.

4              JUDGE LYNCH:  I don't know that it isn't your facts.

5    Your facts are that an agency that is trying to set a

6    benchmark -- and I have a problem with the exclusion of Ewan's

7    testimony because that could problematize this, but on the

8    record that we've got, they're asked for an honest estimate.

9    They're not asked pick a number in a range.  They're not

10   asked -- the literal question that's asked is certainly not:

11   Give us a number that falls somewhere in the ballpark of what

12   you might be able to borrow at.  They're asked, what's your

13   estimate?  What's the number at which you could borrow?  And

14   there's evidence that your clients calculated such a number,

15   and then were responsive to somebody who said, you know, it

16   would be good for us to submit a different number than that.

17             Now, I don't understand why -- again, we're not

18   talking now at the moment about the evidentiary issues, but as

19   a matter of what is false and fraudulent, is there not

20   plentiful evidence from which a reasonable jury could conclude

21   that they were asked what is their estimate, and they did not

22   give their estimate; they gave something else that was not

23   their honest answer to that question.  Tell me what's wrong

24   with that as a theoretical matter of what's a crime under the

25   wire fraud statute.

H1QQALL-COA

1          MR. SCHACHTER:  I'll answer it two ways.  First, there

2    was not evidence that that occurred.  Rather, I think it's

3    important to discuss a little bit the construct here.

4          The question, at what rate could you borrow -- this is

5    the question posed by the BBA:  At what rate could you borrow

6    funds if ordered to do so by asking for and then accepting

7    interbank offers in reasonable market size just prior to 11:00?

8    The question was posed for 15 different time periods, from

9    overnight to 12 months.

10          It is undisputed that banks did not borrow for a vast

11    majority of those purposes.  There was no interbank borrowing.

12    It was undisputed that this is a subjective estimate and not

13    more than that.  It is not transaction based.  Nobody is

14    required to look to --

15          JUDGE LYNCH:  But they're asked for their subjective

16    estimate.  It's not a case where they're asked what is the

17    scientific fact, and, alas, there is no such thing, so there

18    can't be a falsehood.  They're asked for their estimate.  And

19    the question is, did they give their honest estimate or did

20    they give a falsehood that was convenient to them rather than

21    their best guess.

22          If you asked me what's your estimate of how many

23    points the Patriots are going to score in the Superbowl --

24          JUDGE CABRANES:  Judge, why don't we let him answer

25    the question as opposed to going into compound and paragraph?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

H1QQALL-COA

1          MR. SCHACHTER:  There is no evidence that the

2     estimates were not honest in that they were accurate.  There is

3     no evidence that either appellant believed that they were

4     submitting a rate which they did not believe to be an accurate

5     answer, a fair and reasonable estimate.  There is no evidence

6     that supports that.  In fact, the evidence was that there was

7     -- in fact, part of the government's submission is that there

8     was a range of accurate estimates.

9          JUDGE LYNCH:  But are they asked for a fair estimate

10    or are they asked for their opinion?

11         MR. SCHACHTER:  The question that your Honor poses

12    suggests that there is only one answer to the question, and the

13    evidence was to the contrary.  In fact, the government's

14    cooperating witness, Mr. Yagami, whose testimony is at page 265

15    of the joint appendix, he testifies there is no one correct

16    number.

17         Mr. Robson at the beginning of his direct testimony is

18    asked by the prosecutor to basically describe the scheme, and

19    he says -- I'm quoting.  This is page 225 of the appendix.

20    "So, there would be kind of a range of two or three numbers

21    where LIBOR could possibly be."

22         The question, by the way, is:

23    "Q.  First explain again what you did."  That's the question

24    posed by the prosecutor.

25         Here is Mr. Robson, the principal cooperating witness'

H1QQALL-COA

1    opportunity to explain the scheme.  And he says, "So, what I

2    would do is I would ask the interbank broker where he felt the

3    LIBORs would be.  There would be kind of a range of two or

4    three numbers where LIBOR could possibly be."  This is quoted

5    at page 19 of our brief.  "So, for example" --

6                 JUDGE CABRANES:  This is the government witness?

7                 MR. SCHACHTER:  The government witness, direct

8    examination at the outset of Mr. Robson's testimony.

9                 He says, "There would be kind of a range of two or

10   three numbers where LIBOR could possibly be.  So, for example,

11   if the broker came on and said three months, I think I'm

12   hearing might be 80, might be 85, might be 90, but probably

13   75."  He says, "I would go down the middle."

14                And then the government asks:

15   "Q.  Now, let's say you in fact had a trader request where a

16   trader wanted you to submit a LIBOR to favor their position.

17   So what would you do?

18   "A.  So, given those circumstances, if one of the traders had

19   contacted me and said three months, if I needed a higher three

20   months, I would have moved it higher at his request, I would

21   have moved it towards the 90 level or set 90."  In other

22   words --

23                JUDGE LYNCH:  What's he moving?

24                MR. SCHACHTER:  He's moving his estimate.

25                JUDGE LYNCH:  He selected an estimate and then he

12

H1QQALL-COA

1   moved that estimate.  He had got a range -- no question, he got

2   a range of information.  He took that information into account.

3   He said, well, the best I can do is average it.  And then

4   somebody says, don't average it, give the high end of the range

5   because that's what we want.  And then he, in his words, bumps,

6   right, he moves the estimate?

7              MR. SCHACHTER:  He selects in the range of accurate

8   estimates that he could provide --

9              JUDGE LYNCH:  I understand -- maybe we're just talking

10  at cross purposes as to what is an estimate.  I mean, there are

11  lots of things that one could be asked to estimate and it

12  wouldn't be wrong.

13             You can't say -- if I say, oh, the Patriots are going

14  to score 40 points in the Superbowl.  You can't say that's

15  wrong.  Who knows?

16             But if I'm asked what's your estimate, and I pick one,

17  and then somebody else says, wait a minute.  Tell him something

18  else because that's better for you because you got a number in

19  a pool or something.  That's a lie, if I say my estimate is 40

20  points when my estimate is really 28.

21             MR. SCHACHTER:  Respectfully, I disagree, and here is

22  why:  If you're asked for an estimate, and there may -- an

23  estimate is inherent generally in estimates, and it certainly

24  is the evidence in this case that there certainly was no one

25  right answer.  You could choose three.  Assume you could choose

H1QQALL-COA

1    three answers.  You could choose 75, 80, 85.  They're all the

2    same.  They're all equally accurate.  And you select one

3    accurate answer as opposed to another accurate answer because

4    it will help your employer, which is as an employee what you

5    have a fiduciary obligation to do.  If you simply are selecting

6    one accurate answer as opposed to another accurate answer, that

7    is not wire fraud.

8        JUDGE LYNCH:  No, an answer that is accurate in the

9    sense you're saying is, if I honestly thought this, no one

10   could quarrel with me.  But I'm asked for what I honestly

11   think, and if I don't give the answer that I honestly think, I

12   mean that is standard that that's a fraud.

13       MR. SCHACHTER:  A hundred percent I agree.  There was

14   no evidence of that.

15       Had the government presented any evidence that the

16   appellants disbelieved the opinion that they were providing --

17   and the statement of opinion in answering the BBA's query is, I

18   believe that Rabobank can borrow at 3.10 percent for six

19   months.  That's my estimate.  That's what I believe.  Had the

20   government presented any evidence that the appellants in fact

21   didn't believe -- they thought no way 3.0.  In fact, three or

22   four, if there had been evidence of that, then I would agree

23   with your Honor.  However, there was no evidence.  That's our

24   argument.  That's our point.  There was no evidence that they

25   disbelieved.  And in fact in the way the offense was described

H1QQALL-COA

1    to the jury by both the prosecutors and Judge Rakoff, the jury

2    wasn't asked to determine that.  They weren't asked to

3    determine falsehood.

4           I would just like, if I may, to quote from the

5    prosecutor's summation.  "If you find that the defendants took

6    part in the scheme to base Rabobank's LIBOR submissions, at

7    least in part, on trading positions, you should convict.

8    Regardless of whether the submission was inside or outside of

9    some so-called range, you should convict."  It's quoted at page

10   339 of our appendix.

11          So the government is telling the jury, look, all you

12   need to find is that one of the considerations in their mind

13   when they selected a perhaps accurate estimate was what would

14   benefit their employer.  If they did it, that's wire fraud.

15   And that's not the law.

16          JUDGE POOLER:  Counsel, my question is, if they

17   submitted a bid that was outside the range of numbers that they

18   had accumulated from talking to their brokers on the basis of

19   the request of a trader, would that be fraud?

20          MR. SCHACHTER:  That very well may be because then the

21   circumstance would be that there would be evidence that the

22   defendant disbelieved the opinion that he was providing.

23          JUDGE POOLER:  And there was no such evidence in this

24   trial?

25          MR. SCHACHTER:  There was no such evidence, and even

H1QQALL-COA

1    more importantly, the jury wasn't asked to consider that,

2    because they were told that the wire fraud offense here was

3    submitting a rate which may be within the range.  It may be

4    believed by the defendant to be an honest answer, an accurate

5    estimate; but if they took into account what would benefit

6    their employer, then they were told that's the crime that they

7    are charged with.

8           Over our vigorous objection, that's how Judge Rakoff

9    described the offense to the jury, which we believe was a

10   constructive amendment because that's not in the indictment.

11   That is not the theory that's articulated in the indictment.

12   The indictment articulates a fraud theory.  They say that they

13   chose a rate that was not what they perceived to be what

14   Rabobank could borrow money at.  That would be fraud.

15          JUDGE LYNCH:  Could you elaborate on what Mr. Ewan

16   would have testified?  Could you give me two or three of the

17   best quotes for what he would have said about what the question

18   meant?

19          MR. SCHACHTER:  Quoted at page 691 --

20          JUDGE CABRANES:  If you permit me, Judge, maybe he can

21   as a threshold to your question -- which he should, of course,

22   answer -- tell us what exactly happened as to his testimony.

