16-898-cr (L)
*United States v. Allen*

# In the
# United States Court of Appeals
# for the Second Circuit

————

AUGUST TERM 2016

Nos. 16-898-cr (Lead) 16-939-cr (con)

UNITED STATES OF AMERICA,
*Appellee,*

v.

ANTHONY ALLEN AND ANTHONY CONTI,
*Defendants-Appellants.**

————

On Appeal from the United States District Court
for the Southern District of New York

————

ARGUED: JANUARY 26, 2017
DECIDED: JULY 19, 2017

————

Before: CABRANES, POOLER, and LYNCH, *Circuit Judges.*

————

* The Clerk of Court is respectfully directed to amend the caption as set forth above.

This case—the first criminal appeal related to the London Interbank Offered Rate ("LIBOR") to reach this (or any) Court of Appeals—presents the question, among others, whether testimony given by an individual involuntarily under the legal compulsion of a foreign power may be used against that individual in a criminal case in an American court. As employees in the London office of Coöperatieve Centrale Raiffeisen-Boerenleenbank B.A. in the 2000s, defendants-appellants Anthony Allen and Anthony Conti ("Defendants") played roles in that bank's LIBOR submission process during the now-well-documented heyday of the rate's manipulation. Defendants, each a resident and citizen of the United Kingdom, and both of whom had earlier given compelled testimony in that country, were tried and convicted in the United States before the United States District Court for the Southern District of New York (Jed S. Rakoff, *Judge*) for wire fraud and conspiracy to commit wire fraud and bank fraud.

While this appeal raises a number of substantial issues, we address only the Fifth Amendment issue, and conclude as follows.

First, the Fifth Amendment's prohibition on the use of compelled testimony in American criminal proceedings applies even when a foreign sovereign has compelled the testimony.

Second, when the government makes use of a witness who had substantial exposure to a defendant's compelled testimony, it is required under *Kastigar v. United States*, 406 U.S. 441 (1972), to prove,

at a minimum, that the witness's review of the compelled testimony did not shape, alter, or affect the evidence used by the government.

Third, a bare, generalized denial of taint from a witness who has materially altered his or her testimony after being substantially exposed to a defendant's compelled testimony is insufficient as a matter of law to sustain the prosecution's burden of proof.

Fourth, in this prosecution, Defendants' compelled testimony was "used" against them, and this impermissible use before the petit and grand juries was not harmless beyond a reasonable doubt.

Accordingly, we **REVERSE** the judgments of conviction and hereby **DISMISS** the indictment.

———————

MICHAEL S. SCHACHTER (Casey E. Donnelly, *on the brief*), Willkie Farr & Gallagher LLP, New York, NY, *for Defendant-Appellant Anthony Allen*.

Aaron Williamson, Tor Ekeland, P.C., Brooklyn, NY, *for Defendant-Appellant Anthony Conti*.

JOHN M. PELLETTIERI (Leslie R. Caldwell, Assistant Attorney General; Andrew Weissman, Carol Sipperly, Brian R. Young, Sung-Hee Suh, and Michael T. Koenig,

Fraud Section, *on the brief*), Criminal
Division, United States Department of
Justice, Washington, D.C., *for Appellee*.

———————

JOSÉ A. CABRANES, *Circuit Judge*:

This case—the first criminal appeal related to the London
Interbank Offered Rate ("LIBOR") to reach this (or any) Court of
Appeals—presents the question, among others, whether testimony
given by an individual involuntarily under the legal compulsion of a
foreign power may be used against that individual in a criminal case
in an American court. As employees in the London office of
Coöperatieve Centrale Raiffeisen-Boerenleenbank B.A. ("Rabobank")
in the 2000s, defendants-appellants Anthony Allen and Anthony
Conti ("Defendants") played roles in that bank's LIBOR submission
process during the now-well-documented heyday of the rate's
manipulation.[1] Allen and Conti were, for unrelated reasons, no

———————

[1] Problems with LIBOR were noted at least as early as a decade ago.
"Beginning in 2007, regulators and market observers noted that LIBOR had failed
to behave in line with expectations given other market prices and rates." David
Hou & David Skeie, *LIBOR: Origins, Economics, Crisis, Scandal, and Reform*, Federal
Reserve Bank of New York Staff Report No. 667, at 1 (Mar. 2014); *see* Michael S.
Derby, *Fed Aware of Libor Problems in Fall 2007*, Wall St. J. (July 13, 2012),
https://www.wsj.com/articles/SB10001424052702303919504577524830226504326;
Andy Verity, *Libor: Bank of England Implicated in Secret Recording*, BBC (Apr. 10,
2017), http://www.bbc.com/news/business-39548313 ("The 2008 recording adds to
evidence the central bank repeatedly pressured commercial banks during the

longer employed at Rabobank by 2008 and 2009, respectively. By 2013, they were among the persons being investigated by enforcement agencies in the United Kingdom ("U.K.") and the United States for their roles in setting LIBOR.

The U.K. enforcement agency, the Financial Conduct Authority ("FCA"),[2] interviewed Allen and Conti (each a U.K. citizen and resident) that year, along with several of their coworkers. At these interviews, Allen and Conti were compelled to testify and given

---

financial crisis to push their Libor rates down . . . . The Bank of England said Libor was not regulated in the UK at the time.").

Concerns with LIBOR were also publicly reported. *See* Carrick Mollenkamp & Mark Whitehouse, *Study Casts Doubt on Key Rate*, Wall St. J. (May 29, 2008), https://www.wsj.com/articles/SB121200703762027135; Carrick Mollenkamp, *Bankers Cast Doubt on Key Rate Amid Crisis*, Wall St. J. (Apr. 16, 2008), https://www.wsj.com/articles/SB120831164167818299.

These reports were eventually followed by criminal and regulatory probes by domestic and international enforcement agencies into banks' LIBOR submissions. *See* Carrick Mollenkamp & David Enrich, *Banks Probed in Libor Manipulation Case*, Wall St. J. (Mar. 16, 2011), https://www.wsj.com/articles/ SB10001424052748704662604576202400722598060 (stating in March 2011 that the "probe began about a year ago with informal inquiries"). As of February 2, 2017, the DOJ has entered into criminal resolutions with six banks: "Barclays, UBS AG, Royal Bank of Scotland, Rabobank, Lloyds Bank, and Deutsche Bank." Gov't Ltr., Docket No. 94, at 1 & n.1. Each of these agreements includes a "Statement of Facts," in which each bank has admitted to its misconduct with respect to LIBOR. The U.K. has also reached resolutions with these banks.

[2] The FCA replaced the U.K.'s Financial Services Authority ("FSA") in April 2013. Because the distinction is irrelevant for purposes of this opinion, we refer to both entities simply as the "FCA."

"direct use"—but not "derivative use"—immunity.[3] In accordance with U.K. law, refusal to testify could result in imprisonment. The FCA subsequently decided to initiate an enforcement action against one of Defendants' coworkers, Paul Robson, and, following its normal procedures, the FCA disclosed to Robson the relevant evidence against him, including the compelled testimony of Allen and Conti. Robson closely reviewed that testimony, annotating it and taking several pages of handwritten notes.

For reasons not apparent in the record, the FCA shortly thereafter dropped its case against Robson, and the Fraud Section of the United States Department of Justice (the "DOJ") promptly took it

---

[3] The difference between direct use and derivative use immunity is substantial. *See United States v. Plummer*, 941 F.2d 799, 803 (9th Cir. 1991) ("If the government granted [the witness/defendant] use and derivative use immunity, it would be required to have derived all the information on which the subsequent prosecution was based from a source wholly independent of the statements made in the interview. In contrast, if the government granted only direct use immunity, it would not be able to use the interview statements directly against [the witness/defendant] in a subsequent prosecution, but would be allowed to use information derived from the statements." (citations omitted)).

Under American constitutional law, if a witness is compelled to testify, he must be granted use and derivative use immunity. *See Kastigar v. United States*, 406 U.S. 441 (1972). Pursuant to 18 U.S.C. §§ 6002–05, "the United States Government may compel testimony from an unwilling witness, who invokes the Fifth Amendment privilege against compulsory self-incrimination, by conferring on the witness immunity from use of the compelled testimony in subsequent criminal proceedings, *as well as immunity from use of evidence derived from the testimony*." *Id.* at 442 (emphasis added).

up.[4] Robson soon pleaded guilty and became an important cooperator, substantially assisting the DOJ with developing its case. Ultimately, Robson was the sole source of certain material information supplied to the grand jury that indicted Allen and Conti and, after being called as a trial witness by the Government, Robson provided significant testimony to the petit jury that convicted Defendants.

In October 2014, a grand jury returned an indictment charging Defendants with one count of conspiracy to commit wire fraud and bank fraud, in violation of 18 U.S.C. § 1349, as well as several counts of wire fraud, in violation 18 U.S.C. § 1343.[5]  Following a trial held in October 2015 in the United States District Court for the Southern District of New York (Jed S. Rakoff, *Judge*), a jury convicted on all counts. The District Court sentenced Allen principally to two years'

---

[4] In connection with its investigations into LIBOR manipulation, the Government submits that it has charged more than a dozen individuals (including Allen and Conti) with criminal conduct. Gov't Ltr., Docket No. 94, at 1–2. Only Allen and Conti have gone to trial in the United States, but two other individuals have pleaded not guilty and proceedings against them remain pending. *Id.* at 2. Charges were dismissed against four defendants, six defendants pleaded guilty and there are additionally two fugitives. *Id.* The Government further submits that the "United Kingdom has to date charged 19 individuals with LIBOR-related crimes and is seeking to extradite four additional individuals for prosecution. One individual was convicted upon pleading guilty and four were convicted after trial. Six individuals were acquitted after trial. Cases against the others remain pending." *Id.*

[5] *See* Joint Appendix ("JA") 41–76. Ultimately, pursuant to a superseding indictment returned on June 23, 2015, Allen was charged with eighteen counts of wire fraud, and Conti was charged with eight counts of wire fraud. *See* JA 77–112.

imprisonment and Conti to a year-and-a-day's imprisonment.[6] Agreeing that Defendants had raised a "substantial issue" for appeal, the District Court granted bail pending appeal.[7]

In their appeal, Allen and Conti challenge their convictions on several grounds. We address only their Fifth Amendment challenge, however, and conclude as follows.

First, the Fifth Amendment's prohibition on the use of compelled testimony in American criminal proceedings applies even when a foreign sovereign has compelled the testimony.

Second, when the government makes use of a witness who has had substantial exposure to defendant's compelled testimony, it is required under *Kastigar v. United States*, 406 U.S. 441 (1972), to prove, at a minimum, that the witness's review of the compelled testimony did not shape, alter, or affect the evidence used by the government.

Third, a bare, generalized denial of taint from a witness who has materially altered his or her testimony after being substantially exposed to a defendant's compelled testimony is insufficient as a matter of law to sustain the prosecution's burden of proof.

---

[6] The District Court imposed mandatory special assessments of $1,900 for Allen and $900 for Conti but did not impose any supervised release or any fine on either Defendant. Special Appendix ("SPA") 68–71, 74–77.

[7] JA 714 ("[T]he *Kastigar* issue is not without some appellate interest.").

Fourth, in this prosecution, Defendants' compelled testimony was "used" against them, and this impermissible use before the petit and grand juries was not harmless beyond a reasonable doubt.

Accordingly, we **REVERSE** the judgments of conviction and hereby **DISMISS** the indictment.

## I. BACKGROUND[8]

### A. LIBOR

Some journalists and bankers have called LIBOR the world's most important number.[9] It is a "benchmark" and "reference" interest rate meant to reflect the available borrowing rates on any given day in the "interbank market"—in which banks borrow money from other banks. The so-called LIBOR fixed rates, as published

---

[8] Because Allen and Conti "appeal from judgments of conviction entered after a jury trial, we draw the facts from the evidence presented at trial, viewed in the light most favorable to the government." *United States v. Vilar*, 729 F.3d 62, 68 n.2 (2d Cir. 2013).

[9] *See, e.g.*, Gavin Finch & Liam Vaughan, *The Man Who Invented the World's Most Important Number*, Bloomberg Markets (Nov. 29, 2016), https://www.bloomberg.com/news/features/2016-11-29/the-man-who-invented-libor-iw3fpmed; Liam Vaughan & Gavin Finch, *Libor Scandal: The Bankers Who Fixed the World's Most Important Number*, Guardian (Jan. 18, 2017), https://www.theguardian.com/business/2017/jan/18/libor-scandal-the-bankers-who-fixed-the-worlds-most-important-number; Juliet Samuel & Chiara Albanese, *No Fix for Libor: Benchmark Still Broken, Regulators Say*, Wall St. J. (July 7, 2015) https://www.wsj.com/articles/libor-reform-has-not-gone-far-enough-says-regulator-1436195584 (stating LIBOR is "known as 'the world's most important number'").

daily, are regularly incorporated into the terms of financial transactions entered into across the globe, and the overall value of these LIBOR-tied transactions reaches (measured in U.S. dollars) into the hundreds of trillions.[10]

Throughout the time period relevant to this case, LIBOR rates were administered by a private trade group, the British Bankers' Association ("BBA"). As summarized by a New York Federal Reserve staff report:

> LIBOR's origination has been credited to a Greek banker by the name of Minos Zombanakis, who in 1969 arranged an $80 million syndicated loan from Manufacturer's Hanover to the Shah of Iran based on the reported funding costs of a set of reference banks. In

---

[10] According to a New York Federal Reserve staff report:

LIBOR serves two primary purposes in modern markets: as a reference rate and as a benchmark rate. A reference rate is a rate that financial instruments can contract upon to establish the terms of agreement. A benchmark rate reflects a relative performance measure, oftentimes for investment returns or funding costs. LIBOR serves as the primary reference rate for short-term floating rate financial contracts like swaps and futures. At its peak, estimates placed the value of such contracts at upwards of $300 trillion. Variable rate loans, primarily adjustable rate mortgages [ ] and private student loans, are also often tied to LIBOR. As a benchmark rate, it is also an indicator of the health of financial markets. The spreads between LIBOR and other benchmark rates can signal changing tides in the broad financial environment.

Hou & Skeie, note 1, *ante*, at 2–3 (citation and footnote omitted).

addition to providing loans at rates tied to LIBOR, banks whose submissions determined the fixing had also begun to borrow heavily using LIBOR-based contracts by the mid-1980s, creating an incentive to underreport funding costs. As a result, the [BBA] took control of the rate in 1986 to formalize the data collection and governance process. In that year, LIBOR fixings were calculated for the U.S. dollar, the British pound, and the Japanese yen. Over time, the inclusion of additional currencies and integration of existing ones into the euro left the BBA with oversight of fixings over ten currencies as of 2012.[11]

During that period of time, there was no direct governmental regulation of LIBOR submissions.[12]

---

[11] *Id.* at 1 (citation omitted). According to a *Wall Street Journal* report in 2007:

The Libor became popular because in the 1980s the world needed a short-term rate on which to benchmark the costs for loans between banks. At the time, the interest rates banks charged other banks and big companies lacked a universally accepted basis. British bankers' stab at one took hold faster than others, and it is now a benchmark for many globally traded debt securities.