23   Who wanted what and why was he not permitted?

24          MR. SCHACHTER:  He was not permitted because the Court

25   ruled that his testimony was not relevant.  Here is what

H1QQALL-COA

1    happened --

2              JUDGE CABRANES:  Answer the Judge's question.

3              MR. SCHACHTER:  I can lay out the timeline.

4              At Mr. Allen's arraignment on March 20 of 2015, we

5    alerted the district court that we anticipated to move for Rule

6    15 depositions.  We thought that was going to be a real

7    possibility, given the fact that all of the witnesses and all

8    of the conduct occurred outside of the United States.

9              On April 21, 2015, so just one month after the

10   defendant's arraignment, we reminded Judge Rakoff that we

11   believed that we would need to move for Rule 15 depositions,

12   but it's a difficult position to necessarily identify -- what

13   we were effectively doing was identifying trial witnesses one

14   month into the case, and we needed to time to review the

15   hundreds of thousands of documents which were going to be

16   provided to us in discovery.

17             In June of 2015, Mr. Ewan testified in the United

18   Kingdom.  And then two weeks later the Justice Department filed

19   a superseding indictment.  That's June 25.  We received

20   documents from the government relating to the British Bankers

21   Association and Mr. Ewan on June 26.  And within a matter of

22   weeks after that -- so that's June 26.  On July 14, we told the

23   Court that we intended to request Mr. Ewan's deposition, and

24   the district court ordered us to file our motions by July 24.

25   We filed our motions on July 24 and Judge Rakoff denied the

H1QQALL-COA

1     motion on August 18.

2            We thought this was a critical witness, and one of the

3     reasons was his testimony -- I'm quoting, and this is at page

4     691 appendix.  This was his sworn testimony in the United

5     Kingdom:  "A panelist who can borrow in reasonable market size

6     at any one of a wide range of offered rates commits no

7     falsehood if she bases her response to the daily LIBOR survey

8     upon the lowest of these or the highest or any arbitrary

9     selection from among them."

10           If Mr. Allen and Mr. Conti were prosecuted in the

11    United Kingdom, the jury would have heard that testimony, but

12    because Main Justice decided to prosecute them here in the

13    United States, the jury never heard that testimony.  We think

14    that that would have made a significant difference.

15           JUDGE POOLER:  The government decided to prosecute

16    because even though they could pick a number within the

17    reasonable range, they were influenced by the request from

18    traders to pick a certain number.  I'd like it high on the

19    three-month rate, and that is the intent part of the fraud,

20    correct?

21           MR. SCHACHTER:  Correct.

22           JUDGE POOLER:  So why isn't it a complete fraudulent

23    act?

24           MR. SCHACHTER:  Well, several issues.  This Court in

25    the Countrywide decision made very clear that bad faith or

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

H1QQALL-COA

1   impure thoughts does not give rise to fraud.  You need a false

2   representation or a misleading half truth or an omission, and

3   it was conceded below that this case was not based on

4   omissions.  You need the actus reus, not simply the state of

5   mind.

6          JUDGE POOLER:  Your argument is they had impure

7   thoughts, but there was no fraudulent act.  Is that your

8   argument?

9          MR. SCHACHTER:  Well, I guess I would put it somewhat

10  differently.  Certainly, there was no impure act, but I would

11  even quarrel to some extent with the impure thoughts.  The

12  thought that they had was that this will benefit their

13  employer.  These prosecutions we detailed, and this is at

14  sentencing, but there are more than 125 people that were

15  engaged in identical conduct.  In fact, the Bank of England

16  called Barclays and told them that they should put their LIBOR

17  submission low because they were worried about the general

18  economy.  So, what the thoughts of these people were, they're

19  an employee and they're helping their employer.

20          I think that the thought process was something along

21  the lines of:  As long as I'm answering the question

22  accurately, in other words, I'm providing -- there is no one

23  answer.  During the financial crisis, there is no interbank.

24  That's when most of our relevant time period is, the financial

25  crisis.  There is no interbank borrowing at all.  Banks do not

H1QQALL-COA

1    borrow from one another, and yet they are called upon to submit

2    a LIBOR rate, which is what rate can you borrow.  It is a very

3    wide range --

4              JUDGE LYNCH:  In fact, Mr. Ewan's testimony, it seems

5    to me, goes directly to the question, what is it that they are

6    being asked, right?  I mean, the testimony in the record on

7    that, from the government's expert witness at least, is

8    somewhat to the contrary in terms of what he thinks they were

9    supposed to do, which is, as I was trying to suggest, to give

10   their best estimate; not to pick a number in a range.  But

11   Mr. Ewan seems to say the opposite, and he was unwilling to

12   come to the United States to give that testimony.

13             MR. SCHACHTER:  That is certainly correct.

14             JUDGE LYNCH:  And you asked to do what you do when a

15   witness is unavailable, which is to do a Rule 15 deposition,

16   and the government opposed, and the judge didn't let you do it.

17             MR. SCHACHTER:  That is absolutely correct.  And with

18   all due respect to this business school professor from

19   California that the Justice Department flew in to testify, his

20   knowledge of how to interpret the BBA's question is no greater

21   than any of ours.  There is no book of rules from the British

22   Bankers Association --

23             JUDGE LYNCH:  I mean, there doesn't need to be a book

24   of rules necessarily.  There's a reasonable way of interpreting

25   this question based on what the purpose of this is, and the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

H1QQALL-COA

1    jury had certain information from an expert that goes to that.

2    Whether or not you are right about the argument that there is

3    no possibility of a crime here, you've also got the argument

4    that the jury was not permitted to hear all of the evidence

5    that bears on the question of how the question should be

6    interpreted.

7            MR. SCHACHTER:  That is absolutely correct.  And even

8    Mr. Harris, the government's expert, testified that this is an

9    estimate, it's subjective; and during most of these time

10   periods there is no interbank borrowing whatsoever from which

11   these traders are to draw on to come up with a number to submit

12   each day.

13           JUDGE CABRANES:  Do we know from the record or do we

14   care why Mr. Ewan couldn't come to testify?  Does it matter?

15   Maybe he just didn't want to get on a plane, which is fine.

16   I'm just wondering whether there was something in the record we

17   should know.

18           MR. SCHACHTER:  I don't think so.

19           JUDGE CABRANES:  What was your argument on behalf of

20   the Rule 15 deposition, which was denied?

21           MR. SCHACHTER:  Well, it wasn't --

22           JUDGE CABRANES:  He doesn't want to come?  He's

23   available in London?

24           MR. SCHACHTER:  We were informed by his counsel that

25   he would not come.  So, the only way to have this testimony

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

H1QQALL-COA

1    presented before the jury is to take his Rule 15 deposition.

2              JUDGE LYNCH:  You might want to stay out of the United

3    States if you're anywhere near LIBOR with --

4              MR. SCHACHTER:  I think that's true.

5              JUDGE LYNCH:  He just might not want to get in an

6    airplane.

7              JUDGE CABRANES:  What's the theory of denial, if you

8    can refresh our recollection?  I know that in fast-moving

9    prosecutions or hearings -- and all hearings before Judge

10   Rakoff are fast moving, but what's the reason for denying?  Do

11   we know what the reason is for denying the Rule 15?  It seems

12   like a simple enough motion.

13             MR. SCHACHTER:  I think I have trouble articulating

14   the basis for why his testimony would not meet the relevance

15   standard.  I think for Rule 15 standard, it has to be highly

16   relevant, not just 401, but nonetheless I have trouble

17   articulating the Court's decision.  He said it wasn't relevant

18   to whether a fraud had occurred --

19             JUDGE POOLER:  Did the government object?

20             MR. SCHACHTER:  The government certainly did object.

21   I was surprised that the government objected to a request to

22   take testimony and have it presented to the jury of what seems

23   to be a central witness, particularly when one of the

24   government's theories is that the defendants were acting

25   dishonestly in not following the British Bankers Association's

H1QQALL-COA

1    expectations.  In fact, that's much of the government's

2    summation.  The government talks about that.  How could then

3    the witness from the British Bankers Association that runs

4    LIBOR, how could that testimony be denied to this jury?  Yes,

5    the government objected.

6           JUDGE CABRANES:  We'll hear from them on that for

7    sure, and they will want to be thinking about it; but before

8    you sit down, would you briefly address the Kastigar issue?

9           MR. SCHACHTER:  Yes.  So what we had, again, by virtue

10   of the fact that these men were prosecuted in the United

11   States, in an extremely unusual circumstance.  We are aware of

12   one case where it has ever happened that a witness, a

13   government witness, has been exposed to a defendant's compelled

14   testimony.  Really, this never happens; never should happen.

15          JUDGE LYNCH:  Unless somebody testifies on national

16   television under an immunity granted by Congress.

17          MR. SCHACHTER:  Exactly.  It's an extremely rare

18   circumstance.

19          JUDGE LYNCH:  Which has happened, and that's the case

20   you're referring to, I take it?

21          MR. SCHACHTER:  Of course.  Yes, your Honor.  Yes.

22          JUDGE CABRANES:  Poindexter and North, right?

23          MR. SCHACHTER:  Yes.

24          JUDGE CABRANES:  Unusual.

25          MR. SCHACHTER:  It's very unusual.  Here, you have a

H1QQALL-COA

1    circumstance where -- I was present, by the way, at Mr. Allen's

2    U.K. testimony, and I said, I just want to make perfectly clear

3    that this man has Fifth Amendment rights in the United States,

4    and so if, God forbid, he's ever prosecuted in the United

5    States, that no use or derivative use could be made of this

6    testimony.  There can be no exposure -- any exposure by anyone

7    associated with this prosecution, any witness, would

8    effectively make him non-prosecutable here in the United

9    States.  I just want to make that clear.

10            And here you had a circumstance where the government's

11   main cooperating witness, Paul Robson, he testifies one way

12   before the financial conduct authority.  He testifies

13   effectively that he didn't think he was doing anything wrong.

14            JUDGE CABRANES:  During that proceeding in Britain,

15   was there anybody from the United States Government present?