Ian McDonald & Alistair MacDonald, *Why Libor Defies Gravity: Divergence of a Key Global Rate Points to Strain*, Wall St. J. (Sept. 5, 2007), https://www.wsj.com/articles/SB118891774435316875.

[12] In 2012, Martin Wheatley, who was then managing director of the FSA and slated to become the first Chief Executive of the soon-to-be-established FCA, conducted a review of potential reforms to LIBOR (the "Wheatley Review"). This review culminated in the issuance of a final report. *See The Wheatley Review of LIBOR: Final Report* (the "Wheatley Report") (Sept. 2012) https://www.gov.uk

For each of the world's major currencies, the BBA assembled a panel of banks—typically established institutions that were active in the interbank market in that currency and had a large presence in London. The LIBOR panels for the U.S. Dollar ("USD") and Japanese Yen ("JPY") consisted of 16 banks, including Rabobank, a Dutch bank.[13] As explained below, these panel banks submitted the figures that the BBA used to calculate a currency's official LIBOR rates.

According to the LIBOR "definition" on the BBA's website during the relevant time period, each panel bank, every day at around 11 a.m. London time, was to "contribute the rate at which it could borrow funds, were it to do so by asking for and then accepting

---

/government/uploads/system/uploads/attachment_data/file/191762/wheatley_review_libor_finalreport_280912.pdf. That report recommended "comprehensive reform of LIBOR," *id.* at 7–8, noting, among other things, that "there is no directly applicable specific regulatory regime covering [LIBOR submissions]," *id.* at 11. In April 2013, several reforms were enacted, including "statutory regulation of the administration of, and submission to, LIBOR; an Approved Persons regime; and both civil and criminal enforcement." ICE Benchmark Administration, *Roadmap for ICE LIBOR* (Mar. 18, 2016), https://www.theice.com/publicdocs/ICE_LIBOR_Roadmap0316.pdf. In February 2014, ICE Benchmark Administration replaced the BBA as the administrator of LIBOR, now known as "ICE LIBOR." *Id.*

[13] Rabobank is a "co-operative owned bank, which is the Netherlands' biggest lender," and "which was formed [over a century ago] to serve Dutch farmers and later branched into international and investment banking." Laura Noonan & Pan Kwan Yuk, *Rabobank To Cut 9,000 More Jobs and Shrink Balance Sheet*, Financial Times (Dec. 9, 2015), https://www.ft.com/content/38a8afea-9e9f-11e5-b45d-4812f209f861.

inter-bank offers in reasonable market size just prior to 1100."[14] Each panel bank typically designated a particular employee to be principally responsible for submitting that bank's LIBOR contributions generally or for a particular currency or set of currencies. That employee, a so-called LIBOR submitter, would submit multiple rates within each currency that varied based on the hypothetical loan's "tenor," or duration (pursuant to the basic proposition that the interest rate of a loan will vary based, among other things, on the loan's duration). There were fifteen tenors ranging from overnight to one year—*e.g.*, one month (or "1M"), three months (or "3M"), and so forth.

After receiving submissions from each panel bank, the BBA would, within each tenor of each currency, sort the submissions from lowest to highest, disregard the lower and upper quartiles, and average the remaining submissions. The resulting number became the LIBOR fixed rate and was released to the public daily (through Thomson Reuters, acting as the BBA's agent).[15] Accordingly, for sixteen-bank panels like the USD and the JPY panels, each day, and with respect to each tenor, the BBA would disregard the highest four and lowest four submissions from the panel, and then average the

---

[14] JA 528; *see* JA 517–32 (LIBOR definitions—substantially the same—from 2002 to 2008).

[15] The individual submissions of each contributor panel bank were also released simultaneously. One of the reforms to LIBOR, proposed by Wheatley and later enacted, now requires a three-month delay in the release of banks' individual submissions. *See* Wheatley Report, note 12, *ante*, at 13.

remaining eight submissions to produce that day's LIBOR fixed rate in each tenor of USD and JPY–*e.g.*, the 1M USD LIBOR rate.

As noted, LIBOR fixed rates, as published every day shortly after 11 a.m. London time, are incorporated into the terms of financial transactions—such as so-called "interest rate swaps"—throughout the world.[16] An interest rate swap, to take one example of a LIBOR-based financial instrument, is an agreement between two parties in which one agrees to pay a fixed interest rate on some agreed-upon notional amount, while the other party agrees to pay a floating rate (usually tied to the LIBOR) on that same amount. The two sides agree to exchange payments on agreed-upon dates over the course of an agreed-upon time period. The date on which the floating rate is set (or reset) is often called the "fixing" or "fixing date."[17] If the floating rate references LIBOR, the relevant LIBOR rate on a fixing date determines how much or how little that party pays. Put simply, one party bets that interest rates (using LIBOR as the reference) will

---

[16] *See generally* Hou & Skeie, note 1, *ante*; *see, e.g.*, *Gelboim v. Bank of Am. Corp.*, 823 F.3d 759, 765 (2d Cir. 2016) ("The LIBOR-based financial instruments held by the appellants included: (1) asset swaps, in which the owner of a bond pegged to a fixed rate pays that fixed rate to a bank or investor while receiving in return a floating rate based on LIBOR; (2) collateralized debt obligations, which are structured asset-backed securities with multiple tranches, the most senior of which pay out at a spread above LIBOR; and (3) forward rate agreements, in which one party receives a fixed interest rate on a principal amount while the counterparty receives interest at the fluctuating LIBOR on the same principal amount at a designated endpoint. These examples are by no means exhaustive.").

[17] *See, e.g.*, Government's Supplemental Appendix ("GSA") 103–08 (swap agreement between Rabobank and Citibank).

increase, and the other bets that interests rates (again, based on LIBOR) will decrease.

In effect, and in short, money changes hands as LIBOR rates change. And the panel banks, the joint controllers of LIBOR rates, themselves entered and were parties to large-volume LIBOR-tied transactions as a matter of course.

**B. LIBOR Submissions, and Their Manipulation, at Rabobank**

As relevant here, Rabobank was a contributor panel bank for USD LIBOR and JPY LIBOR. Allen joined Rabobank in 1998 as a cash trader and was the bank's USD LIBOR submitter until 2005, when he became Rabobank's Global Head of Liquidity and Finance. In that new role, which he held until being laid off when Rabobank closed its London branch in late 2008, he was responsible for supervising other cash traders. One of those cash traders was Conti, who assumed primary responsibility for USD LIBOR submissions starting in 2005 and continuing through 2009, when he quit shortly after his job was moved to Utrecht.[18] Another cash trader, Paul Robson

---

[18] While LIBOR has been called the world's most important number, it is not clear that anyone would call Allen and Conti "masters" of the LIBOR universe. *Cf.* Tom Wolfe, Opinion, *Greenwich Time*, N.Y. Times (Sept. 27, 2008), http://www.nytimes.com/2008/09/28/opinion/28wolfe.html (discussing the author's term "Masters of the Universe," which referred to "ambitious young men (there were no women) who, starting with the 1980s, began racking up millions every year—millions!—in performance bonuses at investment banks like Salomon Brothers, Lehman Brothers, Bear Stearns, Merrill Lynch, Morgan Stanley and Goldman Sachs"). According to the presentence reports, Allen earned an annual income at Rabobank of $190,000 (though the PSR does not list his bonus range)

(whose testimony is central to the issue before us), was primarily responsible for Rabobank's JPY LIBOR submissions during the relevant time period. Others, including Allen himself, would sometimes submit USD LIBOR rates or JPY LIBOR rates when Conti or Robson were unavailable. According to the "Final Notice" issued to Rabobank by the FCA for its LIBOR-related misconduct, "Rabobank did not explicitly have a policy in place to address LIBOR submissions procedures until 30 March 2011, and certain LIBOR-related compliance risks were not addressed until August 2012."[19]

---

and Conti had an annual income of $141,583 with an annual bonus ranging from $50,000 to $186,000.

[19] U.K. FCA, Final Notice to Rabobank (Oct. 29, 2013), at ¶ 2.3, https://www.fca.org.uk/publication/final-notices/rabobank.pdf. As already explained, there were likewise no governmental regulations of LIBOR during the relevant time period, *see* note 12, *ante*, leaving oversight to the BBA, *but see* note 38, *post*.

One of the issues that Defendants raise in this appeal relates to the District Court's denial of their request to depose John Ewan, the LIBOR Manager at the BBA during the relevant time period. A U.K. resident and citizen, Ewan declined to appear at Defendants' trial in the United States, but he testified in LIBOR-related trials in the U.K. that ended in acquittals for certain individuals and convictions for others. Defendants suggest that Ewan's testimony would have been material because it would have directly rebutted the Government's theory of fraud. They argue that the District Court therefore erred in refusing to grant them permission to depose Ewan and to use his deposition testimony at trial. The Government, however, contests whether, based on Ewan's equivocal testimony in the United Kingdom, Ewan's hypothetical deposition testimony in this case would have helped Allen's and Conti's defense. Given our disposition of this appeal, we need not reach the question and intimate no final view of the issue.

16

In addition to LIBOR submitters, Rabobank also employed derivatives traders who would regularly enter into interest rate swap agreements. It was a routine practice of these derivatives traders to submit requests to Conti and Robson (or, at times, their stand-ins) for higher or lower LIBOR submissions. The Government's theory of the case was that these trader requests were dictated by the traders' (and thus Rabobank's) interest in having LIBOR be higher or lower on particular dates based on the transactions that the trader had entered or positions they held. Allen and Conti, the Government alleged, honored those requests in lieu of making good-faith estimates of Rabobank's projected borrowing rates.

One USD derivatives trader, Lee Stewart (nicknamed the "Ambassador"), sat in the same line of desks at Rabobank's London office as did Allen and the cash traders—including Conti, the principal USD LIBOR submitter. Stewart testified at trial that he offered LIBOR requests "out loud," "in front of everyone," and never used "code" or "tr[ied] to hide what [he] was talking about."[20] Robson testified that every morning before 11 a.m., Conti led, and Allen participated in, a "gather[ing]" and "discuss[ion]" of the best way to influence LIBOR, prefaced by the shout, "right, LIBOR times[!]"[21]

---

[20] JA 213–14 (Trial Tr. 259–60).

[21] *Id.* at 224 (Trial Tr. 324).

By contrast, those derivatives traders located in other offices, like USD derivatives trader Christian Schluep (located in New York) or JPY derivatives trader Takayuki Yagami (located in Tokyo), would more often submit their LIBOR requests in writing. Thus there are numerous arguably incriminating written exchanges between the latter traders and the LIBOR submitters. Schluep and Conti had several exchanges regarding the setting of USD LIBOR[22]—for example:

- On July 17, 2006, Schluep asked Conti, "IF ANY CHANCE, A HIGH 3MTH TODAY PL!" Conti replied, "[o]k matey . . . high one today."[23]

- On October 31, 2006, Schluep sent Conti a message discussing market activity and then stated, "SMALL FAVOUR AS USUAL, LOW 2S HIGH 3S IF POSSIBLE MATEY," meaning he wanted a low two-month LIBOR and a high three-month LIBOR. Conti responded to the earlier parts of Schluep's message and added, "[w]ill do matey on the libors."[24]

- On August 13, 2007, Schluep sent a message to Conti, requesting "HIGH 3S AND 6S PLS TODAY MATE (ESP 6MNTHS!!) IF U WOULD BE SO KIND . . [sic] GOTTA MAKE MONEY SOMEHOW!" Conti

---

[22] During the roughly three-year time period, Conti received seventeen written LIBOR requests.

[23] GSA 26.

[24] *Id.* at 116.

responded simply, "cool," to which Schluep replied, "CHEERS TC.. [sic] EVERY LITTLE HELPS!"[25]

Schluep also had exchanges with Allen[26]—for example:

- On October 6, 2006, Schluep sent a message to Allen stating, "HELLO SKIPPER, CAN U PUT 3S AT 37 FOR ME TOMORROW PLS. . . MANY THANKS." Allen replied, "NEVER IN DOUBT!"[27]

- On November 29, 2006, Schluep sent a message to Allen asking for a "LOW 1S HIGH 3S LIBOR PLS!!!" Allen replied "OK MATE, WILL DO MY BEST . . . SPEAK LATER." Schluep later thanked Allen, because the submissions were "BANG ON THE MONEY!" Allen replied, "NO WORRIES" and joked that he "HAD TO WORK MY WAY OUT OF AN AMBASS HEADLOCK TO GET THOSE IN!"[28]

- On December 1, 2006, Schluep sent a message to Allen stating, "APPRECIATE 3S GO DOWN, BUT A HIGH 3S TODAY WOULD BE NICE." Allen responded, "I AM FAST TURNING INTO YOUR LIBOR BITCH!!!!" Schluep replied, "JUST FRIENDLY ENCOURAGEMENT THAT'S ALL, APPRECIATE

---

[25] *Id.* at 13.

[26] During the roughly three-year time period, Allen received thirteen written LIBOR requests. Allen responded in writing to five of those requests.

[27] *Id.* at 8.

[28] *Id.* at 6; *see* JA 233–34 (Trial Tr. 403–04).

THE HELP." Allen replied, "NO WORRIES MATE,
GLAD TO HELP[.]"[29]

There were similar, if perhaps more explicit and thus arguably more
incriminating, exchanges between Yagami and Robson regarding the
setting of JPY LIBOR—for example:

- On September 21, 2007, Robson told Yagami that
market information supported a submission of 0.85
for the one-month JPY LIBOR. Yagami asked for a
higher rate, specifically 0.90. Robson agreed, even
though he would "probably get a few phone calls,"
telling Yagami that there were "bigger crooks in the
market than us guys!"[30]

- On March 19, 2008, Yagami told Robson "[w]e have
loads of 6mth fixings today" and—conveying a
request from another trader—asked Robson to submit
1.10 for the six-month yen LIBOR. Robson responded
that market information supported a 1.03 submission
for the six-month LIBOR but that he would submit
1.10 as asked, even though it would likely prompt "a
phone call." Robson added that it "will be quite
funny to see the reaction" to his submission at
Yagami's requested rate.[31]

---

[29] GSA 10.

[30] *Id.* at 18–19.

[31] *Id.* at 109–10.