16            MR. SCHACHTER:  No, although they were well aware of

17   the testimony, I believe, because I believe that I had notified

18   the Justice Department of the testimony, and I believe that

19   they speak in their papers of their efforts to wall themselves

20   off from the testimony so that the prosecutors themselves did

21   not hear of the testimony, even though they were speaking to

22   the FSO, I understand, on a pretty regular basis because they

23   were coordinating the investigation who was going to prosecute

24   who.  There's interactions between the Justice Department and

25   the FSO, but they walled themselves off from that.

24

H1QQALL-COA

1          JUDGE CABRANES:  I interrupted you.  Go ahead.

2          MR. SCHACHTER:  Mr. Robson testifies one way before

3     the FSA.  Then it was called the FSA; now the FCA.  Then he

4     receives Mr. Allen's compelled testimony, which he's forced to

5     testify under penalty of imprisonment in the U.K.  He reads

6     that testimony, and he has obviously read it carefully.  We

7     attach his markups of the testimony in the appendix.  He

8     circles, he stars throughout the testimony.  And it's not

9     surprising that he would pay attention because Mr. Allen was

10    Mr. Robson's supervisor, so this is pretty important testimony.

11         In fact, Mr. Robson had testified that he thought he

12    was supposed to be speaking to traders in other countries so

13    that he could estimate borrowing costs.  And Mr. Allen says

14    no -- his testimony before the FCA is, no, he shouldn't be

15    looking to other traders in order to set LIBOR.  And he stars

16    and he circles and he asterisks, and then he writes five pages

17    of notes to his attorney about what he read in Mr. Allen's

18    testimony and also Mr. Conti who he sits next to.  And

19    remember, the subject of this testimony is about things that

20    happened years ago and these are close coworkers of Mr. Robson,

21    so, of course, he pays close attention to the compelled

22    testimony, and then he tells a completely different story.  We

23    detail certain portions of that in our brief.  He tells a

24    completely different story.

25         Now, the government has what the courts have referred

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

H1QQALL-COA

1    to as an extremely heavy burden, and the reason why it's a

2    heavy burden is they have to prove a negative.  They have to

3    prove that there was no use made; that he made no use

4    whatsoever.  He was not affected.  His recollection was not

5    refreshed.  According to the D.C. Circuit, it doesn't even

6    matter if that witness had personal knowledge of these events

7    because you still don't know what can affect somebody's --

8        JUDGE LYNCH:  To the D.C Circuit, it didn't even

9    matter that the witness had given on substantive terms the same

10   testimony to a grand jury before being exposed to Mr. North's

11   testimony.  The normal way that this would be done, that the

12   government tries to meet this burden in these cases, is to look

13   back at, if they are fortunate enough to have such a thing or

14   they took the trouble to make it, at exactly what you're doing:

15   Look at Robson's testimony before he was exposed to the

16   immunized testimony, compare it after, and demonstrate that

17   it's the same thing.  But here you're telling us it is in

18   significant ways not the same thing.

19       MR. SCHACHTER:  The canned testimony is completely --

20   what the D.C. Circuit referred to as the canned testimony which

21   you could look to, to show theoretically that the witness was

22   not in any way affected by his review of this testimony, and

23   the D.C. Circuit's -- memory is a very difficult thing.  When

24   you're asking witnesses to talk about their memory, what could

25   affect a memory of things that happened years ago, it's hard.

H1QQALL-COA

1       But if you had, the D.C. Circuit theorizes, if you had canned

2       testimony, and you're able to show the testimony is identical

3       to the testimony they provided from before exposure to after,

4       then, then perhaps you could show that this witness was not

5       affected in any way.

6               Judge Rakoff in addressing the Kastigar issue that we

7       raised explicitly stated he is not following the D.C. Circuit's

8       standard and makes no analysis of what the D.C. Circuit said

9       was the test, that Mr. Robson was not in any way -- and these

10      are their words -- shaped, altered or affected; that the

11      government must prove, they must negate the possibility that

12      his testimony was refreshed or influenced, and that is a heavy

13      burden.  And it is a burden that Judge Rakoff released the

14      government from in this circumstance; said that's not the test

15      he's going to apply, and we believe that was error.

16              JUDGE LYNCH:  This is a rare circumstance, as you say,

17      and the D.C. Circuit is not us, and we've never confronted this

18      situation before.  Isn't it right that what Judge Rakoff did

19      was essentially apply a test, almost like what happens to

20      eyewitnesses in a suggestive identification test situation,

21      which is to say, since Mr. Robson says he had a good

22      opportunity to learn this information on his own, since he was

23      there, presumably, for I think most of the things anyway he's

24      testifying about, and I credit that he says this is his real

25      recollection now and it's not really influenced, that's enough?

27

H1QQALL-COA

1    Isn't that basically what he did?

2         MR. SCHACHTER:  I will add one caveat.  There is one

3    additional thing we suggest is relevant that he also looked at;

4    that is, effectively he credited Mr. Robson's denials.  And I

5    will note this is an issue that this Court has confronted

6    because in many circumstances the question is whether

7    prosecutors have been exposed, and this Court has said on

8    numerous occasions that we're not going to rely on a

9    prosecutor, an officer of the Court's denials as to exposure.

10   The government needs to prove more than that.  And we suggest,

11   we argued that certainly if the prosecutor --

12        JUDGE LYNCH:  Before you get away from it, what is the

13   extra thing mentioned to Judge Rakoff?

14        MR. SCHACHTER:  The government also assembled a chart

15   which compared Mr. Robson's testimony to other evidence that

16   was presented to the jury.  So, in other words, Mr. Robson says

17   this, but so does Mr. Yagami.  Mr. Robson says this, but so

18   does Mr. Stewart.

19        JUDGE POOLER:  But they didn't print a chart of his

20   before and after testimony, did they?

21        MR. SCHACHTER:  Absolutely not, because that would

22   actually address the issue, which is, was Mr. Robson's

23   testimony in any way shaped, altered or affected.  The fact

24   that Mr. Yagami testified at trial something that's consistent

25   with Mr. Robson, well, that's not the basis for Mr. Robson's

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

H1QQALL-COA

1    testimony.  He certainly didn't review Mr. Yagami's trial

2    testimony before testifying at trial.

3         JUDGE LYNCH:  There is one other issue you've got to

4    get over, right, on the Kastigar issue, which is, say

5    hypothetically that we agreed with you that if the SEC or the

6    U.S. Justice Department had given Mr. Robson this transcript

7    and then Mr. Robson testified.  Assume that we agree that that

8    would be a flagrant violation of Kastigar.  How is it changed

9    or is it changed by the fact that the testimony was compelled

10   by a foreign government, and under the foreign government's

11   rules, if they had done this prosecution, they could have done

12   essentially what the government did here -- I take it that's

13   the belief -- without consequence.

14        MR. SCHACHTER:  Yes.  That is, I believe, simply

15   wrong.  The reason for that -- first of all, I will note that

16   taken to its logical end, the government would say, well, sure,

17   Mr. Allen was compelled under penalty of imprisonment in the

18   U.K. to testify, but we didn't do it, so the Fifth Amendment

19   doesn't apply.  Nothing would prevent them from using it any

20   way they see fit.  In fact, according to the government's

21   theory, they could introduce it to the jury.

22        JUDGE LYNCH:  They could introduce it to the jury.

23        MR. SCHACHTER:  Sure, let's have Mr. Allen's compelled

24   testimony presented before the jury under their argument.

25        JUDGE LYNCH:  There might be some due process limits

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

H1QQALL-COA

1      to this, right?  For example, if it was compelled by torture,

2      the case might be different.  Or if it was a more flagrant use

3      of the testimony, that might be different.  But does every jot

4      and tittle of Fifth Amendment law apply in the circumstance

5      where a foreign government has done something that could

6      compromise American prosecutions?  Because they're just doing

7      what they do under their law; they give this witness the

8      testimony to look at because there's no problem for them to do

9      that.  Now it's happened, and now an important witness is just

10     unavailable to the United States?

11            MR. SCHACHTER:  Well, it's difficult to address

12     circumstances beyond this one, but here we have the Fifth

13     Amendment, and the reason why the Fifth Amendment applies here

14     is the act which violates the Fifth Amendment is the use of the

15     compelled testimony.  It's not the compulsion.  The Supreme

16     Court has made that clear.  It is the use of the compelled

17     testimony.  That is when the violation has occurred.  It

18     doesn't matter --

19            JUDGE LYNCH:  Which is the Fourth Amendment cases.

20            MR. SCHACHTER:  That's correct.  But under the Fifth

21     Amendment, it is the use of the compelled testimony in any way,

22     a direct derivative that is the Fifth Amendment violation.  It

23     doesn't matter who did the compelling because that is not the

24     threshold issue.  No court has suggested that the Fifth

25     Amendment does not apply to taking compelled testimony of a

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

30

H1QQALL-COA

1    witness who is subsequently prosecuted in the United States.

2              And in fact, the Supreme Court in United States v.

3    Bram.  They dealt with this exact circumstance.  This was

4    testimony that was taken in Canada of someone who then is

5    prosecuted in the United States, and the Supreme Courts -- it's

6    a long time ago.  It's late 1800's; 1898, I believe.

7              JUDGE LYNCH:  They were remarkably liberal, the

8    Supreme Court, in the late 19th century.

9              MR. SCHACHTER:  But just as authoritative.

10             JUDGE LYNCH:  They made the Warren Court look tough.

11             JUDGE CABRANES:  The case has not fallen into

12   desuetude.

13             MR. SCHACHTER:  That's correct.  Many courts,

14   including this Court, some directly, have said that it's

15   well-settled -- in In Re: Terrorist Bombings, this Court said

16   "foreign nationals interrogated overseas but tried in the

17   civilian courts of the United States are protected by the Fifth

18   Amendment."

19             In Yousef, this Court said, "The law is settled that

20   statements taken by foreign police in the absence of Miranda

21   warnings are admissible if voluntary."