Whether Allen and Conti did, in fact, accommodate trader requests by adjusting their LIBOR submissions was an issue that Defendants contested at trial. Although Allen and Conti claim they ignored the trader requests, the Government presented evidence at trial purporting to show that these trader requests were accommodated. For instance, on August 13, 2007, Schleup e-mailed Conti and said: GONNA NEED A FRICKIN HIGH 6 MTH FIX TOMORROW IF OK WITH U . . . 5.42?"[32] The next day, Schluep sent a reminder and Allen informed another trader that the six-month LIBOR submission would be 5.42 because "i think thats [sic] what [C]hristian [Schluep] needs."[33] The Rabobank submission for six-month USD LIBOR that day was 5.42.[34]

To be clear, Defendants did not argue at trial that it was *permissible* to accommodate such requests. Allen and Conti agreed with the Government that making submissions based on the interests of Rabobank's traders was not permitted.[35] And Defendants and the Government further agreed—putting aside whether, in the end, Allen and Conti honored or ignored trader requests—that the process for submitting LIBOR involved collecting "market information" in the morning, typically from brokers who would canvass the rates

---

[32] *Id.* at 15.

[33] *Id.* at 17.

[34] *Id.* at 47.

[35] *See* Trial Tr. 1277–78 ("Q. Would you have considered it impermissible at that time to take a trader's position into account? A. Yes."); *id.* at 1289; *id.* at 1303.

that might be on offer in the market. There was further agreement that, as "estimates,"[36] LIBOR submissions were necessarily imprecise even when there was decent market information, such that, at any given time, there existed a "range" of reasonable LIBOR submissions.[37] This imprecision was exacerbated during periods of illiquidity in the interbank market, such as the financial crisis in 2007–2008. In a September 26, 2008 phone call, for example, the BBA's LIBOR Manager, John Ewan, told Allen that LIBOR is "just a line in the sand. What's it based on? Nothing."[38] At the same time, however, the Government presented evidence that Defendants understood that it was improper to take Rabobank's traders interests into account in determining their submissions, and that their proper role was to give an honest estimate of Rabobank's borrowing costs.

Where Defendants and the Government parted ways on the facts was whether the traders' requests were honored. While Conti did not take the stand at trial, Allen testified that he never actually

---

[36] Gov't Br. 11; Defs.' Br. 13–14.

[37] *See* JA 225 (Trial Tr. 333–34).

[38] *Id.* at 507. The Government's witnesses, Robson and Stewart, echoed this assessment. Robson testified that he had viewed the LIBOR submission process as "nonsense" and as "a charade," and that he eventually "decided not to spend much time worrying about it." *Id.* at 249 (Trial Tr. 518). When Robson first met with prosecutors in July 2014, he "told them that [by 2007] LIBOR in general was absolute garbage." *Id.* at 251 (Trial Tr. 553). At the time, Stewart referred to LIBOR as a "made-up number," though at trial he clarified that an "[e]ducated guess would probably be more appropriate." *Id.* at 217 (Trial Tr. 274–75).

accommodated such requests.[39] On direct examination by the Government, by contrast, Robson—Rabobank's JPY LIBOR submitter—explained that LIBOR's lack of precision allowed him to accommodate trader requests without raising eyebrows:

> [Robson]. I would ask the broker where he felt the LIBORs would be. They would then give us—for example, three months they would give us a number of submissions or possible rates where the three months could be depending on credit rates and stuff like that. So there would be kind of a range of two or three numbers where LIBOR could possibly be.

> Q. Before I ask about trader positions, let's say no trader request was made. What would you do with that information?

> [Robson]. I would go straight down the middle as much as I could. So, for example, if the broker came on and said, three months I think I'm hearing might be 80, might be 85, might be 90, but probably 75, I would go down the middle.

> Q. Now, let's say you, in fact, had a trader request where a trader wanted you to submit a LIBOR to favor their position. What would you do?

> [Robson]. So given those circumstances, if one of the traders had contacted and said three months, if I needed a higher three months, I would have moved it higher at

---

[39] *See, e.g., id.* at 300–01 (Trial Tr. 1222, 1227).

his request. I would have moved it towards the 90 level
or set 90.

Q. Was that permissible?

[Robson]. No, it wasn't.[40]

Moreover, Robson proffered to the Government that Conti likewise
accommodated trading positions when making LIBOR submissions.[41]
And Robson was the sole source of trial and grand jury testimony
that Allen specifically directed and instructed others in this scheme.[42]

The scheme was established by May 2006 and continued
through early 2011; as noted previously, however, Allen and Conti
left Rabobank in 2008 and 2009, respectively.

---

[40] *Id.* at 225 (Trial Tr. 333–34).

[41] By contrast, Stewart acknowledged that Conti "was free to ignore [his]
preferences." *Id.* at 215 (Trial Tr. 266–67) ("Q. Generally, after you express
preferences like this there was no follow-up conversation, is that right? A. No, not
really. Q. It was ultimately up to [Conti] to decide what rate he would submit? A.
Yeah. Q. [Conti] was free to ignore your preferences? A. Yeah."). Yagami, a JPY
trader, did not testify about a single instance in which Conti was responsible for a
JPY LIBOR submission.

[42] *Id.* at 980 (Transcript of *Kastigar* Hearing ("*Kastigar* Hearing Tr."), at 253)
("Q. Isn't it a fact that there is not a single witness that told you that Mr. Allen
instructed them to accommodate trader requests, other than Paul Robson? [Agent
Weeks]. That's correct."). By contrast, Stewart agreed that Allen had never given
him a "directive to try to influence the LIBOR rate." *Id.* at 210 (Trial Tr. 192). And
Yagami never discussed the LIBOR submission process with Allen. *Id.* at 262
(Trial Tr. 703) ("Q. Sir, you have never spoken to Tony Allen about the LIBOR
submission process, have you? [Yagami]. No.").

## C. Investigation and Indictment

By 2013, the British and American authorities had commenced LIBOR-related investigations into Rabobank and other institutions. As part of their investigations, the U.K. FCA and the U.S. DOJ began conducting interviews.

The FCA's interviews were compulsory; they were conducted under a grant of direct (but not derivative) use immunity,[43] and a witness's failure to testify under such terms could result in imprisonment.[44] In order to avoid potential problems under *Kastigar*, the DOJ took care to conduct their interviews wholly independently of the FCA's interviews and their fruits. Specifically, the FCA agreed to procedures to maintain a "wall" between its investigation and the DOJ's investigation, including a "day one/day two" interview procedure in which the DOJ interviewed witnesses prior to the FCA. In accordance with that protocol, the FCA interviewed Robson (on January 17, 2013), Conti (on January 25, 2013), and Allen (on June 20 and 21, 2013), among others. Robson, in his compelled testimony to the FCA, denied any improper conduct at Rabobank.

---

[43] On the differences between direct and derivative use, see note 3, *ante*.

[44] There is no dispute that Defendants were compelled to testify. *See, e.g.*, Gov't Br. 25 (discussing "Robson's exposure to testimony by defendants that was compelled by regulatory authorities in the United Kingdom"); *id.* at 131, 132, 137, 138 (quoting with approval the District Court's reference to Allen's and Conti's FCA testimony as "the defendants' compelled testimony" or their "compelled statements").

In November 2013,[45] the FCA initiated an enforcement action against Robson and, following its normal procedure, disclosed to Robson the relevant evidence against him, including the compelled testimony of Allen and Conti. Robson's attorney instructed him to review the materials sent by the FCA in preparation for a meeting between Robson and his attorney. Robson "reviewed the materials over the course of two to three successive or nearly successive days sometime in or about November and/or December of 2013."[46] During this review, Robson underlined, annotated, and circled certain passages of both Allen's and Conti's compelled testimony.[47] Robson also took roughly five pages of handwritten notes. Before Robson had the chance to discuss this material with his attorney, however, the FCA stayed its regulatory proceeding in favor of a criminal prosecution of Robson by the DOJ. On instruction from his lawyer,

---

[45] The prior month, on October 29, 2013, the DOJ entered into a deferred prosecution agreement ("DPA") with Rabobank. *See United States v. Allen*, 160 F. Supp. 3d 684, 689 (S.D.N.Y. 2016). The essence of the DPA bargain is that in exchange for its cooperation, the Government refrains from prosecution. *See, e.g., United States v. HSBC Bank USA, N.A.*, --- F.3d ---, 2017 WL 2960618, at *2–3 (2d Cir. July 12, 2017). "Under a typical DPA with a corporate defendant, the defendant admits to a statement of facts, submits to the filing of criminal charges against it on the basis of those facts, and agrees to a forfeiture or fine and to institute remedial measures. In exchange, the government agrees to defer prosecution and to ultimately seek dismissal of all charges if the defendant complies with the DPA. If the government determines that the defendant has breached the DPA, however, the government may rip up the agreement and pursue the prosecution." *Id.* at *2.

[46] *Kastigar* Hearing Tr. 20.

[47] *See* JA 742–851.

Robson placed the FCA materials in a box, put them in his attic, and did not review them further.[48]

On April 28, 2014, a grand jury in the United States District Court for the Southern District of New York returned an indictment charging Robson (Rabobank's JPY submitter) and two JPY derivatives traders, Paul Thompson and Tetsuya Motomura, with, *inter alia*, wire fraud. The Government had not requested that the grand jury indict Conti or Allen.[49]

In mid-July 2014, the DOJ first interviewed Robson at a so-called proffer session.[50] On August 5, 2014, Robson signed a

---

[48] *Kastigar* Hearing Tr. 6–7; *see also id.* at 76–88.

[49] *Id.* at 227.

[50] One typically "participate[s] in a proffer session in the hopes of obtaining a cooperation agreement." *United States v. Oluwanisola*, 605 F.3d 124, 127 (2d Cir. 2010). Such proffer sessions are typically conducted pursuant to an agreement in which the government may use the interviewee's statements at the proffer session only as rebuttal evidence, and the defendant waives any objection to such use. *See United States v. Velez*, 354 F.3d 190, 196 (2d Cir. 2004) ("[A] defendant remains free to present evidence [at trial] inconsistent with his proffer statements, with the fair consequence that, if he does, the Government is then permitted to present the defendant's own words in rebuttal." (internal quotation marks and alterations omitted)); *see, e.g., Oluwanisola*, 605 F.3d 124 at 127–28 (discussing an agreement that the government would not use any statements except "as substantive evidence to rebut, directly or indirectly, any evidence offered or elicited, or factual assertions made, by or on behalf of [the interviewee] at any stage of a criminal prosecution"). There is no guarantee that proffers will give rise to a cooperation agreement. *See, e.g., id.* at 128 ("The government determined that Oluwanisola was not fully truthful regarding the scope of his involvement with the conspiracy and did not offer him a cooperation

cooperation agreement and shortly thereafter pleaded guilty. At Robson's plea hearing, the prosecutor informed the District Court that "there is . . . a chance that we would seek a superseding indictment in light of information that has come to light from our two cooperators"[51] and that there was "a distinct possibility" the new indictment would "involve[ ] other individuals."[52]

So it did. On October 16, 2014, the grand jury returned a superseding indictment charging two new individuals—Allen and Conti—with one count of conspiracy to commit wire fraud and bank fraud as well as several counts of wire fraud. It is not disputed that the Government's presentation of evidence to the grand jury that indicted Defendants relied on evidence that Robson had provided.[53] While Robson did not himself testify, the new information he gave was relayed to the grand jury through FBI Special Agent Jeffrey

---

agreement."). While the statements made by the would-be cooperator at a proffer session are granted "use immunity," they are not granted "derivative-use immunity." *See United States v. Christian*, 111 F. Supp. 3d 287, 305 (E.D.N.Y. 2015). That means that the statements can be used by the Government to develop further information that could be used against the defendant in the event that the case does go to trial. *See United States v. Ramos*, 685 F.3d 120, 127 (2d Cir. 2012) ("An individual who makes self-incriminating statements without claiming the [Fifth Amendment] privilege is deemed not to have been 'compelled' but to have spoken voluntarily.").

[51] Yagami had previously agreed to cooperate with the U.S. government and, on June 10, 2014, pleaded guilty to conspiracy charges.

[52] JA 903.

[53] *See Allen*, 160 F. Supp. 3d at 697; *see also Kastigar* Hearing Tr. 238–42.

Weeks, who did testify.[54] And Weeks's testimony to the grand jury on certain matters derived exclusively from Robson.[55] In particular, Robson was the only source for Weeks's testimony that Allen "instructed, specifically instructed, LIBOR submitters in London to consider the positions and the requests of Rabobank traders and adjust their submissions for LIBOR and various currencies based on the means of those traders,"[56] and that "Mr. Robson said that sitting near Mr. Conti he was aware that Mr. Conti set U.S. dollar LIBOR rates in which he considered his own positions as appropriate reason or justification for setting the rates."[57]

## D. Trial and Post-Trial *Kastigar* Hearing

Allen and Conti each waived his right to contest extradition from the U.K. and appeared voluntarily. Prior to trial, they moved under *Kastigar* to dismiss the indictment or suppress Robson's testimony, but the District Court opted to address any *Kastigar* issues after trial "in accordance with prevailing practice in the Second

---

[54] *Kastigar* Hearing Tr. 238–42.

[55] *Id*.

[56] JA 907.

[57] *Id.* at 910.

Circuit."[58] Trial thus commenced on October 14, 2015, and lasted approximately three weeks.

At trial, the Government's case-in-chief consisted of documentary evidence (*e.g.*, e-mails, "instant chats," and phone calls involving Allen, Conti, or their alleged co-conspirators) and testimony from eight witnesses, including three cooperators: Stewart, Yagami, and Robson.[59] In addition to cross-examination of the Government's witnesses, Allen and Conti each offered an expert witness,[60] and Allen testified in his own defense. On November 5, 2015, the jury returned a verdict of guilty on all counts (nineteen counts, in total, for Allen and nine for Conti).

Defendants' *Kastigar* challenge remained pending, however.[61] Beginning on December 16, 2015, the District Court held a two-day

---

[58] JA 921. We offer no opinion here regarding the merits of such a practice or whether such a practice prevails. This decision by a district court is an exercise of its discretion.

[59] The Government also called an expert who explained LIBOR and its connection to derivative transactions, *see* Trial Tr. 115–61; an FBI accountant, *see id.* at 843–960; and three "counterparty" witnesses (*i.e.*, individuals who were at one time employed by an entity that had entered into a derivatives transaction with Rabobank during the relevant time period), *see id.* at 494–510, 822–43.

[60] Conti's expert analyzed the effect of Rabobank's LIBOR submissions on the trading books of certain Rabobank derivatives traders, and Allen's expert compared Rabobank's LIBOR submissions with the contemporaneous borrowing conditions in the London interbank market. *See* Trial Tr. 981–1029, 1034–1156.

[61] Defendants also filed post-trial motions, pursuant to Federal Rules of Criminal Procedure 29(c) and 33(a), for acquittal or for a new trial, respectively,

hearing on *Kastigar* issues at which Robson and Agent Weeks testified. During this hearing it came to light that Robson had not only read but also marked up, and drafted notes regarding, Defendants' compelled testimony, and that material parts of Agent Weeks's testimony to the grand jury derived solely from Robson.[62]

Following subsequent *Kastigar* briefing from the parties, the District Court denied Defendants' motion by written opinion. The District Court held that, assuming *Kastigar* applies to testimony compelled by a foreign power, there had been no *Kastigar* violation.[63] In its ruling, the District Court explicitly declined to apply case law of the United States Court of Appeals for the District of Columbia Circuit ("D.C. Circuit") on the legal standards applicable when a

---

which the District Court denied. *See United States v. Allen*, 160 F. Supp. 3d 698 (S.D.N.Y. 2016).