22             The Ninth Circuit in Brulé addressed this case this

23   circumstance head on because it was statements that had been

24   compelled by Mexican law enforcement, and the Ninth Circuit

25   says the Fifth Amendment applies.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

H1QQALL-COA

1          There is no case which has ever held that the Fifth

2     Amendment does not apply to the Justice Department's use of

3     compelled testimony because the compelling was outside of the

4     United States.  And unlike the Fourth Amendment, this is not a

5     restriction on government action.  It's not like Miranda.  It's

6     not a prophylactic rule.

7          The rule is against the use of the testimony

8     regardless.  It doesn't ask anyone to find fault in the

9     compulsion.  It's not a question of whether or not the Justice

10    Department is to blame for this testimony.  The issue is are

11    they using it.

12         JUDGE CABRANES:  Thank you, Mr. Schachter.

13         MR. SCHACHTER:  Thank you.

14         JUDGE CABRANES:  Mr. Pellettieri, looking forward to

15    hearing from you.  You might give some thought to the original

16    inquiry by me at the threshold regarding the history and

17    timeline of the prosecution itself.

18         MR. PELLETTIERI:  May it please the Court, John

19    Pellettieri from the Department of Justice on behalf of the

20    United States.

21         Turning to that first, Judge Cabranes, LIBOR was

22    devised by the British Bankers Association to be an impartial

23    market tool for use in financial transactions throughout the

24    world; and it was used, and it is used, in financial

25    transactions throughout the world, including many in the United

H1QQALL-COA

1    States and in New York.

2           Now, the defendants here also manipulated the U.S.

3    dollar LIBOR.  In fact, they did it with individuals located in

4    New York in a bank branch located in New York, and Main Justice

5    as a general matter has been investigating and prosecuting

6    LIBOR cases and has been handling those and taking the lead on

7    them.  So that is generally the background here.

8           JUDGE POOLER:  Are other cases pending on LIBOR?

9           MR. PELLETTIERI:  There are other prosecutions

10   pending, yes, your Honor.

11          JUDGE POOLER:  In the Southern District?

12          MR. PELLETTIERI:  I believe in Southern District.  I'm

13   not positive off the top of my head, your Honor.

14          JUDGE POOLER:  But this was the first to go to trial?

15          MR. PELLETTIERI:  This was the first to go to a jury

16   and lead to a conviction, but there have been deferred

17   prosecution agreements with the banks, a number of them, and so

18   those prosecutions have been resolved with Main Justice with

19   the banks themselves.  This was the only one to go to trial so

20   far and to lead to a jury verdict against individuals.

21          JUDGE POOLER:  But the banks who submitted bids, are

22   those the banks you're talking about?  So you've had deferred

23   prosecutions with other banks?

24          MR. PELLETTIERI:  Other banks, your Honor.  Rabobank

25   for one entered into a deferred prosecution agreement and other

H1QQALL-COA

1      banks as well.

2              JUDGE POOLER:  So you have a deferred prosecution with

3      Rabobank, and yet you're pursuing these two employees of

4      Rabobank.

5              MR. PELLETTIERI:  Well, they -- they admitted

6      liability.  They admitted guilt, and there's a deferred

7      prosecution agreement, yes.  And we also prosecuted individuals

8      as well.

9              Now, turning back to the purpose of LIBOR and its

10     function.  As I mentioned, the British Bankers Association

11     intended it to be an impartial market tool, and for that reason

12     they selected a panel of banks based on the reputation, the

13     scale of activity and the perceived expertise of those things.

14     And then they required that those banks provide an estimate of

15     the bank's borrowing costs on the interbank market every day

16     around 11:00 a.m. London time.

17             Now, Rabobank required the defendants here, who are

18     cash traders, to provide that estimate because they had the

19     expertise.  So they were able to evaluate -- and Mr. Allen's

20     testimony at trial went into this.  He described at pages 1165

21     to 1169 in the trial transcript how he was able to evaluate

22     market information every day.  He had the expertise as a cash

23     trader, evaluate market information, and get a picture of the

24     market, get a picture of where cash was trading, and as time

25     went on, that picture narrowed down to a single number that he

H1QQALL-COA

1      could provide --

2              JUDGE POOLER:  A single number or a range of numbers?

3              MR. PELLETTIERI:  He said it was a straightforward

4      process, and I could provide an estimate every day of what the

5      bank's borrowing costs were.  He didn't mention a range or say

6      I couldn't figure out between one of a number.  His testimony

7      was that I had the expertise, and I could do it, and I did do

8      it, and he said, yes, I received requests from traders.  They

9      asked me.  It was, number one, improper for them to even ask

10     me, but I just didn't act on those.  I kind of pushed them off,

11     and I gave my honest estimate every day.  That was his

12     testimony.

13             The jury was entitled to reject that testimony, and in

14     fact, the jury on that testimony alone could have convicted

15     Mr. Allen, but there was ample evidence supporting that there

16     was a single number, an estimate that the defendants were able

17     to come to every day, and that instead of providing that

18     estimate, they provided something different.

19     They bumped the number, they biased the number, and provided

20     that biased number with the purpose of benefiting Rabobank

21     traders, the positions they held in interest rate swaps.  Now

22     these interest rate swaps --

23             JUDGE LYNCH:  I may tend to agree with you about that,

24     what a jury could have found on the evidence in the record, but

25     it seems to me there is some possibility that the question is

H1QQALL-COA

1    ambiguous; that it could be read the way Mr. Schachter wants it

2    to be read, and he had a witness from the BBA who would have

3    testified that that's not what the question meant, that the BBA

4    would have been satisfied with any estimate -- high, low or in

5    the middle -- plucked from a range of reasonable guesses.

6           MR. PELLETTIERI:  Well, that wasn't Mr. Ewan's

7    testimony.  I think you have to look at the actual transcript,

8    which is at Docket 1063 page 8, and if you look at the --

9           JUDGE LYNCH:  Is that in the appendix?  I have the

10   appendix.

11          MR. PELLETTIERI:  I believe it was in the --

12          JUDGE LYNCH:  The transcript?

13          MR. PELLETTIERI:  I will double check for you.  Maybe

14   my colleague will recall it.

15          JUDGE LYNCH:  Just read it then.

16          MR. PELLETTIERI:  What happened was, this was on

17   cross-examination, Mr. Ewan was presented with a document that

18   was authored by someone, I believe it was Fred Stern, and in

19   it, it contained the statement that was quoted in the briefs

20   and has been quoted to the Court today where it said -- this is

21   Fred Stern saying, "A contributor panelist who can borrow in

22   reasonable market size at any one of a wide range of offered

23   rates commits no falsehood if she bases her response to the

24   daily LIBOR survey upon the lowest of these or the highest or

25   any other arbitrary selection."  That's what Fred Stern said in

H1QQALL-COA

1    a document.

2            Then Mr. Ewan was asked, "is that" -- you know, do you

3    agree?  And he said, well, that's fine as far as what Fred

4    Stern is saying.  It's consistent with the definition.  Then he

5    says, "but" and he goes into a whole other explanation.  He

6    says, "But there's a final component of the definition which is

7    a bank can't submit a range.  It has to submit one number.  And

8    so that's why the LIBOR question isn't where did you last

9    borrow money.  In order to arrive at that one, that one number,

10   the question is where do you think you would be lent money?

11   And there can be only be one answer to that, and it should be

12   where do you think an unnamed counterparty would offer you

13   money?"  And he said, "You should be using all information

14   available to you to get to that one figure."

15           He said, "Well, was that a funneling process?"  He's

16   asked.

17           He said, "I don't know if there's a funneling process,

18   but yes, there should be a process at the bank that lays out

19   how you arrive at your number and whether it's a funneling down

20   or an iteration of evidence, or however you want to describe

21   it, but there should be a process for doing it."

22           So he says, yes -- and it's consistent with Allen's

23   testimony.  Allen said, "Yes, there was a process.  Every

24   morning I got down to one number."

25           JUDGE LYNCH:  It's a somewhat contradictory answer at

H1QQALL-COA

1      least if he starts by saying yes, Mr. Stern is correct, because

2      what Mr. Stern apparently says is that any estimate would do.

3           MR. PELLETTIERI:  And then he qualifies it.

4      Initially, I agree, it's somewhat --

5           JUDGE LYNCH:  But then he comes back and says

6      something else.  But does he ever say it would be -- flatly say

7      it would be wrong, it would be a falsehood to give an estimate

8      that is influenced by a trader?

9           MR. PELLETTIERI:  Yes, he absolutely said that.  He

10     said that it was against the letter and the spirit of the

11     definition to take into account a trader's interest in

12     providing a LIBOR submission.  He absolutely said that.  He

13     said, I didn't know about it until 2012.  I think he says maybe

14     there's some inklings in 2012, but I didn't know about it in

15     2010.  I didn't know about it until 2012.

16          In fact, Mr. Ewan was called as a Crown witness

17     against an individual who was charged and convicted of

18     manipulation.  He was called to testify that it was not proper,

19     it was not part of the definition to take trader interest into

20     account.  I didn't know about it, and if I'd known about it, I

21     wouldn't have approved of it.  There was a conviction in that

22     case.

23          So Judge Rakoff did not abuse his discretion at all in

24     concluding that Mr. Ewan's testimony when viewed in its

25     totality was not material.  And, again, there's a different

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

H1QQALL-COA

1    standard.  It's not relevance.  It's materiality.  In addition

2    to materiality, there also has to be a showing that it would be

3    a deprivation of justice if the deposition were not taken.  So

4    depositions are the exception; not the rule.

5         And materiality is different than relevance.  There

6    has to be something that would show a reasonable likelihood

7    that would actually change the outcome of the trial or affect

8    the outcome of the trial.

9         In light of everything Mr. Ewan testified to, the fact

10   that it absolutely was not proper to take into account trader

11   interest in setting a LIBOR, he didn't know about it, and that

12   there has to be one number.  Mr. Ewan's testimony which

13   supported our case --

14        JUDGE POOLER:  In order to get to the one number,

15   doesn't he get information from various sources, and isn't that

16   what we've been calling the range of the one number, the range

17   of the right number?  Isn't that correct?