[62] While Robson's marked-up copies of Defendants' compelled testimony were produced and are in the record, Robson asserted attorney-client privilege over his handwritten notes. *See Kastigar* Hearing Tr. 82–88. Defendants' motion to compel production of those notes was denied. *See United States v. Robson et al.*, 1:14-cr-00272-JSR (S.D.N.Y.) ("District Court Docket"), Docket No. 206. The annotated transcripts suggest areas in which Robson's testimony was affected by his reading. For example, during his FCA interview, Robson said he "really [did not] know" the particulars of how the bonuses were structured because Allen was the one who "made the decisions" about that. JA 727–28. In reviewing Allen's compelled testimony, he circled sections concerning bonus structures. *Id.* at 744–45. When he testified at the Defendants' trial, he testified about the "bonus pool" in accord with how Allen had described the system in his compelled testimony to the FCA. *Id.* at 234 (Trial Tr. 407).

[63] *See Allen*, 160 F. Supp. 3d at 690 n.8.

government witness has previously reviewed a defendant's compelled testimony.[64] Looking to Second Circuit precedent, the District Court concluded that Robson's review of Defendants' compelled testimony did not taint the evidence he later provided, because the Government had shown an independent source for such evidence, "to wit, [Robson's] personal experience and observations."[65]

## II. DISCUSSION

Although Defendants raise a number of substantial issues on appeal, we reach only their *Kastigar* challenge. Defendants contend that the Government violated their Fifth Amendment rights when it used—in the form of tainted evidence from Robson—their own compelled testimony against them. Specifically, they argue that the District Court applied the wrong legal standard in assessing whether the evidence provided by Robson was tainted by his review of their compelled testimony. They also assert that, properly assessed, the Government cannot meet its burden of showing that Robson's evidence was *not* tainted, and that the prosecution's use of tainted evidence from Robson was not harmless beyond a reasonable doubt.

---

[64] *Id.* at 691 n.9 ("While the Court is of the view that the Government would likely meet its *Kastigar* burden under the standards of the D.C. Circuit, especially in light of *U.S. v. Slough,* 641 F.3d 544 (D.C. Cir. 2011), the Court sees no reason to discuss this matter further, as the Court is obligated to apply the standards set by the Second Circuit.").

[65] *Allen*, 160 F. Supp. 3d at 697.

The Government takes a different view. It submits, as a threshold argument, that testimony compelled by a foreign sovereign and used in a U.S. criminal prosecution "do[es] not implicate the Fifth Amendment."[66] In the event that the Fifth Amendment does apply, the Government argues that the District Court employed the correct legal standard to determine, properly, that evidence provided by Robson was untainted. In the alternative, the Government argues that any use of tainted evidence was harmless.

For the reasons that follow, we conclude that Defendants prevail on each point.

## A. Applicability of the Fifth Amendment

In arguing that Fifth Amendment protections apply in this case, Defendants rely on our cases pertaining to foreign and cross-border law enforcement, which have consistently held that "in order to be admitted in our courts, inculpatory statements obtained overseas by foreign officials must have been made voluntarily."[67] In

---

[66] Gov't Br. 118.

[67] *In re Terrorist Bombings of U.S. Embassies in E. Africa*, 552 F.3d 177, 200 (2d Cir. 2008); *see id.* at 208 (noting that "statements obtained under . . . circumstances" where suspects were "forced to speak" to the agents of a foreign state "could not be admitted in a U.S. trial if the situation indicated that the statements were made involuntarily"); *United States v. Yousef*, 327 F.3d 56, 124, 145 (2d Cir. 2003) ("[T]he law is settled that statements taken by foreign police in the absence of *Miranda* warnings are admissible *if voluntary*." (emphasis added)); *United States v. Welch*, 455 F.2d 211, 213 (2d Cir. 1972) ("Whenever a court is asked to rule upon the admissibility of a statement made to a foreign police officer, the court must consider the totality of the circumstances to determine whether the

so holding, we joined our sister circuits that have considered the issue.[68] Defendants contend that these cases are sufficient to resolve the present dispute regarding whether compulsion by a foreign power implicates the Fifth Amendment. We agree.

### 1. The Requirement of Voluntariness

The Supreme Court has "recognized two constitutional bases for the requirement that a confession be voluntary to be admitted into evidence: the Fifth Amendment right against self-incrimination and the Due Process Clause of the Fourteenth Amendment."[69] Of

---

statement was voluntary. If the court finds the statement involuntary, it must exclude this because of its inherent unreliability, as in *Bram v. United States*, 168 U.S. 532 (18[9]7).").

[68] *See United States v. Abu Ali*, 528 F.3d 210, 232 (4th Cir. 2008) ("When *Miranda* warnings are unnecessary, as in the case of an interrogation by foreign officials, we assess the voluntariness of a defendant's statements by asking whether the confession is the product of an essentially free and unconstrained choice by its maker. *If it is*, it may be used against him." (citation and internal quotation marks omitted) (emphasis added)); *Brulay v. United States*, 383 F.2d 345, 349 n.5 (9th Cir. 1967) ("[I]f the statement is not voluntarily given, whether given to a United States or foreign officer[ ]—the defendant has been compelled to be a witness against himself when the statement is admitted."); *United States v. Mundt*, 508 F.2d 904, 906 (10th Cir. 1974) (analyzing admissibility in terms of "voluntariness"); *Kilday v. United States*, 481 F.2d 655, 656 (5th Cir. 1973) (citing *Bram*). Nevertheless, our Court, along with the Fifth Circuit—each of which has explicitly held a voluntariness test applies—could be read to have elsewhere suggested that a "shocks the conscience" standard applies. That is discussed below, as is the Ninth Circuit's dictum in *United States v. Wolf*, 813 F.2d 970, 972 n.3 (9th Cir. 1987).

[69] *Dickerson v. United States*, 530 U.S. 428, 433 (2000).

these two potential "constitutional bases," our precedents applying such a requirement to confessions procured by foreign law enforcement have been grounded in the Self-Incrimination Clause and *Bram v. United States*, 168 U.S. 532 (1897).[70] This constitutional footing is significant.

The freedom from self-incrimination guaranteed by the Fifth Amendment is a personal trial right of the accused in any American "criminal case."[71] To that end, "a violation of the Fifth Amendment's right against self-incrimination occurs *only* when a compelled statement is offered at trial against the defendant."[72] Whatever may

---

[70] In *Bram*, the Supreme Court reversed a conviction that stemmed from a confession procured abroad by a Canadian official, and explained that "[i]n criminal trials, in the courts of the United States, wherever a question arises whether a confession is incompetent because not voluntary, the issue is controlled by that portion of the fifth amendment to the constitution of the United States commanding that no person 'shall be compelled in any criminal case to be a witness against himself.'" 168 U.S. 532, 542 (1897).

[71] U.S. Const. amend. V.; *see United States v. Patane*, 542 U.S. 630, 637 (2004) (plurality opinion) ("[T]he core protection afforded by the Self–Incrimination Clause is a prohibition on compelling a criminal defendant to testify against himself *at trial*." (emphasis added)). One commentator has observed that "[p]rovisions in the Bill of Rights that have been interpreted as 'trial rights' protect all defendants, regardless of alienage, during their trials in the United States," and noted that "[t]his point is so widely accepted and practiced that courts rarely feel the need to state it." Mark A. Godsey, *The New Frontier of Constitutional Confession Law—The International Arena: Exploring the Admissibility of Confessions Taken by U.S. Investigators from Non-Americans Abroad*, 91 Geo. L.J. 851, 873–74 & n.126 (2003).

[72] *In re Terrorist Bombings*, 552 F.3d at 199 (emphasis added).

occur prior to trial, the right not to testify against oneself *at trial* is "absolute."[73] Even a negative comment by a judge or prosecutor on a defendant's silence violates that defendant's constitutional right.[74]

These features of the Self-Incrimination Clause distinguish it from the exclusionary rules attached to unreasonable searches and seizures and to otherwise-valid confessions given without *Miranda* warnings. As the Supreme Court has explained, the Fourth Amendment's exclusionary rule "is a judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect, rather than a personal constitutional right of the party aggrieved."[75] So too with the exclusionary rule buttressing *Miranda* warnings, which "were primarily designed to prevent United States police officers from relying upon improper interrogation techniques."[76] Such exclusionary rules "have little, if any, deterrent effect upon *foreign* police officers."[77] Accordingly, we

---

[73] *Salinas v. Texas*, 133 S. Ct. 2174, 2179 (2013) (internal quotation marks omitted).

[74] *See Griffin v. California*, 380 U.S. 609, 613–15 (1965).

[75] *United States v. Calandra*, 414 U.S. 338, 348 (1974); *see also id.* at 347 ("[T]he rule's prime purpose is to deter future unlawful police conduct.").

[76] *Welch*, 455 F.2d at 213.

[77] *Id.* (emphasis added).

do not apply the strictures of our Fourth Amendment and *Miranda* jurisprudence to foreign authorities.[78]

The Supreme Court has taken care, however, to distinguish extraterritorial applications of the Fourth Amendment from those of the Self-Incrimination Clause of the Fifth Amendment.[79] The Fourth Amendment "prohibits unreasonable searches and seizures *whether or not* the evidence is sought to be used in a criminal trial," such that "a violation of the Amendment is fully accomplished at the time of an unreasonable governmental intrusion."[80] By contrast, in the case of the Fifth Amendment's Self-Incrimination Clause, "a constitutional violation occurs *only at trial*," even if "conduct by law enforcement officials prior to trial may ultimately impair that right."[81] In light of that distinction, "it naturally follows that, regardless of the origin—

---

[78] *See United States v. Verdugo-Urquidez*, 494 U.S. 259, 264 (1990) (Fourth Amendment); *In re Terrorist Bombings*, 552 F.3d at 202–03 (*Miranda* (citing cases)).

[79] *See Verdugo-Urquidez*, 494 U.S. at 264.

[80] *Id.* (internal quotation marks omitted) (emphasis added).

[81] *Id.* (emphasis added); *see also Chavez v. Martinez*, 538 U.S. 760, 767 (2003) (plurality opinion) ("[I]t is not until [a compelled statement's] *use* in a criminal case that a violation of the Self-Incrimination Clause occurs." (emphasis added)); *Deshawn E. ex rel. Charlotte E. v. Safir*, 156 F.3d 340, 346 (2d Cir. 1998) ("Even if it can be shown that a statement was obtained by coercion, there can be no Fifth Amendment violation until that statement is introduced against the defendant in a criminal proceeding.").

37

*i.e.*, domestic or foreign—of a statement, it cannot be admitted at trial in the United States if the statement was 'compelled.'"[82]

Thus, the Self-Incrimination Clause's prohibition of the use of compelled testimony arises from the text of the Constitution itself, and directly addresses what happens in American courtrooms, in contrast to the exclusionary rules that are crafted as remedies to deter unconstitutional actions by officers in the field.[83] Its protections therefore apply in American courtrooms even when the defendant's testimony was compelled by foreign officials.

Moreover, for much the same reasons, the Clause applies in American courtrooms even where, as here, the defendant's testimony was compelled by foreign officials *lawfully*—that is, pursuant to foreign legal process—in a manner that does not shock the conscience or violate fundamental fairness. The Clause flatly prohibits the use of compelled testimony and is not based on any matter of misconduct or illegality on the part of the agency applying the compulsion.

In short, compelled testimony cannot be used to secure a conviction in an American court. This is so even when the testimony was compelled by a foreign government in full accordance with its own law.

---

[82] *In re Terrorist Bombings*, 552 F.3d at 199 (quoting U.S. Const. amend. V).

[83] *See United States v. Kurzer*, 534 F.2d 511, 516 (2d Cir. 1976) ("[T]he principal function of the Fourth Amendment exclusionary rule is to deter unlawful police conduct . . . . The Fifth Amendment, in contrast, is by its terms an exclusionary rule . . . .").

It is true that, with respect to statements taken abroad by foreign agents, we have often referred to the Fifth Amendment's prohibition against illicit use as encompassing "involuntary," rather than "compelled," statements. But this semantic distinction does not bear significant, much less dispositive, weight.[84] Accordingly, we agree with Defendants that our cases applying a voluntariness test in

---

[84] As a general matter, courts' descriptions of statements as "compelled" (invoking the text of the Self-Incrimination Clause) and/or "involuntary" (invoking, arguably, the Due Process Clause) are often used interchangeably and the words often treated synonymously. *See, e.g., Berkemer v. McCarty*, 468 U.S. 420, 433 n.20 (1984) ("We do not suggest that compliance with *Miranda* conclusively establishes the *voluntariness* of a subsequent confession. But cases in which a defendant can make a colorable argument that a self-incriminating statement was "*compelled*" despite the fact that the law enforcement authorities adhered to the dictates of Miranda are rare." (emphases added)). Although the Supreme Court has clarified that the standard for voluntariness *Bram* offered is not correct, *see Arizona v. Fulminante*, 499 U.S. 279, 285 (1991), the `Court has never overruled *Bram*'s use of a voluntariness test grounded in the Self-Incrimination Clause. Relying on *Bram*, the Supreme Court proclaimed—albeit, in 1924, before *Brown v. Mississippi*, 297 U.S. 278 (1936)—that "a confession obtained by compulsion must be excluded whatever may have been the character of the compulsion, and whether the compulsion was applied in a judicial proceeding or otherwise." *Ziang Sung Wan v. United States*, 266 U.S. 1, 14–15 (1924) (Brandeis, J.). In *Dickerson v. United States*, the Supreme Court acknowledged that it has "recognized two constitutional bases for the requirement that a confession be voluntary." 530 U.S. at 433. And *Dickerson* declined to abandon *Miranda* as a Self-Incrimination-Clause doctrine applicable to police questioning while simultaneously explaining that the Court has "never abandoned [its] due process jurisprudence, and thus continue[s] to exclude confessions that were obtained involuntarily." *Id.* at 433-34. More recently, in *Chavez v. Martinez*, the Supreme Court appeared to assume that both the Self-Incrimination Clause and the Due Process Clause applied to the coercive police questioning at issue in that case. 538 U.S. at 773.

the context of physical coercion extend to the present context of lawful compulsion.

### 2. The Government's Counterarguments

The Government's three principal counterarguments are unpersuasive. The Government first questions the validity of our precedents on the basis of *Colorado v. Connelly*[85] and subsequent cases involving foreign and cross-border law enforcement that have relied on *Connelly*. That case concerned a mentally ill defendant who sought out police and confessed to a murder. Despite the absence of any law enforcement misconduct, the Colorado Supreme Court affirmed the suppression from evidence of Connelly's statements because they were "'involuntary'"—that is, not "'the product of a rational intellect and a free will.'"[86] In reversing, the Supreme Court held "that coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment."[87]

We are not persuaded that *Connelly* requires reconsideration of our precedents. For one thing, *Connelly* is explicitly a Due Process Clause case, whereas the precedents we rely on today were grounded in the Self-Incrimination Clause—which, by its terms, is an exclusionary rule grounded in the very text of the Constitution and

---

[85] 479 U.S. 157 (1986).