18        MR. PELLETTIERI:  The cash brokers, who were the LIBOR

19   submitters, had their own expertise just by trading cash, and

20   then they also collected market information; and among the

21   market information they collected was information from brokers,

22   and different brokers may have given different information.  So

23   there was perhaps on any given day different numbers, and the

24   responsibility of the LIBOR submitter was to take all that

25   information and provide an estimate.  And the evidence

H1QQALL-COA

1    established that they were able to do it, they were able to get

2    to that number.  They were able to get to an estimate, but they

3    gave a different number.  And by giving that different number,

4    that's deceit.  That's deceptive.  Because every estimate

5    provided by the defendants carries with it an assertion that

6    this is actually my estimate; this is not something else.

7            JUDGE POOLER:  The nature of the fraud is what?

8    Describe the fraud to me.  What is the fraud that was

9    perpetrated?

10           MR. PELLETTIERI:  Well, a scheme to defraud is a

11   scheme to deprive another of property or money through deceit.

12   And here, the defendants deceptively provided estimates that

13   were not actually their estimates, so those were misleading and

14   false, in order to deprive their counterparties in these

15   interest rate swaps of their money, because, remember, these

16   interest rate swaps are directly tied to the LIBOR.  If in this

17   interest rate swap a counterparty agreed I'm going to pay the

18   floating rate LIBOR on this notional amount of 10 million, if

19   LIBOR goes up, the counterparty automatically has to pay more

20   money to Rabobank.  And so by scheming and deceptively changing

21   that number, that --

22           JUDGE POOLER:  Even marginally.

23           MR. PELLETTIERI:  Even marginally, because many of

24   these were billions of dollars, many hundreds of millions of

25   dollars.  Even marginally affects and deprives the counterparty

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

H1QQALL-COA

1    of money or property.  So that was the scheme.  The whole

2    purpose of the scheme was to profit, to maximize Rabobank's

3    profits in these interest rate swaps.

4            JUDGE POOLER:  Can I turn a moment to the ten-year

5    statute of limitations that you need to show a harm, as we were

6    just talking, to an FDIC bank, correct?  The charge that Judge

7    Rakoff gave added that the "investment decisions of that bank

8    would have been different if the bank had known of the fraud."

9            Now, that's not anywhere in this statute.  As far as I

10   can tell, that was made up.  It may be correct, but it was made

11   up.  I believe the defendants objected strenuously to that

12   language, and yet it was delivered to the jury.  Can you speak

13   to that?

14           MR. PELLETTIERI:  A few points.  So, the statute uses

15   the word affect.  And everyone agrees, the defendants agree

16   that an affect on a bank includes exposing that bank to loss or

17   a risk of loss.  Now, loss and risk of loss --

18           JUDGE POOLER:  He said risk of loss, but then he added

19   "or" so he gave an alternative ground, and there was no special

20   verdict, so we don't know on which ground the jury decided.

21   "Or that the investment decisions of that bank would have been

22   different if the bank had known of the fraud."  And that's not

23   in the statute, is it?

24           MR. PELLETTIERI:  No, and neither is loss or risk of

25   loss.  It gives explanation for the word affect.  And in our

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

H1QQALL-COA

1    view, an influence on a bank's investment decision is an effect

2    on that bank.  It does affect that bank.  In fact, there's very

3    little difference between affecting a bank's investment

4    decision and exposing the bank to a risk of loss because

5    investment decisions are intended to maximize profit and reduce

6    risk of loss.

7            JUDGE POOLER:  You didn't submit this language either.

8            MR. PELLETTIERI:  No, we did not submit it.  We didn't

9    rely on it in our argument at all.  But a few points.  Number

10   one is, this is not a jury question under this Court's

11   precedent.  It was submitted to the jury, but it didn't have to

12   be.

13           JUDGE POOLER:  Under the statute, the judge could have

14   decided by himself?

15           MR. PELLETTIERI:  Well, this Court has held that in

16   the statute that tolls the limitations period for a period

17   where the defendant is a fugitive from justice, it is the

18   district court that finds by a preponderance of the evidence

19   whether the defendant was a fugitive and tolls that period.  We

20   don't see any way of distinguishing that determination from the

21   determination of whether a fraud affects a bank.

22           JUDGE POOLER:  You needed the fraud to affect the bank

23   to get the ten-year statute to make all these cases within the

24   statute of limitations.  Isn't that correct?

25           MR. PELLETTIERI:  For the substantive wire fraud, not

H1QQALL-COA

1    for the conspiracy counts.  Because an objective of the

2    conspiracy counts was bank fraud, that carried a ten-year

3    statute of limitations of already.

4         JUDGE POOLER:  If the convictions were based on all

5    the overt acts of the wire fraud, it would have been harder to

6    prove conspiracy without the overt acts.  Isn't that correct?

7         MR. PELLETTIERI:  Well, a statute of limitations is an

8    affirmative defense.  It needs to be pressed by the defendants

9    at the trial.  There was never any assertion of a statute of

10   limitations to the conspiracy counts here.  So it's waived.

11   That's the Musacchio case in the Supreme Court just recently

12   decided.  The reason for that is because perhaps we would have

13   presented different evidence to show whatever had to be

14   demonstrated.

15        JUDGE POOLER:  They argue it now, I suppose we would

16   look at it as a harmless error standard, but I think they argue

17   now that the ten-year statute shouldn't have applied.

18        MR. PELLETTIERI:  For the conspiracy, it wouldn't be

19   plain error, harmless error.  It's waived.  But for the

20   substantive wire fraud counts, the first question is whether

21   the instructions were erroneous.  We don't think they are, but

22   if they were, the Court would then determine whether it is

23   harmless error.  In our view it is harmless error because of

24   the overwhelming evidence of a risk of loss to these banks, to

25   these FDIC-insured banks.  These banks were the object of the

H1QQALL-COA

1   fraud.  They were the counterparties in these swaps, and the

2   purpose of the fraud was to deprive those counterparties of

3   money.

4           JUDGE POOLER:  So you have no problem with risk of

5   loss.

6           MR. PELLETTIERI:  Absolutely no problem with risk of

7   loss.  It's clear that, as this Court has said, if a bank was

8   the object of the fraud, it clearly was affected; and we proved

9   that these banks were the object of the fraud, and by being an

10  object were supposed to a risk of loss.

11          JUDGE POOLER:  You didn't really need the second

12  phrase in that charge which says "or that the investment

13  decisions of that bank would have been different if the bank

14  had known of the fraud."  You really don't need that.  All you

15  needed is the risk of loss.

16          MR. PELLETTIERI:  Right, your Honor.  We don't need

17  it.

18          JUDGE POOLER:  So it was surplusage, and yet there was

19  no special verdict, the jury could have found on that basis.

20          MR. PELLETTIERI:  It wasn't surplusage.  It was

21  explicating the word affect.  So, as this Court has said,

22  affect encompasses a broad range of influences.  It's not

23  limited to a particular loss or risk of loss in the language of

24  the statute.  It talks about effect.

25          JUDGE POOLER:  He was just elaborating on what risk of

H1QQALL-COA

1    loss is.

2         MR. PELLETTIERI:  Well, no, he's elaborating on

3    effect.  Risk of loss elaborates on effect, and changing the

4    bank's investment decision elaborates on effect.

5         JUDGE POOLER:  I was only troubled that neither party

6    asked for that language and the defendants objected, and yet it

7    was given to the jury.  That was my concern.

8         MR. PELLETTIERI:  Well, in our view it was consistent

9    with the language of the statute.  The jury didn't even have to

10   make that determination because it was a determination of the

11   judge, and any error in the instructions was harmless because

12   there was ample evidence of risk of loss to these banks.

13        JUDGE LYNCH:  Can we go back to the jury instructions

14   on the theory of mail fraud for a moment?  It is clear from

15   some of my questions that I tend to agree with you that if

16   there was not an honest answer given, that's clearly a mail

17   fraud; but the defense actually requested an instruction that

18   seems to me to be entirely consistent with your theory, and at

19   least what I'm inclined to think, they asked for an instruction

20   that "a statement of opinion or estimate may constitute a false

21   statement or misrepresentation only if the government can prove

22   beyond a reasonable doubt it was not honestly held by the

23   person making it at the time that it was made."

24        Isn't that an exact accurate statement of law and

25   indeed a statement of what your theory was; that they didn't

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

H1QQALL-COA

1    give an honest estimate at the time that it was made?

2        MR. PELLETTIERI:  I think the only word we would

3    quibble with is "only," but yes, it was generally an accurate

4    statement, but the Court correctly concluded that that concept

5    was already incorporated into --

6        JUDGE LYNCH:  Where?  Can you just point me to what

7    the judge said that conveys that piece of law?

8        MR. PELLETTIERI:  Yes.  To begin with, the broader

9    instruction where the Court said that "the government had to

10   prove a plan or design to obtain money or property by means of

11   false or fraudulent pretenses, representations or promises

12   which can take the form of outright lies but can also consist

13   of misleading half-truths."  So that encompasses the general

14   framework; and as we discussed, when someone gives an estimate

15   that is not an actual estimate, that is a lie.  So as a broad

16   matter, that is in there.

17       JUDGE LYNCH:  To be very specific though, in a case

18   where the whole point according to the government is that the

19   defendants did not -- maybe I'm misunderstanding your theory.

20   I thought your theory was precisely that this was a fraud

21   because the defendants did not give their honest estimate.

22       MR. PELLETTIERI:  So that provides the background, but

23   there's more specific --

24       JUDGE CABRANES:  In reference to Judge Rakoff's

25   instruction, do you have a page citation for it?  You seem to

H1QQALL-COA

1   be reading from it.