[86] *Id.* at 162 (quoting 702 P.2d 722, 728 (Colo. 1985)).

[87] *Id.* at 167.

designed to protect a defendant at trial.[88] For another, *Connelly* did not concern cross-border investigations or foreign government conduct (and accordingly, the majority did not even mention *Bram*).[89] And the final reason we do not believe *Connelly* renders our precedents invalid stems from an important acknowledgment the Government makes on appeal.

Specifically, the Government submits—in a footnote pregnant with meaning—that "there may be some other constitutional doctrine apart from the Fifth Amendment right against self-incrimination that

---

[88] For that same reason, we believe that the Ninth Circuit's dictum in *United States v. Wolf*, 813 F.2d 970 (9th Cir. 1987)—proclaimed without the benefit of "argu[ment] or brief[ing]"—questioning "[t]he continuing vitality of [its prior] holding in [*Brulay v. United States*]" in light of *Connelly* was mistaken. *Id.* at 973 n.3. *Brulay*'s holding, like those of our cases, was grounded in the Self-Incrimination Clause. *See Brulay*, 383 F.2d at 349 n.5.

[89] In that regard, the Government places too much weight on our decision in *United States v. Salameh*, 152 F.3d 88 (2d Cir. 1998), a cross-border confession case that relied on *Connelly*. In *Salameh*, we rejected the defendant's challenge to the admission at trial of two comments he made after being placed in U.S. custody, "informed that he was under arrest," and "advised . . . of his constitutional rights." *Id.* at 117. The defendant asserted that his two comments "were given involuntarily and without a valid *Miranda* waiver because they followed ten days of incarceration and torture in Egypt." We explained, however, that these concerns would only be relevant if the defendant was being coerced when the two comments were elicited by U.S. officials. *Id.* And, indeed, the defendant did "not contend that federal agents either mentally or physically coerced his remarks during that interrogation." *Id.* The Government misreads *Salameh* as a foreign coercion case when, in fact, our holding turned on the absence of any "coercive activity of the State" during the *relevant* interrogation. *Connelly*, 479 U.S. at 165. Our reading of *Salameh* is confirmed by the fact that the decision ignored *Bram* and our own binding precedent of *Welch*.

would require exclusion of a confession coerced by foreign officials, such as a due process violation based on conduct that 'shocks the judicial conscience.'"[90] That could only be so, however, if the Due Process Clause applied in some degree to the conduct of foreign officials—the very proposition that the Government otherwise contends *Connelly* rejected. By dangling a "shocks the conscience" test in this footnote, the Government implies that it takes issue not with *whether* confessions procured by foreign officials can be excluded from American trials based on our Constitution, but with the *standard* our courts should apply in evaluating admissibility.

---

[90] Gov't Br. 122 n.22 (quoting *Yousef*, 327 F.3d at 146). In *Yousef*, which the Government quotes, we explained, first, "that statements taken by foreign police in the absence of *Miranda* warnings are admissible *if voluntary*." 327 F.3d at 145 (emphasis added). We then characterized the "shocks the conscience" test as an exception to the rule of admitting voluntary confessions. The import of this passage in *Yousef* is thus that even voluntary statements resulting from foreign government conduct that shocks the judicial conscience—however unlikely it may be that conscience-shocking circumstances would produce a "voluntary" confession—will be rendered inadmissible. Admittedly, the far-fetched nature of this scenario did not help clarify the confusion created by the "shocks the conscience" test sometimes lingering in our Fifth Amendment jurisprudence. *See United States v. Karake*, 443 F. Supp. 2d 8, 53 n.74 (D.D.C. 2006) (explaining that "the Second Circuit case most often cited in support of the 'shock the conscience' test [*United States v. Nagelberg*, 434 F.2d 585, 587 n.1 (2d Cir. 1970)] in fact . . . relied solely on *Brulay*, which . . . applies a straightforward voluntariness test in determining the admissibility of statements obtained by foreign officials"). As explained by the *Karake* Court, the "shocks the conscience" test has generally been developed in the search and seizure context. *See id.* Our discussion makes clear that self-incrimination is different.

The Government's second counterargument extends from the premise that foreign governments are on the same footing as private employers when it comes to compelled testimony. In particular, the Government points to the fact that *private* employers may question an employee under threat of discharge without Fifth Amendment consequence,[91] whereas in certain circumstances courts have found that the same threat by an American *government* employer rendered an employee's testimony "compelled" and excludable under the Fifth Amendment.[92] "For purposes of the Fifth Amendment," the Government submits, "the British government is on the same footing as a private entity such as the New York Stock Exchange."[93] We disagree.

Only sovereign power exposes "'those suspected of crime to the cruel trilemma of self-accusation, perjury or contempt.'"[94] Only the U.K. *government* could have immunized Defendants (neither of whom were employed by Rabobank at the time), compelling them to testify or go to jail. To the extent there may be an "official/private

---

[91] Gov't Br. 123 (citing *United States v. Solomon*, 509 F.2d 863, 867-71 (2d Cir. 1975)).

[92] *Id.* (citing *Garrity v. New Jersey*, 385 U.S. 493, 496 (1967)).

[93] *Id.*

[94] *Murphy v. Waterfront Comm'n of N.Y. Harbor*, 378 U.S. 52, 55 (1964); *see also In re Martin-Trigona*, 732 F.2d 170, 174 (2d Cir. 1984) ("The primary purpose of the self-incrimination privilege is to avoid confronting the witness with the 'cruel trilemma' of self-accusation, perjury or contempt.").

action spectrum,"[95] when foreign authorities compel testimony they are acting in the quintessence of their sovereign authority, not in their capacity as a mere employer, and thus their compulsion is cognizable by the Fifth Amendment (when testimony so compelled is used in a U.S. trial). The Supreme Court's decision in *Garrity v. New Jersey*—like *Connelly*—does not foreclose constitutional review of a foreign sovereign's threats to deprive an individual of his liberty. If our Constitution is to prohibit the use in American trials of confessions coerced or compelled by a foreign sovereign under *some* circumstances, as the Government suggests "may be" the case, it cannot be the case that compulsion by a foreign authority *ipso facto* ends the constitutional inquiry.[96]

---

[95] Geoffrey S. Corn & Kevin Cieply, *The Admissibility of Confessions Compelled by Foreign Coercion: A Compelling Question of Values in an Era of Increasing International Criminal Cooperation*, 42 Pepp. L. Rev. 467, 476 (2015).

[96] One pair of commentators assessed *Connelly*'s import as follows:

Setting reasonable boundaries, so that private actors cannot intentionally or unintentionally destroy criminal investigations or impede on the government's right to protect its citizens against dangerous individuals, makes sense.

Given that premise, it certainly would not be unreasonable to conclude that the link between a coercive act and some sort of state action is stronger when foreign government officials act than when private action is solely responsible for a coercive act. And certainly, allowing admission of foreign coerced evidence is much more offensive to basic notions of fairness in the pursuit of justice than when pure private action is responsible.

*Id.* at 481 (footnote omitted).

Finally, the Government's third counterargument is that testimony is only "compelled" for purposes of the Self-Incrimination Clause if the compelling sovereign is bound by the Fifth Amendment. Here, too, we disagree. The Government's argument relies on the so-called "same-sovereign" principle, under which Fifth Amendment protections apply only if the same sovereign (or, at least, a Fifth-Amendment-bound sovereign) both compelled and used testimony.[97] This "same-sovereign" principle has never been fully abandoned; it still applies, for example, where the prosecuting sovereign is not bound by the Fifth Amendment (*i.e.*, where the prosecuting authority is a foreign government).[98] But where, as here,

---

[97] In particular, its argument relies on cases decided prior to the application of the Fifth Amendment to the States in *Malloy v. Hogan*, 378 U.S. 1 (1964), and the Supreme Court's decision in *Murphy v. Waterfront Comm'n of N.Y. Harbor*, 378 U.S. 52 (1964), that immediately followed *Malloy*. In *United States v. Murdock*, 284 U.S. 141 (1931), the Supreme Court held that the federal government could compel a witness to give testimony that might incriminate him under state law. Complementing *Murdock*, the Court held in *Knapp v. Schweitzer*, 357 U.S. 371 (1958), that a State could compel a witness to give testimony that might incriminate him under federal law. The decision most relevant here came between *Murdock* and *Knapp*, in *Feldman v. United States*, 322 U.S. 487 (1944). In *Feldman*, the Supreme Court held that a statement compelled under a grant of immunity by an American state (then not bound by the Fifth Amendment) could be used in a federal criminal case.

[98] In *United States v. Balsys*, 524 U.S. 666 (1998), the Supreme Court relied on *Murdock* in holding that individuals being questioned by the U.S. government may not invoke the Fifth Amendment privilege based on fear of foreign prosecution. *Balsys* is notable because the Supreme Court had overruled *Murdock* (as well as *Knapp* and *Feldman*) in its 1964 decision in *Murphy*. But the *Balsys* Court understood *Murphy* as having overruled *Murdock* not because the "same-sovereign" principle was inherently wrong in that context, but rather because the

the prosecuting sovereign *is* bound by the Fifth Amendment, the "same-sovereign" principle no longer has force. As already explained, it is now clear that the Fifth Amendment is a personal *trial* right—one violated only at the time of "use" rather than at the time of "compulsion."[99] Accordingly, the Government's reliance on the

---

Court had just extended the Fifth Amendment to bind the states in *Malloy*. "[I]t would therefore have been intolerable," the *Balsys* Court explained, "to allow a prosecutor in one or the other jurisdiction to eliminate the privilege by offering immunity less complete than the privilege's dual jurisdictional reach." *Id.* at 682.

[99] In overruling *Feldman* (and its counterparts), the *Murphy* Court expressly stated that its "decision today in *Malloy v. Hogan* . . . necessitate[d] a reconsideration of" its precedents. 378 U.S. at 57. In an accompanying footnote, however, the majority in *Murphy* suggested that it had been reluctant to cure the "whipsaw" problem because of the lack of clarity regarding when a Fifth Amendment violation occurs. *See id.* 57 n.6 ("In every 'whipsaw' case, either the 'compelling' government or the 'using' government is a State, and, until today, the States were not deemed fully bound by the privilege against self-incrimination. Now that both governments are fully bound by the privilege, the conceptual difficulty of pinpointing the alleged violation of the privilege on 'compulsion' or 'use' need no longer concern us.").

The concurring opinion in *Murphy* of Justice Harlan (who simultaneously dissented in *Malloy*) is instructive. Justice Harlan argued that the exercise of the Court's "'supervisory power' over the administration of justice in federal courts," rather than the Fifth Amendment itself, was a proper basis for the exclusion from a federal criminal trial of testimony compelled by state agents. *Id.* at 80-81 (Harlan, J., concurring) (relying on *Elkins v. United States*, 364 U.S. 206 (1960)). He explained in part that "[i]ncreasing interaction between the State and Federal Governments speaks strongly against permitting federal officials to make prosecutorial use of testimony which a State has compelled when that same testimony could not constitutionally have been compelled by the Federal Government and then used against the witness." *Id.* at 91. Justice Harlan's perspective is entirely consistent with the Supreme Court's subsequent decision in *Balsys* and accords with its subsequent case law emphasizing that the core of the

"same-sovereign" principle in the circumstances of this case is unavailing.[100]

### 3. The Consequences of Our Holding

The Government also asserts that a prohibition on its use in U.S. courts of testimony compelled by a foreign authority "could seriously hamper the prosecution of criminal conduct that crosses international borders."[101] In particular, the Government submits:

> A foreign government could inadvertently scuttle prosecutions in the U.S. by compelling testimony and

---

Fifth Amendment is a trial right violated only when compelled testimony is *used* in an American tribunal. We believe that Justice Harlan's views apply with equivalent force to the current case and the interaction between the U.S. and the U.K. authorities, and thus conclude that the application of the supervisory power of the federal courts over the administration of criminal justice would likewise compel the outcome here: the exclusion of Defendant's compelled statements from use against them at trial.

[100] To be clear, we do not hold or suggest that the Clause applies where the prosecuting authority is not bound by the Fifth Amendment (*i.e.*, where the prosecuting authority is a foreign government). That is, we do not question the rule in *Balsys* and *Murdock*.

Nor, of course, do we hold or suggest that the Defendants in this case had a right under the U.S. Constitution not to testify in England before the U.K. Financial Conduct Authority out of a concern with U.S. prosecution. That is, we do not question the rule in *Knapp*.

Rather, we merely conclude that testimony compelled by the U.K. authorities may not be *used* in a U.S. criminal trial.

[101] Gov't Br. 123.

then making the testimony available to potential witnesses or the public. Worse yet, a hostile government bent on frustrating prosecution of a defendant would have to do no more than compel [that defendant[102]] to testify and then publicize the substance of that testimony, unilaterally putting the United States to its heavy *Kastigar* burden.[103]

The Government's first concern—that foreign powers could inadvertently or negligently obstruct federal prosecutions—fails to account for the fact that this risk already exists within our own constitutional structure. In our system—composed of "State and National Governments,"[104] with the latter government further divided into separate co-equal branches—the DOJ does not control the granting or handling of witness immunity by the States or by the U.S. Congress.[105] Similarly, and "[f]or better or for worse, we live in a world of nation-states in which our Government must be able to 'function effectively in the company of sovereign nations.'"[106]

---

[102] For clarity, we have taken the liberty of emending the Government's original use of "a witness" to "that defendant," because self-incrimination, by definition, is only a concern when *the defendant* was the witness.

[103] *Id.* at 123.

[104] *Younger v. Harris*, 401 U.S. 37, 44 (1971).

[105] *See United States v. North*, 920 F.2d 940, 942 (D.C. Cir. 1990) ("[W]itnesses' exposure to immunized testimony can taint their trial testimony irrespective of the prosecution's role in the exposure."); *see also* 18 U.S.C. § 6005.

[106] *Verdugo-Urquidez*, 494 U.S. at 275 (quoting *Perez v. Brownell,* 356 U.S. 44, 57 (1958)).

We are confident the Government is able to do so. Indeed, in a March 2016 address that specifically discussed the immunity issue in this case, Leslie Caldwell, then-Assistant Attorney General for the Criminal Division, observed that

> as we and our [foreign] counterparts work together more frequently and better understand our respective systems, we are having . . . conversations [about double jeopardy and Fifth Amendment protections] earlier, so that individuals are much less likely to be caught in the middle of last minute turf battles over where and by whom a prosecution should be brought.[107]

In the present case, the Government was plainly aware from the outset—well before the FCA transmitted the Defendants' compelled testimony to Robson—of the need for close coordination of its efforts with those of the U.K. authorities. The practical outcome of our holding today is that the risk of error in coordination falls on the U.S. Government (should it seek to prosecute foreign individuals), rather than on the subjects and targets of cross-border investigations.