2           MR. PELLETTIERI:  Yes.  It's in the trial transcript

3   at 1631 to 1633, I believe, or 1634 are the elements of wire

4   fraud.  So that's where that is.  Also, again, the general

5   instruction about falsehood, lies, things of that sort.

6           Then that has to be understood together with the

7   good-faith instruction which says, "A statement made with a

8   good-faith belief in its accuracy does not amount to an

9   intentional false or misleading statement and is not a crime

10  even if the statement itself is accurate or misleading."

11          So that encompasses the idea that if they felt their

12  estimate was somehow accurate, if they believed that, they

13  wouldn't be convicted.

14          Now, to go further, the Court also explained the

15  government's allegations, and when he explained the

16  government's allegations, he said, "The government alleges that

17  the defendants submitted LIBOR or rate estimates that were not

18  at the levels the defendants would have honestly submitted

19  otherwise, but were instead at levels reflecting, at least in

20  part, an intent to benefit Rabobank's trading positions."

21          So, under that theory if the defendants gave an honest

22  estimate that's different than their -- so that that

23  encompasses the idea if they thought all three were perfectly

24  appropriate, then they wouldn't have been guilty.

25          Now, fourth, there's another component of the

H1QQALL-COA

1    good-faith instruction where the Judge says, "If a defendant

2    believed in good faith that he was acting properly in making

3    such a statement or causing it to be made, even if he was

4    mistaken in that belief and even if others were injured by his

5    conduct, there would be no crime." So this was a very defense

6    friendly good-faith instruction.

7            And Mr. Conti made a pitch about a range -- Mr. Allen

8    didn't, but Mr. Conti made this pitch in closing arguments. He

9    said, look, my client thought every day there may be a few

10   numbers that he thought accurately described Rabobank's

11   borrowing costs, and he didn't think there was anything wrong

12   with providing a number based on trader interest. Now, if the

13   jury accepted that, the jury would have acquitted under these

14   instructions.

15           JUDGE POOLER:  Counsel, in an exchange with

16   Mr. Yagami, Mr. Robson said, "Don't worry, mate. There's

17   bigger crooks in the market than us."

18           Do you have more cases that you're going to bring

19   based on the fact that, I guess, everyone was a crook in doing

20   this?

21           MR. PELLETTIERI:  These investigations and

22   prosecutions continue, yes, your Honor.

23           Now, just turning to some of the strength of the

24   evidence of this range and the fact that they didn't believe

25   it. There's two issues here. One is sufficiency of the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

48

H1QQALL-COA

1    evidence and one is the jury instructions.

2            I just described how the jury instructions allowed or

3    required acquittal if the jury found the facts as described in

4    Mr. Conti's closing statement.  But the facts didn't establish

5    that; far from it.  The facts established the opposite.  We

6    provided really very substantial evidence that showed that the

7    defendants did, in fact, collect market information, come to a

8    figure that represented their estimate, and then change that

9    figure and provided that figure instead of their actual

10   estimate in order to bump up or bump down the LIBOR and benefit

11   the traders.

12           I think that some of the best evidence are the

13   collection of emails between the government supplemental

14   appendix 14 through 17.  And in that exchange Christian Schleup

15   from New York asks Conti, "Where do you see the six-month LIBOR

16   tomorrow?"

17           And Conti says, "Where do you like to see it is more

18   the question."

19           Later in the exchange, he says, "Well, at the moment,

20   5.40."

21           Then later in the day, Schluep texts Conti and says,

22   "Gonna need a fricking high six-month fix tomorrow if OK with

23   you.  5.42?"

24           Conti says, "Remind me tomorrow.  I have too much on

25   my plate right now."

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

H1QQALL-COA

1          So tomorrow Schluep obliges and says, "Don't want you

2    to price yourself out of the market.  A 41, 42 level would be

3    great though."

4          Then there's another exchange between Sliney, who is

5    another New York trader, and Mr. Allen.  And Sliney asks Allen,

6    "Any feel for the LIBORs today?"  This is the date when the

7    other trader had asked Conti can you bump it to 42?

8          And Allen says, "Well, one, two, three months are 59,

9    56, 53.5," and he says, "six month, 42 -- six month, 42.  I

10   think that's what Christian needs," Schluep.

11         So Christian Schluep made the request at 5.42 to

12   Conti.  Allen was aware of it.  They provided 5.42 because

13   that's what Christian needs, not because it was some reasonable

14   number we thought it was.  It was the actual number, and we

15   changed what we actually would have given.

16         There's another exchange with Mr. Conti in which he

17   similarly describes a number 5.20.  This is at GSA 100.  He

18   says that it was not specifically correct.  He says, "Today's

19   LIBOR was 5.20."  That was not specifically correct.  It was

20   too high.  And he says, "Well, even though I gave 5.20 as well,

21   just because Lee had a fixing."  That's Lee Stewart, the trader

22   who sits across the desk from Conti.  So all of this evidence

23   firmly established that there was one number that represented

24   their estimate, and they gave a different number.

25         Regarding the Kastigar issue, there's a factual and a

H1QQALL-COA

```
1    legal question there, both of which support the district
2    court's determination.  Legally, a Fifth Amendment claim
3    requires both compulsion and use of the compiled statement.
4    The compulsion and the use have to be accomplished by a
5    sovereign bound by the Fifth Amendment.
6              JUDGE POOLER:  Why wasn't the use showing the tomorrow
7    to Mr. Robson?  Isn't that use?
8              MR. PELLETTIERI:  Well, factually, that was not use,
9    and that's what the district court concluded.  I can go into
10   that.
11             JUDGE POOLER:  Well, is the district court correct?
12   That's my question.
13             MR. PELLETTIERI:  Yes, I'll turn to that.
14             JUDGE POOLER:  It seems to me it was use if someone
15   gets to look at it and change their testimony; that's use.
16             MR. PELLETTIERI:  Well, if the exposure to the
17   compelled testimony is the reason for the change in the
18   testimony, that is the use.  But here, we established that the
19   changes in Robson's testimony to the FCA in the UK and his
20   trial testimony in the United States had nothing to do with his
21   exposure to these transcripts.
22             He plainly described, he said, yeah, I was fabricating
23   things in the U.K.  I was just trying to prevent market color
24   because I was just trying to exculpate myself, and I was lying.
25   Right?  Then he comes and he decides, now I'm going to come
```

H1QQALL-COA

1    clean, and I'm going to testify in the United States

2    truthfully.

3              JUDGE POOLER:  He says the first time he was lying.

4    Then he looked at the transcripts.  And now, lo and behold,

5    he's telling the truth.

6              MR. PELLETTIERI:  Well, looking at the transcripts did

7    not in any way result in his actual truthful testimony.

8              JUDGE LYNCH:  But he says --

9              MR. PELLETTIERI:  Yes, your Honor.

10             JUDGE LYNCH:  And it's enough for the judge in your

11   view to credit what he said, and then that solves your Kastigar

12   problem?

13             MR. PELLETTIERI:  We do believe that it's enough, but

14   that's not the only component here.  We do believe that if

15   there's credible testimony, and that's what the Court in the

16   D.C. Circuit in Poindexter says was missing there.  If you have

17   credible testimony from a witness that his actual testimony was

18   not influenced by exposure to tainted testimony, that can

19   satisfy the government's Kastigar burden.

20             But we didn't only have that here.  We had more.

21   Number one, we looked at the overlap between the subject

22   matter, and the D.C. Circuit recently in the Slough case said

23   applying its own standards in the North/Poindexter cases, it

24   said, if a person who is exposed to tainted testimony, if their

25   current testimony has no antecedent in that compelled

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

H1QQALL-COA

1     testimony, generally that's not enough to show use.  There's

2     not going to be use there.  And that was the Slough case.  So

3     if you compare --

4            JUDGE LYNCH:  Wait a minute.  So if you have a witness

5     who gives an account before he's exposed to tainted immunized

6     testimony that leaves out some significant details, he's

7     exposed to the testimony immunized testimony that contains

8     those details and then he testifies at a trial including those

9     details, it's just a question of his credibility for the

10    district court?  I'm sorry, I must have missed it.

11           MR. PELLETTIERI:  That's not what we're saying.  What

12    we're saying is Mr. Allen's and Mr. Conti's testimony said X,

13    Y, Z, and Robson's testimony may have been A, B, X.  So for the

14    A and B, there's no use.

15           JUDGE LYNCH:  The A and B is fine.

16           MR. PELLETTIERI:  So that was one additional --

17           JUDGE LYNCH:  But the question is the X.

18           MR. PELLETTIERI:  Yes.

19           JUDGE LYNCH:  The question is, this is not a case

20    where there's canned testimony that you can go back to and say,

21    Robson essentially told the same story on every material point

22    in the pre-exposure testimony to the post exposure testimony.

23           Instead, am I wrong about this, there are at least

24    some significant issues on which either Robson testifies to

25    something that he had never talked about before but that is in

H1QQALL-COA

1    the immunized testimony, or in which he actually said something

2    different for whatever reason before seeing the immunized

3    testimony, and then changes his tune after to accord with the

4    immunized testimony?  Is that not a factual statement about at

5    least some of Robson's testimony?

6            MR. PELLETTIERI:  Where there's overlap, the Court has

7    to determine whether the testimony from Robson was in any way

8    affected, and that's what the Court made --

9            JUDGE LYNCH:  But that's a rather extraordinary thing

10   to say it's just a question of -- a judge can just say, hey, I

11   believe him; he has an honest face, it's fine.  How is that

12   meeting a heavy burden to establish that there is no influence

13   of the testimony?  I mean, I have a passing familiarity with

14   the North case.  In North, the D.C. Circuit said, you know,

15   even if they said the same factual thing before that they said

16   after, the possibility that they testified more forcefully

17   because they now knew that North wasn't going to contradict

18   them or, more emphatically, because they thought that North was

19   going to call them a liar, that is enough to change to be a use

20   of the testimony.