As to the Government's concerns that a hostile foreign government might hypothetically endeavor to sabotage U.S. prosecutions by immunizing a suspect and publicizing his or her

---

[107] Leslie R. Caldwell, Remarks at American Bar Association's 30th Annual National Institute on White Collar Crime (Mar. 4, 2016), https://www.justice.gov/opa/speech/assistant-attorney-general-leslie-r-caldwell-speaks-american-bar-association-s-30th.

testimony—that, of course, is not this case.[108] *This* case raises no questions regarding the legitimacy or regularity of the procedures employed by the U.K. government or the U.K. government's investigation more generally. We thus need only say here that should U.S. prosecutors or judges face the situation suggested by the Government, our holding today would not necessarily prevent prosecution in the United States. That is true not only if the U.S. prosecution navigated any resulting *Kastigar* issues by meeting its burden or by not using exposed witnesses. It is true for another reason as well. Specifically, should the circumstances in a particular case indicate that a foreign defendant had faced no real threat of sanctions by his foreign government for not testifying, then that defendant's testimony might well not be considered involuntary.[109] In short, the situation hypothesized by the Government is not before

---

[108] Hostile foreign governments could, of course, simply refuse to extradite a suspect to prevent his prosecution in the U.S., rather than attempt the elaborate means of sabotage suggested here. *See, e.g.*, *In re Terrorist Bombings*, 552 F.3d at 208 ("[I]t is only through the cooperation of local authorities that U.S. agents obtain access to foreign detainees.").

[109] *See Hoffa v. United States*, 385 U.S. 293, 304 (1966) ("[A] necessary element of compulsory self-incrimination is some kind of compulsion."). In assessing whether the testimony in such a case was compelled by an actual threat, it would be relevant to consider whether the underlying investigation appeared to be bona fide; a sham investigation concocted to bestow immunity on "suspects" in exchange for their "compelled" testimony is unlikely to have produced testimony that was *actually* compelled, and thus *actually* involuntary—*i.e.*, backstopped by the credible threat of imprisonment. The circumstances of the foreign government's "publiciz[ing]," Gov't Br. 123, the defendant's supposedly compelled testimony would obviously be an important factor in evaluating a purportedly bona fide investigation.

us today, and our resolution of this case on the facts that are before us leaves open the issue of foreign efforts to sabotage a U.S. prosecution.

On the other hand, the Government nowhere responds to the troubling consequences of accepting its argument. As conceded at oral argument, the Government's rule would remove any bar to introducing compelled testimony directly in U.S. prosecutions similar to this one—as in, "Your honor, we offer Government Exhibit 1, the defendant's compelled testimony."[110] To be sure, the Government did not introduce Defendants' compelled testimony directly and appears to have generally sought in good faith to respect the principles underlying the Fifth Amendment. But it is well

---

[110] See the following exchange at oral argument before us:

MR. PELLETTIERI: . . . [W]e don't think we had to meet our burden under *Kastigar*. We only did it out of an abundance of caution because there was no compulsion. There was no compulsion by a sovereign bound by the Fifth Amendment.

JUDGE LYNCH: Well, if that's true, then it would have been OK, would it not, for you to introduce the transcript of Conti's [or Allen's] testimony at this trial. You didn't do that.

MR. PELLETTIERI: Under the Fifth Amendment. But we were being cautious, your Honor.

Oral Arg. Tr. 55–56. According to the Government's brief, "there may be some other constitutional doctrine apart from the Fifth Amendment right against self-incrimination that would require exclusion of a confession coerced by foreign officials, such as a due process violation based on conduct that 'shocks the judicial conscience,'" but it submits that "no such doctrine has been—or could be—claimed to apply in this case." Gov't Br. 122 n.22 (quoting *Yousef*, 327 F.3d at 146).

established that a defendant's "preservation of his rights" does not turn "upon the integrity and good faith of the prosecuting authorities."[111] We cannot entertain a rule that discards the most basic Fifth Amendment right simply because prosecutors can be expected to respect its objectives generally.

The concerns that we express here are not idle. However unusual this particular prosecution may prove to be, so-called cross-border prosecutions have become more common.[112] Such

---

[111] *Kastigar*, 406 U.S. at 460; *cf. United States v. Stevens*, 559 U.S. 460, 480 (2010) ("[T]he First Amendment protects against the Government; it does not leave us at the mercy of *noblesse oblige*."); *Ullmann v. United States*, 350 U.S. 422, 428 (1956) ("Having had much experience with a tendency in human nature to abuse power, the Founders sought to close the doors against like future abuses by law-enforcing agencies.").

[112] The rise in non-prosecution agreements and deferred-prosecution agreements between the U.S. and foreign entities for misconduct occurring abroad attests to this new reality. In addition to LIBOR, there have recently been agreements arising out of investigations into the manipulation of certain foreign exchange rates, *see* DOJ, Press Release, *Five Major Banks Agree to Parent-Level Guilty Pleas* (May 20, 2015), https://www.justice.gov/opa/pr/five-major-banks-agree-parent-level-guilty-pleas; agreements arising out of investigations into U.S. tax evasion at Swiss banks, *see* DOJ, Swiss Bank Program, https://www.justice.gov/tax/swiss-bank-program (last visited July 18, 2017); and of course agreements arising out of FCPA enforcement, *see* DOJ, FCPA-Related Enforcement Actions: 2017, https://www.justice.gov/criminal-fraud/case/related-enforcement-actions/2017 (last visited July 18, 2017). While a rise in *individual* prosecutions of foreign defendants may not be as evident, the DOJ has expressed a clear preference that, as a matter of general prosecutorial policy, where there is a resolution with an institution, there should be a prosecution of a responsible individual (or individuals) as well. *See* Sally Quillian Yates, Memorandum, Individual Accountability for Corporate Wrongdoing (Sept. 9, 2015), https://www.justice.gov/dag /individual-accountability.

prosecutions necessarily entail intimate coordination between the United States and foreign authorities. As then-Assistant Attorney General Caldwell put it in the address to which we referred earlier, "[c]ollaboration and coordination among multiple regulators in cross-border matters is the future of major white collar criminal enforcement."[113] Perhaps the most striking development in cooperative conduct is the embedding of U.S. prosecutors in foreign law enforcement. According to Caldwell, the DOJ "recently placed Criminal Division prosecutors with Eurojust in The Hague and INTERPOL in France" and was "exploring the possibility of embedding prosecutors with other foreign law enforcement as well."[114] In a more recent address, Acting Principal Deputy Assistant Attorney General Trevor N. McFadden announced that DOJ will be detailing one of its anti-corruption prosecutors to work at the U.K. FCA—"the first time the Criminal Division . . . will detail a prosecutor to work in a foreign regulatory agency on white collar crime issues."[115]

---

[113] Caldwell, note 107, *ante.*

[114] *Id.*

[115] Trevor N. McFadden, Remarks at American Conference Institute's 7th Brazil Summit on Anti-Corruption (May 24, 2017), https://www.justice.gov/opa/speech/acting-principal-deputy-assistant-attorney-general-trevor-n-mcfadden-speaks-american. We also note that the U.K. government recently announced the creation of an "International Anti-Corruption Coordination Centre (IACCC), hosted by the UK's National Crime Agency," the members of which "include agencies from Australia, Canada, New Zealand, Singapore, the UK and the USA, with Interpol scheduled to join later this year," as part of an effort to "bring[ ]

One area in particular where intimate cooperation and coordination will be needed between U.S. prosecutors and foreign authorities (or, perhaps, between U.S. prosecutors and U.S. prosecutors on detail to foreign authorities) is the securing of witness testimony. As the Government explained in a letter to the District Court in this case, "large scale economic crime conspiracies that harm U.S. markets, such as LIBOR rigging and the manipulation of the foreign exchange spot, often occur, in large part, overseas and *successful prosecutions of these matters frequently rely on evidence provided by witnesses who live in foreign countries*."[116] And as this case illustrates, foreign authorities may conduct compulsory witness interviews, including interviews of those who end up being—or are already—the targets of U.S. prosecution.

We do not presume to know exactly what this brave new world of international criminal enforcement will entail. Yet we are certain that these developments abroad need not affect the fairness of our trials at home.[117] If as a consequence of joint investigations with

---

together specialist law enforcement officers from multiple jurisdictions into a single location to tackle allegations of grand corruption." U. K. National Crime Agency, Press Release, *International Partners Join Forces To Tackle Global Grand Corruption* (July 5, 2017), http://www.nationalcrimeagency.gov.uk/news/1138-international-partners-join-forces-to-tackle-global-grand-corruption.

[116] District Court Docket, Docket No. 264 (Gov't Sentencing Submission as to Paul Robson), at 4 (emphasis added).

[117] *See Balsys*, 524 U.S. at 700 (Stevens, J., concurring) ("The primary office of the Clause at issue in this case is to afford protection to persons whose liberty

foreign nations we are to hale foreign men and women into the courts of the United States to fend for their liberty we should not do so while denying them the full protection of a "*trial* right"[118] we regard as "fundamental"[119] and "absolute."[120]

Accordingly, we adhere to our precedent in assessing the voluntariness of inculpatory testimony compelled abroad by foreign governments. In the instant appeal, there is no question that the Defendants' testimony was compelled and, thus, involuntary. We therefore conclude in this case that the Fifth Amendment prohibited the Government from using Defendants' compelled testimony against them.

## B. Whether Defendants' Rights Were Violated

We thus turn to the parties' arguments under the doctrines of the Fifth Amendment and the seminal case of *Kastigar*.[121] The Fifth

has been placed in jeopardy in an American tribunal. The Court's holding today will not have any adverse impact on the fairness of American criminal trials.").

[118] *Patane*, 542 U.S. at 641 (emphasis in original) (internal quotation marks omitted).

[119] *Verdugo-Urquidez*, 494 U.S. at 264.

[120] *Salinas*, 133 S. Ct. at 2179.

[121] We note that, under our Fifth Amendment jurisprudence, it is not clear whether all involuntary statements or all compelled statements should be subjected to the strong medicine prescribed in *Kastigar*, or whether some other doctrine should govern in certain circumstances. *Compare, e.g., United States v. Ghailani*, 743 F. Supp. 2d 242 (S.D.N.Y. 2010) (rejecting the applicability of *Kastigar* to coerced and uncounseled statements made to agents of the U.S. Central

Amendment provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself . . . ."[122] Like the privilege itself, the lawful compulsion of testimony under a grant of immunity has "historical roots deep in Anglo-American jurisprudence."[123] In *Kastigar*, the Supreme Court upheld the constitutionality of compelling testimony in exchange for "use and derivative use" immunity under 18 U.S.C. § 6002, because the scope of the protection afforded was "coextensive with the scope of the [Fifth Amendment] privilege."[124] Thus, the scope of the constitutional privilege and use and derivative use immunity are two sides of the same coin, and we therefore seek guidance from cases interpreting either.

---

Intelligence Agency and finding an attenuation analysis applied, while at the same time concluding that the "core application" doctrine was inapplicable due to the Fifth Amendment's self-incrimination clause), *with*, *Chavez*, 538 U.S. at 769–70 (2003) ("[O]ur cases provide that those subjected to coercive police interrogations have an *automatic* protection from the use of their involuntary statements (or evidence derived from their statements) in any subsequent criminal trial. This protection is, in fact, coextensive with the use and derivative use immunity mandated by *Kastigar* when the government compels testimony from a reluctant witness." (citations omitted)). We need not resolve such questions in this case. The Government makes no argument on behalf of applying something other than *Kastigar*—instead posing the Fifth Amendment question we answered above as "all or nothing," *see* Gov't Br. 118 (asserting that foreign compulsion "do[es] not implicate the Fifth Amendment" whatsoever)—and any argument to that effect has therefore been waived.

[122] U.S. Const. amend. V.

[123] *Kastigar*, 406 U.S. at 445.

[124] *Id.* at 453.

In its holding, the *Kastigar* Court emphasized the breadth of use and derivative use protection. Such protection bars "use of compelled testimony, as well as evidence derived directly and indirectly therefrom."[125] And it "prohibits the prosecutorial authorities from using the compelled testimony in *any* respect, . . . therefore insur[ing] that the testimony cannot lead to the infliction of criminal penalties on the witness."[126] As the *Kastigar* Court observed, "[t]his total prohibition on use provides a comprehensive safeguard, barring the use of compelled testimony as an investigatory lead, and also barring the use of any evidence obtained by focusing investigation on a witness as a result of his compelled disclosures."[127] Because this "very substantial protection[] [is] commensurate with that resulting from invoking the privilege itself," it "leaves the witness and the prosecutorial authorities in substantially the same position as if the witness had claimed the Fifth Amendment privilege."[128]

*Kastigar* also established a doctrine to enforce this protection. When a witness has been compelled to testify relating to matters for which he is later prosecuted, the government bears "the heavy burden of proving that all of the evidence it proposes to use was

---

[125] *Id.*

[126] *Id.* (emphasis in original).

[127] *Id.* at 460 (internal quotation marks and footnote omitted).

[128] *Id.* at 461–62.

derived from legitimate independent sources."[129] This burden is "not limited to a negation of taint; rather, it imposes on the prosecution the affirmative duty to prove that the evidence it proposes to use is derived from a legitimate source wholly independent of the compelled testimony."[130]

We interpreted the teaching of *Kastigar* a mere four years after the Supreme Court's decision, noting that

> [w]hile this formulation repeats rather than defines the word 'derived,' it places a significant gloss upon it by putting the burden firmly on the prosecution to demonstrate that an indictment [and/or conviction] is the product of legitimate rather than tainted evidence, and by insisting that legitimate evidence be from a source *wholly* independent of the compelled testimony.[131]

In *United States v. Hubbell*, the Supreme Court rejected the government's attempt to shift this burden because doing so would "repudiat[e] the basis for . . . *Kastigar*."[132] The Government must

---

[129] *Id.*

[130] *Id.* at 460.

[131] *United States v. Kurzer*, 534 F.2d 511, 516 (1976) (Feinberg, J.) (emphasis in original) (internal quotation marks omitted).

[132] 530 U.S. 27, 45–46 (2000).

prove it has met this heavy, albeit not insurmountable, burden by a preponderance of the evidence.[133]

### 1. Was Evidence from Robson Tainted?

With the foregoing principles in mind, we consider whether any evidence from Robson used in Defendants' prosecution was tainted. To be clear, there is no dispute that the Government "used" evidence from Robson: he was a key cooperator and a prominent trial witness. The less straightforward question is whether any evidence supplied by Robson (to the government, to the grand jury, or at trial) was tainted by his earlier review of the testimony of Defendants compelled in the United Kingdom under U.K. law.