21           MR. PELLETTIERI:  I think in North factually there

22   wasn't a dispute whether it had refreshed their recollection,

23   and the issue was a legal issue whether refreshing recollection

24   was actually use, and the Court determined that it was actual

25   use.  And here, they didn't try and they didn't show; and we

H1QQALL-COA

1   proved to the contrary, there was no refreshing of

2   recollection.  There was nothing, and for a few different

3   reasons --

4           JUDGE LYNCH:  This seems to me this opens an enormous

5   door for the government to make use of immunized testimony.  It

6   might be a risk, but it seems to me you're saying there's

7   nothing that really prevents a prosecutor from giving a witness

8   the transcript because afterwards if he says, oh, well, my

9   recollection was independently refreshed by something else --

10          MR. PELLETTIERI:  Every case is going to turn on the

11  facts.  I mean, the Slough case in the D.C. Circuit, those

12  witnesses were exposed to testimony, and the Court concluded

13  based on the unique facts there that that didn't kick in

14  Kastigar.

15          And here, it's not just Robson's word.  They had

16  ample, ample opportunity to cross-examine Robson with any kind

17  of inconsistencies, and the Court observed him.  The Court

18  listened to all of those arguments.  The district court was in

19  the best position to evaluate.

20          But we're not only relying on Robson's say-so.  As I

21  mentioned, what the Court took into account as well are the

22  testimony of other witnesses and other documentary testimony

23  that showed --

24          JUDGE LYNCH:  You've got one cooperator who is

25  vulnerable to all kinds of impeachment because he's cooperating

H1QQALL-COA

1    with the government in exchange for a benefit.  You bring in

2    another cooperator who's been exposed to immunized testimony,

3    and you say, oh, there's no problem because he matches up with

4    the first cooperator.

5         MR. PELLETTIERI:  The reason the district court took

6    that into account is to corroborate Robson's testimony that he

7    actually saw, and that was the basis for his testimony, because

8    there were other witnesses.

9         JUDGE LYNCH:  But he may have actually seen it, but

10   we've got a record in which he didn't testify to it until after

11   he had been exposed to the immunized testimony.

12        MR. PELLETTIERI:  We have Robson's testimony.  We have

13   the corroboration.  We also have the fact that much of the

14   testimony from Allen and Conti consisted of kind of vague

15   denials, a lack of recollection and really nothing to use,

16   nothing to prompt the memory, to change or in any way affect

17   Robson's testimony.  Cumulatively, all of that amply met our

18   burden under Kastigar, but we don't think we had to meet our

19   burden under Kastigar.  We only did it out of an abundance of

20   caution because there was no compulsion.  There was no

21   compulsion by a sovereign bound by the Fifth Amendment.

22        JUDGE LYNCH:  Well, if that's true, then it would have

23   been OK, would it not, for you to introduce the transcript of

24   Conti's testimony at this trial.  You didn't do that.

25        MR. PELLETTIERI:  Under the Fifth Amendment.  But we

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

H1QQALL-COA

1   were being cautious, your Honor.

2           JUDGE LYNCH:  I understand you were being cautious,

3   but you may not be cautious the next time because you're asking

4   us to hold that it would be permissible for you to do that

5   because since you weren't the ones who compelled the testimony

6   in the first place, there's no bar to your use of that

7   immunized foreign testimony at a trial, any kind of use.  The

8   whole Kastigar hearing was a waste of time on that theory

9   because even if Robson had been refreshed by the testimony,

10  that wouldn't be a problem.  Even if you had given him the

11  transcript in order to refresh his recollection, that wouldn't

12  be a problem.  And even if you introduced the testimony at the

13  trial itself, that wouldn't have been a problem either.

14          MR. PELLETTIERI:  Under the Fifth Amendment -- if the

15  government as an employer tells a witness, tells an employee,

16  look, we want information, you've got to testify or we're going

17  to fire you, if the government does that, that's compulsion

18  under the Fifth Amendment.  We can't use that at a trial.

19          Now, if a private employer does the same and it says,

20  well, we're going to fire you unless you provide information,

21  that doesn't kick in the Fifth Amendment protection.  That can

22  be introduced at a later trial.  And the British government is

23  on the same footing as a private employer.  The Fifth Amendment

24  has to be --

25          JUDGE CABRANES:  Who said that?  What court has

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

57

H1QQALL-COA

1   supported the proposition that a British government is on the

2   same footing as a private employer?

3       MR. PELLETTIERI:  Well, Judge Friendly ruled that a

4   private employer like the New York Stock Exchange, if they

5   compel testimony, that doesn't trigger the Fifth Amendment.

6       JUDGE CABRANES:  What's that got to do with a foreign

7   sovereign?

8       MR. PELLETTIERI:  Because if the United States compels

9   testimony as an employer, that triggers it.  And if you make

10  that distinction between private employer and a public

11  employer, there's no reason -- the reason is because the

12  private employer is not bound by the Fifth Amendment, just as

13  the U.K. government --

14      JUDGE CABRANES:  Yes, and you earlier, in response to

15  Judge Lynch, suggested that compulsion and use had to be by the

16  same sovereign.  That seems to be in direct conflict with our

17  decisions in Yousef and In Re: Terrorist Bombings.  And I was

18  just scanning your brief in response to defense counsel with

19  respect to those cases, and I think it's the case that you are

20  suggesting that those passages of Yousef and In Re: Terrorist

21  Bombings were dicta.  Is that right?

22      MR. PELLETTIERI:  Well, they weren't necessary to the

23  result the way we read those cases.

24      JUDGE CABRANES:  It's called dicta.

25      MR. PELLETTIERI:  Yes.  And the reason is also because

58

H1QQALL-COA

1    Salameh is really more on all fours here.  In that case, you

2    had an individual who was in foreign custody, was allegedly

3    compelled -- there's coercive activity by that foreign entity,

4    and then he was put into United States custody and provided

5    statements, and this Court held that because of the coercive

6    activity was allegedly perpetrated by a foreign sovereign, that

7    didn't kick in the due process protections for a coercion.  And

8    now there's a distinction between this notion of due process --

9         JUDGE CABRANES:  Salameh, with which we're all kind of

10   familiar, it's an important case in this circuit, but it does

11   antedate the two decisions that we were just talking about.

12   I'm not suggesting that there was some modification of the law

13   of the Circuit, but I would think that the more recent

14   decisions are more compelling on some of these principles, but

15   I guess you don't agree with that.

16        MR. PELLETTIERI:  Well, I don't think that in the -- I

17   don't think that in the Yousef and the Terrorist Bombings case

18   that the issue that turned on the Court's decision was whether

19   there was coercion by a foreign government that resulted in

20   testimony used in the United States.  That just wasn't an issue

21   there as far, as I read those cases.  And the Court did hold

22   that the Miranda rights --

23        JUDGE CABRANES:  I wonder why the Court would have

24   carried on about that subject if it wasn't an issue.

25        MR. PELLETTIERI:  The Court did hold that Miranda

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

H1QQALL-COA

1    rights and the requirement that someone be read warnings before

2    their testimony can be used, that that's a prophylactic rule

3    intended to protect Fifth Amendment rights, the privilege

4    against self-incrimination, and it doesn't kick in when foreign

5    authorities question an individual.  If a foreign authority

6    questions --

7            JUDGE CABRANES:  Your theory, of course, is taking us

8    to the proposition suggested earlier by Judge Lynch, that if a

9    foreign sovereign beats the hell out of somebody and compels

10   the testimony, since it's a different sovereign, you're able to

11   use that compelled testimony in a federal court.

12           MR. PELLETTIERI:  Well, there might be other

13   constitutional doctrines that kick in there.  We acknowledge

14   that --

15           JUDGE CABRANES:  It's not a Fifth Amendment issue.

16           MR. PELLETTIERI:  It's not a Fifth Amendment issue,

17   no.

18           JUDGE LYNCH:  If they don't beat somebody, but they

19   simply compel him by force of legal compulsion that's legal in

20   that country to do, in that event, I assume that wouldn't shock

21   anybody's conscience to follow that, since it's not necessarily

22   a due process question.  You're saying as a matter of Fifth

23   Amendment law anyway, that's perfectly OK for you -- you are

24   overly cautious here because you absolutely could have

25   introduced Allen's and Conti's testimony on your theory.

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

H1QQALL-COA

1          MR. PELLETTIERI:  Correct, your Honor.  And out of an

2     abundance of caution we didn't, and we also showed factually we

3     did not use it, and the district court's determinations are not

4     clearer in light of the record, their really meticulous

5     evaluation --

6          JUDGE CABRANES:  Let me ask you, our standard of

7     review of that decision is clearer.

8          MR. PELLETTIERI:  Yes, your Honor, clearer.

9          JUDGE CABRANES:  Anything else you'd like to add?

10          MR. PELLETTIERI:  Unless the Court has any questions,

11     we would ask that the Court affirm.  Thank you, your Honor.

12          MR. SCHACHTER:  I would like to begin with something

13     that the government says here and said in the indictment but

14     did not say to the jury.  The government here said that the

15     evidence showed that their estimates were not their estimates.

16     They also said that they came up with one number and gave a

17     different number.  That would fall within what is established

18     law with respect to fraud based on statements of opinions or

19     estimates.  They have to prove beyond a reasonable doubt that

20     it was not honestly held by the person making it at the time.

21     It was disbelieved by the speaker.  That is the theory that the

22     government articulated in the indictment.

23          JUDGE LYNCH:  Isn't it a reasonable inference from the

24     kinds of conversation that Mr. Pellettieri read to us that if

25     Schleup says to Conti, you know, what do you think the number

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

H1QQALL-COA

1    is going to be?  And Conti says, the real question is what do

2    you want it to be?  Why couldn't a reasonable jury draw the

3    inference beyond a reasonable doubt that Conti wasn't

4    interested in making an honest estimate.  He was interested in

5    doing whatever Schleup wanted, or at least whatever Schleup

6    wanted that wasn't so ridiculous that they'd be laughed at and

7    people would start to suspect something was wrong.  Why is that

8    not a plausible inference?