Our Court apparently has never encountered the circumstance in which a government trial witness had, prior to testifying, reviewed a defendant's compelled testimony. The D.C. Circuit, however, has addressed the applicable legal standards in a pair of high-profile cases arising out of the Iran-Contra affair.[134] In those cases, that Court held that "the use of immunized testimony by witnesses to refresh their memories, or otherwise to focus their thoughts, organize their testimony, or alter their prior or contemporaneous statements,

---

[133] *United States v. Nanni*, 59 F.3d 1425, 1431–32 (2d Cir. 1995).

[134] *See United States v. North*, 910 F.2d 843, 861 (D.C. Cir. 1990) ("*North I*"); *United States v. North*, 920 F.2d 940, 942 (D.C. Cir. 1990) ("*North II*"); *United States v. Poindexter*, 951 F.2d 369, 373 (D.C. Cir. 1991); *see also United States v. Slough*, 641 F.3d 544, 549–50 (D.C. Cir. 2011).

constitutes" an impermissible use of the defendants' compelled testimony.[135]

Despite briefing from both parties that cited the standards used by the D.C. Circuit, the District Court in this case relegated any mention of those precedents to a footnote that indicated that it would look only to Second Circuit precedent, of which there is none directly on point. As a result, it is unclear precisely what standards the District Court applied to determine whether the evidence supplied by Robson was tainted by his study of the Defendants' compelled testimony. What *is* clear, however, is that the District Court impermissibly lowered the bar when it determined that the Government had satisfied its heavy *Kastigar* burden based on the

---

[135] *North I*, 910 F.2d at 856; *accord Poindexter*, 951 F.2d at 373 ("[A] prohibited use occurs if a witness's recollection is refreshed by exposure to the defendant's immunized testimony, or if his testimony is in any way shaped, altered, or affected, by such exposure." (citation and internal quotation marks omitted)).

There is potential for semantic confusion surrounding the term "use." The federal immunity statute, like the Fifth Amendment, provides protection from direct and derivative use—meaning that the testimony itself and evidence derived from the testimony cannot be used. In other words, there is no meaningful distinction between the testimony itself and evidence derived from the testimony. Separately, our precedents recognize that certain alleged uses are without constitutional significance. *See, e.g.*, *United States v. Mariani*, 851 F.2d 595, 600 (2d Cir. 1988) ("To the extent that [*United States v. McDaniel*, 482 F.2d 305 (8th Cir. 1973),] can be read to foreclose the prosecution of an immunized witness where his immunized testimony *might* have *tangentially* influenced the prosecutor's thought processes in preparing the indictment and preparing for trial, we decline to follow that reasoning." (emphases added)).

mere fact that Robson himself asserted that his testimony was not tainted by his review of Defendants' compelled testimony and the fact that there was corroborating evidence for Robson's trial testimony.[136]

In apparent agreement with both parties on appeal,[137] we conclude that the legal standards set forth by the D.C. Circuit in *North I* are helpful here. We need not, in this case, decide whether the Government is required to demonstrate that Robson's review of Defendants' compelled testimony did not in any manner subtly "refresh his memory, focus or organize his thoughts," or in some other traceless way influence his state of mind. At a minimum, however, we agree with the D.C. Circuit that the Government is required to prove that his exposure to the compelled testimony did not shape, alter, or affect the information that he provided and that the Government used.

The most effective way to demonstrate that a witness's testimony was untainted by exposure to a defendant's immunized testimony is by demonstrating that his or her testimony was unchanged from comparable testimony given before the exposure. Thus, typically, the prosecution can meet its burden by

---

[136] We review *de novo* whether the legal standard applied by a district court was in error. *See Highmark Inc. v. Allcare Health Mgmt. Sys., Inc.*, 134 S. Ct. 1744, 1748 (2014).

[137] *See* Defs.' Br. 102-107; Gov't Br. 138-140 (arguing that the District Court "performed the analysis required by the D.C. Circuit"); *see also id.* at 126-128.

memorializing (or "canning") the witness's testimony prior to his or her exposure.[138]

In the present case, Robson did testify to the FCA regarding Rabobank's submission and alleged manipulation of LIBOR rates, as well as the roles of Allen and Conti, *prior to* Robson's exposure to Defendants' compelled testimony. But what Robson's "canned" testimony preserved is toxic to the Government's case; it omits or contradicts in material parts the testimony Robson later provided indirectly to the grand jury and directly to the petit jury. At the *Kastigar* hearing held by the District Court, Robson agreed that "the testimony that [he] gave to the [FCA] and the testimony that [he] gave before the jury in this trial were very different."[139] For instance, Robson testified to the jury about an altercation between Stewart and Damon Robbins, an alternate submitter for USD LIBOR, on Rabobank's London desk. But Robson did not testify about this to the FCA, and the *Kastigar* hearing raised questions about whether he had even seen the incident at all or merely read about it in the compelled testimony.[140] Far from rebutting the presumption that Robson's trial testimony was tainted, his pre-exposure testimony actually *evidences*

---

[138] *See North II*, 920 F.2d at 942–43 (explaining that, absent canned testimony, it may be "extremely difficult for the prosecutor to sustain its burden of proof").

[139] *Kastigar* Hearing Tr. 25.

[140] *Id.* at 51–58.

such taint through its material differences with Robson's post-exposure trial testimony.

As Robson's FCA testimony hurts rather than helps its cause, the Government appears to contend on appeal that it satisfied its burden solely through Robson's "'persuasive[ ]'" testimony at the *Kastigar* hearing.[141] We conclude, however, that Robson's testimony at the hearing falls far short of satisfying the demands of *Kastigar*. As explained below, the Government adduced, at bottom, nothing more than bare, self-serving denials from Robson to meet its heavy burden. We hold that such conclusory denials are insufficient as a matter of law to sustain the prosecution's burden of proof under *Kastigar* in the face of materially inconsistent pre-exposure testimony.[142]

---

[141] Gov't Br. 128 (quoting *Poindexter*, 951 F.2d at 376 ("[W]here a substantially exposed witness does not *persuasively claim that he can segregate the effects of his exposure*, the prosecution does not meet its burden merely by pointing to other statements of the same witness that were not themselves shown to be untainted." (emphasis added))).

[142] However difficult or easy it may be, precisely, for the prosecution to sustain its burden of proof in the absence of *any* canned testimony or with the aid of materially *consistent* canned testimony—questions we need not answer or discuss in detail here—it is, at a minimum and without a doubt, extremely difficult for the prosecution to sustain its burden of proof in the face of materially *inconsistent* canned testimony. *Cf. North II*, 920 F.2d at 942–43 (explaining that, absent canned testimony, it may be "extremely difficult for the prosecutor to sustain its burden of proof"). In order to be "materially" inconsistent, the witness's account of events before exposure must be significantly different, and less incriminating, than the testimony ultimately used against the defendant.

By the Government's own count, 27 of the 58 topics discussed by Robson during his trial testimony had an antecedent in Allen's compelled testimony, and 18 of those 58 topics had an antecedent in Conti's compelled testimony.[143] Yet at no time during the *Kastigar* hearing did Robson claim that he could "segregate the effects of his exposure" with respect to each, or *any*, of those topics.[144] Notably, the Government never asked Robson whether his memory was, or might have been, substantially refreshed by his review of Defendants' compelled testimony—or, to put a finer point on the inquiry, whether Robson could testify under oath at the *Kastigar* hearing that his memory had *not* been refreshed.

Robson *was* asked by the Government several times in various generalized, leading ways whether his review of the compelled testimony "inform[ed] . . . in any way" his cooperation or testimony and he responded, without qualification, "no."[145] Despite Robson's unqualified assertions in response to those leading questions, we are mindful that memory remains "a mysterious thing,"[146] and its mysteries were on full display at the *Kastigar* hearing in the District Court. Perhaps most mysterious was what, exactly, Robson remembered of the compelled testimony of Allen and Conti that he

---

[143] *See* JA 923–64.

[144] *Poindexter*, 951 F.2d at 376.

[145] *See, e.g.*, *Kastigar* Hearing Tr. 126.

[146] *North I*, 910 F.2d at 860 (alteration omitted).

had reviewed. For instance, Robson was asked if he had "any specific recollection of the materials that [he] had reviewed," and he answered "[n]o, not specifically."[147] But sometimes Robson *did* have specific recollections:

> Q. But when you read Mr. Conti's F[C]A transcript, you saw that he acknowledged that Lee Stewart made requests that were intended to benefit his derivative positions. Do you recall that?
>
> A. Yes, I do.[148]

Similarly, the Government asked Robson if he "learn[ed] any new facts from reviewing those materials," to which he answered "[n]o, I didn't."[149] But it later became apparent that he had learned, through reviewing the compelled testimony of Allen and Conti, of specific communications in which he had not been an original participant—and that Robson had discussed such communications with the DOJ when he began cooperating.[150] This particular

---

[147] *Kastigar* Hearing Tr. 8.

[148] *Id.* at 119–20; *cf. id.* at 52 ("Q. [Y]ou recall that [information about the dispute between Stewart and alternate LIBOR submitter Damon Robbins] was contained in Mr. Allen's compelled testimony, right? Right? A. I have a vague recollection. I can't remember the specifics.").

[149] *Id.* at 8; *see also, e.g., id.* at 15 (Q. Did you learn any specific facts about [the co-defendants who pleaded guilty] from [Allen's and Conti's] FCA testimony? A. Not that I recall, no.").

[150] *See, e.g., id.* at 124, 179–80, 182, 185; *see also id.* at 143–44.

inconsistency eventually led to the following colloquy between Robson and the District Court:

> THE COURT: I just want to be sure I am clear on the chronology. You reviewed [Allen's and Conti's FCA testimony] when?
>
> THE WITNESS: Towards the end of November 2013.
>
> THE COURT: That was before you had begun cooperating with the government?
>
> THE WITNESS: Yes, it is.
>
> THE COURT: Some of the things you saw in this transcript were references to conversations that you had not been a party to yourself, yes?
>
> THE WITNESS: Yes, your Honor.
>
> THE COURT: And they were conversations that you did not know about until reading the transcripts, true?
>
> THE WITNESS: Yes, your Honor.
>
> THE COURT: So when you said, in answer to government counsel's question, that you were already familiar with various things, you weren't referring to these conversations, you were referring to some of the other things?
>
> THE WITNESS: Sorry, your Honor?
>
> THE COURT: A few minutes ago you said that you hadn't underlined or circled things that you didn't already know, or words to that effect, if I remember correctly.

THE WITNESS: I underlined and circled things that I believe were things that I knew from my personal experiences at Rabobank.

THE COURT: But not the specific conversations?

THE WITNESS: No, your Honor.

THE COURT: Is it your testimony that you did not bring any of those conversations to the attention of the government?

THE WITNESS: No, I didn't, your Honor.

THE COURT: Now, you testified yesterday that in preparation for your testimony, the government, after you began cooperating, showed you some of the e-mails involving conversations between two third-parties that you were not a party to, yes?

THE WITNESS: Yes.

THE COURT: But you knew about them because you had seen references to them in the transcripts of Mr. Allen or Mr. Conti, yes?

THE WITNESS: Some of them I had, yes.

THE COURT: When they showed them to you, did you say to the government, I have seen that before?

THE WITNESS: I don't recall, sir.

THE COURT: Did you say, I haven't seen them before?

THE WITNESS: I think there were a couple I hadn't seen, which I might have mentioned I hadn't seen.[151]

Even Robson's more generalized recollection of the transcripts appeared to wax and wane depending on the month (or even the day) in which he was asked. At one point during the *Kastigar* hearing, defense counsel directed Robson's attention to an August 5, 2015 declaration—in which Robson had declared, "I recall that I did not agree with or believe everything reflected in transcripts of Messrs. Allen and Conti . . ."[152]—and the following exchange ensued:

Q. So did you recall when you signed this on August 5, 2015[,] not agreeing or believing with everything in Mr. Conti's transcript?

A. Yes.

Q. Do you recall *now* [on December 16, 2015,] not agreeing at the time that you read the transcript with everything Mr. Conti said?

A. I don't recall. Sorry.[153]

---

[151] *Id.* at 220–22.

[152] *Id.* at 110.

[153] *Id.* (emphasis added). *But see, e.g.,* note 62, *ante* (providing an instance in which Robson circled material in the transcript that he later provided to the jury at trial, but that he earlier had told the FCA he did not know).

Adding another wrinkle, Robson would, during the next day of testimony at the *Kastigar* hearing, explain his various purposes for annotating, underlining, or circling various passages of the compelled testimony of Allen and Conti as including the "circl[ing of] anything that I felt was untrue."[154]

Even putting aside such mnemonic curiosities, Robson's testimony at the *Kastigar* hearing with respect to his ability to "segregate the effects of his exposure" amounts to nothing more than simply replying "no" in a conclusory fashion to generalized leading questions from the Government.[155] We have found the sorts of bare, self-serving denials given by Robson, when given by a prosecutor (*i.e.*, an officer of the court), to be insufficient to satisfy the demands of *Kastigar*,[156] and the Government supplies no convincing reason why the same rule should not apply here.[157] In light of the foregoing

---

[154] *Id.* at 185–86.

[155] *See, e.g., id.* at 11–14.

[156] *See Nanni*, 59 F.3d at 1432; *United States v. Tantalo*, 680 F.2d 903, 908 (2d Cir. 1982); *United States v. Nemes*, 555 F.2d 51, 55 (2d Cir. 1977). In *Tantalo*, we explained that "the heavy burden cast upon the Government . . . is not satisfied by the prosecution's assertion that immunized testimony was not used" and that "[s]uch disclaimer provides an inadequate basis for the denial of a motion to dismiss an indictment." 680 F.2d at 908.

[157] The weakness of Robson's denials is particularly troubling given the nature of his review of the immunized testimony. Robson was not merely a witness who was exposed in some tangential way to Defendants' immunized testimony. He was a subject of the same investigation, who later became a government cooperator, who was provided by his lawyer with the transcripts of their statements, and made, as instructed by his lawyer, a careful review of those

discussion, moreover, it seems clear to us that the same rule *should* apply.

Accordingly, we hold that a bare, generalized denial of taint from a witness who has materially altered his testimony after being substantially exposed to a defendant's compelled testimony is insufficient as a matter of law to sustain the prosecution's burden of proof under *Kastigar* that that witness's testimony was derived from a wholly independent source.

In view of our holdings, the District Court's conclusion that the prosecution had met its heavy burden under *Kastigar* to show that the evidence supplied by Robson was untainted cannot stand. Moreover, a remand for a further factual hearing on the question of taint would be futile. For one thing, Robson was again shown, and he again reviewed, critical portions of Defendants' compelled testimony during the *Kastigar* hearing.[158] And what Robson did repeatedly claim at the hearing—an inability to recall clearly much of anything—establishes that he lacked the ability "to separate the wheat of [his] unspoiled memory from the chaff of [Defendants']

---

transcripts, at a time when he had a substantial motive to examine that testimony and either conform his own statements to, or protect himself against, what he found there.