9         MR. SCHACHTER:  There is no question that swap traders

10   made requests.  They would say, hey, can you put it higher or

11   lower?  And there is no question that the cash traders would

12   say sure.  That does not prove a violation of the wire fraud

13   statute because the government has an obligation to prove that

14   the ultimate statement that the speaker made was disbelieved by

15   him at the time.

16        JUDGE LYNCH:  But that can be a matter of inference.

17   We're always trying to draw inferences about what's in

18   somebody's head.  It seems to me if somebody says to another

19   person:  What I'm interested in is just what do you want.

20   That's all I want to know.  That's what I care about.  Then he

21   gives the estimate that Schleup asked for, and there's no other

22   evidence suggesting that there was some calculation that

23   reached that number, why can't it -- it's a matter of inference

24   whether Mr. Conti in this case didn't believe what he said.

25        MR. SCHACHTER:  Here, it would be based entirely on

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

H1QQALL-COA

1     speculation because that's not what the government told the

2     jury they needed to determine.  Again, that was the theory

3     articulated in the indictment.  It said that they submitted

4     rates that were inconsistent with what they perceived to be the

5     rate.

6            Comes time for the charge conference, and Judge Rakoff

7     says that the Court is going to describe the charges in this

8     other way that doesn't speak to it being inconsistent with the

9     opinion that the speaker actually had, and instead comes up

10    with the formulation that they submitted a LIBOR rate that was

11    different than they otherwise would have to help their

12    employer.  Different, however, does not equal false.

13           And we said, your Honor, if you're going to describe

14    the indictment, why not use the language of the indictment?

15    And we asked the Court to include just that language.

16           JUDGE LYNCH:  That might have been better for the

17    judge to do, but still, he does give the good faith

18    instruction, right?  That if the person believed in good faith

19    that what he was doing was submitting the right estimate, he's

20    fine.

21           MR. SCHACHTER:  The problem with the good faith

22    instruction -- there's a number of problems with the good faith

23    instruction.  Principally, the good faith instruction tells a

24    jury:  Here's the circumstances where a statement may not

25    amount to a false or misleading statement.  The problem was, it

H1QQALL-COA

1     was academic to the determination that the jury was told by the

2     Court and by the prosecutors in summation that they needed to

3     make because they didn't need to consider whether a statement

4     was false.  Then the good faith instruction would have been a

5     useful tool for them.

6            But that's not what they were asked to determine.

7     Judge Rakoff said that the crime, the issue that you need to

8     determine, jury, is, was it different?  Was it influenced in

9     part by what would help their employer?  And these words are

10    really important.  The prosecutors in summation said, if you

11    find that the defendants took part in the scheme to base

12    Rabobank's LIBOR submissions, at least in part, on trading

13    positions, you convict.  Regardless of whether they're inside

14    or outside of the range, you should convict.  So, in other

15    words, the jury --

16            JUDGE LYNCH:  Stay away from the range, right?

17    Whether or not it's what they honestly believed.

18            MR. SCHACHTER:  Yes.  Yes.  Whether or not it's what

19    they -- exactly.  That's the problem.

20            JUDGE LYNCH:  The words "whether or not they honestly

21    believed" are not there.  It seems to me that what Mr. Ewan's

22    testimony, at least as the part that Mr. Pellettieri quotes,

23    says he would have thought that that was not what they're

24    supposed to do.  They're supposed to give their honest

25    estimate; not what they wish it would be for their own trading

H1QQALL-COA

1    positions.

2         MR. SCHACHTER:  I'm going to answer that question in

3    two ways.  First, perhaps one could say that's unethical.  That

4    is a sharp practice.  Wire fraud does not embrace everything

5    that one wishes to consider to be a sharp practice.  But I said

6    two ways, there's two ways; and that is, that it was not clear

7    even to the government's own cooperating witnesses that there

8    was anything inappropriate with "as long as you are submitting

9    a rate that is within the range, that it's a fair and

10   reasonable estimate," it was not clear to them that that was

11   unlawful.  And it's really important, I found it somewhat

12   shocking.  I'm not sure how his plea was taken, but Mr. Stewart

13   testified -- and this is the appendix at page 214 -- that in

14   his view it was, and I'm quoting, "not considered inappropriate

15   for swap traders to ask the people submitting LIBOR for a

16   higher or lower rate."  This is the government's cooperating

17   witness' testimony.  At trial he testifies that when he left

18   the bank a year later, he had "no inkling that LIBOR

19   submissions at Rabobank were an issue or a problem."  That's

20   the government's own cooperating witness who ultimately pled

21   guilty pursuant to a cooperation agreement.

22        The other cooperating witness says the same thing.

23   Mr. Yagami testified, page 265 of the joint appendix -- this is

24   the government cooperating witnesses' testimony.

25        JUDGE CABRANES:  What page was that?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

H1QQALL-COA

```
1          MR. SCHACHTER:  265 of the appendix.  I apologize
2    because we submitted appendices with four pages, which I
3    realized after submitting was not particularly helpful to the
4    Court, but it can be found on page 265 of the appendix.
5    Mr. Yagami testified, "The practice of adjusting submissions by
6    a few basis points based on a trader's request was a gray area
7    but 'agreeable' and 'OK to do.'"
8          He even testified about a conversation that he had
9    with Mr. Robson -- a contemporaneous conversation before he was
10   threatened with indictment and ultimately pleads guilty.
11   Mr. Yagami testified the same page of the appendix that
12   Mr. Robson said, "That it was OK because LIBOR moves in a range
13   and there were multiple correct LIBOR rates he could submit."
14         JUDGE POOLER:  Excuse me, because opposing counsel
15   said there was only one rate, not a range.  There was only one
16   rate that was correct.  That's what he just said on the podium.
17         MR. SCHACHTER:  Well, there is nothing that supports
18   that.  I think what -- I think what counsel from the government
19   said is he was quoting language from Mr. Ewan that said there's
20   only one rate that can be submitted.  Yeah, of course,
21   ultimately, you may have a range of equally accurate estimates,
22   but ultimately you have to submit one.
23         JUDGE POOLER:  He said there was one rate that was the
24   right rate.
25         MR. SCHACHTER:  That is completely contradicted by the
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

66

H1QQALL-COA

1  evidence at trial.  There is nothing in the record which

2  suggests that there was one rate.

3        JUDGE CABRANES:  I suppose, in part, because there are

4  15 plus banks which are making their own estimates of what the

5  correct rates are.

6        MR. SCHACHTER:  And there is no interbank borrowing

7  during most of this time period and certainly for most of the

8  time periods they have to submit LIBOR for, what would they

9  have to pay to borrow for eight months?  There can't be one

10  number.  It never happens.  It's, at best, a rough estimate.

11  The contemporaneous testimony from the communications is, I

12  don't know, it's between, you know, 3.1 and 3.2, I could -- I

13  could put it in anywhere.

14        In fact, just to address that, when the government

15  points to the evidence of he mentioned a number 5.20, which

16  Mr. Conti puts in LIBOR that day at 5.20, that's final LIBOR

17  that day.  Final LIBOR is 5.20.  Rabobank put in 5.20, which

18  means that the final LIBOR is you have 16 panel banks that each

19  submit their estimates.  And the BBA lops off the top four,

20  lops off the bottom four, averages the middle eight, and

21  Mr. Conti's submission that day, 5.20, was exactly the same as

22  the average of the middle eight banks.  That can't be fraud.

23        JUDGE LYNCH:  Unless Mr. Conti thought it was 5.18,

24  and if he put that in, it might have come out at 5.19 as the

25  total average.

67

H1QQALL-COA

1        MR. SCHACHTER:  I agree with your Honor one hundred

2    percent.  And had the jury been instructed that that's what

3    they need to find -- had they been instructed, as we asked, on

4    how they should assess an opinion or estimate, and they have to

5    find that the opinion or estimate provided was disbelieved by

6    the speaker, had Judge Rakoff and the government told them

7    that's the test, maybe it wouldn't be an issue.

8        And the reason why the Court and the government

9    instructed the jury in this fashion was because it was the end

10   of the trial, and the government had not presented any

11   evidence -- they didn't have any evidence that any of the

12   opinions were, in fact, disbelieved by the speaker, and that's

13   why they opted for this different formulation which is not

14   consistent with wire fraud.

15       JUDGE CABRANES:  They say on TV.  I have a final

16   question of context before we recess.  There was a reference

17   earlier, and Mr. Pellettieri may wish to comment on this too,

18   about a deferred prosecution of Rabobank?

19       MR. SCHACHTER:  Yes.

20       JUDGE CABRANES:  Can you give us the timeline and also

21   just indicate what relevance, if any, it has to this.

22       MR. SCHACHTER:  The timeline was that Rabobank entered

23   into a resolution with the government --

24       JUDGE CABRANES:  Did you represent them?

25       MR. SCHACHTER:  No.  It's of no relevance.  Look, the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

68

H1QQALL-COA

1    reality is --

2            JUDGE CABRANES:  It antedated the indictments here.

3            MR. SCHACHTER:  Absolutely correct, and financial

4    institutions settle cases with the government for all sorts of

5    reasons.

6            JUDGE CABRANES:  I understand that.  What was the

7    role, if any, of Rabobank in cooperating with the government?

8    Do we know that?  Do we care about that?

9            MR. SCHACHTER:  I don't think it is of any moment.  I

10   think they responded to the government's requests.

11           JUDGE CABRANES:  Yes.  OK.

12           Mr. Pellettieri, would you like to comment on that?

13           MR. PELLETTIERI:  The deferred prosecution was in that

14   time period, and it reserved the ability of the Department of

15   Justice to go after individuals.

16           JUDGE CABRANES:  Right.  I think it would be helpful

17   to the Court if counsel on both sides were to make arrangements

18   with the clerk's office have a transcript of this splendid oral

19   argument prepared for your use as well as ours.

20           We thank you very much.  We will take this case under

21   submission.  You expected a summary order, I know, but absent a

22   summary order, we will recess.  We will adjourn for the day.

23           (Adjourned)

24

25