[158] At a side bar during the *Kastigar* hearing, the parties reached an agreement in which defense counsel would be permitted to use the transcripts of Defendants' FCA testimony during cross-examination of Robson. *See Kastigar* Hearing Tr. 38–39.

immunized testimony."[159] Notably, the Government does not even request a remand on this question or otherwise suggest it has some plausible alternative means of sustaining its burden of proof.

In sum, the Government did not, and cannot, meet its burden under *Kastigar*. We therefore conclude that the Government's use of evidence provided by Robson violated the Defendants' Fifth Amendment rights.

## 2. Was the "Use" Harmless?

Even where a prosecution runs afoul of *Kastigar*'s strict standards, we will not vacate or reverse a conviction where the error was harmless.[160] We thus turn to whether the admission of Robson's tainted testimony constituted harmless error.

### a. Use at Trial

When tainted evidence is presented at trial, we will deem the error harmless if we are "persuaded beyond a reasonable doubt that the jury would have reached the same verdict even without consideration of the tainted evidence."[161]

Upon review of the trial record, we have no trouble concluding that this error was not harmless beyond a reasonable doubt. While

---

[159] *North I*, 910 F.2d at 862.

[160] *See Nanni*, 59 F.3d at 1443.

[161] *Id.*

two other cooperating witnesses testified, Robson was the unique source of particularly significant and incriminating evidence. Robson was the only LIBOR *submitter* to testify on behalf of the government, and he testified—contrary to the Defendants' central argument for acquittal—that, pursuant to a scheme at Rabobank, he in fact took trading positions into account when making submissions.[162] And Robson was also the *only* witness the Government ever interviewed who said that Allen "directed" Rabobank's submitters to account for trading positions when setting LIBOR.[163] Indeed, absent Robson's testimony that Allen issued "instructions" to him,[164] Allen likely would not have been charged, much less convicted, of the nine counts relating to specific JPY LIBOR submissions, because Allen never submitted LIBOR estimates for that currency.[165] Well aware of the substantial litigation risk under *Kastigar* of using a witness who not only had been exposed to Defendants' compelled testimony but who dramatically changed his own story after such exposure, the Government nevertheless chose to call Robson to the witness stand,

---

[162] JA 225 (Trial Tr. 333–34).

[163] *See Kastigar* Hearing Tr. 253.

[164] JA 908 (Agent Weeks testifying before the grand jury that Robson informed him that Allen issued "instructions" pertaining to "both yen and dollar" LIBOR manipulation).

[165] *See id.* at 301 (Trial Tr. 1225–26) (stating Paul Butler was the backup JPY submitter when Robson was unavailable).

underscoring the significance of his testimony to the Government's case.[166]

Accordingly, we conclude that the admission of Robson's trial testimony was not harmless. This error requires that Defendants' convictions be vacated and that they be awarded a new trial wherein any tainted statements are suppressed.[167] Defendants also argue,

---

[166] Outside the context of this appeal, the Government itself has explicitly attested to its significance. In a letter regarding Robson's cooperation, submitted to the District Court pursuant to Section 5K1.1 of the Sentencing Guidelines, the Government argued in favor of "a downward departure [from Mr. Robson's applicable Sentencing Guidelines range] in light of [the] substantial assistance provided by Mr. Robson." District Court Docket, Docket No. 264 (Gov't Sentencing Submission as to Paul Robson), at 1. The letter explained that

> Mr. Robson provided substantial assistance to the government in two meaningful ways. First, he assisted in the prosecution of Anthony Allen and Anthony Conti by providing compelling testimony at their trial in October 2015 . . . . Mr. Robson was an effective witness. He was candid about his culpability and helped the jury to understand dozens of communications laced with lingo and technical trading language. Mr. Robson's explanations for how the scheme worked and why it was dishonest were persuasive.

*Id.* at 2–3 (emphasis omitted).

[167] Pursuant to the parties' agreement in this case, *see* note 158, *ante*, such a retrial might have resulted in the Government being permitted (should it so choose) to read into the record the portions of Robson's trial testimony that did not have any overlap with Allen's and Conti's compelled testimony. *Cf. Slough*, 641 F.3d at 550 (reasoning that "elements of [an exposed witness's] testimony [which] have no antecedent in the immunized statements . . . cannot be tainted (unless somehow the statements caused [the exposed witness's] testimony in some subtler way)").

however, that the use of Robson's tainted evidence, conveyed to the grand jury through Agent Weeks's testimony, requires dismissal of the indictment. We thus turn to that argument.

### b. Use in the Grand Jury

Our precedents establish that an indictment is subject to dismissal if it was procured on the basis of tainted evidence. In *United States v. Hinton*,[168] the same grand jury that had heard a witness's immunized testimony later returned an indictment against that witness. We dismissed the indictment, explaining in part that "the fact that none of Hinton's immunized testimony was introduced at the trial does not resolve the question, for [the federal immunity statute] speaks to any use of the immunized testimony against the witness in any criminal case, and so prohibits its use not merely at trial, but in the grand jury proceedings as well."[169] Our holding in *United States v. Tantalo* was to the same effect,[170] and in *United States v. Nanni* we explained that "if the government has presented immunized testimony to the grand jury, the indictment should be dismissed unless the government establishes that the grand jury would have indicted even absent that testimony."[171]

---

[168] 543 F.2d 1002 (2d Cir. 1976)

[169] *Id*. at 1009.

[170] 680 F.2d 903, 908–09 (2d Cir. 1982) ("[I]t was error to deny the appellant's motion to dismiss the superseding indictment.").

[171] 59 F.3d 1425, 1443 (2d Cir. 1995).

The Government's reliance on our 1990 decision in *United States v. Rivieccio*[172] is misplaced. To whatever extent *Rivieccio* may have accurately described the law in our Circuit, at the time it was decided,[173] it has been overtaken by the Supreme Court's subsequent decision in *United States v. Hubbell*.[174] The defendant in *Hubbell* had been forced to produce documents to the grand jury, which, the Supreme Court held, violated his Fifth Amendment right pursuant to the act-of-production doctrine.[175] The Supreme Court further held

---

[172] 919 F.2d 812 (2d Cir. 1990).

[173] In *Rivieccio*, we stated that when the Government uses "immunized testimony before a grand jury, generally the remedy for the violation is the suppression of the tainted evidence at trial, not a dismissal of the indictment." *Id.* at 186. In a footnote, *Rivieccio* characterized *Hinton* and *Tantalo* as falling in one of "two narrow exceptions to th[is] general rule"—applicable when the same grand jury that heard the immunized testimony returned the indictment. *Id.* at 816 n.4. The other exception *Rivieccio* identified was when "the indictment rests almost exclusively on tainted evidence." *Id.* (citing *United States v. Tane*, 329 F.2d 848, 854 (2d Cir. 1964)). *Rivieccio* did not offer a rationale for this "general rule" and its "narrow exceptions."

In addition, *Rivieccio* offered a confusing holding with respect to whether *United States v. Mechanik*, 475 U.S. 66 (1986), applies to *Kastigar* errors in the grand jury. *Compare Rivieccio*, 919 F.2d at 817 (stating that "any misuse of the immunized testimony which may have occurred before the indicting Grand Jury was rendered harmless" because at trial "the Government did not use, either directly or indirectly," any immunized testimony before the convicting petit jury), *with id.* at 817 n.5. (purporting not to "express any opinion" regarding whether the petit jury's guilty verdicts had rendered harmless any error in the grand jury pursuant to *United States v. Mechanik*, 475 U.S. 66 (1986)).

[174] 530 U.S. 27 (2000).

[175] *Id.* at 40–46.

that dismissal of the indictment was required despite the fact that it "assume[d] that the Government is . . . entirely correct in its submission that it would not have to advert to respondent's act of production in order to prove the existence, authenticity, or custody of any documents that it might offer in evidence at a criminal trial."[176] In fact, the Government had "disclaim[ed] any need to introduce any of the documents produced by respondent into evidence in order to prove the charges against him."[177] Nevertheless, the Supreme Court held that the government had made use of compelled testimony and that dismissal of the indictment was required.[178]

Accordingly, in view of *Hubbell*, our precedents, and the general principle that harmless error review applies to violations of non-structural constitutional rights,[179] "if the government has

---

[176] *Id.* at 41.

[177] *Id.*

[178] *Id.* at 45 ("*Kastigar* requires that respondent's motion to dismiss the indictment on immunity grounds be granted unless the Government proves that the evidence it used in obtaining the indictment and proposed to use at trial was derived from legitimate sources 'wholly independent' of the [immunized testimony].").

[179] "The Supreme Court has distinguished two kinds of errors that can occur at, or in relation to, a criminal proceeding: so-called 'trial errors,' which are of relatively limited scope and which are subject to harmless error review, and 'structural defects,' which require reversal of an appealed conviction because they 'affect[ ] the framework within which the trial proceeds.'" *United States v. Feliciano*, 223 F.3d 102, 111 (2d Cir. 2000) (quoting *Arizona v. Fulminante*, 499 U.S. 279, 307–10 (1991). The Supreme Court has "recognized that 'most constitutional errors can be harmless.'" *Neder v. United States*, 527 U.S. 1, 8 (1999) (quoting

presented immunized testimony to the grand jury, the indictment should be dismissed unless the government establishes that the grand jury would have indicted even absent that testimony."[180] "[E]xploration of the question of taint can be made . . . by review of the prosecution's evidence and of the grand jury transcript."[181]

Upon review of the evidence and testimony presented to the grand jury in this case, we cannot conclude beyond a reasonable doubt that the grand jury would have indicted Allen and Conti without the evidence supplied by Robson. As the District Court itself acknowledged, "material parts of [Agent Weeks's] grand jury testimony derived exclusively from Mr. Robson."[182] Specifically, when Agent Weeks testified that Allen was the scheme's leader who

---

*Fulminante*, 499 U.S. at 306). By the same token, the Supreme Court has "found an error to be 'structural,' and thus subject to automatic reversal, only in a 'very limited class of cases.'" *Id.* at 8 (quoting *Johnson v. United States*, 520 U.S. 461, 468 (1997)). "[I]f the defendant had counsel and was tried by an impartial adjudicator, there is a strong presumption that any other [constitutional] errors that may have occurred are subject to harmless-error analysis." *Rose v. Clark*, 478 U.S. 570, 579 (1986); *see also United States v. Dhinsa*, 243 F.3d 635, 659 (2d Cir. 2001) ("It is beyond cavil that most constitutional errors occurring during trial may [potentially] be deemed harmless and, thus, not require automatic reversal of a conviction.").

[180] *Nanni*, 59 F.3d at 1433; *see also Poindexter*, 951 F.2d at 377. Because we have already concluded that Defendants' convictions at trial must be vacated, we need not and do not consider whether *United States v. Mechanik*, 475 U.S. 66 (1986) extends to *Kastigar* error. *See* note 173, *ante*.

[181] *Hinton*, 543 F.2d at 1010 n.10.

[182] *Allen*, 160 F. Supp. 3d at 697.

had "instructed, specifically instructed, LIBOR submitters in London to consider the positions and the requests of Rabobank traders and adjust their submissions for LIBOR," his testimony derived exclusively from Robson's proffer.[183] And when Agent Weeks testified that Mr. Conti "adjusted his U.S. dollar LIBOR rates . . . for his own benefit and the benefit of the other traders,"[184] he based his testimony exclusively upon Mr. Robson's proffer, telling the grand jury that "Mr. Robson said that sitting near Mr. Conti he was aware that Mr. Conti set U.S. dollar LIBOR rates in which he considered his own positions as appropriate reason or justification for setting the rates."[185]

These statements were not merely "material." They were essential—especially (as already noted) with respect to the JPY-related charges against Allen.[186] More broadly, they provided the grand jury with definitive, clear-cut testimony that Allen and Conti had directly participated in the scheme.

Seeking to downplay the importance of the evidence supplied by Robson, the Government emphasizes the extent of its documentary evidence. But all of this documentary evidence was available prior to Robson's cooperation and the Government did not

---

[183] JA 907; *see also id.* at 909.

[184] *Kastigar* Hearing Tr. 253–54.

[185] JA 910.

[186] *See* text at note 165, *ante*.

attempt to indict Allen and Conti on the basis of it. Said differently, the fact that the Government did not charge Allen and Conti until Robson became a cooperator ("flipped," in the argot of law enforcement) further signifies the importance of his evidence to the indictment. Indeed, at Robson's plea hearing, the Government informed the District Court explicitly that "there is . . . a chance that we would seek a superseding indictment *in light of information that has come to light from our two cooperators*" and that there was "a distinct possibility" the new indictment would "involve[] other individuals."[187] We cannot discount as unreasonable the possibility that, without the evidence supplied by Robson and conveyed to the grand jury by Agent Weeks, the grand jury would not have returned an indictment charging Allen and Conti.

Neither did the District Court suggest that the evidence conveyed from Robson, through Agent Weeks, to the grand jury, was harmless; instead, the District Court concluded that the Government had met its burden to prove Robson's evidence was untainted.[188] As explained above, that conclusion was in error. Because we cannot conclude that the *Kastigar* errors before the grand jury were harmless, the indictment must be dismissed.

---

[187] JA 903 (emphasis added). As already noted, the other cooperator, Yagami (a JPY trader located in Japan), never discussed LIBOR with Allen and at trial never testified about a single instance in which Conti (the principal USD LIBOR submitter) was responsible for a JPY LIBOR submission. *See* notes 41–42, *ante*.

[188] *Allen*, 160 F. Supp. 3d at 696–97.

### III. CONCLUSION

To summarize:

(1) The Fifth Amendment's prohibition on the use of compelled testimony in American criminal proceedings applies even when a foreign sovereign has compelled the testimony. To be clear, we do not purport to prescribe what the U.K. authorities (or any foreign authority) may do in their witness interviews or their criminal trials. We merely hold that the Self-Incrimination Clause prohibits the use and derivative use of compelled testimony in an American criminal case against the defendant who provided that testimony.

 (2) When the government uses a witness who has been substantially exposed to a defendant's compelled testimony, it is required under *Kastigar v. United States*, 406 U.S. 441 (1972), to prove, at a minimum, that the witness's review of the compelled testimony did not shape, alter, or affect the evidence used by the government.

(3) Where, as here, the witness's account of events before exposure was significantly different, and less incriminating, than the testimony ultimately used against the defendants, the witness's bare, generalized denial of taint—here, the witness's conclusory responses to the Government's leading questions during the *Kastigar* hearing—is insufficient as a matter of law to sustain the prosecution's burden of proof.

(4) In this prosecution, Defendants' compelled testimony was "used" against them through evidence provided by a tainted witness, a key cooperator and prominent witness both at trial and (via a hearsay presentation) before the grand jury. This tainted testimony was significant both at trial and in the grand jury, because it provided the only first-hand eyewitness account that refuted the Defendants' central argument for acquittal, and was therefore not harmless beyond a reasonable doubt.

For the foregoing reasons, we **REVERSE** the judgments of conviction and hereby **DISMISS** the indictment.